UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TONY R. SELLMON
    Fed. Reg. No: 11630-007
    FCI Cumberland
    Federal Correctional Institution
    P.O. Box 1000
    Cumberland, MD  21501,
              Plaintiff,

v.

EDWARD F. REILLY, JR., Chairman of the
United States Parole Commission,

CRANSTON J. MITCHELL, Commissioner of
the United States Parole Commission,

DEBORAH A. SPAGNOLI, Commissioner of
the United States Parole Commission,

PATRICIA K. CUSHWA, Commissioner of the
United States Parole Commission, and

ISAAC FULWOOD, JR., Commissioner of the
United States Parole Commission

    United States Parole Commission
    5550 Friendship Boulevard, Suite 420
    Chevy Chase, MD 20815-7286

              Defendants.

## COMPLAINT

This is a civil action brought by Tony R. Sellmon, who is a prisoner confined at Federal Correctional Institution Cumberland ("FCI Cumberland") in Cumberland, Maryland. Defendants are the Chairman and/or Commissioners of the United States Parole Commission (the "Commission") and, as such, they, their predecessors, or their designees are and were responsible for considering and acting upon Plaintiff's requests for parole in accordance with

2142461.03

federal law and regulations. Plaintiff alleges that he has been, and continues to be, subjected to various injurious acts by the Defendants. Plaintiff seeks declaratory and injunctive relief.

## JURISDICTION

1. Plaintiff seeks to vindicate rights protected by the Ex Post Facto Clause of Article 1, Section 9 of the United States Constitution, the Fifth and Fourteenth Amendments to the United States Constitution, and federal law. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (a)(4), (b)(1), and 42 U.S.C. § 1983.

2. The Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3. This Court has jurisdiction to declare the rights of the parties and to grant all further relief found necessary and proper.

## VENUE

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5. Plaintiff Tony R. Sellmon is confined at FCI Cumberland, pursuant to a sentence imposed on February 26, 1992 by the Superior Court of the District of Columbia.

6. Defendant Edward F. Reilly, Jr. is the current Chairman of the Commission.

7. Defendant Patricia K. Cushwa is a current Commissioner of the Commission.

8. Defendant Isaac Fulwood, Jr. is a current Commissioner of the Commission.

9. Defendant Cranston J. Mitchell is a current Commissioner of the Commission.

10. Defendant Deborah A. Spagnoli is a current Commissioner of the Commission.

2142461.03

11.  Defendants, as the Chairman and/or Commissioners of the Commission, were responsible for reviewing and acting upon Plaintiff's requests for parole in accordance with the United States Constitution and federal law and regulations.

## INTRODUCTION

12.  On February 26, 1992, the Superior Court of the District of Columbia sentenced Mr. Sellmon to imprisonment for a term of fifteen years to life for one count of violating District of Columbia Code ("D.C. Code") § 22-2403 (second degree murder while armed; currently D.C. Code § 22-2103) and a sentence of five years to fifteen years for one count of violating D.C. Code § 22-3202 (possession of a firearm during the Defendants of a crime of violence; currently D.C. Code § 22-4502). These sentences were to run concurrently.

13.  At the time Mr. Sellmon committed this crime and was convicted and sentenced, authority for parole decisions for D.C. Code violators was vested in the District of Columbia Parole Board (the "Parole Board").

14.  Five years after Mr. Sellmon's conviction, Congress enacted the National Capital Revitalization and Self-Government Improvement Act of 1997 (the "Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712 (1997).

15.  The Revitalization Act abolished the Parole Board, see Pub. L. No. 105-33 § 11231(b), and directed the Defendants, as the Chairman and Commissioners of the Commission, to conduct parole hearings for District of Columbia prisoners "pursuant to the parole laws and regulations of the District of Columbia," id. § 11231(c).

16.  On August 5, 1998, the Defendants assumed the responsibility for making parole-release decisions for all eligible District of Columbia Code felons, pursuant to the Revitalization Act.

17. In 2000, despite the requirements of the Revitalization Act that the Defendants apply the parole statutes, regulations, guidelines, and practices of the Parole Board, the Defendants published new parole rules, regulations, and guidelines that they deemed applicable to any D.C. inmate receiving an initial parole hearing after August 5, 1998 (the "2000 Guidelines"). *See* 28 C.F.R. § 2.80(a)(5).

18. For inmates who had an initial parole hearing date prior to August 5, 1998, the Defendants chose to apply the Parole Board's Guidelines. *See* 28 C.F.R. § 2.80(a)(4). For all other inmates, some variation of the Defendants' 2000 Guidelines apply. *See id.* § 2.80(a)(1) & (5).

19. The Commission determined, under the statutes, regulations, guidelines, rules, policies, practices, and customs of the Parole Board, that Mr. Sellmon became eligible for parole on April 5, 2003. Using the Commission's 2000 Guidelines, the Defendants conducted Mr. Sellmon's initial parole hearing in August 2002, a second initial hearing in June 2004 after Mr. Sellmon successfully challenged the Defendants' refusal to grant him credit for his institutional programming at his August 2002 hearing, and a parole rehearing in August 2005, at which the Defendants again failed to give Mr. Sellmon credit for his institutional programming.

20. Under the Parole Board's parole regulations, policies, and practices, Mr. Sellmon had served the "minimum sentence" for his offenses when he became eligible for parole. Under the Parole Board's regulations, policies, and practices, the "minimum sentence" represented the period that an inmate needed to serve to satisfy the inmate's accountability for the offense itself.

21. The Defendants' 2000 Guidelines, on the other hand, do not treat an inmate's "minimum sentence" as satisfying offense accountability. Instead, they automatically add to the

parole eligibility period a base number of additional months that an inmate presumptively must serve before being considered to be suited for parole.

22. Furthermore, in explaining the basis for denying Mr. Sellmon's requests for parole, the Defendants or their predecessors or designees have relied upon bases that are inconsistent with the Parole Board's regulations, guidelines, policies, and practices.

23. As set forth below, when the Defendants applied the Commission's 2000 Guidelines to deny Mr. Sellmon's request for parole on the ground that they do not believe Mr. Sellmon has served long enough to address offense accountability, they significantly increased the risk that Mr. Sellmon would serve a longer period of incarceration than he would have had they applied the Parole Board's parole regulations, guidelines, policies, and practices, under which Mr. Sellmon satisfied the offense accountability after serving 136 months. As a result, the Defendants acted in violation of the Ex Post Facto Clause of Article 1, Section 9 and the Fifth and Fourteenth Amendments of the United States Constitution and federal law.

### Regulatory Framework for Parole Decisions for D.C. Code Inmates at the Time of Mr. Sellmon's Conviction and Sentencing

24. At the time that Mr. Sellmon committed the crimes for which he is currently imprisoned and at the time he was sentenced, the Parole Board administered parole proceedings for D.C. Code violators in the custody of the District of Columbia.

25. Where D.C. Code offenders were in the custody of the United States Government, the Commission administered their parole hearings, but in such circumstances, the Commission was required to apply the Parole Board's regulations, guidelines, policies, and practices, which were found by this Court to have the force and effect of law.

2142461.03

26. Under the Parole Board's statutes, guidelines, rules, policies, practices, and customs, the "minimum sentence" for a crime, i.e., the period that an inmate must serve before he or she is eligible for parole, satisfied the inmate's accountability for the offense of conviction.

27. In conducting parole hearings and making parole determinations, the Parole Board applied mandatory guidelines, many of which were codified as municipal regulations, that carefully prescribed the method and criteria that the Parole Board used to render decisions on parole requests. As its guide for determining whether an incarcerated individual would be paroled or re-paroled, the Board used the criteria set forth in the guidelines.

28. At the time Mr. Sellmon committed the crime for which he is currently imprisoned and at the time of his sentencing for that crime, the Parole Board made parole decisions for D.C. Code offenders using guidelines it adopted in 1985 and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Guidelines").

29. In 1991, to ensure consistent and equitable application of the 1987 Guidelines and other parole regulations, the Parole Board adopted a Policy Guideline defining terms used in the 1987 Guidelines (the "1991 Policy Guideline"). The 1991 Policy Guideline applied to all requests for parole heard by the Parole Board.

30. The 1987 Guidelines required the Parole Board to calculate a Salient Factor Score ("SFS") for a prisoner. Based on a parole applicant's SFS, the Parole Board then calculated a "total point score," using pre- and post-incarceration factors, on which it based its decision to grant or deny parole. In "unusual circumstances," when mitigating and/or countervailing factors applied, the Parole Board could depart from action indicated by an inmate's total point score.

31. In the case of an initial parole hearing, the 1987 Guidelines state that:

2142461.03

After determining an adult parole candidate's SFS score and after applying the pre and post incarceration factors to arrive at a total point score pursuant to §204 and Appendix 2-1, the Board shall take one (1) of the following actions:

(a) IF POINTS = 0:  Parole shall be granted at initial hearing with low level of supervision required;

(b) IF POINTS = 1:  Parole shall be granted at initial hearing with high level of supervision required;

(c) IF POINTS = 2:  Parole shall be granted at initial hearing with highest level of supervision required; or

(d) IF POINTS = 3-5: Parole shall be denied at initial hearing and rehearing scheduled.

32. In the case of a parole rehearing, the 1987 Guidelines state that:

In determining whether to release on parole an adult or a youth offender appearing before the Board at a parole rehearing, *the Board shall take the total point score from the initial hearing* and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2. The Board shall then take one of the following actions:

(a) IF POINTS = 0-3: Parole shall be granted at this rehearing with highest level o[f] supervision required; or

(b) IF POINTS = 4-5:  Parole shall be denied and a rehearing date scheduled.

33. The Parole Board is directed by the 1987 Guidelines to grant parole to an adult at a parole rehearing if the final adjusted score is less than four, except in "unusual circumstances."

34. The manner in which the "institutional record of the candidate" is used to adjust the total point score from the initial hearing, as required by 28 D.C.M.R. § 204.21, is also the subject of precise guidelines adopted by the Parole Board. The adjustment is done via the "point grid" in Appendices 2-1 and 2-2 of title 28 of the District of Columbia Municipal Regulations. Appendix

7

2-1 is used to calculate an inmate's SFS and total point score at the initial parole hearing, and Appendix 2-2 is used to calculate an inmate's SFS and total point score at a parole rehearing.

35. Pursuant to Appendices 2-1 and 2-2 of the Parole Board Guidelines, in parole hearings, one point can be added to an inmate's total point score for "negative institutional behavior." In his almost fifteen years of imprisonment, however, Mr. Sellmon has never received a Disciplinary Report for violating an institutional rule or policy.

36. Pursuant to Appendices 2-1 and 2-2, in parole hearings, one point can be subtracted from an inmate's total point score for "Program Achievement" (referred to in the 1991 Policy Guideline as "sustained program or work assignment achievement").

37. Section VI(A)(2)(a) of the 1991 Policy Guideline defines "sustained program or work assignment achievement" for purposes of Appendix 2-1 as:

> In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:
>
> (1) Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area.

38. Section VI(A)(2)(b) of the 1991 Policy Guideline defines "sustained program or work assignment achievement" for purposes of Appendix 2-2: "In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence."

39. The "negative institutional behavior" and "program achievement" factors correspond to two findings required by Appendices 2-1 and 2-2: "Has this offender committed

serious infractions (adjudicated under Department of Corrections due process procedures)?" and "Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignments during this period of incarceration?"

40. As noted above, the Parole Board may depart from the result dictated by sections 204.19 and 204.21 only in "unusual circumstances," and when particular procedures are followed: Any parole release decision falling outside the numerically determined guideline should be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-2. Section 204.22 of the District of Columbia Municipal Regulations provides that:

> The Board may, *in unusual circumstances*, waive the SFS and the pre and post incarceration factors [which comprise the total point score] set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

41. In the 1991 Policy Guideline, the Parole Board further defined the scope of its authority to deny parole for unusual circumstances when a point score indicates that parole should be granted. Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," lists and defines the following to constitute "unusual circumstances" countervailing a grant of parole:

    a.    Repeated Failure Under Parole Supervision;

    b.    Ongoing Criminal Behavior;

    c.    Lengthy History of Criminally-Related Alcohol Abuse;

    d.    History of Repetitive Sophisticated Criminal Behavior;

    e.    Unusually Extensive or Serious Prior Record;

    f.    Instant Offense Involved Unusual Cruelty to Victims, which applied where the offense involved physical, mental, or emotional abuse beyond the degree needed to sustain a conviction on the instant offense or especially vulnerable victims such as children or elderly persons; and

    g.    Repeated or Extremely Serious Negative Institutional Behavior.

**THE PAROLE REGULATIONS USED AT MR. SELLMON'S PAROLE HEARINGS**

42. As noted above, the Revitalization Act abolished the Parole Board and directed the Commission to conduct parole hearings for District of Columbia offenders according to the parole laws, customs and regulations of the District of Columbia.

43. After the Commission assumed responsibility for parole hearings for D.C. Code offenders, the Commission adopted the 2000 Guidelines and determined that those guidelines would apply to any D.C. Code offender that had not received an initial parole hearing as of August 5, 1998.

44. Unlike the Parole Board's guidelines, practices, policies and customs, the Commission's 2000 Guidelines and parole eligibility criteria do not consider the completion of a prisoner's "minimum sentence" as satisfying offense accountability. Instead, the Commission and its designees have repeatedly denied D.C. inmates' requests for parole, including those of Mr. Sellmon, on the ground that they believe the inmates have not served enough time for their offenses.

45. To account for the nature and circumstances of parole applicants' offenses, and the history and characteristics of the prisoners, the 2000 Guidelines contain instructions for the rating of certain offenses. Chapters 1 through 12, § 2.20 of the Commission Rules and Procedures comprise the Commission's offense severity index.

46. Like the 1987 Guidelines, the 2000 Guidelines require the Commission to determine a Salient Factor Score ("SFS") for each parole applicant, which is based upon factors

2142461.03

such as prior convictions/adjudications, prior commitments of more than 30 days, age at current offense/prior commitments, recent commitment-free period, probation/parole/confinement/ escape status at the time of the current offense, and the age of the offender. The Commission guidelines also state that the "Commission may take into account any substantial information available to it in establishing the prisoner's offense severity rating, salient factor score, and any aggravating or mitigating circumstances, provided the prisoner is apprised of the information and afforded an opportunity to respond." Under the Commission guidelines, the SFS becomes a part of a Base Point Score ("BPS") which is comprised of three categories in which points are assigned according to the following factors:

>  Category I – Risk of Recidivism (Based on the Salient Factor Score)
>  Category II – Current or Prior Violence
>  Category III – Death of a Victim or High Level of Violence

(Although the Parole Board guidelines also require the formulation of an SFS for parole applicants, the Parole Board used the SFS only to determine the risk of recidivism on the part of the parole applicant. The Parole Board did not use the SFS as the basis for an increase in the period of imprisonment the inmate had to serve to demonstrate parole suitability.)

47. The Commission's method of parole eligibility determination is to apply the BPS (the combination of points assigned from Categories I-III) to the appropriate category of offense behavior, then to add the corresponding number of months to a parole applicant's minimum sentence (the number of months an inmate must serve before becoming eligible for parole), based on the offense severity index. The months added to the parole applicant's minimum sentence based on the BPS are considered the "Base Guideline Range" and are considered the by the Commission and its designees as the additional imprisonment the inmate must serve above the months required for parole eligibility to be qualified for parole.

48. Pursuant to section 2.80(e)(1) of the Commission's guidelines, the Commission "shall assess whether the prisoner has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense." Under this structure, the Commission has the sole discretion of determining whether the parole applicant's work and program achievements are to be considered "superior" or "ordinary." Per the Commission's guidelines, "if superior achievement is found, the award for superior program achievement shall be one-third of the number of months during which the prisoner demonstrated superior program achievement." The Parole Board guidelines, however, use an objective standard to reward "Sustained Program Achievement or Work Assignment Achievement" and an award is granted even for what the Commission might consider "ordinary" achievement.

49. The "Total Guideline Range" (the ultimate determination of time to be served to establish presumptive suitability for parole pursuant to the Commission's guideline structure) is reached by adding: "the minimum of the base point guideline range, the number of months required by the prisoner's parole eligibility date, and the minimum of the guideline range for disciplinary infractions, if applicable. Then subtract the award for superior program achievement, if applicable."

50. Pursuant to section 2.80(a)(4) of the Commission's guidelines regarding D.C. Code offenders, the Commission's guidelines apply to "all prisoners who are given initial parole hearings on or after August 5, 1998. For prisoners whose initial hearings were held prior to August 5, 1998, the Commission shall render its decisions by reference to the guidelines applied by the D.C. Board of Parole." Thus, regardless of the guidelines, rules, practices and customs in

effect when an offender committed his or her crime and was sentenced, the offender's fitness for parole may hinge arbitrarily upon the date of his or her initial parole hearing.

B.    Mr. Sellmon's Parole Hearings and the Defendants' Use of the 2000 Guidelines

51. When Mr. Sellmon became eligible for parole in April 2003 and had his first parole hearing in August 2002, Defendants or their predecessors assigned a hearing examiner, Robert Haworth, to conduct Mr. Sellmon's initial parole hearing.

52. Despite the fact that Mr. Sellmon had been convicted and sentenced at a time when the Parole Board applied its 1987 Guidelines and other policies and practices to parole determinations, Defendants or their predecessors instructed Hearing Examiner Haworth to use the Defendants' 2000 Guidelines in evaluating Mr. Sellmon's request for parole.

53. Under the 2000 Guidelines, Mr. Sellmon's salient factor score at his initial hearing on August 7, 2002 and at his rehearing on August 2, 2005 was 9 and his Base Point Score was 5. His SFS scored was based upon no prior convictions, no prior commitments of 30 days, his age at the time of his offense, and the fact that he was not on parole when the offense was committed. His SFS placed in him in the "very good risk" category. His Base Point Score was based upon the violence of the offense and the death of the victim. Mr. Sellmon's Base Point Score under the Federal 2000 Guidelines increased the range of months he was expected to serve from the minimum term at which he was eligible for parole, 136 months, by an additional 18-24 months. As of his initial parole hearing, Mr. Sellmon had served 127 months and the Defendants had determined that their guidelines indicated that he should serve between 154 and 160 months.

54. At his initial parole hearing, despite the fact that Mr. Haworth recommended that the Commission grant Mr. Sellmon credit for his institutional programming and parole Mr. Sellmon on May 13, 2003, the Defendants refused to grant Mr. Sellmon credit for his

institutional programming, denied parole, and gave Mr. Sellmon a three-year "set-off," i.e., the period between a parole hearing and an inmate's next opportunity to request parole, setting a reconsideration hearing for 2005. The notice of action the Defendants gave Mr. Sellmon indicated that their decision was not appealable.

55. The Defendants' stated basis for denying Mr. Sellmon's request for parole was that his behavior "involved the brutal beating of the female victim with a gun causing massive head trauma and death." Furthermore, Defendants rejected Mr. Sellmon's claim that he was a victim of a robbery or attempted robbery because it allegedly was "not supported by the evidence."

56. Thereafter, Mr. Sellmon filed a petition for a writ of habeas corpus on February 6, 2003 in the United States District Court for the Western District of Virginia (Civil Action No. 7:03-CV-00169) challenging, among other things, the Defendants' refusal to grant him credit for his program achievement. After Senior United States District Judge James C. Turk ruled, on March 15, 2004 that Defendants had erred by failing to grant Mr. Sellmon credit for his program achievement, Defendants issued a notice of action vacating their decision at Mr. Sellmon's initial parole hearing and reheard Mr. Sellmon's request for parole on June 22, 2004.

57. In compliance with the habeas court's ruling, following Mr. Sellmon's June 22, 2004 parole hearing, Defendants granted Mr. Sellmon fifty (50) months credit for his institutional programming, thus bringing the guideline range for Mr. Sellmon to between 104 and 110 months. As of his June 22, 2004 hearing, Mr. Sellmon had served 149 months, but, again despite the recommendation of Mr. Haworth, who conducted the June 2004 hearing, the Defendants nevertheless denied Mr. Sellmon's request for parole stating:

> a decision above the Current Total Guideline Range is warranted because you brutally beat the female victim with a gun causing massive head trauma. The victim died as a result of the injuries you inflicted. While

you have programmed well, you continue to claim that you were the victim of a robbery or an attempted robbery that is not supported by the evidence.

58. In August 2005, Defendants conducted Mr. Sellmon's parole rehearing.

59. Although Mr. Sellmon had continued to program well between his June 2004 hearing and his August 2005 rehearing, Defendants did not give him any credit for his program achievement during that period.

60. Furthermore, despite the fact that Mr. Sellmon had served 163 months and Defendants' guidelines indicated that he should have been paroled after the service of 110 months, Defendants again denied Mr. Sellmon's request for parole in August 2005 and gave him a three year set off, until August 2008.

61. Defendants' alleged basis for denying Mr. Sellmon's request for parole at his August 2005 parole hearing was, again, that the murder he committed "was extremely brutal, as evidenced by the massive head trauma [he] inflicted upon the victim."

62. In coming to each of their determinations regarding Mr. Sellmon's requests for parole, the Defendants and their designees have relied upon the belief that Mr. Sellmon had not served sufficient time to satisfy the accountability for the offense he committed. Thus, because they and their designees have felt that Mr. Sellmon should serve 15-20 years to satisfy the accountability for the offense he committed, they have ignored not only the objective factors in their own 2000 Guidelines indicating that Mr. Sellmon should be paroled, but the core factors of the Parole Board and its 1987 Guidelines, under which Mr. Sellmon satisfied the accountability for his offense when he served his "minimum sentence," i.e., when he was parole eligible.

63. Despite the fact that he was eligible for parole in April 2003 and had a spotless record of institutional conduct, as of approximately January 11, 2007, Mr. Sellmon will have

served the full fifteen years that the judge who sentenced him established as the baseline for his sentence. Nevertheless, Defendants have given Mr. Sellmon a set-off until August 2008 for his next parole rehearing, because they believe he has not served sufficient time to satisfy the offense accountability. Thus, under the Defendants' decisions and guidelines, Mr. Sellmon will be forced to serve at least 200 months for a crime that the court sentenced him to imprisonment for a minimum of fifteen years (180 months), subject to the Parole Board's determination that he could be paroled after 136 months when he had satisfied his offense accountability.

C.   Mr. Sellmon's Rights Under the Parole Board's 1987 Guidelines

64.   If Mr. Sellmon had been evaluated under the D.C. Guidelines, his SFS at his initial hearing would have been 9 and his "total point score" would have been 0, which would have included a reduction of -1 for his sustained program achievement.

65.   Under the Parole Board's 1987 Guidelines, if the grid point score equals three or less, parole should be granted unless the Parole Board finds that "unusual circumstances" are present. See 28 D.C.M.R. §§ 204.19, 204.22.

66.   At his parole rehearing in August 2005, Mr. Sellmon's SFS under the Parole Board's guidelines again would have been a 9 and his total point score also would have been a 0, but the Parole Board would have recognized that Mr. Sellmon would have again qualified for a reduction of -1 from his total point score for his sustained program achievement, even though it could not have awarded that reduction because Mr. Sellmon already had the lowest possible risk score.

67.   Under the Parole Board's regulations, guidelines, and practices, Mr. Sellmon satisfied the accountability for his offense after serving 136 months, i.e., as of April 5, 2003.

68. The Defendants' application of the 2000 Guidelines, rather than the 1987 and 1991 Guidelines, and repeated denials of Mr. Sellmon's requests for parole on the ground that he had not served sufficient time to be accountable for his crime, however, has resulted in a significant risk of prolonging Mr. Sellmon's incarceration, and therefore constitutes an Ex Post Facto Violation of the United States Constitution.

## COUNT 1:  THE DEFENDANTS VIOLATED THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION

69. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 68 as if fully set forth herein

70. The retroactive application of a new law, resulting in a significant risk of prolonging an inmate's sentence than what would have resulted under the guidelines in effect when the inmate was convicted, constitutes a violation of the Ex Post Facto clause of the United States Constitution.

71. Prisoners are entitled to know the range of punishments available at the time of sentencing, and during the adjudication of their case.  The Ex Post Facto Clause assures that individuals are given fair warning of what actions will be punished *and the degree to which they will be punished.*

72. Pursuant to the 1987 Guidelines, which governed parole decisions at the time Mr. Sellmon committed the crime for which he is imprisoned and was sentenced, Mr. Sellmon's total point score of 0 indicated that parole could be granted at his initial hearing subject to a low level of supervision.

73. Furthermore, per Section IV(C)(7) of the Parole Board's 1991 policy guideline, none of the "unusual circumstances" identified by the Parole Board as a basis for departing from

2142461.03

the guideline's indicated course of action based on the total point score of 0, i.e., grant parole with a low level of supervision, would have applied.

74. Under the 2000 Guidelines, however, Defendants, their predecessors, and/or their designees denied Mr. Sellmon's requests for parole and significantly increased the risk that his incarceration would be prolonged and he would serve longer than he would have had the Parole Board's guidelines been applied by: (1) immediately increasing the period the Parole Board considered as satisfying his offense accountability, i.e., his parole eligibility date, by 18-24 months based on his Base Point Score of 5 and (2) failing to give Mr. Sellmon any credit for his program achievements between his initial parole hearing and his parole rehearing. These actions, significantly increasing the risk that Mr. Sellmon would be incarcerated longer, were in violation of the Ex Post Facto Clause.

75. Furthermore, by ignoring the Parole Board's policy and practice of considering Mr. Sellmon's parole eligibility date, April 5, 2003, as satisfying Mr. Sellmon's accountability for his offense, the Defendants have necessarily significantly increased the risk that Mr. Sellmon will be incarcerated longer than he would have been had the Parole Board's regulations and practices been applied.

## COUNT II: VIOLATION OF MR. SELLMON'S FIFTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS

### The Commission's Denial of Credit for Mr. Sellmon's Program Achievement Violated His Due Process Rights.

76. Mr. Sellmon repeats and re-alleges the allegations set forth in paragraphs 1 through 75 as if fully set forth herein.

77. Mr. Sellmon has a constitutionally protected interest in receiving credit for his program and work achievement as provided for under the 1987 Guidelines, the 1991 Policy

Guideline, and the Commission's own 2000 Guidelines. Defendants, however, refused to give him credit for such achievement for the period between his May 2004 initial hearing and his August 2005 parole rehearing.

78. As a result, Defendants denied Mr. Sellmon his constitutional right to a fair review process.

## **RELIEF REQUESTED**

Wherefore, Plaintiff Tony Sellmon respectfully requests that this Court:

1. require the Defendants to apply the Parole Board's guidelines, practices, and procedures, including, but not limited to the 1987 Guidelines and the 1991 policy guideline to Mr. Sellmon;

2. deem that Mr. Sellmon's service of his sentence to his parole eligibility date satisfies the offense accountability for parole consideration purposes;

3. order the Defendants to reconsider the decision rendered on Mr. Sellmon's application for parole based on the existing record in a manner consistent with the D.C. Parole Board's 1987 Guidelines, 1991 Policy Guideline, and policies, federal regulations, the Constitution, and all other requirements of law;

4. award him attorneys fees and litigation expenses; and

5. grant such other and further relief as the Court deems appropriate.

Dated: September 22, 2006

Respectfully submitted,

*/s/ Jason D. Wallach*

Jason D. Wallach, D.C. Bar No. 456154
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
(202) 420-2200
Attorneys for Plaintiff