## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

TONY R. SELLMON                          :
    Fed. Reg. No:  11630-007             :
    FCI Cumberland                      :
    Federal Correctional Institution    :
    P.O. Box 1000                       :
    Cumberland, MD  21501,              :
                                        :
CURTIS D. EASON                          :
    U.S. Reg. No. 09114-007,            :
    U.S. Penitentiary, Lee              :
    County, P.O. Box 305,               :
    Jonesville, VA  24263-0305,         :
                                        :
JAMES GAMBRELL                           :
    Fed. Reg. No. 29898-117             :
    USP Lewisburg                       :
    P.O. Box 1000                       :
    Lewisburg, PA  17837,               :
                                        :
CARLTON R. MARTIN                        :
    U.S. Reg. No. 11400-007,            :
    U.S. Penitentiary, Lee              :
    County, P.O. Box 900,               :
    Jonesville, VA  24263-0900,         :
                                        :
DARIUS C. SMITH                          :
    U.S. Reg. No. 05639-000,            :
    U.S. Penitentiary, Lee              :
    County, P.O. Box 305,               :
    Jonesville, VA  24263-0305,         :
                                        :
BENSON F. WEST-EL                        :
    U.S. Reg. No. 06319-007,            :
    U.S. Penitentiary, Lee              :
    County, P.O. Box 305,               :
    Jonesville, VA  24263-0305,         :
              Plaintiffs,    : Case 1:06-cv-01650-ESH
               v.          : Judge Ellen Segal Huvelle
                                        :

2154979.02

**EDWARD F. REILLY, JR., Chairman of the**    :
**United States Parole Commission,**    :
   :
**CRANSTON J. MITCHELL, Commissioner of**    :
**the United States Parole Commission,**    :
   :
**DEBORAH A. SPAGNOLI, Commissioner of**    :
**the United States Parole Commission,**    :
   :
**PATRICIA K. CUSHWA, Commissioner of the**    :
**United States Parole Commission, and**    :
   :
**ISAAC FULWOOD, JR., Commissioner of the**    :
**United States Parole Commission**    :
   :
      **United States Parole Commission**    :
      **5550 Friendship Boulevard, Suite 420**    :
      **Chevy Chase, MD 20815-7286**    :
   :
               **Defendants.**    :
   :

## AMENDED COMPLAINT

      This is a civil action brought by several inmates convicted of violating the District of

Columbia Code ("D.C. Code") who are confined in federal correctional institutions. Defendants

are the Chairman and/or Commissioners of the United States Parole Commission (the

"Commission") and, as such, they, their predecessors, or their designees are and were

responsible for considering and acting upon Plaintiffs' requests for parole. Plaintiffs have been,

and continue to be, subjected to various injurious acts by the Defendants, who have repeatedly

and improperly denied Plaintiffs' requests for parole. Plaintiffs seek declaratory and injunctive

relief.

## JURISDICTION

      1.    Plaintiffs seek to vindicate rights protected by the Ex Post Facto Clause of Article 1,

Section 9 of the United States Constitution, the Fifth and Fourteenth Amendments to the United

States Constitution, and federal law.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (a)(4), (b)(1), and 42 U.S.C. § 1983.

2.    The Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3.    This Court has jurisdiction to declare the rights of the parties and to grant all further relief found necessary and proper.

## VENUE

4.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5.    Plaintiff Tony R. Sellmon is confined at Federal Correctional Institution Cumberland, MD pursuant to a sentence imposed on February 26, 1992 by the Superior Court of the District of Columbia.

6.    Plaintiff Carlton R. Martin is confined at U.S. Penitentiary, Lee County, Virginia ("USP Lee") pursuant to a sentence imposed on February 19, 1992 by the Superior Court of the District of Columbia.

7.    Plaintiff Darius C. Smith is confined at the USP Lee pursuant to a sentence imposed on April 6, 1994 by the Superior Court of the District of Columbia.

8.    Plaintiff Benson F. West-El is confined at USP Lee pursuant to a sentence imposed on February 13, 1984 by the Superior Court of the District of Columbia.

9.    Plaintiff Curtis D. Eason is confined at USP Lee pursuant to a sentence imposed on November 9, 1988 by the Superior Court of the District of Columbia.

10.    Plaintiff James Gambrell is confined at U.S. Penitentiary, Lewisburg, Pennsylvania pursuant to a sentence imposed on January 3, 1991 by the Superior Court of the District of Columbia.

11.    Defendant Edward F. Reilly, Jr. is the current Chairman of the Commission.

12.    Defendant Patricia K. Cushwa is a current Commissioner of the Commission.

13.    Defendant Isaac Fulwood, Jr. is a current Commissioner of the Commission.

14.    Defendant Cranston J. Mitchell is a current Commissioner of the Commission.

15.    Defendant Deborah A. Spagnoli is a current Commissioner of the Commission.

16.    Defendants, as the Chairman and/or Commissioners of the Commission, were and are responsible for reviewing and acting upon Plaintiffs' requests for parole in accordance with the United States Constitution and federal law and regulations.

## INTRODUCTION

17.    Plaintiffs are individually serving sentences imposed by the Superior Court of the District of Columbia for various violations of the District of Columbia Code.  At the time that Plaintiffs committed the crimes for which they were convicted and were sentenced, authority for parole decisions for D.C. Code violators was vested in the District of Columbia Parole Board (the "Parole Board").

18.    On August 5, 1997, Congress enacted the National Capital Revitalization and Self-Government Improvement Act (the "Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712 (1997).

19.    The Revitalization Act abolished the Parole Board, *see* Pub. L. No. 105-33 § 11231(b), and directed the Defendants, as the Chairman and Commissioners of the Commission, to conduct parole hearings for D.C. Code prisoners "pursuant to the parole laws and regulations of the District of Columbia," *id.* § 11231(c).

4

2154979.02

20.    On August 5, 1998, Defendants assumed the responsibility for making parole-release decisions for all eligible D.C. Code felons, pursuant to the Revitalization Act.

21.    In 2000, despite the requirements of the Revitalization Act that the Defendants apply the parole statutes, regulations, guidelines, and practices of the Parole Board, the Defendants published new parole rules, regulations, and guidelines that they deemed applicable to any D.C. Code inmate receiving an initial parole hearing after August 5, 1998 (the "2000 Guidelines"). *See* 28 C.F.R. § 2.80(a)(5).

22.    For inmates who had an initial parole hearing date prior to August 5, 1998, the Defendants chose to apply the Parole Board's Guidelines. *See* 28 C.F.R. § 2.80(a)(4). For all other inmates, some variation of the Defendants' 2000 Guidelines apply. *See id.* § 2.80(a)(1) & (5).

I.    **REGULATORY FRAMEWORK FOR PAROLE DECISIONS FOR D.C. CODE INMATES AT THE TIME OF THE PLAINTIFFS' CONVICTIONS AND SENTENCING.**

23.    Prior to 1998, at the time that Plaintiffs committed the crimes for which they are currently imprisoned and at the time that they were sentenced, the Parole Board administered parole proceedings for D.C. Code violators in the custody of the District of Columbia.

24.    Prior to 1998, where D.C. Code offenders were in the custody of the United States Government, the Commission administered their parole hearings, but in such circumstances, the Commission was required to apply the Parole Board's regulations, guidelines, policies, and practices, which were found by this Court to have the force and effect of law.

25.    Under the Parole Board's statutes, regulations, guidelines, policies, and practices, the "minimum sentence" for a crime, i.e., the period that an inmate must serve before he or she is eligible for parole, satisfied the inmate's accountability for the offense of conviction.

26.    In conducting parole hearings and making parole determinations, the Parole Board applied mandatory guidelines, many of which were codified as municipal regulations, that carefully prescribed the method and criteria that the Parole Board used to render decisions on parole requests.  As its guide for determining whether an incarcerated individual would be paroled or re-paroled, the Parole Board used the criteria set forth in the guidelines.

27.    At the time that the Plaintiffs committed the crimes for which they are currently imprisoned, and at the time of their sentencing for those crimes, the Parole Board made parole decisions for D.C. Code offenders using guidelines that it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Guidelines").

28.    In 1991, to ensure consistent and equitable application of the 1987 Guidelines and other parole regulations, the Parole Board adopted a Policy Guideline defining terms used in the 1987 Guidelines (the "1991 Policy Guideline").  The 1991 Policy Guideline applied to all requests for parole heard by the Parole Board.

29.    The 1987 Guidelines required the Parole Board to calculate a Salient Factor Score ("SFS") for each prisoner.  Based on a parole applicant's SFS, the Parole Board then calculated a "total point score", using pre- and post-incarceration factors, on which it based its decision to either grant or deny parole.  In "unusual circumstances," when mitigating and/or countervailing factors applied, the Parole Board could depart from an action (to grant or to deny parole) otherwise indicated by an inmate's total point score.

30.    In the case of an initial parole hearing, the 1987 Guidelines state that:

> After determining an adult parole candidate's SFS score and after applying the pre and post incarceration factors to arrive at a total point score pursuant to §204 and Appendix 2-1, the Board shall take one (1) of the following actions:

(a)  IF POINTS = 0:   Parole shall be granted at initial hearing with low level of supervision required;

(b)  IF POINTS = 1:   Parole shall be granted at initial hearing with high level of supervision required;

(c)  IF POINTS = 2:   Parole shall be granted at initial hearing with highest level of supervision required; or

(d)  IF POINTS = 3-5: Parole shall be denied at initial hearing and rehearing scheduled.

31.   In the case of a parole rehearing, the 1987 Guidelines state that:

In determining whether to release on parole an adult or a youth offender appearing before the Board at a parole rehearing, *the Board shall take the total point score from the initial hearing* and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2.  The Board shall then take one of the following actions:

(a)  IF POINTS = 0-3: Parole shall be granted at this rehearing with highest level o[f] supervision required; or

(b)  IF POINTS = 4-5:  Parole shall be denied and a rehearing date scheduled.

32.   The 1987 Guidelines directed the Parole Board to grant parole to an adult at a parole rehearing if the final adjusted score is less than four, except in "unusual circumstances," as discussed *infra* ¶¶ 40-42.

33.   The manner in which the "institutional record of the candidate" is used to adjust the total point score from the initial hearing, as required by 28 D.C.M.R. § 204.21, also is the subject of precise guidelines adopted by the Parole Board.  The adjustment is done via the "point grid" in Appendices 2-1 and 2-2 of title 28 of the District of Columbia Municipal Regulations.  Appendix

2-1 is used to calculate an inmate's SFS and total point score at the initial parole hearing, and

Appendix 2-2 is used to calculate an inmate's SFS and total point score at a parole rehearing.

34.    Pursuant to Appendices 2-1 and 2-2 of the Parole Board Guidelines, in parole

hearings, one point can be added to an inmate's total point score for "negative institutional

behavior."

35.    In section VI.A.1 of the 1991 Policy Guideline, the Parole Board defined the types

of institutional disciplinary actions that would qualify as "negative institutional behavior":

> 1.    **Negative Institutional Behavior** consists of serious or repeated major disciplinary infractions as described below that are sanctioned under Department of Corrections due process procedures.
>
> a.    In INITIAL PAROLE CONSIDERATION cases, the following disciplinary infractions shall ordinarily be considered as negative institutional behavior:
>
> (1)    One Class I Offense for murder, manslaughter, kidnapping, armed robbery or first degree burglary at any time during the minimum sentence (see DCMR 28-502.3, May 1987); OR
>
> (2)    One Class I Offense . . . *during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years*, whichever is longer; OR
>
> (3)    Two Class II Offenses . . . *during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years*, whichever is longer.
>
> b.    In PAROLE RECONSIDERATION cases, the following disciplinary infractions occurring *since the preceding release consideration on the sentence* shall ordinarily be considered as negative institutional behavior:
>
> (1)    One Class I Offense (see DCMR 28-502.3 through 502.17, May 1987); OR
>
> (2)    Two Class II Offenses (see DCMR 28-503.2 through 503.12, May 1987).

36.    Pursuant to Appendices 2-1 and 2-2, in parole hearings, one point can be subtracted from an inmate's total point score for "Program Achievement" (referred to in the 1991 Policy Guideline as "sustained program or work assignment achievement").

37.    Section VI(A)(2)(a) of the 1991 Policy Guideline defines "sustained program or work assignment achievement" for purposes of Appendix 2-1 as:

> In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:
>
> (1) Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area.

38.    For purposes of parole rehearings under Appendix 2-2 of the 1987 Guidelines, Section VI(A)(2)(b) of the 1991 Policy Guideline defines "sustained program or work assignment achievement":  "In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence."

39.    The "negative institutional behavior" and "program achievement" factors correspond to two findings required by Appendices 2-1 and 2-2:  "Has this offender committed serious infractions (adjudicated under Department of Corrections due process procedures)?" and "Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignments during this period of incarceration?"

40.    As noted above, the Parole Board could depart from the result dictated by sections 204.19 and 204.21 only in "unusual circumstances," and when it followed particular procedures:

Any parole release decision falling outside the numerically determined guideline should be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-2.  Section 204.22 of the District of Columbia Municipal Regulations provides that:

> The Board may, *in unusual circumstances*, waive the SFS and the pre and post incarceration factors [which comprise the total point score] set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

41.   In the 1991 Policy Guideline, the Parole Board further defined the scope of its authority to deny parole for "unusual circumstances" when a point score indicates that parole should be granted.  Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," lists and defines the following to constitute "unusual circumstances" countervailing a grant of parole:

a.    Repeated Failure Under Parole Supervision;

b.    Ongoing Criminal Behavior;

c.    Lengthy History of Criminally-Related Alcohol Abuse;

d.    History of Repetitive Sophisticated Criminal Behavior;

e.    Unusually Extensive or Serious Prior Record;

f.    Instant Offense Involved Unusual Cruelty to Victims, which applied where the offense involved physical, mental, or emotional abuse beyond the degree needed to sustain a conviction on the instant offense or especially vulnerable victims such as children or elderly persons; and

g.    Repeated or Extremely Serious Negative Institutional Behavior.

42.   The Parole Board further defined these "unusual circumstances" in the 1991 Policy Guideline and established objective criteria to determine their applicability.

2154979.02

## II.    THE PAROLE REGULATIONS USED BY DEFENDANTS.

43.    As noted above, the Revitalization Act abolished the Parole Board and directed the Commission to conduct parole hearings for District of Columbia offenders according to the parole statutes, regulations, guidelines, policies, and practices of the District of Columbia.

44.    After the Commission assumed responsibility for parole hearings for D.C. Code offenders, the Commission adopted the 2000 Guidelines and determined that those guidelines would apply to any D.C. Code offender that had not received an initial parole hearing as of August 5, 1998.

45.    Unlike the Parole Board's statutes, regulations, guidelines, policies, and practices, the Commission's 2000 Guidelines and parole eligibility criteria do not consider the completion of a prisoner's "minimum sentence" as satisfying offense accountability.  Instead, the Commission and its designees have repeatedly denied D.C. inmates' requests for parole, including those of Plaintiffs, on the ground that they believe that the inmates have not served enough time for their offenses, i.e., that the inmates have not been incarcerated long enough to satisfy the accountability for their offenses.

### A.    PAROLE ELIGIBILITY

46.    To account for the nature and circumstances of parole applicants' offenses, and the history and characteristics of the prisoners, the 2000 Guidelines contain instructions for the rating of certain offenses.  Chapters 1 through 12, § 2.20 of the Commission Rules and Procedures comprise the Commission's offense severity index.

47.    Like the 1987 Guidelines, the 2000 Guidelines require the Commission to determine a Salient Factor Score ("SFS") for each parole applicant, which is based upon factors such as prior convictions/adjudications, prior commitments of more than 30 days, age at current

offense/prior commitments, recent commitment-free period, probation/parole/confinement/ escape status at the time of the current offense, and the age of the offender.  The Commission guidelines, however, also allow the "Commission [to] take into account any substantial information available to it in establishing the prisoner's offense severity rating, salient factor score, and any aggravating or mitigating circumstances, provided the prisoner is apprised of the information and afforded an opportunity to respond."  Under the Commission guidelines, the SFS becomes a part of a Base Point Score ("BPS") which is comprised of three categories in which points are assigned according to the following factors:

> Category I – Risk of Recidivism (Based on the Salient Factor Score)
> Category II – Current or Prior Violence
> Category III – Death of a Victim or High Level of Violence

(Although the Parole Board guidelines also require the formulation of an SFS for parole applicants, the Parole Board used the SFS only to determine the risk of recidivism on the part of the parole applicant.  The Parole Board did not use the SFS as the basis for an increase in the period of imprisonment the inmate had to serve to demonstrate parole suitability.)

48.    The Commission's method of determining parole eligibility is to apply the BPS (the combination of points assigned from Categories I-III) to the appropriate category of offense behavior, then to *add the* corresponding number of *months to a parole applicant's minimum sentence* (the number of months an inmate must serve before becoming eligible for parole), based on the offense severity index.  The months added to the parole applicant's minimum sentence based on the BPS are considered to be the "Base Guideline Range", and are used by the Commission and its designees to determine the additional months of imprisonment that the inmate must serve above the months that the Parole Board required for parole eligibility.

2154979.02

### 1.    Program Achievement

49.    Pursuant to section 2.80(e)(1) of the Commission's guidelines, the Commission "shall assess whether the prisoner has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense."  Under this structure, the Commission has the sole discretion of determining whether the parole applicant's work and program achievements are to be considered "superior" or "ordinary."  Per the Commission's guidelines, "if superior achievement is found, the award for superior program achievement shall be one-third of the number of months during which the prisoner demonstrated superior program achievement."  (The Parole Board guidelines, on the other hand, use an objective standard to reward "Sustained Program Achievement or Work Assignment Achievement", and an award is granted even for what the Commission might consider "ordinary" achievement.)

### 2.    Institutional Behavior

50.    The Commission's guidelines, like those of the Parole Board, take an inmate's institutional behavior into account for purposes of parole determinations.  Unlike the Parole Board's guidelines, the 2000 Guidelines determine a range of months that the Commission adds to an inmate's minimum sentence under the provisions of 28 C.F.R. § 2.36 "for any significant disciplinary infractions since the beginning of confinement on the current offense in the case of an initial hearing, and since the last hearing in the case of a rehearing."  28 C.F.R. § 2.80(j).

51.    Unlike the Parole Board's guidelines, 28 C.F.R. §§ 2.80(j) and 2.36 do not limit consideration at initial parole hearings of institutional behavior within the three years prior to the parole hearing.

### B.    DETERMINING WHETHER TO GRANT PAROLE

52.    The "Total Guideline Range" (the ultimate determination of time to be served to establish presumptive suitability for parole pursuant to the Commission's guideline structure) is reached by adding: "the minimum of the base point guideline range, the number of months required by the prisoner's parole eligibility date, and the minimum of the guideline range for disciplinary infractions, if applicable.  Then subtract the award for superior program achievement, if applicable."

53.    After calculating an inmate's Total Guideline Range, under the 2000 Guidelines, the Commission "may, in unusual circumstances, grant or deny parole to a prisoner notwithstanding the guidelines."  28 C.F.R. § 2.80(n).

54.    28 C.F.R. § 2.80(n) defines "unusual circumstances" for purposes of the 2000 Guidelines and provides examples similar to those applied by the Parole Board, but without the definitions of such unusual circumstances that the Parole Board adopted in the 1991 Policy Guideline to ensure consistency in parole determinations.

55.    Pursuant to section 2.80(a)(4) of the Commission's guidelines regarding D.C. Code offenders, the Commission's guidelines apply to "all prisoners who are given initial parole hearings on or after August 5, 1998.  For prisoners whose initial hearings were held prior to August 5, 1998, the Commission shall render its decisions by reference to the guidelines applied by the D.C. Board of Parole."  Thus, regardless of the statutes, regulations, guidelines, policies, and practices in effect when an offender committed his or her crime and was sentenced, the offender's fitness for parole may hinge arbitrarily upon the date of his or her initial parole hearing.

2154979.02

### III.    PLAINTIFF TONY SELLMON'S PAROLE HEARINGS

### A.    DEFENDANTS' USE OF THE 2000 GUIDELINES.

56.    On February 26, 1992, the Superior Court of the District of Columbia sentenced Mr. Sellmon to imprisonment for a term of fifteen years to life for one count of violating D.C. Code § 22-2403 (second degree murder while armed; currently D.C. Code § 22-2103) and a sentence of five years to fifteen years for one count of violating D.C. Code § 22-3202 (possession of a firearm during the Defendants of a crime of violence; currently D.C. Code § 22-4502).  These sentences were to run concurrently.

57.    Under the statutes, regulations, guidelines, policies, and practices of the Parole Board, Mr. Sellmon became eligible for parole on April 5, 2003.  Using the Commission's 2000 Guidelines, the Defendants conducted Mr. Sellmon's initial parole hearing in August 2002, a second initial hearing in June 2004 after Mr. Sellmon successfully challenged the Defendants' refusal to grant him credit for his institutional programming at his August 2002 hearing, and a parole rehearing in August 2005, at which the Defendants again failed to give Mr. Sellmon credit for his institutional programming.

58.    When Mr. Sellmon became eligible for parole had his first parole hearing in August 2002, Defendants or their predecessors assigned a hearing examiner, Robert Haworth, to conduct Mr. Sellmon's initial parole hearing.

59.    Despite the fact that Mr. Sellmon had been convicted and sentenced at a time when the Parole Board applied its 1987 Guidelines and other policies and practices to parole determinations, Defendants or their predecessors instructed Hearing Examiner Haworth to use the Defendants' 2000 Guidelines in evaluating Mr. Sellmon's request for parole.

2154979.02

60.    Under the Parole Board's parole statutes, regulations, guidelines, policies, and practices, Mr. Sellmon had served the "minimum sentence" for his offenses when he became eligible for parole.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, the "minimum sentence" represented the period that an inmate needed to serve to satisfy the inmate's accountability for the offense itself.

61.    Under the 2000 Guidelines, however, Mr. Sellmon's salient factor score at his initial hearing on August 7, 2002 and at his rehearing on August 2, 2005 was 9 and his Base Point Score was 5.  His SFS score was based upon no prior convictions, no prior commitments of 30 days, his age at the time of his offense, and the fact that he was not on parole when the offense was committed.  His SFS placed in him in the "very good risk" category.  His Base Point Score was based upon the violence of the offense and the death of the victim.  Mr. Sellmon's Base Point Score under the Federal 2000 Guidelines increased the range of months he was expected to serve from the minimum term at which he was eligible for parole, 136 months, by an additional 18-24 months.  As of his initial parole hearing, Mr. Sellmon had served 127 months and the Defendants had determined that their guidelines indicated that he should serve between 154 and 160 months.

62.    At his initial parole hearing, despite the fact that Mr. Haworth recommended that the Commission grant Mr. Sellmon credit for his institutional programming and parole Mr. Sellmon on May 13, 2003, the Defendants refused to grant Mr. Sellmon credit for his institutional programming, denied parole, and gave Mr. Sellmon a three-year "setoff," i.e., the period between a parole hearing and an inmate's next opportunity to request parole, setting a reconsideration hearing for 2005.  The notice of action the Defendants gave Mr. Sellmon indicated that their decision was not appealable.

63. The Defendants' stated basis for denying Mr. Sellmon's request for parole was that his behavior "involved the brutal beating of the female victim with a gun causing massive head trauma and death." Furthermore, Defendants rejected Mr. Sellmon's claim that he was a victim of a robbery or attempted robbery because it allegedly was "not supported by the evidence."

64. Thereafter, Mr. Sellmon filed a petition for a writ of habeas corpus on February 6, 2003 in the United States District Court for the Western District of Virginia (Civil Action No. 7:03-CV-00169) challenging, among other things, the Defendants' refusal to grant him credit for his program achievement. After Senior United States District Judge James C. Turk ruled, on March 15, 2004, that Defendants had erred by failing to grant Mr. Sellmon credit for his program achievement, Defendants issued a notice of action vacating their decision at Mr. Sellmon's initial parole hearing and reheard Mr. Sellmon's request for parole on June 22, 2004.

65. In compliance with the habeas court's ruling, following Mr. Sellmon's June 22, 2004 parole hearing, Defendants granted Mr. Sellmon fifty (50) months credit for his institutional programming, thus bringing the guideline range for Mr. Sellmon to between 104 and 110 months. As of his June 22, 2004 hearing, Mr. Sellmon had served 149 months, but, again despite the recommendation of Mr. Haworth, who conducted the June 2004 hearing, the Defendants denied Mr. Sellmon's request for parole stating:

> a decision above the Current Total Guideline Range is warranted because you brutally beat the female victim with a gun causing massive head trauma. The victim died as a result of the injuries you inflicted. While you have programmed well, you continue to claim that you were the victim of a robbery or an attempted robbery that is not supported by the evidence.

66. In August 2005, Defendants conducted Mr. Sellmon's parole rehearing.

67.    Although Mr. Sellmon had continued to program well between his June 2004 hearing and his August 2005 rehearing, Defendants did not give him any credit for his program achievement during that period.

68.    Furthermore, despite the fact that Mr. Sellmon had served 163 months and Defendants' guidelines indicated that he should have been paroled after the service of 110 months, Defendants again denied Mr. Sellmon's request for parole in August 2005 and gave him a three year setoff, until August 2008.

69.    Defendants' alleged basis for denying Mr. Sellmon's request for parole at his August 2005 parole hearing was, again, that the murder he committed "was extremely brutal, as evidenced by the massive head trauma [he] inflicted upon the victim."

70.    In coming to each of their determinations regarding Mr. Sellmon's requests for parole, the Defendants and their designees have relied upon the belief that Mr. Sellmon had not served sufficient time to satisfy the accountability for the offense he committed.  Thus, because they and their designees have felt that Mr. Sellmon should serve 15-20 years to satisfy the accountability for the offense he committed, they have ignored not only the objective factors in their own 2000 Guidelines indicating that Mr. Sellmon should be paroled, but the core factors of the Parole Board, its 1987 Guidelines, and its 1991 Policy Guideline, under which Mr. Sellmon satisfied the accountability for his offense when he served his "minimum sentence," i.e., when he was eligible for parole.

71.    Despite the fact that he was eligible for parole in April 2003 and had a spotless record of institutional conduct, as of approximately January 11, 2007, Mr. Sellmon will have served the full fifteen years that the judge who sentenced him established as the baseline for his sentence.  Nevertheless, Defendants have given Mr. Sellmon a setoff until August 2008 for his

next parole rehearing, because they believe he has not served sufficient time to satisfy the offense accountability.  Thus, under the Defendants' decisions and guidelines, Mr. Sellmon will be forced to serve at least 200 months for a crime that the court sentenced him to imprisonment (subject to the Parole Board's determination that he could be paroled after 136 months when he had satisfied his offense accountability) for fifteen years (180 months).

> **B.     MR. SELLMON'S RIGHTS UNDER THE PAROLE BOARD'S 1987 GUIDELINES.**

72.    Had the Commission evaluated Mr. Sellmon under the D.C. Parole Board's guidelines, his SFS at his initial hearing would have been 9 and his "total point score" would have been 0, which would have included a reduction of -1 for his sustained program achievement.

73.    Under the Parole Board's 1987 Guidelines, if the grid point score equals three or less, parole should be granted unless the Parole Board finds that "unusual circumstances" are present.  *See* 28 D.C.M.R. §§ 204.19, 204.22.

74.    No unusual circumstances, as defined by the Parole Board in the 1991 Policy Guideline, would have applied in Mr. Sellmon's case.

75.    At his parole rehearing in August 2005, Mr. Sellmon's SFS under the Parole Board's guidelines again would have been a 9 and his total point score also would have been a 0, but the Parole Board would have recognized that Mr. Sellmon would have again qualified for a reduction of -1 from his total point score for his sustained program achievement, even though it could not have awarded that reduction because Mr. Sellmon already had the lowest possible risk score.

76.    Under the Parole Board's statutes, regulations, guidelines, policies, and practices, Mr. Sellmon satisfied the accountability for his offense after serving 136 months, i.e., as of April 5, 2003.

77.    The Defendants' application of the 2000 Guidelines, rather than the 1987 Guidelines and the 1991 Policy Guideline, and repeated denials of Mr. Sellmon's requests for parole on the ground that he had not served sufficient time to be accountable for his crime, however, has resulted in a significant risk of prolonging Mr. Sellmon's incarceration, and therefore constitutes an Ex Post Facto Violation of the United States Constitution.

## IV.    PLAINTIFF BENSON WEST-EL′S PAROLE HEARINGS

### A.    DEFENDANTS′ USE OF THE 2000 GUIDELINES.

78.    On February 13, 1984, the Superior Court of the District of Columbia sentenced Plaintiff Benson West-El to twenty years-to-life, based on convictions for attempted robbery while armed, first-degree murder while armed, attempted robbery, armed robbery, and carrying a weapon without a license, all of which arose out of the same incident on January 5, 1982 when Mr. West-El was seventeen years old.  The sentences for these offenses were mandated to run concurrently.  These were Mr. West-El's first convictions of any sort.

79.    In 2002, the Commission determined that Mr. West-El would be eligible for parole after serving 227 months.  As discussed below, this determination turned out to be incorrect as Mr. West-El received a mandatory minimum sentence of twenty years, which required that he serve 240 months before becoming eligible for parole.

80.    Defendants or their predecessors assigned a hearing examiner, Adrienne R. Poteat, to conduct Mr. West-El's initial parole hearing, which took place on April 29, 2002.

81.   Despite the fact that Mr. West-El had been convicted and sentenced at a time when the Parole Board applied its 1987 Guidelines and other policies and practices to parole determinations, Defendants or their predecessors instructed Hearing Examiner Poteat to use the Defendants' 2000 Guidelines in evaluating Mr. West-El's request for parole.

82.   Under the 2000 Guidelines, Mr. West-El's SFS was 7 and his Base Point Score was 6 for the purposes of his 2002 parole hearing.  His SFS was based on his lack of prior convictions and adjudications, his lack of prior commitments, his recent commitment-free period (three years); and, his lack of a probation or escapee status. His Base Point Score was based upon the violence of the offense and the death of the victim.  Under the 2000 Guidelines, Defendants used Mr. West-El's Base Point Score to increase the range of months that Mr. West-El was expected to serve to become eligible for parole from the minimum term (240 months, or 20 years) under the Parole Board's statutes, regulations, guidelines, policies, and practices to the minimum term plus an additional 36-48 months.  Thus, Defendants, using the 2000 Guidelines, increased Mr. West-El's minimum sentence by 3 to 4 years to 23 to 24 years.

83.   At Mr. West-El's initial hearing, Defendants further increased Mr. West-El's Total Guideline Range by 24-40 months by adding months under the "Disciplinary Guideline Range." Defendants based this increase in the period Mr. West-El had to presumptively serve before being considered suitable for parole on disciplinary reports Mr. West-El had received prior to May 1992, in the first half of his minimum sentence – disciplinary reports that, as discussed below, would not have been considered by the Parole Board under the 1987 Guidelines or the 1991 Policy Guideline.  In increasing Mr. West-El's guideline range, Defendants relied on the Rescission Guidelines in Section 2.63 of the Commission's regulations and increased Mr. West-El's range by 0-8 months for four non-drug related infractions in 1984, 1986, and 1992, 12-16

months for allegedly assaulting a correctional officer in 1989, and 12-16 months for allegedly possessing a dangerous weapon in 1983, before he even began serving the current sentence.

84.    Pursuant to Mr. West-El's 2002 parole review hearing, Defendants denied parole to Mr. West-El, finding only that a decision to grant parole outside of the guidelines (or, before his minimum sentence was reached) was unwarranted.

85.    At his initial parole hearing, the 2002 initial hearing examiner's report acknowledged that Mr. West-El had program achievements in Metal Fabrication and Industrial Maintenance, the Refrigeration Squad, 24 weeks of the Drug Program, religious and self-help groups.  Nevertheless, Defendants did not credit Mr. West-El for these program achievements. As discussed below, these program achievements would have reduced Mr. West-El's grid point score by one point under the Parole Board's 1987 Guidelines.

86.    In addition to denying Mr. West's parole application, at Mr. West-El's initial parole hearing Defendants gave Mr. West-El a 48 month setoff, thereby delaying his parole rehearing for four years.  (Defendants elected a 4-year setoff despite the fact that the initial hearing examiner, Poteat, had recommended a five-year setoff.  The 4-year setoff brought Mr. West-El within 7 months of his original court-ordered mandatory minimum sentence of 20 years.)

87.    After his initial hearing, the Commission determined that, under the statutes, regulations, guidelines, policies, and practices of the Parole Board, Mr. West-El would become eligible for parole after serving 240 months.

88.    On March 22, 2006, after Mr. West-El had served 278 months (more than three years longer than the minimum sentence he would have had to serve to become eligible for parole under the Parole Board's statutes, regulations, guidelines, policies, and practices),

2154979.02

Defendants conducted Mr. West-El's parole rehearing again using the 2000 Guidelines as opposed to the Parole Board's 1987 Guidelines and 1991 Policy Guideline.

89.    At the March 2006 parole rehearing, Defendants adjusted Mr. West-El's minimum sentence to reflect the 240 month mandatory minimum sentence imposed by the court.  They then took the Base Point Score Guideline Range and Disciplinary Guideline Range from Mr. West-El's initial parole hearing and adjusted the range for disciplinary infractions since the initial hearing, of which there were none, and program achievement since the initial hearing.

90.    For program achievement, Defendants awarded Mr. West-El 16 months of credit for "Superior Program Achievement," which reflected Mr. West-El's programming since his initial hearing, but not for any programming prior to the initial hearing.

91.    At his parole rehearing, Defendants calculated Mr. West-El's Total Guideline Range to be 284-312 months. Although Mr. West-El had met his minimum sentence requirements (and thus his offense accountability requirements) under the Parole Board's guidelines as of February, 2004, Defendants refused to grant Mr. West-El immediate parole. Instead, they continued his parole application to a presumptive parole date of January 5, 2009, thus effectively increasing Mr. West-El's minimum sentence from 20 years to 25 years. Defendant's provided no explanation for denying immediate parole to Mr. West-El at this hearing, other than to state that "a decision outside the Current Total Guideline Range at this consideration is not found warranted."

92.    The hearing examiner at Mr. West-El's parole rehearing, who recommended a presumptive parole date after Mr. West-El had served approximately 25 years, however, indicated that the delay in granting parole was attributable to Mr. West-El not having served long

enough for his crime.  The hearing examiner explained that 25 years was the period "[t]hat seems to appropriately fit this case."

**B.    MR. WEST-EL'S RIGHTS UNDER THE PAROLE BOARD'S 1987 GUIDELINES.**

93.    Under the Parole Board's statutes, regulations, guidelines, policies, and practices, Mr. West-El had served the "minimum sentence" for his offenses when he became eligible for parole after serving 240 months.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, the "minimum sentence" represented the period that Mr. West-El needed to serve to satisfy his accountability for the offense itself.

94.    As explained above, the Parole Board's statutes, regulations, guidelines, policies, and practices treated the minimum sentence as addressing offense accountability.  Defendants, under federal guidelines, however, take the offender's minimum sentence (i.e., the initial date of parole eligibility) and add a "Base Point Score Guideline Range," which under the Parole Board's statutes, regulations, guidelines, policies, and practices, already has been accounted for in the minimum sentence.  Mr. West-El has already served over three years in excess of his minimum sentence.

95.    The Parole Board's 1987 Guidelines also do not provide for increasing an offender's minimum sentence by considering formulaic disciplinary guideline ranges.  Thus, whereas Defendants increased Mr. West-El's Total Guideline Range by 24-40 months under the 2000 Guidelines based on disciplinary infractions that occurred approximately 10 years prior to his initial (2002) parole hearing, the Parole Board guidelines would not have considered any of these disciplinary infractions.  Instead, under the 1987 Guidelines, only disciplinary infractions committed within the 12 months preceding the hearing or during the last half of the minimum sentence up to a period of three years are considered for purposes of evaluating an inmate's

parole eligibility, unless the infraction is for an offense involving murder, manslaughter, kidnapping, armed robbery, or first-degree burglary.  Mr. West-El's violations did not qualify because none were within the three years prior to the parole hearing or in the last half of Mr. West-El's minimum sentence and none were for murder, manslaughter, kidnapping, armed robbery, or first-degree burglary.

96.    Had Defendants applied the Parole Board's 1987 Guidelines to Mr. West-El's parole review, Mr. West would have received credit at his initial parole hearing for the program achievements he earned prior to his initial hearing.  Under the Parole Board's Policy Guidelines, successful completion of one or two educational or vocational programs would ordinarily be considered to be "sustained program or work assignment achievement", through which one point can be deducted from an inmate's total point score.  Based on the report of Hearing Examiner Poteat (the initial parole hearing examiner), Mr. West-El's achievements clearly would have qualified for a point reduction based on the Parole Board's statutes, regulations, guidelines, policies, and practices.

97.    Had Defendants properly applied the Parole Board's 1987 Guidelines and 1991 Policy Guideline, only looking at disciplinary infractions considered by the Parole Board to be relevant to the parole determination and giving Mr. West-El credit for his early program achievement (and reducing his total point score appropriately), Mr. West-El would have earned a score of 1 at his initial parole hearing, under which parole should have been granted, with a medium level of supervision.  Further, had Defendants applied the Parole Board's guidelines at Mr. West-El's parole rehearing, an additional one-point reduction would have been earned based on his program achievements between the first and second hearings, giving him a 0 total point

score under the 1987 Guidelines, under which parole should be granted with a minimum level of supervision.

98.    As the United States Court of Appeals for the District of Columbia Circuit recently recognized in *Fletcher v. Reilly*, the Defendants' application of new guidelines that significantly increased the risk that Mr. West-El would serve a longer prison sentence than he would had the Defendants' applied the 1987 Guidelines violated the Ex Post Facto clause of the United States Constitution.

## V.        PLAINTIFF DARIUS SMITH'S PAROLE HEARINGS

### A.        DEFENDANT'S USE OF THE 2000 GUIDELINES.

99.    On April 6, 1994, Plaintiff Darius C. Smith was sentenced to a combined, concurrent term of fifteen years-to-life based on convictions for:  possession of a firearm during a crime of violence; carrying a weapon without a license; and second-degree murder.

100.    Under the Parole Board's statutes, regulations, guidelines, policies, and practices, Mr. Smith became eligible for parole on February 26, 2005 when he had served 140 months, which was the "minimum sentence," i.e., the period Mr. Smith had to serve before becoming eligible for parole, for his sentence of 15 years to life.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, the minimum sentence represented the period that an inmate needed to serve to satisfy the inmate's offense accountability for the offense itself.

101.    On June 24, 2004, Rob Haworth, a parole examiner appointed by Defendants, conducted Mr. Smith's initial parole hearing, .

102.    Rather than apply the Parole Board's regulations, polices, and practices with respect to offense accountability, Defendants and Mr. Haworth conducted Mr. Smith's initial parole hearing under the Commission's 2000 Guidelines.

2154979.02

103.  Under the 2000 Guidelines, Defendants took Mr. Smith's "minimum sentence" of 140 months, calculated a Base Point Score using Mr. Smith's offense characteristics and prior convictions, and assigned Mr. Smith a Base Point Guideline Range of 18-24 months that Mr. Smith would have to serve, in addition to the "minimum sentence," to satisfy offense accountability.

104.  Additionally, at Mr. Smith's initial parole hearing, Defendants used the Rescission Guidelines in Section 2.63 of the Commission's guidelines to increase Mr. Smith's Total Guideline Range because of disciplinary infractions Mr. Smith received in 1997 and 1998 (none of which involved murder, manslaughter, kidnapping, armed robbery, or first-degree burglary). Defendants used these disciplinary infractions to calculate a Disciplinary Guideline Range of 88-124 months that they added to Mr. Smith's 18-24 months for the Base Point Score Guideline Range and 140 months for the "Months Required to Serve to Parole Eligibility Date."  The most recent of Mr. Smith's disciplinary infractions had occurred approximately six years prior to his initial parole hearing.

105.  Although Mr. Smith's "minimum sentence" (the period of incarceration Mr. Smith had to serve to become eligible for parole) under the Parole Board's statutes, regulations, guidelines, policies, and practices was 140 months, after Defendants increased the "minimum sentence" by the Base Point Score Guideline Range and the Disciplinary Guideline Range and reduced it by a 12-month period based on Mr. Smith's superior program achievement, Mr. Smith's Total Guideline Range was 234-276 months.

106.  Because Mr. Smith was still 102 months away from the bottom of this Total Guideline Range, the hearing examiner at his initial parole hearing determined that there was no reason to go outside the guidelines.  As a result, Defendants denied Mr. Smith's parole

2154979.02

application and gave him a five-year setoff, setting his parole reconsideration hearing for June, 2009.  Defendants' Notice of Action explained that their decision to deny Mr. Smith's initial parole application was based on the fact that "a decision outside the Total Guideline Range at this consideration is not found warranted."

### B.    MR. SMITH'S RIGHTS UNDER THE PAROLE BOARD'S 1987 GUIDELINES.

107.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, Mr.Smith satisfied offense accountability after serving his minimum sentence of 140 months (11.6 years), which would have been in February, 2005.

108.  As noted above, the D.C. Parole Board's Guidelines do not provide for increasing an offender's minimum sentence by considering formulaic offense accountability guidelines. Defendants have almost doubled the time that Mr. Smith will have to serve, based on the application of their 2000 Guidelines, under which Mr. Smith's sentence was increased by 1.5 to 2 years based on the offense severity Base Point Guideline Range, and his sentence was increased by approximately 7 to 10 years based on the Defendants' Disciplinary Guideline Range.

109.  Under the Parole Board Guidelines, only prison disciplinary infractions committed within 12 months prior to the parole hearing or within the last half of the minimum sentence *up to three years prior to the initial parole hearing* (unless the infraction is for an offense such as murder, manslaughter, kidnapping, armed robbery or first-degree burglary) are used to determine parole eligibility.  Defendants, on the other hand, using the 2000 Guidelines, increased Mr. Smith's sentence guidelines by 7 to 10 years based on infractions that the Parole Board would not have even considered under its statutes, regulations, guidelines, policies, and practices.

2154979.02

110.  The Defendants' continued use of their own guidelines, rather than applying the Parole Board's 1987 Guidelines and 1991 Policy Guideline under which an offender's minimum sentence satisfies offense accountability and under which disciplinary reports occurring more than three years prior to the parole hearing are not considered, has significantly increased the risk that Mr. Smith will serve a longer period of incarceration than he would have had Defendants applied the Parole Board's guidelines that were in effect when he committed his crime and was sentenced.  As a result, Defendants have violated the Ex Post Facto Clause of the United States Constitution.

## VI.    PLAINTIFF CARLTON MARTIN'S PAROLE HEARINGS

### A.    DEFENDANTS' USE OF THE 2000 GUIDELINES.

111.  In 1992, Mr. Martin pleaded guilty to three D.C. Code violations:  1) manslaughter while armed;  2) possession with intent to distribute cocaine;  and, 3) possession of a firearm during the commission of a crime of violence.  In accordance with the D.C. Code, on February 19, 1992, the Superior Court of the District of Columbia sentenced Mr. Martin to 15 years-to-life for the "manslaughter" charge, four-to-twelve years for the charge of "possession with intent to distribute cocaine", and five-to-fifteen years for the "possession of a firearm during the commission of a crime" charge.  The sentences for all three charges to which Mr. Martin pleaded guilty were to run concurrently.

112.  The present charges are the only ones for which Mr. Martin has been convicted as an adult.

113.  Mr. Martin has been in continuous custody since March 21, 1991, and thus, has jail credit time of approximately 187 months (or 15+ years, as of November, 2006).

114.  At the time that Mr. Martin committed the crimes for which he is currently imprisoned, and at the time that he was sentenced, the Parole Board administered parole proceedings for D.C. Code violators, such as Mr. Martin, based on its 1987 Guidelines.

115.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, the "minimum sentence" for a crime satisfied the inmate's offense accountability.

116.  Based on the Superior Court of the District of Columbia's sentencing, Mr. Martin's initial parole eligibility date was determined to be June 14, 2003, the date upon which he would have completed his minimum sentence of 138 months.  Additionally, as part of his parole eligibility calculation, Mr. Martin was to have been credited for 71 days of jail time accrued prior to his sentencing.

117.  While incarcerated, Mr. Martin has had two parole hearings:  the first hearing was held on January 21, 2003, and the second hearing was held on March 22, 2006.  After Mr. Martin's initial hearing, the Defendants denied parole to Mr. Martin, and assigned him a three-year set-off, setting a reconsideration hearing for 2006.  Subsequent to Mr. Martin's March 22, 2006 re-hearing, the Defendants again denied parole and assigned Mr. Martin another three-year set-off, setting the next hearing for 2009.

118.  At each of Mr. Martin's parole hearings, Defendants have purported to apply their 2000 Guidelines, rather than the Parole Board's statutes, regulations, guidelines, policies, and practices.

119.  At each of his parole hearings, Defendants have denied Mr. Martin's requests for parole, citing offense accountability standards, despite the fact that under the Parole Board's 1987 Guidelines, Mr. Martin satisfied offense accountability when he became eligible for parole, i.e., after he had served his "minimum sentence", on June 14, 2003.

2154979.02

120.  Prior to his January 21, 2003 parole hearing, while incarcerated, Mr. Martin, in addition to having completed two and four-hour Anger Management courses in November, 2003, among other things, had achieved:  a certificate for completing his GED on February 18, 2000;  a certificate for being Student of the Month for September 1999;  a certificate for completing a Dry Wall and Painting program on February 4, 2002;  a certificate for involvement in a Commercial Cleaning Program on February 9, 2001;  and, a certificate for perfect attendance in the 6-month Electrical Program.  Despite these program achievements and the recommendation of the initial hearing examiner, the Defendants refused to give Mr. Martin any credit for program achievement.  Under the Parole Board 1991 Policy Guideline, these achievements would have qualified as "exceptional program work" or "sustained program achievement" and would have decreased Mr. Martin's total point score by one point thereby increasing the likelihood that Mr. Martin's parole request would be granted.

121.  Between his January 21, 2003 and March 26, 2006 parole hearings, Mr. Martin attained superior program achievement for completing the following courses:  the CODE Program;  Typing; Principles of Marketing and Economics;  Introduction to Photography; Introduction to Spanish;  Computer Technology;  Seven Habits of Highly Effective People; Relapse Prevention;  Principles of Real Estate;  Corporate Law, Anger Management;  Victim Impact;  Criminal Lifestyles;  Rational Emotive Behavior; 40-Hour Drug Program;  Breaking Barriers;  and, Psychology Group.

122.  On December 29, 2002, Mr. Martin received a disciplinary report at USP Lee for a minor violation.  Mr. Martin acknowledged this minor violation – his only post-incarceration institutional infraction.  At Mr. Martin's initial parole hearing on January 21, 2003 and at his

parole rehearing on March 22, 2006, Defendants increased Mr. Martin's base sentence guideline range by two months as a result of this infraction.

**B.    MR. MARTIN'S RIGHTS UNDER THE PAROLE BOARD'S 1987 GUIDELINES.**

123.   Based on the concurrent sentences mandated by the D.C. Superior Court order on February 19, 1992, Mr. Martin's minimum sentence requirement was determined to be 138 months (11.5 yrs.).  In its initial parole review for Mr. Martin, the Commission added 54-72 months to Mr. Martin's minimum sentence for the Base Point Score Guideline Range and 0-2 months for the Disciplinary Guideline Range, resulting in a total guideline sentence range of 192-212 months.  Under the Parole Board's 1987 Guidelines, however, the Parole Board used the minimum sentence to address offense accountability.

124.   Under its guidelines, the Parole Board applied an SFS to the applicant's pre- and post-incarceration record solely to determine parole eligibility.  Defendants, however, applying the Commission's 2000 Guidelines rather than Parole Board guidelines, used Mr. Martin's SFS to add 54-72 months to his sentence to account for offense severity and accountability.  The 54-72 months added to Mr. Martin's original sentence through the Commission's application of its offense accountability guidelines increased the risk that Mr. Martin's incarceration will be prolonged in violation of the Ex Post Facto Clause.

125.   On December 29, 2002, Mr. Martin received his only disciplinary infraction during the course of his imprisonment.  At Mr. Martin's January 21, 2003 parole hearing, Defendants increased Mr. Martin's Total Guideline Range by adding two months to the Disciplinary Guideline Range based on this infraction.  The 1987 Guidelines and the 1991 Policy Guideline in effect at the time of Mr. Martin's commission of the crime and sentencing would have prohibited consideration of Mr. Martin's single disciplinary report for a minor infraction in his almost

2154979.02

fifteen years of imprisonment.  According to the 1987 Guidelines, only serious infractions are to be weighted against an application for parole.  Under the Parole Board guidelines, a record consisting of only a single Class II prison offense, such as Mr. Martin's disciplinary infraction, would not be considered in determining Mr. Martin's eligibility for parole.  Defendant's use of a minor prison offense to increase Mr. Martin's sentence guideline in a manner that is inconsistent with the manner in which the offense would have been treated under the Parole Board's guidelines is a violation of the Ex Post Facto clause as it creates a significant risk of prolonging Mr. Martin's incarceration beyond what it would have been under 1987 Guidelines.

127.  Despite the initial hearing examiner's recommendation to credit Mr. Martin with ten months time-off his sentence guideline for his program achievements, the reviewing hearing examiner and Defendants declined to give Mr. Martin credit for these achievements.  Defendants denied granting credit for Mr. Martin's program achievements partially based on their assumption that Mr. Martin's achievements were "ordinary" rather than "superior".  However, as previously noted, the Parole Board's guidelines would have credited Mr. Martin for "sustained program achievement" based on their objective standards, including "the completion of one or two educational or vocational programs."

128.  Had the Defendants granted Mr. Martin credit for his program achievements as per the initial examiner's advice, Mr. Martin's minimum sentence, after the January 21, 2003 hearing, would have been reduced to 128 months rather than 192-212, as declared in the February 13, 2003 Notice of Action.  (As of November, 2006, Mr. Martin has been confined for approximately 179 months.)

129.  Had Defendants applied the Parole Board's 1987 Guidelines, Mr. Martin would have had a total point score of 2 – taking into account Mr. Martin's program achievement.  At his

parole rehearing, Mr. Martin's previous total point score of 2 would have been reduced an additional point – to a total point score of 1 – for his sustained program or work assignment achievement between the parole hearings and clear institutional record during that period.  A total point score of 2 at an initial hearing and of 1 at a parole rehearing correspond with a presumption that parole should be granted with the highest level of supervision.

130.  Because Defendants increased Mr. Martin's minimum sentence, added 0-2 months to Mr. Martin's sentence for a disciplinary infraction that the Parole Board would not have considered, and denied Mr. Martin credit for his program work achieved prior to the January 21, 2003 parole hearing, Defendants abused their discretion and violated the Ex Post Facto Clause by creating a significant risk that Mr. Martin's incarceration will be prolonged further than it would have been had Defendants utilized the 1987 Guidelines in effect when Mr. Martin committed his crime and was convicted.

VII.     PLAINTIFF CURTIS EASON'S PAROLE HEARINGS

A.     THE DEFENDANTS' PURPORTED USE OF THE PAROLE BOARD'S GUIDELINES AND POLICIES.

131.  On November 9, 1988, the Superior Court of the District of Columbia sentenced Mr. Eason to imprisonment for a term of fourteen years-to-life for pleading guilty to a single charge of Murder II While Armed.

132.  Mr. Eason has had three parole hearings during his incarceration: February 20, 1998, April 23, 1999 and March 2, 2004.  Mr. Eason's original parole eligibility date was September 9, 1998.

133.  At Mr. Eason's initial parole hearing on February 20, 1998, the Parole Board denied Mr. Eason's parole application, based on the fact that Mr. Eason's total point score was a 3,

which indicated that parole should be denied.  For purposes of this hearing, the Parole Board calculated Mr. Eason's SFS to be three, and his total point score to be three.  At the 1998 initial parole hearing, the Parole Board gave Mr. Eason a 1 year setoff and set his parole rehearing for March of 1999.

134.  By March of 1999, the Commission and Defendants and/or their predecessors had assumed responsibility for conducting parole hearings and rehearings for D.C. Code violators, such as Mr. Eason.

135.  Despite purporting to apply the Parole Board's 1987 Guidelines to Mr. Eason's parole applications (based on the fact that Mr. Eason's initial parole hearing occurred before August 5, 1998), Defendants and/or their predecessors have denied parole to Mr. Eason at each of his hearings based on offense accountability criteria.

136.  At Mr. Eason's March 1999 parole rehearing, Defendants took Mr. Eason's total point score from his initial parole hearing and deducted a point for Mr. Eason's continued program achievement, which gave Mr. Eason a total point score of 2.  Nevertheless, and despite the fact that the Parole Board's guidelines indicated that parole should have been granted, Defendants denied Mr. Eason's request for parole.

137.  Defendants departed from the Parole Board guidelines, citing Mr. Eason's prior criminal history, including the fact that the current offense occurred while Mr. Eason was on probation from a 1987 conviction for assault with intent to murder.  (As discussed below, under the Parole Board's guidelines, Mr. Eason's prior criminal record would not have justified a departure from the guidelines' presumption that parole should be granted.)  In addition to denying Mr. Eason's 1999 parole application, Defendants and/or their predecessors gave Mr. Eason a 5-year setoff, scheduling his next parole rehearing for March, 2004.

138.  In April 2004, Defendants again purported to apply the 1987 Parole Board guidelines to Mr. Eason's parole application.  Once again, parole was denied based on Defendant's offense accountability standards.  For purposes of the 2004 hearing, Mr. Eason's total point score had been reduced to 1, reflecting his exemplary institutional record and superior program achievement, and indicating that parole, with moderate supervision, should have been granted pursuant to the Parole Board guidelines.  Defendants, however, departed from the guidelines, stating that Mr. Eason's offense behavior was more serious than his Murder II conviction, and that "the behavior accountability has not been met."  In the addendum to Mr. Eason's 2004 Hearing Summary, one examiner stated that the elements of Mr. Eason's current offense correspond to first-degree murder, although his conviction was for second-degree murder, and therefore, Mr. Eason needed to serve additional time.

### B.     MR. EASON'S RIGHTS UNDER THE 1987 GUIDELINES.

139.  Under the Parole Board's 1987 Guidelines, for rehearing purposes, if the total point score equals three or less, parole should be granted unless the Parole Board finds that "unusual circumstances" are present. *See* 28 D.C.M.R. §§ 204.19, 204.22.  Over the course of his successive parole hearings, Mr. Eason's total point score has decreased from three to one, indicating that he has surpassed the level necessary for a grant of parole.

140.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, Mr. Eason satisfied the accountability for his offense after serving his minimum sentence, i.e., in 1998, after serving approximately ten years.  To date, Mr. Eason has served almost 17 years.  Furthermore, Defendants can under no circumstances hold Mr. Eason accountable for first-degree murder, when he was convicted of second-degree murder.

2154979.02

141.  As noted above, the Parole Board defined the factors countervailing a recommendation to grant parole.  Defendants have regularly cited Mr. Eason's prior criminal history as evidence that he is a more serious risk than his total point score indicates.  Under the Parole Board's 1987 Guidelines and the 1991 Policy Guideline interpreting the 1987 Guidelines, however, Mr. Eason's prior convictions and adjudications already were taken into account when establishing his initial SFS and do not meet the Parole Board's definition of an "unusually extensive or serious prior record."

142.  According to the Parole Board's 1991 Policy Guidelines, an "unusually extensive or serious prior record" consists of at least five convictions for commission or attempted commission of:  1) arson; 2) assault, OR maliciously disfiguring another person, OR mayhem, OR manslaughter, OR murder; 3) forcible sodomy, OR sodomy of a child less than 16 years of age, OR rape; d) kidnapping; e) riot; f) robbery; or, g) unlawful use of explosives.  Prior to his current offenses, Mr. Eason has had three convictions: 1) assault and battery in 1983; 2) robbery in 1985; 3) and robbery with a deadly weapon and assault with intent to murder in 1987.  Therefore, under the Parole Board's guidelines, Mr. Eason could not have been considered a greater risk than indicated by his grid score based on his prior history of convictions.  The Defendants' continued parole denials based on his past criminal convictions violate Mr. Eason's right to a fair parole review process and the Ex Post Facto Clause of the United States Constitution, because they significantly increased the risk that Mr. Eason would serve longer than he would have under the Parole Board's guidelines.

143.  Additionally, the Defendants' consideration of Mr. Eason's probation violation, resulting from his current charges, is improper under the Parole Board Guidelines.  The Parole Board's guidelines only consider "Repeated Failure Under Parole Supervision" as a factor

countervailing a recommendation to grant parole. The Parole Board Guidelines considered

probation a form of parole, subject to the same standards when determining whether an inmate is

to be considered have repeatedly failed parole supervision. Because Mr. Eason has only one

probation violation on his record, the Defendants' use of Mr. Eason's one probation infraction

violates Mr. Eason's right to fair parole proceedings and the Ex Post Facto Clause.

144.  The Defendants' continued use of offense accountability standards rather than

applying the Parole Board's Guidelines, under which an offender's minimum sentence satisfies

offense accountability, has resulted in a significant risk of prolonging Mr. Eason's incarceration,

and therefore constitutes an Ex Post Facto Violation of the United States Constitution.

## VIII.    PLAINTIFF GAMBRELL'S PAROLE HEARINGS

### A.    THE DEFENDANTS' PURPORTED USE OF THE PAROLE BOARD'S GUIDELINES AND POLICIES.

145.  On January 3, 1991, the Superior Court of the District of Columbia sentenced

Plaintiff James Gambrell to a term of 12 years-to-life for Second-Degree Murder While Armed.

146.  Under the Parole Board's statutes, regulations, guidelines, rules, policies, and

practices, Mr. Gambrell first became eligible for parole from his current offense in August 1998

after serving the "minimum sentence" for his crimes.

147.  Mr. Gambrell received his initial parole hearing for his current offense in June,

1998. Since his initial parole hearing, Mr. Gambrell has had three parole rehearings:  in August,

1999; in June, 2003; and in July, 2006.

148.  At each of Mr. Gambrell's parole hearings, Defendants have denied Mr. Gambrell's

parole applications, despite the fact that Mr. has had no disciplinary infractions during more than

seventeen years of incarceration and has had continuous superior program achievements during

his incarceration, which reduced his grid score to zero (0) prior to his most recent parole hearing, indicating that parole should have been granted, with minimum supervision.

149.  Subsequent to his 2006 parole hearing, Mr. Gambrell's grid score would be equivalent to a minus one.

150.  Despite purporting to apply the Parole Board's guidelines to Mr. Gambrell's parole applications, the Defendants have consistently overridden the Parole Board's statutes, regulations, guidelines, policies, and practices to deny parole to Mr. Gambrell based on their view that he has not served sufficient time to satisfy offense accountability.

151.  The Defendants have justified their denial of parole to Mr. Gambrell by claiming that Mr. Gambrell is "a more serious risk than indicated by your grid score of zero." Specifically, Defendants have relied on their belief that Mr. Gambrell's past criminal convictions warrant continued custody.  Defendants have cited Mr. Gambrell's past convictions as evidence of an "unusually extensive or serious prior record," which Defendants assert would be considered one of the Parole Board's "Factors Countervailing a Recommendation to Grant Parole."

### B.    MR. GAMBRELL'S RIGHTS UNDER THE PAROLE BOARD'S 1987 GUIDELINES.

152.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, Mr. Gambrell had satisfied his offense accountability when he served the "minimum sentence" for his offenses and became eligible for parole.

153.  Although the Defendants stated in their Rehearing Summary that their departure from the Parole Board's 1987 Guidelines, i.e., their characterization of Mr. Gambrell as being a more serious risk than indicated by his grid score of zero, is justified due to Mr. Gambrell's previous criminal convictions, and his prior parole experience, the Parole Board's guidelines

provide a specific interpretation of "unusually extensive or serious prior record" countervailing a

presumption that parole should be granted. Significantly, Mr. Gambrell's prior criminal history

does not satisfy the Parole Board's definition of an "unusually extensive or serious prior record."

154. The Parole Board Guidelines state that an "unusually extensive or serious prior

record consists of at least (5) felony convictions for commission or attempted commission, of

any one or any combination of the following crimes of violence . . . :

    a.     Arson;
    b.     Assault, OR maliciously disfiguring another person, OR mayhem, OR manslaughter, OR murder;
    c.     Forcible sodomy, or sodomy of a child less than 16 years of age, OR rape;
    d.     Kidnapping;
    e.     Riot;
    f.     Robbery;
    g.     Unlawful use of explosives."

155. Prior to the second-degree murder charge for which Mr. Gambrell is currently

serving time, Mr. Gambrell had two criminal convictions: 1) a 1968 charge for rape, kidnapping,

and assault with a deadly weapon; and 2) a 1975 charge involving bank robbery and kidnapping.

Therefore, Mr. Gambrell's past criminal recrod does not meet the Parole Board's definition of an

"unusually extensive or serious prior record," because he has had only two prior convictions.

The Defendants' characterization of Mr. Gambrell as being a more serious risk than indicated by

his grid score of zero, based on his prior convictions, violates Mr. Gambrell's constitutional

rights under the Due Process and Ex Post Facto Clauses of the United States Constitution.

156. Additionally, the Defendants' consideration of Mr. Gambrell's parole violation

resulting from his current charges, is improper under the Parole Board's guidelines. The Parole

Board guidelines only consider "Repeated Failure Under Parole Supervision" as a factor

countervailing a recommendation to grant parole. Because Mr. Gambrell has only one parole

violation on his record, the Defendants' use of Mr. Gambrell's one parole infraction violates Mr. Gambrell's right to fair parole proceedings.

## COUNT 1:  THE DEFENDANTS VIOLATED THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION

157.  Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 156 as if fully set forth herein.

158.  The retroactive application of a new law, resulting in a significant risk of prolonging an inmate's sentence beyond what would have resulted under the guidelines in effect when the inmate was convicted, constitutes a violation of the Ex Post Facto clause of the United States Constitution.

159.  Prisoners are entitled to know the range of punishments available at the time of sentencing, and during the adjudication of their case.  The Ex Post Facto Clause assures that individuals are given fair warning of what actions will be punished *and the degree to which they will be punished*.

160.  Under the 2000 Guidelines and their own interpretation of the Parole Board's 1987 Guidelines and 1991 Policy Guideline, the Defendants, their predecessors, and/or their designees have denied the Plaintiffs' requests for parole and significantly increased the risk that Plaintiffs' periods of incarceration will be prolonged and that they will serve longer than they would had the Parole Board's guidelines, policies, and practices been applied.  Specifically, Defendants have significantly increased the risk that Plaintiffs will serve longer periods of incarceration than they would have had the Parole Board's statutes, regulations, guidelines, policies, and practices been applied correctly by:

        a.   increasing the period the Parole Board considered as satisfying offense accountability, i.e., Plaintiffs' parole eligibility dates;

b.  failing to give Plaintiffs credit for program achievements pursuant to the Parole Board's Guidelines; and

c.  increasing Plaintiffs' guideline ranges by considering disciplinary infractions that the Parole Board would have ignored.

161.  By ignoring the Parole Board's statutes, regulations, guidelines, policies, and practices, which consider the Plaintiffs' minimum sentences as satisfying offense accountability, the Defendants have necessarily significantly increased the risk that the Plaintiffs will be incarcerated longer than they would have been had the Parole Board's statutes, regulations, guidelines, policies, and practices been applied.

162.  Similarly, Defendants have necessarily significantly increased the risk that Plaintiffs will be incarcerated longer by failing to award Plaintiffs credit for their program achievements if Defendants felt that such achievements did not rise to the level of "superior program achievement," as opposed to the Parole Board's standard of "sustained program achievement."

163.  Finally, it cannot be disputed that Defendants have necessarily significantly increased the risk that Plaintiffs will be incarcerated longer than they would have been had the Parole Board's Guidelines been applied by considering institutional infractions that would not have affected the Parole Board's consideration of Plaintiffs' parole applications in any way.

**COUNT II:   VIOLATION OF THE PLAINTIFFS' FIFTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS**

164.  Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 156 as if fully set forth herein.

165.  Plaintiffs have constitutionally protected interests in receiving credit for their program and work achievement as provided for under the 1987 Guidelines, the 1991 Policy

2154979.02

Guideline, and the Commission's own 2000 Guidelines.  In previously-outlined instances, however, Defendants have refused to give Plaintiffs credit for such achievement earned prior their parole hearings.

166.  Further, the Defendants continue to apply improper self-imposed standards, rather than the guidelines established by the Parole Board, which held authority over the Plaintiffs who were D.C. Code offenders at the time of their convictions and sentencing.

167.  Finally, Defendants have failed to apply the very guidelines they officially state they are applying, whether it be the Parole Board's guidelines with respect to Mr. Eason's and Mr. Gambrell's parole applications or the 2000 Guidelines with respect to Mr. Sellmon's, Mr. Smith's, Mr. West-El's, and Mr. Martin's parole applications.  Defendants violate Plaintiffs due process rights under the Fifth and Fourteenth Amendments to the United States Constitution when they fail to follow the very guidelines they are purporting to apply.

168.  As a result, Defendants have denied Plaintiffs their constitutional rights to a fair review process.

## **RELIEF REQUESTED**

Wherefore, Plaintiffs respectfully request that this Court:

1.      require the Defendants to apply the Parole Board's statutes, regulations, guidelines, policies, and practices, including, but not limited to the 1987 Guidelines and the 1991 Policy Guidelines, to Plaintiffs' requests for parole;

2.      deem that Plaintiffs' service of their sentence to their parole eligibility dates satisfy the offense accountability for parole consideration purposes;

3.      order the Defendants to reconsider the decisions rendered on Plaintiffs' applications for parole based on the existing record in a manner consistent with the D.C. Parole Board's 1987 Guidelines, 1991 Policy Guideline, the other statutes, regulations, guidelines,

2154979.02

policies, and practices of the Parole Board, federal regulations, the Constitution, and all other requirements of law;

      4.    award Plaintiffs attorneys fees and litigation expenses; and

      5.    grant such other and further relief as the Court deems appropriate.

Dated:  November 15, 2006            Respectfully submitted,

                        /s/ Jason D. Wallach
                        Jason D. Wallach, D.C. Bar No. 456154
                        DICKSTEIN SHAPIRO LLP
                        1825 Eye Street NW
                        Washington, DC 20006-5403
                        (202) 420-2200
                        Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing Amended Complaint was sent on this 15th day of November, 2006 by electronic mail to Diane Sullivan, Counsel for Defendants Edward F. Reilly, Jr., Cranston J. Mitchell, Deborah A. Spagnoli, Patricia K. Cushwa, and Isaac Fulwood, Jr., and for the United States Parole Commission.

                        /s/Jason D. Wallach