**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————— :
TONY R. SELLMON, et al.,                    ::
                 **Plaintiffs,**        :
                             :
            **v.**            : **Civil Action No. 06-1650 (ESH)**
                             :
EDWARD F. REILLY, JR., et al.,            :
                             :
               **Defendants.**        :
—————————————————————— :

### JOINT MOTION OF PLAINTIFFS CURTIS EASON AND JAMES GAMBRELL FOR PARTIAL SUMMARY JUDGMENT ON THEIR EX POST FACTO CLAIMS

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules 7(h) and 56.1, Plaintiffs Curtis Eason and James Gambrell ("Plaintiffs") move this Court to enter summary judgment that the Defendants violated, and continue to violate, the Ex Post Facto Clause of the United States Constitution.

      In support of their motion, Plaintiffs submit the accompanying Memorandum in Support of the Joint Motion of Plaintiffs Curtis Eason and James Gambrell for Partial Summary Judgment on Their Ex Post Facto Claims, Plaintiffs' Joint Statement of Material Facts Not in Dispute, and each Plaintiff's individual statement of material facts not in dispute, as well all exhibits attached to each of these documents. As Plaintiffs' memorandum of law and statements of material facts not in dispute demonstrate, Defendants have violated the Ex Post Facto Clause by applying their own parole practices, instead of those of the former District of Columbia Board of Parole, and thereby increasing Plaintiffs' terms of imprisonment and creating a significant risk of prolonging Plaintiffs' incarceration.

      For the reasons stated herein, along with those in Plaintiffs' memorandum of law in support of this motion and statements of material facts not in dispute, Plaintiffs request that the

Court grant their motion for partial summary judgment with respect to their claims under the Ex

Post Facto Clause of the United States Constitution.


Dated:  December 14, 2007                    Respectfully Submitted,


                              By:    /s/ Jason D. Wallach
                                     Jason D. Wallach (Bar No. #456154)
                                     Jared Rodrigues (Bar No. #496125)
                                     Avner E. Mizrahi (Bar No. #500772)
                                     DICKSTEIN SHAPIRO, LLP
                                     1825 Eye Street, NW
                                     Washington, D.C. 20006
                                     (202) 420-2268
                                     (202) 420-2201 facsimile


                                     Attorneys for Plaintiffs

DSMDB-2367266v01

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TONY R. SELLMON, et al.,** | : |
| **Plaintiffs,** | :: |
| | : |
| **v.** | : **Civil Action No. 06-1650 (ESH)** |
| | : |
| **EDWARD F. REILLY, JR., et al.,** | : |
| | : |
| **Defendants.** | : |
| | : |

## MEMORANDUM IN SUPPORT OF THE JOINT MOTION OF PLAINTIFFS CURTIS EASON AND JAMES GAMBRELL FOR PARTIAL SUMMARY JUDGMENT ON THEIR EX POST FACTO CLAIMS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules 7(h) and 56.1, Plaintiffs Curtis Eason and James Gambrell (collectively, "Plaintiffs") respectfully move this Court to enter summary judgment on their claims that Defendants violated the Ex Post Facto Clause of the United States Constitution. The undisputed facts prove that the United States Parole Commission and the Defendants, as its Chairman and Commissioners (collectively, the "USPC") violated the Ex Post Facto Clause by increasing Plaintiffs' incarceration by ignoring the parole criteria applied by the District of Columbia Board of Parole (the "D.C. Parole Board") under its parole statutes and regulations and applying the criteria of the parole regulations that the USPC applies to United States Code offenders to determine Plaintiffs' suitability for parole.

In this case, the USPC has determined that the District of Columbia Code's criminal provisions, and the judges implementing those provisions and sentencing individuals convicted of violating the District of Columbia Code ("D.C. Code offenders"), did not sufficiently punish Plaintiffs for their crimes. As a result, the USPC has decided to usurp the sentencing judges' function and hand out their own sense of the appropriate punishment for Plaintiffs' crimes. The

DSMDB-2365154v02

Ex Post Facto Clause, however, prohibits such retroactive changes in law where the changes have the effect of increasing the risk that Plaintiffs will serve a longer period of incarceration than they would have before the change.

Because the undisputed facts demonstrate that the USPC not only created a significant risk of prolonging Plaintiffs' incarceration by applying its parole practices instead of the D.C. parole practices, but actually increased Plaintiffs' incarceration, the Court should grant this motion and find that the USPC violated the Ex Post Facto Clause.  The Court also should order the USPC to vacate its decisions with respect to Plaintiffs' requests for parole and grant them new parole rehearings under the D.C. parole practices, including the practices set forth in the D.C. Parole Board's regulations and policy guidelines.

### Factual Background

Plaintiffs Curtis Eason and James Gambrell are D.C. Code offenders who have been incarcerated on their current sentences for approximately twenty years and eighteen years, respectively.[1]  *See* Plaintiff Curtis Eason's Statement of Undisputed Material Facts ("Eason Statement") ¶ 1; *see also* Plaintiff James Gambrell's Statement of Undisputed Material Facts ("Gambrell Statement") ¶ 1.  As of 1998, Plaintiffs had served the "minimum sentence" imposed by the sentencing court for their offenses (i.e., the period of incarceration an inmate must serve before becoming eligible for parole).  When Plaintiffs became eligible for parole, the D.C. Parole Board, under its parole statutes, regulations, policies, and practices (the "D.C. parole practices"), deemed that they had satisfied accountability for their crimes, i.e., the need for punishment and general deterrence, by serving the minimum term imposed by the sentencing judge.  Thus, the

---

[1] The undisputed facts common to Plaintiffs are set forth in the Plaintiffs' Joint Statement of Undisputed Facts.  The undisputed facts with respect to each individual Plaintiff are set forth in that Plaintiff's own Statement of Undisputed Facts.  Each of the plaintiffs' individual statements of undisputed material facts is referred and cited to herein by the particular plaintiff's last name.

DSMDB-2365154v02

only remaining issues under the D.C. parole practices were whether Plaintiffs were presumed suitable for parole, and if so, whether their cases involved "unusual circumstances" that warranted a departure from that presumption.

In 1998, Plaintiffs each had an initial parole hearing before the D.C. Parole Board under the D.C. parole practices. At their initial hearings, the D.C. Parole Board denied Plaintiffs' requests for parole and gave them a setoff, i.e., the period before their next parole hearing, of one year to pursue additional programming. *See* Eason Statement ¶ 4, Gambrell Statement ¶ 3.

Later in1998, however, Congress had abolished the D.C. Parole Board, and the USPC had taken over responsibility for conducting parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations of the District of Columbia." Because Plaintiffs had their initial parole hearings before August 5, 1998, when the USPC took over the D.C. Parole Board's duties, the USPC represented that it would apply the D.C. parole practices at Plaintiffs' parole rehearings. *See* 28 C.F.R. § 2.80(a)(4).

At Plaintiffs' parole rehearings, however, the USPC ignored the D.C. Parole Board's policies and practices for departing from the 1987 Regulations, which did not contain an offense severity aspect and solely looked to the risk of recidivism, when a parole candidate was presumed suitable for parole. Instead, contrary to the D.C. parole practices, the USPC incorporated factors for overcoming the presumptions of parole suitability that were premised on the severity of the Plaintiffs' current offense and aimed at increasing Plaintiffs' punishment for their crimes. By applying parole policies wholly inconsistent and squarely rejected by the D.C. Parole Board, the USPC has created a significant risk that Plaintiffs will serve longer periods of incarceration than they would have under the D.C. parole practices.

DSMDB-2365154v02

I.       THE PAROLE REGULATIONS AND PRACTICES OF THE DISTRICT OF
         COLUMBIA BOARD OF PAROLE

    A.       <u>The Objectives and Principles of the D.C. Parole Board's Guidelines</u>

        Before the USPC took over in 1998, the D.C. Parole Board applied mandatory

guidelines and practices, many of which were codified as municipal regulations, that carefully

prescribed the method and criteria that the D.C. Parole Board used to render decisions on parole

requests.  The D.C. Parole Board formally adopted these guidelines in 1985, and published them

in the District of Columbia Municipal Regulations in 1987 (the "1987 Regulations") (attached as

Exhibit 2 to Plaintiffs' Joint Statement of Undisputed Facts ("Plaintiffs' Joint Statement)).  By

adopting formal regulations, the D.C. Parole Board "sought to structure the exercise of the

paroling authority's discretion."  Report on the Development of Paroling Policy Guidelines for

the District of Columbia Board of Parole (the "D.C. Guidelines Report) at 1 (attached as Exhibit

1 to Plaintiffs' Joint Statement).  The D.C. Parole Board believed that the guidelines were "a

significant step toward a more coherent parole decision-making process that w[ould] lead both to

*increased consistency* in parole release decisions and *enhanced accountability of the Board.*"  *Id.*

(emphasis added).

        To determine whether a parole candidate would be paroled, the D.C. Parole Board

used the criteria set forth in the guidelines.  *See id.* at 2 ("[T]he use of guidelines should be seen

as an effort to make <u>explicit</u> those factors that will be considered in each individual case.").

Although the D.C. Parole Board noted that the guidelines were not necessarily "a finished or

static product" and made minimal revisions to the 1987 Regulations through changes to the

regulations and by issuing formal policy statements, the D.C. Parole Board retained the basic

structure of the regulations until it was abolished in 1998.

        When it drafted the 1987 Regulations, the D.C. Parole Board hoped that the

guidelines would "[p]romot[e] consistent parole decision-making," "[m]ake more explicit the

DSMDB-2365154v02

paroling policies of the Board of Parole," "[i]ncorporat[e] a concern for fairness by ensuring that the time served . . . [wa]s proportionate to the sentence imposed by the court and the risk posed by the offender," and "[a]chiev[e] the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilitation." D.C. Guidelines Report at 2. In furtherance of these objectives, the D.C. Parole Board employed several guiding principles in drafting the 1987 Regulations.

First, the D.C. Parole Board determined that "the touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involvement in criminal behavior." *Id.* The D.C. Parole Board felt that this focus of the guidelines best enabled it to meet its duty to protect the public. *Id.*

Second, and of great importance in this case, the D.C. Parole Board did not include retribution or general deterrence among the goals that its parole practices were to effectuate. *See id.* ("The second principle behind the guidelines is that the court addresses the purposes of retribution and general deterrence through the sentence it imposes in adult cases."). Such concerns, the D.C. Parole Board felt, were left to the sentencing court, and "[a]s a matter of policy, the [D.C. Parole Board] d[id] not and w[ould] not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." *Id.* at 3-4. It was for this very reason that the D.C. Parole Board explicitly rejected patterning its guidelines "after the federal grid which includes an offense severity scale." D.C. Guidelines Report at 17 (explaining that, in adopting guidelines, the D.C. Parole Board specifically looked to jurisdictions with a "guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant").

DSMDB-2365154v02

Instead, the D.C. Parole Board's regulations and practices plainly evidenced "a rehabilitative focus." *Fletcher v. Reilly*, 433 F.3d 867, 871 (D.C. Cir. 2006); *see* D.C. Guidelines Report at 4 ("Guidelines oriented to the assessment of risk and institutional performance, therefore touching on the need for progress towards rehabilitation, will be consistent with the intent of this Act."). As this Court noted in *Cosgrove* in distinguishing the 1987 D.C. Parole Board Regulations from the federal guidelines enacted in 1976, which were "primarily concerned with punishment and the public safety," "[t]he [D.C.] guidelines emphasize early release of an offender who responds favorably to rehabilitative efforts." 703 F. Supp. at 1003.

## B.    The D.C. Parole Board's 1987 Regulations

Under its practices and the 1987 Regulations, the D.C. Parole Board "employed an analytic framework that relied on both 'pre and post-incarceration factors.'" *Fletcher*, 433 F.3d at 871 (quoting 28 D.C. Mun. Regs. ("DCMR") § 204.1 (Weil)). The D.C. Parole Board utilized four factors to determine suitability for parole: two pre-incarceration factors (the degree of risk and the type of risk) and two post-incarceration factors (institutional adjustment and program participation). *See* D.C. Guidelines Report at 5; *Cosgrove*, 703 F. Supp. at 1003. Significantly, the D.C. Parole Board intentionally did not employ an offense severity factor in its guidelines. *See* Memorandum from M. Stover, General Counsel, and R. Chickinell, Deputy General Counsel, U.S. Parole Commission to J.R. Clay, Jr., Acting Chairman, U.S. Parole Commission at 2 (Aug. 21, 1992) ("[T]he D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served.") (hereinafter "Stover Memorandum" or "Stover Mem."] (attached as Exhibit 3 to Plaintiffs' Joint Statement). Instead, as indicated above, the D.C. Parole Board's philosophy was to let the "court-imposed sentence serve as its offense severity indicant." D.C. Guidelines Report at 17; *see also* Stover Mem. at 2-3 ("[T]he D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of

6

accountability for the offense, and apply a point score system . . . to determine whether or not the prisoner is suitable for parole upon the completion of the minimum term."). Thus, the D.C. Parole Board did not look to the seriousness of the offense for which a D.C. Code offender was imprisoned, and it assumed that society's punishment and deterrence interests in an inmate's sentence, i.e., the offense accountability characteristics of the sentence, were addressed by the sentencing court.[2]

### 1.    The Degree of Risk

The first factor to which the D.C. Parole Board looked in determining a parole candidate's suitability for parole was the degree of risk that a D.C. Code offender would commit another crime if released on parole. *See* D.C. Guidelines Report at 5. The "Degree of Risk" was "the primary factor of the guidelines, applicable in all cases," and was based on the Salient Factor Score ("SFS"), which was an "actuarial risk assessment device that relie[d] exclusively on information know at the time of incarceration." *Id.*; *see* 28 DCMR § 204.3. In calculating a prisoner's SFS, the D.C. Parole Board looked at a parole candidate's prior convictions and adjudications, prior commitments of more than 30 days, age at the commission of current offense, recent commitment-free period, status of prisoner at time of current offense, and history

---

[2] *See id.* at 4 ("[T]he Board of Parole does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge."); Memorandum from Michael A. Stover, General Counsel, USPC, to Michael J. Gaines, Chairman, USPC, at 3 (June 26, 1998) ("the guidelines of the D.C. Board of Parole clearly focus exclusively on the issue of risk") (attached as Exhibit 4 to Plaintiffs' Joint Statement) [hereinafter, the "1998 Memorandum"]; Deposition of Gladys W. Mack ("Mack Dep.") at 42-43, *Cosgrove v. Meese*, No. 80-0516 (Mar. 18, 1988) (Chairperson of the D.C. Parole Board in 1988 testifying that the 1987 Regulations are premised on the principle that the court addresses the purposes of retribution and general deterrence identified in the D.C. Guidelines Report at 3-4; 63 Fed. Reg. 39172, 39174 (July 21, 1998) (recognizing that the "parole function for D.C. Code offenders rests on a premise somewhat different from that of the federal parole guidelines" and under which "the minimum term of imprisonment imposed by the court [is treated] as the usual measure of basic accountability for the offense of conviction") (attached as Exhibit 5 to Plaintiffs' Joint Statement).

DSMDB-2365154v02

of heroin or opiate dependence. *See Fletcher*, 433 F.3d at 871 (citing 28 DCMR § 204.4-204.16). The D.C. Parole Board then weighed these factors "by a formula to determine the candidate's risk category, called a 'salient factor score.'" *Id.* (citing 28 DCMR § 204.17 & App. 2-1) (App. 2-1 attached as Exhibit 6 to Plaintiffs' Joint Statement).

A parole candidate's SFS placed the candidate into one of four risk categories (10-9=low risk, 8-6=fair risk, 5-4=moderate risk, or 3-0=high risk) from which the D.C. Parole Board would determine a "baseline number of points" – 0 for low risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk. D.C. Guidelines Report at 5; *see* 28 DCMR § 204.17 & App. 2-1. Thus, the higher a candidate's SFS, the lower the risk of that parole candidate becoming a recidivist and the lower number of "baseline" points with which the candidate began for purposes of the D.C. Parole Board's further calculations. The D.C. Parole Board then would take a candidate's "baseline number of points" and adjust it using the remaining pre-incarceration factor, i.e., the type of risk, and two post-incarceration factors – institutional adjustment and program participation – and arrive at a total point score. *Id.*

2.     The Type of Risk

The "Type of Risk" factor under the 1987 Regulations was "an aggravating factor applicable to those cases in which the Board ha[d] made findings that the current offense, or the offender's pattern of past offenses, involved violence, weapons, or drug trafficking." D.C. Guidelines Report at 5. This factor recognized that "if an offender has already indicated through past behavior that he or she is capable of committing a type of crime that is considered particularly serious . . . , we should be willing to tolerate a lesser degree of risk." *Id.* at 21.

To account for the type of risk posed by a parole candidate based on his current or past offenses, the D.C. Parole Board chose three types of offense behaviors that it would consider as parole indicants: violence, use of a weapon, and drug trafficking. *Id.*; *see* 28 DCMR

DSMDB-2365154v02

§ 204.18 & App. 2-1.  Under the 1987 Regulations, the D.C. Parole Board increased the "baseline number of points" that it derived from the candidate's SFS by one point if it determined that the parole candidate's "current offense, or two prior felony convictions, involve[d] any or all of the above listed behaviors."  D.C. Guidelines Report at 22; 28 DCMR § 204.18 & App. 2-1.

### 3.    Institutional Adjustment and Program Achievement

After calculating a parole candidate's SFS and the corresponding risk category and "baseline" point score and adjusting that score to account for the type of risk, the D.C. Parole Board's 1987 Regulations required the Board to determine whether the candidate had "committed serious disciplinary infractions" and/or had "demonstrated sustained achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense."  28 DCMR § 204.18(h) & (i).  Under the 1987 Regulations, the candidate's institutional adjustment was "an aggravating factor applicable [where] the Board has made findings that disciplinary infractions . . . are either serious or repetitious enough to impact negatively on the parole decision" and the candidate's program participation was a "mitigating factor" applied when the Board found that the parole candidate's program or work accomplishments were substantial enough to impact favorably on the parole decision.  D.C Guidelines Report at 5.

The manner in which the D.C. Parole Board used the parole candidate's institutional adjustment and program participation, i.e., the "institutional record of the candidate," to adjust the baseline point score at an initial parole hearing was the subject of precise guidelines adopted by the D.C. Parole Board.  Specifically, the D.C. Parole Board used the "point grid" in Appendices 2-1 and 2-2 the 1987 Regulations, 28 DCMR Apps. 2-1 & 2-2, to reflect adjustments to a parole candidate's baseline point score.  Pursuant to Appendices 2-1 and 2-2, the D.C. Parole

DSMDB-2365154v02

Board could add one point to a candidate's total point score for "negative institutional behavior" and/or subtract one point for a candidate's sustained program or work assignment achievement (App. 2-2 attached as Exhibit 7 to Plaintiff's Joint Statement). The 1987 Regulations, however, did not provide guidance as to the criteria the D.C. Parole Board was to apply to determine whether to adjust a parole candidate's point score for institutional adjustment or program achievement, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to avoid.

4.    The Parole Decision

Once the D.C. Parole Board calculated its "baseline" point score and adjusted it based on the "Type of Risk," "Institutional Adjustment," and "Program Achievement" factors under Appendix 1 of the 1987 Regulations, the D.C. Parole Board "integrated [these factors] into a calculus to produce a *point score which constrained the Board's discretion in making final parole determinations*." *Fletcher*, 433 F.3d at 871 (citing 28 DCMR § 204.19 & App. 2-1 (emphasis added)). The total point score "determine[d] whether or not parole is granted, and if so, the level of supervision to be imposed." D.C. Guidelines Report at 6.

In the case of an initial parole hearing, the 1987 Regulations, as amended by the D.C. Parole Board in 1994, stated that:

> After determining an adult parole candidate's SFS score and after applying the pre and post incarceration factors to arrive at a total point score pursuant to §204 and Appendix 2-1, the Board shall take one (1) of the following actions:
>
> (a)  IF POINTS = 0:   Parole may be granted at initial hearing with low level of supervision required;
>
> (b)  IF POINTS = 1:   Parole may be granted at initial hearing with high level of supervision required;

DSMDB-2365154v02

> (c) IF POINTS = 2:   Parole may be granted at initial hearing with highest level of supervision required; or
>
> (d) IF POINTS = 3-5:Parole may be denied at initial hearing and rehearing scheduled.

In the case of a parole rehearing, the 1987 Regulations stated that:

> In determining whether to release on parole an adult or a youth offender appearing before the Board at a parole rehearing, *the Board shall take the total point score from the initial hearing* and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2.  The Board shall then take one of the following actions:
>
> (a) IF POINTS = 0-3:Parole may be granted at this rehearing with highest level o[f] supervision required; or
>
> (b) IF POINTS = 4-5:  Parole may be denied and a rehearing date scheduled.

Thus, the 1987 Regulations established a presumption that a parole candidate was suitable for parole and directed the D.C. Parole Board to grant parole to an adult at an initial parole rehearing if the final adjusted score was two or less and at a parole rehearing if the total point score was three or less.  As the D.C. Parole Board recognized when it promulgated the 1987 Regulations, this suitability presumption could be overcome because "there occasionally would be *unique circumstances* that are not taken into account by either the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on the release decision." D.C. Guidelines Report at 22 (emphasis added).  To address these unique circumstances, the 1987 Regulations permitted the D.C. Parole Board to depart from the action indicated by a parole candidate's total point score only when mitigating and/or countervailing factors applied that demonstrated "unusual circumstances," which the Board had to explain by reference to the

DSMDB-2365154v02

specific aggravating or mitigating factors listed in Appendices 2-1 and 2-2.  28 DCMR

§ 204.22.[3]

In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board listed those pre-and

post-incarceration circumstances that it determined might be deemed unusual and therefore

warrant a departure from the 1987 Regulations where a parole candidate's total point score

indicated that the candidate should be paroled.  *See* 28 DCMR at App. 2-1; Mack Dep. at 11-13,

22-25.  The D.C. Parole Board believed that the following pre-incarceration circumstances

ordinarily demonstrated that the candidate was a worse risk for parole at the candidate's initial

parole hearing than indicated by his or her total point score:

1.    the candidate repeatedly failed under parole supervision – "Repeated failure under parole supervision";

2.    the "Current offense involve[d] on-going criminal behavior";

3.    the candidate had a "Lengthy history of criminally related alcohol abuse";

4.    the candidate had a "History of repetitive sophisticated criminal behavior";

5.    the candidate had an "Unusually extensive and serious prior record (at least five felony convictions)"; and

6.    the candidate's crime involved "Unusual cruelty to victims."

The 1987 Regulations, however, did not list the criteria that the D.C. Parole Board was to apply

to determine whether one or more of these factors applied in a specific case, which sometimes

led to inconsistent and inequitable interpretations and applications of the regulations by D.C.

Parole Board officials.

---

[3] *See* Mack Dep. at 12-13 (testifying that the six aggravating factors in Appendix 2-1 of the 1987 Regulations indicating that a parole candidate was a worse risk than the candidate's total point score indicated were the only pre-incarceration factors the Board used to depart from the guidelines and deny parole) (pertinent portions of the Mack Deposition are attached as Exhibit 4); D.C. Guidelines Report at 6 ("Decisions outside the guidelines may be rendered for good cause when accompanied by written reasons that include a summary of the information upon which the determination is based.").

DSMDB-2365154v02

Furthermore, Appendix 2-2 of the 1987 Regulations, which applied at parole rehearings, did not include any pre-incarceration aggravating factors on which the D.C. Parole Board could rely to depart from the regulations and deny parole. *See* Mack Dep. at 26-27. Thus, it was the D.C. Parole Board's policy and practice not to consider a parole candidate's current offense at a parole rehearing, *see* Mack Dep. at 28 (testifying that there is no place in Appendix 2-2 for the D.C. Parole Board to consider the current offense behavior as a reason for going outside of the guidelines), and instead, to focus on the candidate's rehabilitation, community resources, and health, *see id.* at 26-27.

### C.    The D.C. Parole Board's 1991 Policy Guideline

In 1991, to ensure consistent and equitable application of the 1987 Regulations, the D.C. Parole Board adopted a Policy Guideline that defined the terms used in the Appendices to the 1987 Regulations (the "1991 Policy Guideline") (attached as Exhibit 8 to Plaintiffs' Joint Statement"). The 1991 Policy Guideline applied to all requests for parole heard by the D.C. Parole Board, *see* 1991 Policy Guideline at 1, and following this Court's decision in the *Cosgrove* case in 1988, the USPC instructed its personnel to apply the 1991 Policy Guideline when conducting parole hearings for D.C. Code offenders in federal correctional facilities, *see* Deposition of Rockne Chickinell ("Chicken Dep.") at 57:12-16. (attached as Exhibit 9 to Plaintiffs' Joint Statement); Stover Mem. at 2.

The purpose of the 1991 Policy Guideline was "[t]o define criteria and parameters for determining the applicability of descriptive terminology used in the [1987 Regulations] for release decisionmaking, and to facilitate consistency in Guideline application." 1991 Policy Guideline at 1. The D.C. Parole Board explained its rationale for adopting the 1991 Policy Guideline as follows:

> Many of the descriptive terms used in the Parole Guidelines criteria are judgmental or subjective. As such, they lend themselves to disparate

13

interpretations and applications by Guideline users.  To ensure equitable
treatment of similarly-situated offenders, these terms require definitions
that facilitate equitable application across affected cases, while preserving
sufficient discretion to accommodate individual circumstances.

As the 1991 Policy Guideline recognizes, the D.C. Parole Board expressly adopted the policy guideline to avoid disparate decisions for similarly-situated offenders under the 1987 Regulations resulting from the subjective views and judgments of the various individuals at the Board applying those regulations to D.C. Code offenders.  To promote consistency in its exercise of discretion under the 1987 Regulations and D.C. parole practices, the D.C. Parole Board sought to limit that discretion in the 1991 Policy Guideline by identifying the criteria and parameters that it used to determine whether certain discretionary factors in the 1987 Regulations applied.

First, as part of its effort to ensure consistency in its application of the "institutional adjustment" factor in its 1987 Regulations, the D.C. Parole Board promulgated section VI.A.1 of the 1991 Policy Guideline, which defined the types of institutional disciplinary actions that the D.C. Parole Board ordinarily considered to be "negative institutional behavior" under Appendices 2-1 and 2-2 of the 1987 Regulations.  Second, in section VI(A)(2)(a) of the 1991 Policy Guideline, the D.C. Parole Board also defined "sustained program or work assignment achievement" for purposes of Appendices 2-1  and 2-2 of the 1987 Regulations.

Finally, the D.C. Parole Board used the 1991 Policy Guideline to clarify the scope of its authority to deny parole for "unusual circumstances" when a parole candidate's total point score indicates that parole should be granted.  Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," defined each of the factors listed in Appendix 2-1 of the 1987 Regulations that the D.C. Parole Board recognized as ordinarily constituting "unusual circumstances" and described the objective criteria and parameters that the D.C. Parole Board required to establish the existence of those circumstances.

14

For example, the 1991 Policy Guideline defined the "unusual circumstance" of "Repeated Failure Under Parole Supervision" listed in Appendix 2-1 of the 1987 Regulations as requiring "two (2) or more revocations of parole on the current sentence, OR three (3) or more revocations of parole on any sentence within the preceding five years." 1991 Policy Guideline at 6. Similarly, the 1991 Policy Guideline defined "Unusually Extensive or Serious Prior Record" as consisting of "at least five (5) felony convictions" for the commission of certain crimes of violence. For the "unusual circumstance" where the "Instant Offense Involved Unusual Cruelty to Victims," the 1991 Policy Guideline required a finding that the offense involved "a. [p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense; OR b. [e]specially vulnerable victims, e.g., children or elderly persons were the victims of assaultive or fraudulent behavior." 1991 Policy Guideline at 7.

Plaintiffs both became eligible for parole in 1998 and appeared before the D.C. Parole Board for their initial parole hearings. At Plaintiffs' initial hearing, the Board found them unsuitable for parole and set Plaintiffs off until 1999 for parole rehearings.

## II.     THE USPC'S APPLICATION OF THE 1987 REGULATIONS IN PLAINTIFFS' CASES

Effective August 5, 1998, the Revitalization Act abolished the D.C. Parole Board. Thereafter the USPC assumed responsibility for parole hearings for D.C. Code offenders, including Plaintiffs. Although the USPC promulgated new parole guidelines for D.C. Code offenders, the USPC decided that it would apply the 1987 Regulations to D.C. Code offenders who had received an initial parole hearing prior to August 5, 1998, including Plaintiffs. The USPC, however, chose to ignore the D.C. Parole Board's other parole policies and guidelines, including the 1991 Policy Guideline. Chickinell Dep. at 38:17-39:11; Deposition of Steven Husk ("Husk Dep.") at 60:21-61:16 (attached as Exhibit 10 to Plaintiffs' Joint Statement);

DSMDB-2365154v02

Deposition of Paul Howard ("Howard Dep.") at 83:2-40:7 (attached as Exhibit 11 to Plaintiffs'

Joint Statement).

When Plaintiffs came before the USPC for their parole rehearings in 1999, the USPC

took Plaintiffs' total point score from their 1998 D.C. Parole Board hearing and adjusted it for

Plaintiffs' positive and negative institutional behavior during the one-year setoff.  The USPC

then determined that neither Mr. Eason nor Mr. Gambrell were suitable for parole and gave Mr.

Eason a four-year setoff and Mr. Gambrell a three-year setoff.

At each of Plaintiffs' parole rehearings since the USPC took over the D.C. Parole

Board's responsibilities, the USPC has awarded Plaintiffs a one point reduction for their positive

institutional adjustment and rehabilitation and it has never found that Plaintiffs' scores should be

increased based on negative institutional behavior.[4]  As a result of these reductions, Mr. Eason's

and Mr. Gambrell's total point scores have indicated that they are presumptively suitable for

parole since 1999.  At his last rehearing in March 2007, Mr. Eason's total point score was 0, and

Mr. Gambrell's total point score at his last rehearing in July 2007 was 0.

A.    The USPC Focused on Offense Severity and Accountability Factors in
      Finding "Unusual Circumstances" in Plaintiffs' Cases

Despite these total point scores indicating that Plaintiffs are suitable for parole absent

unusual circumstances, the USPC has denied both Mr. Eason's and Mr. Gambrell's requests for

parole.  In doing so, the USPC has relied persistently on considerations regarding Plaintiffs'

offense severity and accountability, which the D.C. Parole Board assumed were satisfied by the

minimum sentence imposed by the sentencing court.

---

[4] In Mr. Eason's twenty years in prison, he has received only two disciplinary infractions, both
insufficient to be considered negative institutional behavior under the D.C. Parole Board's 1991
Policy Guideline.  See Eason Statement ¶ 9, Gambrell Statement ¶ 11.  In Mr. Gambrell's
eighteen years in prison, he has *never* received a disciplinary infraction, which Mr. Gambrell's
Case Manager indicated deserves merit.  Gambrell Statement ¶ 11.

DSMDB-2365154v02

     1.     <u>The USPC Applied the Federal Parole Standard in Denying Mr.
Eason's Requests for Parole</u>

In 1999, Mr. Eason had a total point score of 2, indicating that he was presumptively
suitable for parole.  The USPC, however, denied Mr. Eason's 1999 parole request and gave him
a four-year setoff.  The reason the USPC gave in its Notice of Action was that Mr. Eason was a
more serious risk than his point score reflected because he had prior convictions "for assault and
battery in 1983; robbery in 1985; [and] robbery with a deadly weapon and assault with intent to
murder in 1987" and committed his current offense while he was on probation for the 1987
conviction.  *See* Eason Statement ¶¶ 8-9.  The rationale set forth in the prehearing assessment
and hearing summary from Mr. Eason's 1999 parole hearing, however, indicate that the focus
was not on Mr. Eason's prior history, but on his current offense and whether he had served
sufficient time for accountability purposes.

For example, in the 1999 prehearing assessment, the reviewer's evaluation stated:
"The subject is now within the parolable guidelines with a total point score of 2.  *The issue is
whether or not 11 years in custody is adequate accountability for the taking of a life during a
robbery offense*."  Eason Statement ¶ 8, Prehearing Assessment at 3.  And in the summary of Mr.
Eason's 1999 parole hearing, the hearing examiner explained his recommendation to deny parole
as follows:

> The prisoner certainly is doing extremely well in terms of programming
> and conduct, however, in this examiner's opinion, the prisoner's favorable
> institutional adjustment does not outweigh the issues of risk or
> accountability.  This examiner would believe that for the nature of the
> prisoner's instant offense some minimal service of up to 20 years would
> be indicated or possibly even more.  It appears that the prisoner has served
> between 10 and 11 years in continuous custody at this juncture and again
> in this examiner's opinion, it simply would not be sufficient for purposes
> of accountability not to mention the issue of risk.

Eason Statement ¶ 9, Hearing Summary at 3.

DSMDB-2365154v02

In 2004 and 2007, at Mr. Eason's second and third parole rehearings, the USPC expressly acknowledged that it based its denial of parole on its view that Mr. Eason's court-imposed punishment was insufficient and that Mr. Eason needed to serve additional incarceration to account for his crime. Eason Statement ¶¶ 12 and 13. As the USPC explained in its Notices of Action for Mr. Eason's 2004 and 2007 hearings: "[A] departure . . . is warranted [because] your offense behavior is more serious than your conviction to Murder II in that the murder was planned and an act of revenge. Consequently the Commission has determined additional time incarcerated is necessary for accountability purposes." *Id.*[5]

The following recommendation and comments from the Executive Reviewer involved in Mr. Eason's 2007 request for parole, Hearing Examiner Jeffrey Kostbar, highlight the USPC's rationale for denying Mr. Eason's parole requests:

> The subject will serve 17.5 years if he is released on 8/8/07, as recommended by the hearing examiner. It would be a decision consistent with the DC Grid Score system.
>
> However, I disagree. This is a highly aggravated case and outside the "heartland" of a 2nd degree murder case. The case specifics are more closely associated with a 1st degree, premeditated murder.
>
> Consequently, I believe that the subject should serve much more time on this term, possibly as much as 25-30 years. *A decision less than that, would, in my opinion, depreciate the seriousness of the behavior and promote disrespect of the law.*

---

[5] *See also* Eason Statement ¶ 11 (Executive Reviewer comments: "The hearing [examiner] is recommending a parole effective date for this offender, and I disagree! . . . [A]lthough the offender was permitted to plead to the reduced offense of Murder II, the offense behavior has all of the elements of Murder I. There was planning aforethought, etc. . . . Although he has made a generally good [institutional] adjustment, the behavior accountability factor has not been met. In many jurisdictions release for a case of this magnitude would not be seriously considered until, at least 20 years had been served.").

DSMDB-2365154v02

Eason Statement ¶ 14, Hearing Summary, Executive Reviewer comments (emphasis added).

The USPC adopted the Executive Reviewer's recommendation when it denied Mr. Eason's

request for parole.

It is, however, significant to note that the standards for parole that the Executive

Reviewer applied at Mr. Eason's 2007 parole determination are the standards under the former

U.S. Code parole laws and the regulations that the USPC applies to U.S. Code offenders who are

eligible for parole from their federal sentences which provide:

> The granting of parole to an eligible prisoner rests in the discretion of the
> U.S. Parole Commission.  As prerequisites to a grant of parole, the
> Commission must determine that . . . upon consideration of the nature and
> circumstances of the offense and the history and characteristics of the
> prisoner, . . . release would not depreciate the seriousness of his offense or
> promote disrespect for the law . . . .

28 C.F.R. § 2.18.

> 2.    The USPC Applied the Federal Parole Standard in Denying Mr.
>       Gambrell's Requests for Parole

At his first parole rehearing in 1999, which the USPC conducted, Mr. Gambrell had a

total point score of 0, indicating that he was presumptively suitable for parole.  The USPC,

however, denied Mr. Gambrell's 1999 parole request and gave him a four-year setoff.  In its

Notice of Action, the USPC cited Mr. Gambrell's criminal history and status on parole when he

committed his current offense as the basis for their parole denial.  Gambrell Statement ¶ 8.

In 2003, the USPC again denied Mr. Gambrell's request for parole.  The USPC cited

the same factors on which it had relied to deny Mr. Gambrell's 1999 parole request and gave Mr.

Gambrell a three-year setoff until July 2006.  Gambrell Statement ¶ 10.

In 2006, at Mr. Gambrell's third parole rehearing, the USPC's Notice of Action

recited the exact same factors on which the USPC had departed from the 1987 Regulations'

presumption that Mr. Gambrell was suitable for parole at his two previous parole rehearings.

Gambrell Statement ¶ 13. At this parole hearing, however, the USPC only gave Mr. Gambrell a one-year setoff, until July 2007, which was the recommendation of Paul Howard, the July 2007 Hearing Examiner. *Id.* Jeffrey Kostbar, the Executive Reviewer for Mr. Gambrell's July 2006 parole hearing, agreed with Mr. Howard's recommendation, as did Chairman Edward Reilly and Commissioner Isaac Fulwood. *Id.*

One year later, in July 2007, Mr. Gambrell appeared for his fourth parole rehearing before the USPC. Between his third and fourth parole rehearings, Mr. Gambrell had maintained his spotless record of institutional conduct by not receiving any disciplinary infractions and continuing to program, including completing "the Challenge Program which was requested of him by the US Parole Commission." Gambrell Statement ¶ 10, Hearing Summary at 1. As a result of Mr. Gambrell's continued rehabilitative conduct, the Hearing Examiner at the July 2007 hearing recommended that the USPC parole Mr. Gambrell in February 2008. Gambrell Statement ¶ 10.

Jeffrey Kostbar, who in July 2006 had agreed with Mr. Howard that a one-year setoff was appropriate for Mr. Gambrell, served as the Executive Reviewer for Mr. Gambrell's July 2007 parole determination as well. Gambrell Statement ¶ 13. At Mr. Gambrell's fourth parole rehearing, however, Mr. Kostbar disagreed with the Hearing Examiner's recommendation that the USPC parole Mr. Gambrell in February 2008. Instead, Mr. Kostbar recommended that the USPC deny parole and give Mr. Gambrell a five-year setoff. *Id.* Mr. Kostbar, who a year earlier agreed that Mr. Gambrell only needed a one-year setoff, explained his recommendation as follows:

> While the subject's DC Grid Score is 0 and suggests a parole in this case, I disagree. This is an exceptional case in which the gravity of the offense is sufficient to warrant an upward departure from the Grid Score. In addition, the subject's prior record consists of serious and repetitive criminal acts, which were used in the past by the Commission to continue

DSMDB-2365154v02

> supervision above his guidelines.  I believe that these are still valid in this
> case.
>
> 19 years is simply not enough time for an individual to serve for a crime
> of this nature and *I believe that release at this time, or any time in the near
> future, would depreciate the seriousness of the offence behavior and
> promote disrespect for the law*.  Consequently, *I am recommending a
> Decision Above the 12 month Rehearing Range AND Above the Grid
> Score "guideline" of 0.  The recommendation is 60 months for a
> rehearing*.
>
> This will put him around 24 1/2 years of custody at the time of his next
> hearing.

Gambrell Statement ¶ 22, Hearing Summary, Executive Review comments (emphasis added).

The USPC's Case Operations Administrator, Stephen Husk, and Commissioners Cranston

Mitchell and Isaac Fulwood, who also had just one year before agreed that Mr. Gambrell only

deserved a one-year setoff, agreed with Mr. Kostbar.  Gambrell Statement ¶ 24.

As in Mr. Eason's case, the USPC applied the standards for parole that apply to U.S.

Code offenders under the USPC parole guidelines at Mr. Gambrell's fourth parole rehearing.

*See* 28 C.F.R. § 2.18.  These are the very offense severity-based guidelines that the D.C. Parole

Board declined to adopt in 1985 because of its policy that the court-imposed minimum sentence

addressed offenses severity and accountability.

It also is significant for Mr. Gambrell's case that not a single thing happened between

Mr. Gambrell's third and fourth rehearings that would have made Mr. Gambrell any more of a

risk in July 2007 than he was in July 2006.  As the Hearing Examiner at Mr. Gambrell's July

2007 hearing noted, Mr. Gambrell had maintained clear institutional conduct and done exactly

what the USPC had asked him to do – finish the Challenge program.  Gambrell Statement ¶ 20.

In fact, the only significant event in Mr. Gambrell's life between July 2006 and July 2007 was

the filing of this lawsuit with Mr. Gambrell as a plaintiff in November 2006.  That event should

have had no effect on Mr. Gambrell's suitability for parole, but Plaintiffs believe that the only

logical inference from Mr. Kostbar's and Commissioner Fulwood's change of their assessment

of Mr. Gambrell's accountability for his crimes is that it is an act of vindictiveness for Mr. Gambrell's pursuit of his constitutional rights.

In practice, the USPC has re-defined the term D.C. Parole Board's policy and definition of the "unusual circumstances" that are sufficient to depart from the presumptive parole suitability indicated by the 1987 Regulations. Whereas the D.C. Parole Board adopted and applied specific criteria in the 1991 Policy Guideline to determine the existence of "unusual circumstances," the USPC chose to ignore that policy guideline and the D.C. Parole Board's definition of "unusual circumstances." Instead, with respect to Plaintiffs, the USPC now has defined "unusual circumstances" to include offense severity and accountability factors, and specifically the factors that the USPC applies to determine U.S. Code offenders' parole suitability.

The Defendants' new interpretation of the term "unusual circumstances" has allowed them to create bases for departure that the D.C. Parole Board explicitly rejected as permissible under the 1987 Regulations. In every decision regarding Plaintiff Curtis Eason and in Plaintiff James Gambrell's last parole rehearing, the USPC has used its expanded definition of "unusual circumstances" to deny parole based on offense accountability and severity grounds, which the D.C. Parole Board assumed the sentencing court already had addressed.

These undisputed facts (and those set forth in the Plaintiffs' individual statement of undisputed fact) demonstrate that Defendants violated the Ex Post Facto Clause in deciding the Plaintiffs' requests for parole. As a result, the Court should grant Plaintiffs' motion for summary judgment with respect to their claims based on the Ex Post Facto Clause.

DSMDB-2365154v02

**ARGUMENT**

I.       **THE STANDARD FOR SUMMARY JUDGMENT**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R. Civ. Proc. 56(c). Whether a fact is "material" is determined by the substantive law on which each claim rests. *See Tax Analysts v. IRS*, 217 F. Supp. 2d 23, 25 (D.D.C. 2002). A genuine issue is an issue "whose resolution could establish an element or a claim or defense and, therefore, affect the outcome of the action." *Id.*

The material facts regarding the issues addressed in this motion are set forth in the accompanying Plaintiffs' Joint Statement of Undisputed Material Facts and in the Plaintiffs' individual statements of undisputed material facts filed concurrently with this memorandum. The undisputed facts establish that the USPC has applied its own parole regulations, guidelines, policies, and practices retroactively to Plaintiffs and other D.C. Code offenders instead of the parole regulations, guidelines, policies, and practices of the D.C. Parole Board that governed parole decisions for D.C. Code offenders prior to August 5, 1998. The facts also establish that by applying its own practices, the USPC has created a significant risk that Plaintiffs will serve longer periods of incarceration as punishment for their crimes and, in fact, increased the periods of incarceration for Plaintiffs to punish them more. Plaintiffs, therefore, are entitled to judgment in their favor on their claims under the Ex Post Facto Clause and an order vacating the USPC's prior decisions with respect to Plaintiffs' parole requests and requiring the Defendants to conduct new parole hearings for Plaintiffs under the regulations, guidelines, policies, and practices of the D.C. Parole Board.

DSMDB-2365154v02

**II.      THE EX POST FACTO CLAUSE PROHIBITS RETROACTIVE CHANGES TO PAROLE POLICIES AND PRACTICES THAT CREATE A SIGNIFICANT RISK OF PROLONGING A PRISONER'S INCARCERATION**

The Ex Post Facto Clause of the United States Constitution prohibits retroactive increases in punishment for a crime after its commission. *See* U.S. Const. art. I, § 9, cl. 3; *Fletcher*, 433 F.3d at 877.  Under the Supreme Court's decision in *Garner v. Jones*, 529 U.S. 244, 251 (2000), a retroactively applied parole regulation, guideline, or policy statement violates the Ex Post Facto Clause if it "creates a significant risk of prolonging [an inmate's] incarceration."  *See Fletcher*, 433 F.3d at 876-77.  A party can demonstrate that the retroactive application of change in parole policy creates a "significant risk" in two ways:  (1) it can establish that "there are facial distinctions between the old and new parole/reparole regimes"; or (2) it can introduce "evidence drawn from the rule's *practical implementation by the agency*" showing that "retroactive application [of the policy] *will result in a longer period of incarceration than under the earlier rule*."  *Id.* at 877 (quoting *Garner*, 529 U.S. at 255).

To determine whether the retroactive application of a new parole regime violates the Ex Post Facto Clause, the D.C. Circuit requires "a searching comparison" of the two parole regimes.  *Id.* at 879.  The Court must then use the information gleaned from this comparison of the two parole regimes to determine whether the USPC's change in policies, and/or practices "created a significant risk that [Plaintiffs would] be subjected to a lengthier incarceration than [they] would have been if the Commission had adhered to the rules and practices of the D.C. Board." *Fletcher,* 433 F.3d at 879*; see also id*. at 877 (the "controlling inquiry 'is one of practical effect'").

A searching comparison of the USPC parole practices to the D.C. parole practices proves beyond dispute that under the D.C. parole practices, the D.C. Parole Board applied the clearly defined parameters and criteria in the 1991 Policy Guideline to determine whether "unusual circumstances" justifying a denial of parole existed.  The facts likewise demonstrate

24

that the D.C. Parole Board refused to consider offense severity and accountability factors as "unusual circumstances," and left it to the sentencing court's minimum sentence to address such factors.  The practical effect of the USPC's application of its own regulations and practices has been to increase Plaintiffs' period of incarceration by repeatedly denying Plaintiffs' requests for parole on the basis that the USPC believes Plaintiffs deserve more punishment.  Accordingly, Plaintiffs have demonstrated as a matter of law that the USPC and Defendants violated their rights under the Ex Post Facto Clause by failing to "adhere[] to the rules and practices of the D.C. Board" in Plaintiffs' cases.  *Fletcher*, 433 F.3d at 879.

The 1987 Regulations did not contain an offense severity factor and the D.C. Parole Board deemed that the court-imposed, minimum sentence satisfied all offense severity and accountability.  As the D.C. Parole Board explained when it promulgated the 1987 Regulations:

> The second principle behind the guidelines is that the court addresses the purposes of retribution and general deterrence through the sentence it imposes in adult cases.  *As a matter of policy, the Board of Parole does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge.*

D.C. Guidelines Report at 3 (emphasis added).  In describing the rationale for the 1987 Regulations, the D.C. Parole Board further explained:

> The Board incorporates the risk assessment component of the federal [parole guideline] model, the Salient Factor Score, into its guidelines, thereby benefitting [sic] from the results of extensive research carried out over the last fourteen years to construct and validate this actuarial device. *The Board, however, did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale.* It therefore looked to other jurisdictions for a guideline structure that would be more compatible with *the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant.*

DSMDB-2365154v02

*Id.* at 17 (emphasis added); Deposition of Gladys W. Mack ("Mack Dep.") at 42-43 (attached as Exhibit 5 to Plaintiffs' Joint Statement). [6]

Thus, under the 1987 Regulations, once a D.C. Code offender served his or her minimum sentence, the D.C. Parole Board focused exclusively on the risk of recidivism and institutional conduct of the offender. *See* Mack Dep. at 26-27. The D.C. Parole Board did not look at the severity of a parole candidate's offense to determine whether the candidate had been punished enough; instead, the Board's sole focus was on the candidate's rehabilitation and the risk to the community if the candidate was paroled. *See id.*

Under the 1987 Regulations, once a parole candidate's total point score established his or her presumptive suitability for release, the D.C. Parole Board's discretion was limited to departing from that presumption only in "unusual circumstances." 28 DCMR § 204.22. In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board identified circumstances it considered to be "unusual" that would support a departure from the action indicated by a parole candidate's total point score under 28 DCMR § 204.18. To ensure equitable treatment of

---

[6] In an August 21, 1992, memorandum to the Acting Chairman of the USPC, Michael Stover, the General Counsel of the USPC at the time, and Rockne Chickinell, the current General Counsel of the USPC who was at that time Deputy General Counsel of the USPC, stated that

> the D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served. Rather, the D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of accountability for the offense, and apply a point score system (which includes the salient factor score and other readily ascertainable items) to determine whether or not the prisoner is suitable for parole upon completion of the minimum term. Hence, a D.C. Code prisoner has satisfied offense accountability at eligibility . . . .

Stover Mem. at 2-3. Although Mr. Stover asserted that departures from the 1987 Guidelines could be made where "unusual offense factors" were present or in the case of "unusual seriousness of the offense (i.e., factors making the offense a significantly more aggravated version of its type)," nearly six years later Mr. Stover still had not found any evidence supporting these assertions. *See* 1998 Mem. at 3 (noting that case law on the subject is sparse and that "the guidelines of the D.C. Board of Parole clearly focus exclusively on the issue of risk").

DSMDB-2365154v02

similarly-situated parole candidates and consistency in applying the factors in Appendix 2-1 and to avoid disparate interpretations and applications of those factors, the D.C. Parole Board adopted the 1991 Policy Guideline, which set forth specific, definitive "criteria and parameters for determining the applicability" of the factors listed in Appendix 2-1. *See* 1991 Policy Guideline at 1; Stover Mem. at 4 (instructing USPC hearing examiners to "<u>always consult the Policy Guidelines</u>" "<u>[w]hen considering reasons for departure from the point score or rehearing guidelines</u>" (emphasis in original)).

As its decisions in Plaintiffs' cases make clear, the USPC, under the guise of "unusual circumstances," has incorporated into its decisions regarding D.C. Code offenders the offense severity and accountability standards for parole that it applies under its parole regulations for United States Code offenders. By doing so, the USPC has restructured the parole inquiry in D.C. Code cases from the 1987 Regulations' focus on rehabilitation and risk to an inquiry in which the USPC asks whether, "upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner," a D.C. Code offender's release would "depreciate the seriousness of his offense or promote disrespect for the law"? 28 C.F.R. § 2.18. The result of the USPC's application of the federal parole criteria to Plaintiffs has been repeated parole denials based on offense severity and accountability characteristics that the D.C. Parole Board assumed the court-imposed minimum sentence satisfied and Plaintiffs' continued incarceration despite the lack of any actual "unusual circumstances" recognized under the 1987 Regulations.

Under the 1987 Regulations, once a parole candidate's total point score established his or her presumptive suitability for release, the D.C. Parole Board's discretion was limited to departing from that presumption only in "unusual circumstances." 28 DCMR § 204.22; *see also* Mack Dep. at 11-13, 22-25. The D.C. Parole Board recognized the need for the discretion to depart in "unusual circumstances" given the limitations of the "Salient Factor Score" and "type

DSMDB-2365154v02

of risk assessment" in the 1987 Regulations.  As the Board explained when it promulgated the

1987 Regulations:  "The Board of Parole recognizes that, when applying guidelines to individual

cases, there occasionally will be unique circumstances that are *not taken into account by either*

*the Salient Factor Score or the type of risk assessment*, but that none-the-less should impact on

the parole decision."  D.C. Guidelines Report at 22 (emphasis added).  Given that the "Salient

Factor Score" and "type of risk assessment" adopted by the D.C. Parole Board did not contain

offense severity or accountability factors  the Parole Board did not consider such factors as valid

"unique circumstances" because discretion based on such factors would usurp the function of the

sentencing judge.  *See id.* at 3, 17, 22.

   As a result, in Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board

identified circumstances solely addressing the degree and type of risk posed by a parole

candidate that it considered to be "unusual" that would support a departure from the action

indicated by a parole candidate's total point score under 28 DCMR § 204.18.  To ensure

equitable treatment of similarly-situated parole candidates and consistency in applying the

factors in Appendix 2-1 and to avoid disparate interpretations and applications of those factors,

the D.C. Parole Board adopted the 1991 Policy Guideline.  The Guideline set forth specific,

definitive "criteria and parameters for determining the applicability" of the factors listed in

Appendix 2-1.  *See* 1991 Policy Guideline at 1; Stover Mem. at 4 (instructing USPC hearing

examiners to "<u>always consult the Policy Guidelines</u>" "<u>[w]hen considering reasons for departure</u>

<u>from the point score or rehearing guidelines</u>" (emphasis in original)).  Recognizing the

rehabilitative premise of its 1987 Regulations, the D.C. Parole Board also included among the

"unusual circumstances" on which it could depart a parole candidate's "Serious Negative

Institutional Behavior," failure or "Little Effort to Engage in Productive Programming or Work,"

and a need for "Programming to Remain Crime-Free in the Community."  *See* 1991 Policy

DSMDB-2365154v02

Guideline at 6-8; See Eason Statement ¶¶ 10, 12, and 15; see *also* Gambrell Statement ¶¶ 8, 10, and 12.

Notably, nowhere in the 1987 Regulations or in the D.C. parole practices is there any evidence that the Board considered offense severity and accountability factors in determining whether a parole candidate had satisfied his or her offense accountability or whether "unusual circumstances" existed sufficient to warrant denying a D.C. Code offender's parole request where the 1987 Regulations' total point score indicated that the offender was presumptively suitable for release.[7] The stated principle of the 1987 Regulations and policy of the D.C. Parole Board was that the Board "does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." D.C. Guidelines Report at 4. In fact, the D.C. Parole Board expressly rejected adopting the federal parole guideline model for this very reason:

> The Board, however, did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale. It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant.

*Id.* at 17.

Given that the guiding premise of the 1987 Regulations, unlike that of the parole guidelines that the USPC applies to U.S. Code offenders, is that the D.C. Parole Board did not and would not address offense severity and accountability factors in determining whether to grant or deny parole, the USPC necessarily increases a D.C. Code offender's period of

---

[7] Although the 1987 Regulations permitted the D.C. Parole Board to depart from the guidelines in circumstances where a parole candidate's offense involved unusual cruelty to victims or preying on especially vulnerable victims, the Board did not do so on offense severity grounds. Rather, the D.C. Parole Board's focus was on the risk posed to the public if it paroled an offender who inflicted "[p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction" or preyed on "[e]specially vulnerable victims, e.g., children or elderly persons" through assaultive or fraudulent behavior." 1991 Policy Guideline at 7.

DSMDB-2365154v02

incarceration when it applies such factors to determine his or her suitability. The 1987

Regulations deemed offense severity and accountability factors irrelevant to suitability for

parole. As the USPC's former General Counsel recognized, the D.C. Parole Board never

intended for the 1987 Regulations to include such sentencing court factors in the parole

consideration. *See* 1992 Stover Memo at 3-4.

As the undisputed facts demonstrate, under the 1987 Regulations and D.C. parole

practices, the D.C. Parole Board *assumed* that a parole candidate had satisfied the accountability

for his or her offense, i.e., the need for punishment, retribution, and general deterrence, once that

candidate became eligible for parole, i.e., after serving the minimum sentence imposed by the

court. *See* D.C. Guidelines Report at 3-4; 1992 Stover Memo. at 2-3. Thus, the D.C. Parole

Board did not address offense accountability when determining whether an inmate was suitable

for parole, and looked solely at the degree and type of risk of recidivism posed by a parole

candidate and the candidate's institutional conduct (both positive and negative) to determine the

candidate's suitability for parole. *See* 1998 Memo. at 3; 1992 Stover Memo at 2-3.

Although the D.C. Parole Board's 1987 Regulations permitted departures from the

presumption of parole suitability in "unusual circumstances," the 1987 Regulations used the

written, objective standards in the 1991 Policy Guideline to guide their application of those

circumstances. The USPC, on the other hand, has left it to the subjective whims of the USPC

hearing examiners and/or Commissioners to identify a factor for which the USPC did not add a

point to the SFS or type of risk assessment. Husk Dep. at 132:18-12, 141:9-13. The USPC does

not limit in any way the type of circumstance the USPC can deem "unusual."

Applying this new definition, the USPC and the Defendants also have denied the

requests for parole of Plaintiffs Curtis Eason and James Gambrell on offense severity grounds for

DSMDB-2365154v02

which the USPC asserts the 1987 Regulations do not account, despite the D.C. Parole Board's assumption that the sentencing court's sentence addressed offense severity characteristics.

For example, Defendants denied Mr. Eason's March 2007 request for parole on the ground that Mr. Eason's crime allegedly "was planned and an act of revenge." Eason Statement ¶ 14. As a result, Defendants "determined that additional time incarcerated is necessary for accountability purposes." Eason Statement ¶ 15. The Executive Review of Mr. Eason's parole summed up the Defendants' position best: "the subject should serve much more time on this term, possibly as long as 25 – 30 years. A decision less than that, would, in my opinion, depreciate the seriousness of the offense behavior and promote disrespect for the law." Eason Statement ¶ 14. Notably, the standard applied by the Executive Reviewer is the exact same standard applied to determine federal prisoners' suitability for parole under the federal parole guidelines, *see* 28 C.F.R. § 2.18 (based on the former parole statute at 18 U.S.C. § 4206, which was repealed in 1987), which the D.C. Parole Board expressly rejected in 1985, *see Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1003 (D.D.C. 1988); D.C. Guidelines Report at 17 ("The Board, however, did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale. It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant."). As a result of the Defendants' application of such offense severity factors, Mr. Eason, who was sentenced to fourteen-years-to-life by Judge Gladys Kessler in 1988, has served almost ten years more than his minimum sentence, which the D.C. Parole Board assumed under its policies and practices satisfied Mr. Eason's accountability for his offense.

Similarly, in Mr. Gambrell's case, the Defendants denied Mr. Gambrell's 2006 parole request based on his history of convictions of crimes involving violence (the same basis on

which the USPC and Defendants had denied Mr. Gambrell's requests for parole in 1999 and

2003 and essentially the same basis on which the D.C. Parole Board had denied his 1998 parole

request) and gave Mr. Gambrell, who turns age 60 next August, a one-year setoff.  Despite

Mr. Gambrell's continued exemplary institutional conduct during the one-year setoff, Defendants

also denied Mr. Gambrell's July 2007 parole request because of his "prior record of convictions

for assaultive behaviors" and the "exceptional gravity" of Mr. Gambrell's current offense.

Gambrell Statement ¶¶ 24, 29.  As the Executive Reviewer in Mr. Gambrell's case, who had

agreed in 2006, before Mr. Gambrell filed this lawsuit, that Mr. Gambrell only needed a one-year

setoff, explained, "19 years is simply not enough time for an individual to serve for a crime of

this nature and I believe that release at this time, or any time in the near future, would depreciate

the seriousness of the offense behavior and promote disrespect for the law."  Gambrell Statement

¶ 23.

DSMDB-2365154v02

## CONCLUSION

For the reasons stated herein, Plaintiffs' motion for partial summary judgment should be granted.

Dated:  December 14, 2007                    Respectfully Submitted,


By:    */s/ Jason D. Wallach*
       Jason D. Wallach (Bar No. #456154)
       Jared Rodrigues (Bar No. #496125)
       Avner E. Mizrahi (Bar No. #500772)
       DICKSTEIN SHAPIRO, LLP
       1825 Eye Street, NW
       Washington, D.C. 20006
       (202) 420-2268
       (202) 420-2201 facsimile

       Attorneys for Plaintiffs

DSMDB-2365154v02

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TONY R. SELLMON, et al.,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : **Civil Action No. 06-1650 (ESH)** |
| | : |
| **EDWARD F. REILLY, JR., et al.,** | : |
| | : |
| **Defendants.** | : |
| | : |

### PLAINTIFFS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Plaintiffs Curtis Eason, James Gambrell, Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El hereby submit this Joint Statement of Material Facts Not in Dispute in support of their claims that the United States Parole Commission (the "Commission") and the Defendants (as the Chair and Commissioners of the Commission) (collectively the "USPC") violated Plaintiffs' rights under the Ex Post Facto Clause of the United States Constitution when they replaced the parole regulations, guidelines, policies, and practices of the District of Columbia Board of Parole (the "D.C. Parole Board") with their own regulations, guidelines, policies, and practices, which they applied retroactively to Plaintiffs, thereby creating a significant risk of increasing Plaintiffs' punishments. This joint statement of undisputed facts addresses those facts common to all Plaintiffs. Plaintiffs separately filed individual statements of undisputed facts, which address those undisputed facts specific to each individual Plaintiff. As the undisputed facts below and the Plaintiffs' memorandum in support of their motion for summary judgment demonstrate, the USPC, by applying its own parole regulations, guidelines, policies, and practices, instead of those of the D.C. Parole Board, created a significant risk of prolonging Plaintiffs' incarceration and, thereby, violated the Ex Post Facto Clause.

1.  Plaintiffs are inmates serving prison sentences for violating the District of Columbia Code.  They have been incarcerated on their current sentences for between nine and thirty-one years.

2.  For almost ten years, since August 5, 1998, the USPC has conducted the hearings, and decided the requests for parole, of all persons convicted of violating the D.C. Code ("D.C. Code offenders"), including Plaintiffs.

3.  Before August 5, 1998, the D.C. Parole Board conducted the parole hearings of D.C. Code offenders located in District of Columbia correctional facilities, including the hearings of Plaintiffs Curtis Eason and James Gambrell.

4.  Before August 5, 1998, the USPC conducted the parole hearings of D.C. Code offenders located in federal correctional facilities.

5.  On August 5, 1998, the USPC took over the D.C. Parole Board's responsibilities for D.C. Code offenders.  Approximately 10 years before that, this Court ruled that the USPC was obligated to apply the parole guidelines of the D.C. Parole Board, an not the federal parole guidelines, at the hearings of D.C. Code offenders that the USPC conducted.  *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1003-04 (D.D.C. 1988).

6.  Plaintiffs have served the "minimum sentence" imposed by the sentencing court for their offenses (i.e., the period of incarceration an inmate must serve before becoming eligible for parole).

7.  Under the parole statutes, regulations, policies, and practices of the D.C. Parole Board (the "D.C. parole practices"), after Plaintiffs served their minimum sentences, they were assumed (not just presumed) to have satisfied accountability for their crimes, i.e., the need for punishment and general deterrence.  The only remaining questions under the D.C. parole

practices were whether Plaintiffs were presumed suitable for parole, and if so, whether their cases involved "unusual circumstances" that warranted a departure from that presumption.

       8.  Under the D.C. parole practices, Plaintiffs would have been presumed suitable for parole at their first hearings before the USPC.  *See* Plaintiff Tony R. Sellmon's Statement of Undisputed Material Facts ("Sellmon Statement") ¶ 16; Plaintiff Charles Phillips's Statement of Undisputed Material Facts ("Phillips Statement") ¶ 12; Plaintiff Carlton Martin's Statement of Undisputed Material Facts ("Martin Statement") ¶¶ 13-14; Plaintiff Daru Swinton's Statement of Undisputed Material Facts ("Swinton Statement") ¶ 10; Plaintiff Benson West-El's Statement of Undisputed Material Facts ("West-El Statement") ¶¶ 14-15; Plaintiff Darius Smith's Statement of Undisputed Material Facts ("Smith Statement") ¶¶ 12-14.  To overcome that presumption of suitability, the USPC would have needed to identify "unusual circumstances" that warranted ignoring the presumption.

       9.  Because the USPC used its own parole regulations, policies, practices, and criteria (the "USPC parole practices") to determine Plaintiffs' suitability for parole and ignored the D.C. parole practices, Plaintiffs have languished in federal prisons for years past the time when they would have been presumed suitable for parole under the D.C. parole practices.

       10.  In the cases of Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El (and those of hundreds of other D.C. Code offenders who had an initial parole hearing after August 5, 1998), the USPC has applied its parole practices to determine parole suitability.

       11.  Under the USPC parole practices, instead of presuming that these Plaintiffs were suitable for parole upon completion of their minimum sentence – the presumption that would have applied if the D.C. parole practices were applied to Plaintiffs' cases – Defendants presumed that these Plaintiffs were *unsuitable* for parole at that time.  Based on this reversed presumption,

the Defendants increased, in some cases by more than five years, the minimum period of

incarceration that Plaintiffs and other D.C. Code offenders needed to serve to establish that they

are presumed suitable for parole under the D.C. parole practices.

12.  In the cases of Plaintiffs James Gambrell and Curtis Eason (and in the cases of

Plaintiffs Charles Phillips, Tony Sellmon, and Benson West-El after they had served the

additional periods needed to qualify for presumptive parole suitability that the USPC added to

their minimum sentences under the USPC parole practices), the USPC ignored the D.C. parole

practices for departing from the suitability presumptions.  Instead, contrary to the D.C. parole

practices, which did not contain an offense severity aspect and solely looked to the risk of

recidivism, the USPC incorporated into its own practices factors for overcoming the

presumptions that were premised on the severity of the Plaintiffs' current offense and aimed at

increasing Plaintiffs' punishment for their crimes.

### Transfer of Parole Authority from the D.C. Board of Parole to the USPC

13.  On August 5, 1997, Congress enacted the National Capital Revitalization and

Self-Government Improvement Act (the "Revitalization Act"), Pub. L. No. 105-33, § 11231, 111

Stat. 712 (1997); s*ee Fletcher v. Reilly*, 433 F.3d 867, 870 (D.C. Cir. 2006).  The Revitalization

Act abolished the D.C. Parole Board, *see* Pub. L. No. 105-33 § 11231(b), and directed the USPC

to conduct parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations

of the District of Columbia," *id.* § 11231(c).

14.  On August 5, 1998, the USPC assumed the responsibility for making parole-

release decisions for all eligible D.C. Code offenders.  Between 1998 and 2000, despite the

requirements of the Revitalization Act that the Defendants apply D.C. parole practices, the USPS

published new parole regulations and guidelines that it deemed applicable to any D.C. Code

offender receiving an initial parole hearing after August 5, 1998 (the "2000 Guidelines").  *See* 28 C.F.R. § 2.80(a)(5); *Fletcher*, 433 F.3d at 870.

15.  For inmates who had an initial parole hearing date before August 5, 1998, such as Plaintiffs Curtis Eason and James Gambrell, the USPC chose to apply the D.C. Parole Board's guidelines.  *See* 28 C.F.R. § 2.80(a)(4).  For all other inmates, including Plaintiffs Carlton Martin, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El, the USPC applies some variation of the 2000 Guidelines.  *See id.* § 2.80(a)(1) & (5).

16.  At the time that Plaintiffs committed the crimes for which they are currently imprisoned and at the time that Plaintiffs were sentenced, the D.C. Parole Board administered parole proceedings for D.C. Code offenders in the custody of the District of Columbia.  Before August 5, 1998, the USPC conducted the parole hearings for D.C. Code offenders who were in the custody of the United States Government, but in such circumstances, the USPC was required to apply the D.C. parole practices, which were found by this Court to have the force and effect of law.  *See Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1003-04 (D.D.C. 1988).

17.  Before the USPC took over in 1998, the D.C. Parole Board applied mandatory guidelines and practices when it conducted parole hearings and made parole determinations.  Many of the guidelines and practices were codified as municipal regulations, which carefully prescribed the method and criteria that the D.C. Parole Board used to render decisions on parole requests.

### D.C. Parole Board Guidelines and Legislative Intent of D.C. Parole Practices

18.  The D.C. Parole Board (and for certain D.C. Code offenders in federal prison facilities, the USPC) made parole decisions for D.C. Code offenders using guidelines that it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Regulations").  *See* 28 D.C. Mun. Regs. §§ 100-531.12.

19. By adopting formal regulations, the D.C. Parole Board "sought to structure the exercise of the paroling authority's discretion." Report on the Development of Paroling Policy Guidelines for the District of Columbia Board of Parole (the "D.C. Guidelines Report") at 1 (filed as Exhibit A to Defendants' Response to Plaintiffs' First Request for Production of Documents Propounded to Defendants James Palmer, Walter Ridley, and James Freeman in *Cosgrove v. Thornburgh*, C.A. No. 80-0516) (attached as Exhibit 1) .

20. The D.C. Parole Board believed that the guidelines were "a significant step toward a more coherent parole decision-making process that w[ould] lead both to ***increased consistency*** in parole release decisions and ***enhanced accountability*** of the Board." *Id.* (emphasis added).

21. As its guide for determining whether an incarcerated individual would be paroled or reparoled, the D.C. Parole Board used the criteria set forth in the guidelines. *See id.* at 2 ("[T]he use of guidelines should be seen as an effort to make <u>explicit</u> those factors that will be considered in each individual case.") (emphasis in original).

22. Although the D.C. Parole Board noted that the guidelines were not necessarily "a finished or static product" and made minimal revisions to the 1987 Regulations through changes to the regulations and through the issuance of formal policy statements, the D.C. Parole Board retained the basic structure of the regulations until it was abolished in 1998. *Id.*

23. When it drafted the 1987 Regulations, the D.C. Parole Board hoped that, among other things, the guidelines would:

  a. "[p]romot[e] consistent parole decision-making";

  b. "[m]ake more explicit the paroling policies of the Board of Parole";

  c. "[i]ncorporat[e] a concern for fairness by ensuring that the time served . . . [wa]s proportionate to the sentence imposed by the court and the risk posed by the offender"; and

    d. "[a]chiev[e] the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilitation." *Id.*

    24. In furtherance of these objectives, the D.C. Parole Board employed three guiding principles in drafting the 1987 Regulations. *See id.* at 2-4.

    25. The first guiding principle was that "the touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involvement in criminal behavior." *Id.* at 2. The D.C. Parole Board felt that this focus of the guidelines best enabled it to meet its duty to protect the public. *Id.*

    26. The second guiding principle, and of great importance in this case, was that retribution or general deterrence was not included among the goals that the D.C. parole practices were to effectuate. *See id.* at 2. ("The second principle behind the guidelines is that the court addresses the purposes of retribution and general deterrence through the sentence it imposes in adult cases."). Such concerns, the D.C. Parole Board felt, were left to the sentencing court, and "[a]s a matter of policy, the [D.C. Parole Board] d[id] not and w[ould] not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." *Id.* at 3-4.

    27. The D.C. Parole Board explicitly rejected patterning its guidelines "after the federal grid which includes an offense severity scale." *Id.* at 17 (explaining that, in adopting guidelines, the D.C. Parole Board specifically looked to jurisdictions with a "guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant").

    28. The third guiding principle was that the D.C. parole practices should plainly evidence "a rehabilitative focus." *Fletcher*, 433 F.3d at 871; *see* D.C. Guidelines Report at 4 ("Guidelines oriented to the assessment of risk and institutional performance, therefore touching on the need for progress towards rehabilitation, will be consistent with the intent of this Act.").

29.  In *Cosgrove*, this Court factually distinguished the 1987 Regulations from the federal guidelines enacted in 1976, explaining that while the federal guidelines were "primarily concerned with punishment and the public safety," the D.C. guidelines "emphasize[d] early release of an offender who respond[ed] favorably to rehabilitative efforts." *Cosgrove*, 703 F. Supp. at 1003.

### The D.C. Parole Board's 1987 Regulations Focused On Risk Factors

30.  Under its practices and the 1987 Regulations, the D.C. Parole Board "employed an analytic framework that relied on both 'pre and post-incarceration factors.'" *Fletcher*, 433 F.3d at 871 (quoting 28 D.C. Mun. Regs. § 204.1 (Weil) (28 D.C. Mun. Regs. § 204.1-204.18 are attached as Exhibit 2).

31.  The D.C. Parole Board used four factors to determine suitability for parole: two pre-incarceration factors, (i) the degree of risk and (ii) the type of risk; and two post-incarceration factors, (iii) institutional adjustment and (iv) program participation. *See* D.C. Guidelines Report at 5; *Cosgrove*, 703 F. Supp. at 1003.

32.  The D.C. Parole Board intentionally did not employ an offense severity factor in its guidelines. *See* Memorandum from M. Stover, General Counsel, and R. Chickinell, Deputy General Counsel, U.S. Parole Commission to J.R. Clay, Jr., Acting Chairman, U.S. Parole Commission ("1992 Stover Memorandum" or "1992 Stover Mem.") at 2 (Aug. 21, 1992) ("[T]he D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served.") (attached as Exhibit 3).

33.  The D.C. Parole Board's philosophy was to let the "court-imposed sentence serve as its offense severity indicant." D.C. Guidelines Report at 17; *see also* 1992 Stover Mem. at 2-3 ("[T]he D.C. guidelines use the minimum term of the sentence (less good time) as the basic

measure of accountability for the offense, and apply a point score system . . . to determine

whether or not the prisoner is suitable for parole upon the completion of the minimum term.")

34.    The D.C. Parole Board did not look to the seriousness of the offense for which a

D.C. Code offender was imprisoned, and it assumed that society's punishment and deterrence

interests in an inmate's sentence, i.e., the offense accountability characteristics of the sentence,

were addressed by the sentencing court.  *See* D.C. Guidelines Report at 4 ("[T]he Board of

Parole does not and will not function in a manner that might be viewed as a usurpation of the

functions of the sentencing judge."); Memorandum from Michael A. Stover, General Counsel,

USPC, to Michael J. Gaines, Chairman, USPC (the "1998 Stover Memorandum" or "1998

Stover Mem.") at 3 (June 26, 1998) ("the guidelines of the D.C. Board of Parole clearly focus

exclusively on the issue of risk") (attached as Exhibit 4); Deposition of Gladys W. Mack ("Mack

Dep.") at 42-43, *Cosgrove v. Meese*, No. 80-0516 (Mar. 18, 1988) (Chairperson of the D.C.

Parole Board in 1988 testifying that the 1987 Regulations are premised on the principle that the

court addresses the purposes of retribution and general deterrence identified in the D.C.

Guidelines Report at 3-4) (excerpts attached as Exhibit 5); 63 Fed. Reg. 39172, 39174 (July 21,

1998)  (recognizing that the "parole function for D.C. Code offenders rests on a premise

somewhat different from that of the federal parole guidelines" and under which "the minimum

term of imprisonment imposed by the court [is treated] as the usual measure of basic

accountability for the offense of conviction").[1]

---

[1] The USPC recognized this basic premise of the D.C. Parole Board's guidelines in part in the
2000 Guidelines, but it has failed to abide by this principle in its parole decisions with respect to
Plaintiffs and other D.C. Code offenders.  *See* 28 C.F.R. § 2.73 ("It is the policy of the
Commission with respect to District of Columbia Code offenders that the minimum term
imposed by the sentencing court presumptively satisfies the need for punishment for the crime of
which the prisoner has been convicted, and that the responsibility of the Commission is to
account for the degree and the seriousness of the risk that the release of the prisoner would
entail.").  Instead, as demonstrated below, the USPC parole practices presume that all cases
(footnote continued on next page)

**Degree of Risk: The First Factor Considered by the D.C. Parole Board**

35.   The first factor that the D.C. Parole Board considered was the degree of risk posed by a D.C. Code offender, that is, the likelihood that the offender would commit another crime if released on parole.  *See* D.C. Guidelines Report at 5.

36.   The "Degree of Risk" was "the primary factor of the guidelines, applicable in all cases," and was based on the Salient Factor Score ("SFS"), which was an "actuarial risk assessment device that relie[d] exclusively on information known at the time of incarceration." *Id.*; *see* 28 D.C. Mun. Regs. § 204.3.

37.   In calculating a prisoner's SFS, the D.C. Parole Board considered six pre-incarceration factors:  (1) prior convictions and adjudications, (2) prior commitments of more than 30 days, (3) age at the commission of current offense, (4) recent commitment-free period, (5) status of prisoner at time of current offense, and (6) history of heroin or opiate dependence. *See Fletcher*, 433 F.3d at 871 (citing 28 D.C. Mun. Regs. § 204.4-204.16).

38.   The D.C. Parole Board weighed these factors "by a formula to determine the candidate's risk category, called a 'salient factor score.'"  *Id.* (citing 28 D.C. Mun. Regs. § 204.17, app. 2-1).

39.   A parole candidate's SFS placed the candidate into one of four risk categories (10-9 = low risk, 8-6 = fair risk, 5-4 = moderate risk, or 3-0 = high risk) from which the D.C. Parole Board would determine a baseline number of points ("baseline point score") – 0 for low risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk.  D.C. Guidelines Report at 5; *see* 28 D.C. Mun. Regs. § 204.17, app. 2-1.

40.   The higher a candidate's SFS, the lower the risk that parole candidate would become a recidivist and the lower the baseline point score with which the candidate began for

involving the death of the victim are "exceptional cases" to which the presumption in 28 C.F.R. § 2.73 does not apply.

purposes of the D.C. Parole Board's further calculations.  *See* 28 D.C. Mun. Regs. § 204.17 &
App. 2-1.

41.   The D.C. Parole Board then would take a candidate's baseline point score and
adjust it using the remaining pre-incarceration factor, i.e., the type of risk, and two post-
incarceration factors – institutional adjustment and program participation – and arrive at a Point
Assignment Grid Score ("total point score").  D.C. Guidelines Report at 5-6.

## The Type of Risk: The Second Factor Considered by the D.C. Parole Board

42.   The second factor that the D.C. Parole Board considered was the type of risk
posed by a D.C. Code offender, that is, what type of crime an offender would commit if he/she
were to commit another crime while released on parole.  *See* D.C. Guidelines Report at 5.

43.   The "Type of Risk" factor under the 1987 Regulations was "an aggravating
factor applicable to those cases in which the Board ha[d] made findings that the current offense,
or the offender's pattern of past offenses, involved violence, weapons, or drug trafficking."  *Id*.
This factor recognized that "if an offender has already indicated through past behavior that he or
she is capable of committing a <u>type</u> of crime that is considered particularly serious . . . , we
should be willing to tolerate a lesser <u>degree</u> of risk."  *Id.* at 21 (emphasis in original).

44.   To account for the type of risk posed by a parole candidate based on his current
or past offenses, the D.C. Parole Board chose three types of offense behaviors that it would count
as parole indicants:  (1) violence, (2) use of a weapon, and (3) drug trafficking.  *Id.* at 21-22; *see*
28 D.C. Mun. Regs. § 204.18 & App. 2-1.

45.   Under the 1987 Regulations, the D.C. Parole Board increased the baseline point
score that it derived from the candidate's SFS by a maximum of one point if it determined that
the parole candidate's "current offense, or two prior felony convictions involve[d] ***any or all of***

the [following] listed behaviors": violence, the use of a weapon, and drug trafficking. D.C.
Guidelines Report at 21-22 (emphasis added); *see* 28 D.C. Mun. Regs. § 204.18 & App. 2-1.

46. Under the D.C. parole practices, the highest point score a parole candidate could
have based on the candidate's SFS and Type of Risk assessment, and before adjusting for
institutional adjustment and program achievement, was a 4 (3, the highest possible baseline point
score, plus 1, the only, and maximum, number that can be added for type of risk). *See* 28 D.C.
Mun. Regs. § 204.18 & App. 2-1.

**Institutional Adjustment: The Third Factor Considered by the D.C. Parole Board**

47. The third factor that the D.C. Parole Board considered was institutional
adjustment – whether the D.C. Code offender had received any serious disciplinary infractions
since the offender had been imprisoned for the current offense. *See* D.C. Guidelines Report at 5.

48. After calculating a parole candidate's SFS and the corresponding risk category
and baseline point score and adjusting that score to account for the type of risk the D.C. Parole
Board was required, under its 1987 Regulations, to determine whether the candidate had
"committed serious disciplinary infractions." 28 D.C. Mun. Regs. § 204.18(h).

49. Under the 1987 Regulations, the candidate's institutional adjustment was "an
aggravating factor applicable [where] the [D.C. Parole] Board has made findings that
disciplinary infractions . . . are either serious or repetitious enough to impact negatively on the
parole decision." D.C. Guidelines Report at 5.

50. The manner in which the D.C. Parole Board used the parole candidate's
institutional adjustment to adjust the his/her baseline point score at an initial parole hearing was
the subject of precise guidelines adopted by the D.C. Parole Board. Specifically, the D.C. Parole
Board used the "point grid" in Appendices 2-1 and 2-2 to the 1987 Regulations to reflect
adjustments to a parole candidate's baseline point score. *See* 28 D.C. Mun. Regs. apps. 2-1, 2-2.

Pursuant to Appendices 2-1 and 2-2, the D.C. Parole Board could add one point to a candidate's baseline point score for "negative institutional behavior." *See id.* The 1987 Regulations, however, did not provide guidance as to how the D.C. Parole Board was to determine whether to adjust a parole candidate's point score for institutional adjustment, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to, and later did, avoid. *See infra* ¶¶ 65-66.

#### Program Achievement: The Fourth Factor Considered by the D.C. Parole Board

51.  The fourth factor that the D.C. Parole Board considered was program achievement – whether the candidate had achieved sustained program achievement since he/she had been imprisoned for the current offense.

52.  After calculating a parole candidate's SFS, the corresponding baseline point score, and adjusting for "type of risk" and institutional infractions, the D.C. Parole Board, under its 1987 Regulations, was required to determine whether a candidate had "demonstrated sustained achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense."  28 D.C. Mun. Regs. § 204.18(i).

53.  Under the 1987 Regulations, a parole candidate's program participation was a "mitigating factor" applied when the D.C. Parole Board found that the candidate's program or work accomplishments were substantial enough to impact favorably on the parole decision.  D.C. Guidelines Report at 5.

54.  The manner in which the D.C. Parole Board used the parole candidate's program achievement to adjust the baseline point score at an initial parole hearing was the subject of precise guidelines adopted by the D.C. Parole Board.  Specifically, the D.C. Parole Board used the "point grid" in Appendices 2-1 and 2-2 to the 1987 Regulations to reflect adjustments to a parole candidate's adjusted baseline point score.  28 D.C. Mun. Regs. apps. 2-1, 2-2.  Pursuant to

Appendices 2-1 and 2-2, the D.C. Parole Board could subtract one point from a candidate's baseline point score for sustained program or work assignment achievement. *See id.* The 1987 Regulations, however, did not provide guidance as to how the D.C. Parole Board was to determine whether to adjust a parole candidate's adjusted baseline point score for program achievement, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to, and later did, avoid. *See infra* ¶¶ 65-66.

### The Parole Decision

55. Once the D.C. Parole Board calculated its baseline point score and adjusted it based on the "Type of Risk," "Institutional Adjustment," and "Program Achievement" factors under Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board "integrated [these factors] into a calculus to produce a *point score which constrained the Board's discretion in making final parole determinations*." *Fletcher*, 433 F.3d at 871 (citing 28 D.C. Mun. Regs. § 204.19 & App. 2-1 (emphasis added) (Appendix 2-1 is attached as Exhibit 6). This total point score "determine[d] whether or not parole is granted, and if so, the level of supervision to be imposed." D.C. Guidelines Report at 6.

56. In the case of an initial parole hearing, the 1987 Regulations, as amended by the D.C. Parole Board in 1994, directed the D.C. Parole Board to grant parole to an adult at an initial parole rehearing if the final adjusted score was zero, one, or two:

> After determining an adult parole candidate's SFS score and after applying the pre and post incarceration factors to arrive at a total point score pursuant to §204 and Appendix 2-1, the Board shall take one (1) of the following actions:
>
> (a) IF POINTS = 0:  Parole may be granted at initial hearing with low level of supervision required;
>
> (b) IF POINTS = 1:  Parole may be granted at initial hearing with high level of supervision required;

14

(c)  IF POINTS = 2:   Parole may be granted at initial hearing
                      with highest level of supervision
                      required; or


(d)  IF POINTS = 3-5:Parole may be denied at initial hearing
                     and rehearing scheduled.

28 D.C. Mun. Regs. app. 2-1.

57.  In the case of a parole rehearing, the 1987 Regulations, as amended by the D.C.

Parole Board in 1994, directed the D.C. Parole Board to grant parole to an adult at an initial

parole rehearing if the total point score was zero, one, two, or three:

> In determining whether to release on parole an adult or a youth
> offender appearing before the Board at a parole rehearing, *the
> Board shall take the total point score from the initial hearing*
> and adjust that score according to the institutional record of the
> candidate since the last hearing pursuant to Appendix 2-2.  The
> Board shall then take one of the following actions:
>
> (a)  IF POINTS = 0-3:Parole may be granted at this rehearing
>                      with highest level o[f] supervision
>                      required; or
>
> (b)  IF POINTS = 4-5:  Parole may be denied and a rehearing
>                        date scheduled.

28 D.C. Mun. Regs. app. 2-2 (attached as Exhibit 7)

58.  When it promulgated the 1987 Regulations, the D.C. Parole Board recognized

that  "there occasionally will be *unique circumstances* that are not taken into account by either

the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on

the release decision."  D.C. Guidelines Report at 22 (emphasis added).  To address these unique

circumstances, the 1987 Regulations permitted the D.C. Parole Board to depart from the action

indicated by a parole candidate's total point score only when mitigating and/or countervailing

factors applied that demonstrated "unusual circumstances," which the Board had to explain by

reference to the specific aggravating or mitigating factors listed in Appendices 2-1 and 2-2. 28

D.C. Mun. Regs. § 204.22.[2]

59. In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board listed those pre-
and post-incarceration circumstances that it determined might be deemed unusual and therefore
warrant a departure from the 1987 Regulations where a parole candidate's total point score
indicated that the candidate should be paroled. *See* 28 D.C. Mun. Regs. app. 2-1; Mack Dep. at
11-13, 22-25.

60. The D.C. Parole Board believed that six pre-incarceration circumstances or
factors ordinarily demonstrated that the candidate was a worse risk for parole at the candidate's
initial parole hearing than indicated by his/her total point score:

   a. the candidate repeatedly failed under parole supervision – "Repeated
failure under parole supervision";

   b. the "Current offense involve[d] on-going criminal behavior";

   c. the candidate had a "Lengthy history of criminally related alcohol abuse";

   d. the candidate had a "History of repetitive sophisticated criminal behavior";

   e. the candidate had an "Unusually extensive and serious prior record (at least
five felony convictions)"; and

   f. the candidate's crime involved "Unusual cruelty to victims."

28 D.C. Mun. Regs. app. 2-1.

61. The D.C. Parole Board recognized that the six pre-incarceration circumstances
were "unique" or "unusual" circumstances because they did not apply to the majority of parole

---

[2] *See* Mack Dep. at 12-13 (testifying that the six aggravating factors in Appendix 2-1 of the 1987
Regulations indicating that a parole candidate was a worse risk than the candidate's total point
score indicated were the only factors the Board could use to depart from the guidelines and deny
parole); D.C. Guidelines Report at 6 ("Decisions outside the guidelines may be rendered for
good cause when accompanied by written reasons that include a summary of the information
upon which the determination is based.").

candidates, i.e., the usual parole candidate. *See* D.C. Guidelines Report at 22. The D.C. Parole Board did not consider them to be "unique" or "unusual" simply because they were factors not taken into account by the SFS or type of risk assessment. *See id.*

62. The 1987 Regulations did not identify the criteria that the D.C. Parole Board was to apply to determine whether one or more of these six pre-incarceration factors applied in a specific case, which sometimes led to inconsistent and inequitable interpretations and applications of the regulations by D.C. Parole Board officials.

63. Appendix 2-2 of the 1987 Regulations, which applied at parole rehearings, did not include any pre-incarceration aggravating factors on which the D.C. Parole Board could rely to depart from the regulations and deny parole. *See* Mack Dep. at 26-27.

64. It was the D.C. Parole Board's policy and practice not to consider a parole candidate's current offense at a parole rehearing in deciding whether to depart from the guidelines, *see* Mack Dep. at 28 (testifying that there is no place in Appendix 2-2 for the D.C. Parole Board to consider the current offense behavior as a reason for departing from to depart from the action indicated by a parole candidate's total point score), and instead, to focus on the candidate's rehabilitation, community resources, and health since the candidate's previous hearing, *see id.* at 26-27.

**The 1991 Policy Guideline: The D.C. Parole Board's Effort to Remove Inconsistency and Ensure Equitable Application of the 1987 Regulations**

65. In 1991, to ensure consistent and equitable application of the 1987 Regulations, the D.C. Parole Board adopted a Policy Guideline that defined the terms used in the Appendices to the 1987 Regulations (the "1991 Policy Guideline") (attached as Exhibit 8).

66. The 1991 Policy Guideline applied to all requests for parole heard by the D.C. Parole Board. *See* 1991 Policy Guideline at 1.

67.  Following this Court's decision in the *Cosgrove* case in 1988, the USPC instructed its personnel to apply the 1991 Policy Guideline when conducting parole hearings for D.C. Code offenders in federal correctional facilities.  *See* Deposition of Rockne Chickinell ("Chickinell Dep.") at 78 (excerpts attached as Exhibit 9); 1992 Stover Mem. at 2.

68.  The purpose of the 1991 Policy Guideline was "[t]o define criteria and parameters for determining the applicability of descriptive terminology used in the [1987 Regulations] for release decisionmaking, and to facilitate consistency in Guideline application." 1991 Policy Guideline at 1.

69.  The D.C. Parole Board expressly adopted the 1991 Policy Guideline to avoid disparate decisions for similarly-situated offenders under the 1987 Regulations resulting from the subjective views and judgments of the various individuals at the Board applying those regulations to D.C. Code offenders:

> Many of the descriptive terms used in the Parole Guidelines criteria are judgmental or subjective.  As such, they lend themselves to disparate interpretations and applications by Guideline users.  To ensure equitable treatment of similarly-situated offenders, these terms require definitions that facilitate equitable application across affected cases, while preserving sufficient discretion to accommodate individual circumstances.

1991 Policy Guideline at 1.

70.  To promote consistency in its exercise of discretion under the 1987 Regulations and D.C. parole practices, the D.C. Parole Board sought to limit that discretion in the 1991 Policy Guideline by identifying the criteria and parameters that it used to determine whether certain discretionary factors applied.  *See id.*

### The D.C. Parole Board Narrowly Defined Negative Institutional Behavior

71.  As part of its effort to ensure consistency in its application of the "institutional adjustment" factor in its 1987 Regulations, the D.C. Parole Board promulgated section VI.A.1 of the 1991 Policy Guideline, which defined the types of institutional disciplinary actions that the D.C. Parole Board ordinarily considered to be "negative institutional behavior" under

Appendices 2-1 and 2-2 of the 1987 Regulations.  In section VI.A.1 of the 1991 Policy

Guideline, the D.C. Parole Board defined "Negative Institutional Behavior" as:

> serious or repeated major disciplinary infractions as described below that
> are sanctioned under Department of Corrections due process procedures.
>
> > a.      In INITIAL PAROLE CONSIDERATION cases, the following
> > disciplinary infractions shall ordinarily be considered as negative
> > institutional behavior:
> >
> > > (1)      One Class I Offense for murder, manslaughter,
> > > kidnapping, armed robbery or first degree burglary at any time
> > > during the minimum sentence (see DCMR 28-502.3, May
> > > 1987); OR
> > >
> > > (2)      One Class I Offense . . . *during the 12 months
> > > preceding the hearing OR during the last half of the minimum
> > > sentence up to a period of three years*, whichever is longer; OR
> > >
> > > (3)      Two Class II Offenses . . . *during the 12 months
> > > preceding the hearing OR during the last half of the minimum
> > > sentence up to a period of three years*, whichever is longer.
> >
> > b.      In PAROLE RECONSIDERATION cases, the following
> > disciplinary infractions occurring *since the preceding release
> > consideration on the sentence* shall ordinarily be considered as
> > negative institutional behavior:
> >
> > > (1)      One Class I Offense (see DCMR 28-502.3 through
> > > 502.17, May 1987); OR
> > >
> > > (2)      Two Class II Offenses (see DCMR 28-503.2 through
> > > 503.12, May 1987).

1991 Policy Guideline at 2 (emphasis added).

        72.  For purposes of determining at a parole candidate's initial hearing whether the

candidate had engaged in negative institutional behavior, the 1991 Policy Guideline provided

that the D.C. Parole Board's written policy was to consider only those institutional offenses

committed by a candidate in the twelve months preceding the hearing or in the last half of the

minimum sentence up to a period of three years, except in the case of the offenses of murder,

manslaughter, kidnapping, armed robbery, or first degree burglary.  *See id.*

73. The 1991 Policy Guideline provided that at a parole rehearing, the D.C. Parole Board only would consider certain types of offenses committed since the initial parole hearing as "negative institutional behavior," i.e., a Class I offense or two Class II offenses. *See id.*

## The D.C. Parole Board Broadly Defined Sustained Program or Work Assignment Achievement

74. To achieve greater consistency in its application of the "program achievement" factor of the 1987 Regulations, in section VI(A)(2)(a) of the 1991 Policy Guideline, the D.C. Parole Board defined "sustained program or work assignment achievement" for purposes of Appendix 2-1 as:

> In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:
>
> (1) Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area.

1991 Policy Guideline at 3.

75. For purposes of parole rehearings under Appendix 2-2 of the 1987 Regulations, section VI(A)(2)(b) of the 1991 Policy Guideline defined "sustained program or work assignment achievement" as:

> In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy [i.e., those that apply in initial parole hearings] shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence.

*Id.*

**The D.C. Parole Board Limited the Scope of Unusual Circumstances**

76.  In the 1991 Policy Guideline, the D.C. Parole Board clarified the scope of its authority to deny parole for "unusual circumstances" when a parole candidate's total point score indicates that parole should be granted.

77.  Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," defined each of the factors listed in Appendix 2-1 of the 1987 Regulations that the D.C. Parole Board recognized as constituting "unusual circumstances" and described the objective criteria and parameters that the D.C. Parole Board required to establish the existence of those circumstances.  1991 Policy Guideline at 6-9.

78.  The "unusual circumstance" of "Repeated Failure Under Parole Supervision" listed in Appendix 2-1 of the 1987 Regulations was defined by the 1991 Policy Guideline as requiring "two (2) or more revocations of parole on the current sentence, OR three (3) or more revocations of parole on any sentence within the preceding five years."  *Id.* at 6.

79.  The "unusual circumstance" of "Unusually Extensive or Serious Prior Record" was defined by the 1991 Policy Guideline as consisting of "at least five (5) felony convictions" for the commission of certain crimes of violence.  *Id.* at 6-7.

80.  The "unusual circumstance" of "Instant Offense Involved Unusual Cruelty to Victims" was defined by the 1991 Policy Guideline as requiring a finding that the offense involved "a. [p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense; OR b. [e]specially vulnerable victims, e.g., children or elderly persons were the victims of assaultive or fraudulent behavior."  *Id.* at 7.

21

**The USPC Changed the D.C. Parole Board's 's Regulations and Practices and Reinstituted Broad Discretion**

81. Effective August 5, 1998, the Revitalization Act abolished the D.C. Parole Board. Pub. L. No. 105-33 § 11231(b). Thereafter, the USPC assumed responsibility for parole hearings for D.C. Code offenders. *Id.*

82. Congress mandated in the Revitalization Act that the USPC conduct parole hearings for D.C. Code offenders according to the parole statutes and regulations of the District of Columbia. *Id.* at § 11231(c).

83. Instead, the USPC immediately drafted interim parole regulations effective in 1998 that were significantly different from and replaced the D.C. parole practices. 28 C.F.R. § 2.80(a)(5); *Fletcher*, 433 F.3d at 870. The USPC explained that it would apply its new regulations retroactively. *See id.*

84. After promulgating several revisions to those interim rules, the USPC published the 2000 Guidelines in final form and announced that it would apply those guidelines to any D.C. Code offender that had not received an initial parole hearing as of August 5, 1998, 28 C.F.R. § 2.80(a)(5); *Fletcher*, 433 F.3d at 870, including Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El.

85. For D.C. Code offenders who had received an initial parole hearing before August 5, 1998, including Plaintiffs James Gambrell and Curtis Eason, the USPC decided that it would apply the 1987 Regulations but ignore the D.C. Parole Board's other parole policies and guidelines, including the 1991 Policy Guideline. Chickinell Dep. at 38-39; Deposition of Stephen Husk ("Husk Dep.") at 60-61 (excerpts attached as Exhibit 10).

86. The USPC justified its use of the new 1998 regulations and the 2000 Guidelines on the ground that its research and analysis allegedly demonstrated that "[t]he point score system used by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from the

guidelines based upon factors that should be included in the guidelines." 63 Fed. Reg. 17771,

17772 (Apr. 10, 1998).

87.  As the USPC explained when it published its interim rule on July 21, 1998, "in a

random sample of 100 cases decided by the D.C. Parole Board in 1997, the [USPC] found

departures in more than half of the cases." *See* 63 Fed. Reg. 39172, 39172 (July 21, 1998).  The

USPC found that the "[f]actors cited by the [D.C. Parole] Board to justify departures most often

appear to involve aspects of the prisoner's current offense or criminal history that indicate a risk

of violent recidivism." *Id.*  The USPC's new regulations purported to "incorporate factors that

would otherwise be expected to result in decisions outside the guidelines." *Id.*

88.  The USPC also undertook an analysis "to identify factors related to current

offense and criminal history that [could] be empirically correlated with repeat violent crime." *Id.*

For this study, a USPC contractor drew a statistical sample of 1,000 D.C. Code offenders

released in 1992 and evaluated whether those offenders had an arrest for a violent offense within

five years after their release. *Id.*  Despite various data and process deficiencies noted by the

USPC's contractor, the USPC determined that this research confirmed that (a) "a violent current

offense predicts for future violence"; (b) a record of prior violent crime is "predictive even if the

offense did not involve violence;" and (c) that firearm possession also predicts future violent

crime even if the current offense did not involve violence . *Id.* at 39173.

89.  Based on these two studies, the USPC replaced the D.C. parole practices with the

2000 Guidelines for D.C. Code offenders receiving an initial parole hearing after August 5, 1998.

*Id.*  It did so despite the fact that it was concerned that its new guidelines might increase the

period of incarceration that D.C. Code offenders would have to serve.  Chickinell Dep. at 184-

186, 188-189.  The USPC has not analyzed whether the 2000 Guidelines in fact have increased

the period of incarceration served by D.C. Code offenders above what they likely would have served under the D.C. parole practices. *Id.* at 190:19-191:3.

90.  The practices the USPC has followed when applying the 1987 Regulations since 1998 have increased the period of incarceration that offenders convicted of certain crimes, including Plaintiffs, must serve to establish that they are presumed suitable for parole.

91.  Under the D.C. parole practices, an offender who committed a crime of violence that resulted in the victim's death, even if that crime was murder, has satisfied offense accountability once the offender has served his/her "minimum sentence."  D.C. Guidelines Report at 2-4.

92.  Under the practices the USPC has followed when applying the 1987 Regulations since 1998, an offender who committed ***any*** crime of violence that resulted in the victim's death, whether it be involuntary manslaughter or murder, has not satisfied offense accountability once the offender has served his/her "minimum sentence."  *See* Plaintiff Curtis Eason's Statement of Undisputed Material Facts ("Eason Statement") ¶¶ 7-9, 11-15, 17-18; Plaintiff James Gambrell's Statement of Undisputed Material Facts ("Gambrell Statement") ¶¶ 7, 9, 11, 22-24.

93.  On their face, the 2000 Guidelines are significantly different from the D.C. parole practices that applied to D.C. Code offenders before 1998.  These new guidelines have increased the period of incarceration that offenders convicted of certain crimes, including Plaintiffs, must serve to establish that they are presumed suitable for parole.

94.  Under the 2000 Guidelines, an offender who committed ***any*** crime of violence that resulted in the victim's death, whether it be involuntary manslaughter or murder, has not satisfied offense accountability once the offender has served his/her "minimum sentence."  *See* 28 C.F.R. § 2.80(f).

95.  Under the 2000 Guidelines, as explained in greater detail below, 18-24 months is automatically added (more if an offender has prior convictions and/or commitments, is under age 19, and/or was on parole or probation when the crime was committed) to the minimum sentence of an offender who committed *any* crime of violence that resulted in the victim's death, whether it was involuntary manslaughter or murder.  28 C.F.R. § 2.80(f), (h).

96.  The USPC repeatedly has denied D.C. Code offenders' requests for parole, including those of Plaintiffs, on offense severity bases or on the ground that it believes that the parole candidates have not served enough time for their offenses, i.e., that the inmates have not been incarcerated long enough to satisfy the accountability for their offenses.  *See* Sellmon Statement ¶¶ 6-7, 10-11, 18-19; Phillips Statement ¶¶ 7, 16-17; Martin Statement ¶¶ 16-17; Swinton Statement ¶¶ 12-13; West-El Statement ¶¶ 19-20; Eason Statement ¶¶ 9, 11-12, 14-15; Gambrell Statement ¶¶ 7, 20-22.

97.  In the 2000 Guidelines, the USPC has re-defined the term "unusual circumstances" that the D.C. Parole Board applied when it determined that it was appropriate to depart from the presumptive parole suitability indicated by its guidelines.  *Compare* 1991 Policy Guideline at 6-9 *with* 28 C.F.R. § 2.80(n)(2).

98.  The D.C. Parole Board adopted and applied specific criteria in the 1991 Policy Guideline to determine the existence of "unusual circumstances."  1991 Policy Guideline at 6-9. The USPC ignored that policy guideline and the D.C. Parole Board's definition of "unusual circumstances."  *See* 28 C.F.R. § 2.80(n)(2).

99.  The USPC has defined an "unusual circumstance" as any factor that a USPC hearing examiner or commissioner can think of that is not accounted for already in the calculation of a parole candidate's total point score under the 1987 Regulations or Total Guideline Range under the 2000 Guidelines.  Husk Dep. at 133; *see* 28 C.F.R. § 2.80(n)(1).

**The USPC Consider Offense Accountability in Applying the 2000 Guidelines**

100.  Under the 1987 Regulations and D.C. parole practices, the D.C. Parole Board *assumed* that a parole candidate had satisfied the accountability for his or her offense (the need for punishment, retribution, and general deterrence) once that candidate became eligible for parole, i.e., after serving the minimum sentence imposed by the court.  *See* D.C. Guidelines Report at 2-4; 1992 Stover Mem. at 2-3; 63 Fed. Reg. at 39174.

101.  The D.C. Parole Board did not address offense accountability when determining whether an inmate was suitable for parole.  Mack Dep. at 46-47, 52, 53.

102.  The D.C. Parole Board looked solely at the degree and type of risk of recidivism posed by a parole candidate and the candidate's institutional conduct (both positive and negative) to determine the candidate's suitability for parole.  *See* 1998 Stover Mem. at 3; 1992 Stover Mem. at 2-3**.**

103.  In the 2000 Guidelines, the USPC recognized that the 1987 Regulations were premised on the assumption that the "minimum term of imprisonment imposed by the court" was the "measure of basic accountability for the offense of conviction."  63 Fed. Reg. at 39174.  The USPC determined that it could ignore this assumption under the 2000 Guidelines in "exceptional cases" and apply a classic *federal parole guideline* principle of considering based on the severity of a parole candidate's offense.  28 C.F.R. § 2.73(b).  The USPC changed the "assumption" in the 1987 Regulations and D.C. Parole Board's practices into a "presumption" that the USPC determined it could ignore in "exceptional cases" based on "the gravity of the offense."  *Id.*

104.  The USPC has made a similar change in its practices when applying the 1987 Regulations to D.C. Code offenders who received their initial parole hearing before August 5, 1998.  Eason Statement ¶¶ 7-9, 11-15, 17-18; Gambrell Statement ¶¶ 7, 9, 11, 22-24.  The D.C. Parole Board assumed that all D.C. Code offenders had satisfied offense accountability when they became eligible for parole.  *See* D.C. Guidelines Report at 2-4; 1992 Stover Mem. at 2-3; 63

Fed. Reg. at 39174.  The USPC purportedly presumes this fact, but ignores the presumption

whenever it decides that the court's sentence was inadequate to satisfy the goals of punishment,

retribution, and general deterrence.  *See id.*

105.  The USPC has presented no evidence that the D.C. Parole Board ever denied a

parole candidate's request for parole simply because the D.C. Parole Board believed that the

candidate had not been punished enough or needed to serve longer to satisfy accountability for

the offense.

### The Presumption of Suitability Under the 2000 Guidelines

106.  Like the 1987 Regulations, the 2000 Guidelines initially use a point score

system to determine whether a presumption applies that an inmate is suitable for parole.

107.  This point score system, like the 1987 Regulations, begins with the calculation

of a Salient Factor Score for each parole applicant and is aimed at assessing the degree of risk

that a parole candidate will become a recidivist.  *See* 28 C.F.R. §§ 2.80(c) and 2.20.

108.  This point score system then purports to look to the "type of risk" that the

candidate poses should he or she become a recidivist, and finally factors in the candidate's

institutional behavior.  *See* 28 C.F.R. §§ 2.80(f), (j), and (k).

109.  Unlike the 1987 Regulations, which use the SFS, type of risk, and institutional

behavior factors to come up with a total point score that determines whether a parole candidate is

presumed suitable for parole, the 2000 Guidelines use the SFS and type of risk factors to develop

a "Base Point Score," which the USPC uses to determine a "Base Guideline Range," a number of

months the USPC adds to a parole candidate's parole eligibility period.  28 C.F.R. § 2.80(f); *see*

65 Fed. Reg. at 70663; 28 C.F.R. § 2.80(l).  This makes it impossible for any person with a Base

Point Score over three to establish a presumption of suitability for parole when he or she

becomes eligible for parole, i.e., after completion of his or her minimum sentence, as the 1987

27

Regulations permitted.  The Base Guideline Range represents "[t]he time [in excess of the candidate's parole eligibility period, i.e., minimum sentence] expected for the inmate to qualify for parole (assuming no disciplinary infractions and no ordinary program achievement)."  65 Fed. Reg. at 70663.

110.  The USPC adjusts the range resulting from adding the Base Guideline Range to the parole eligibility period by adding or subtracting periods of months to reflect negative institutional behavior and/or superior program achievement.  *See* 28 C.F.R. § 2.80(l).  The 2000 Guidelines refer to the final range of months as the Total Guideline Range and treat it as "the amount of time [an offender] may expect to serve with continued good conduct and ordinary program achievement."  65 Fed. Reg. at 70664.  Until a parole candidate has served a period of time equal to the bottom of his or her Total Guideline Range, the candidate is presumed to be unsuitable for parole.  *See* Chickinell Dep. at 117, 172; Husk Dep. at 187.

111.  Under the 1987 Regulations, depending largely on his or her SFS and institutional behavior, an offender often would have been entitled to a presumption that he or she was suitable for parole at the end of his or her minimum sentence.  Under the 2000 Guidelines, the same offender is now presumed unsuitable for parole until he or she has served his or her minimum sentence as well as any additional period of incarceration indicated by the Base Guideline Range or by adjustments for negative institutional behavior.  *See* 28 C.F.R. § 2.80(h), (i), and (l).

**The USPC's Changes in the 2000 Guidelines to the 1987 Regulations' SFS and Type of Risk Assessments Increased the Period of Incarceration that Plaintiffs Had to Serve to Establish a Presumption that They Were Suitable for Parole**

112.  The USPC accomplished the increase in the period a D.C. Code offender must serve to establish a presumption of suitability for parole through changes it made, under the guise of improving the predictive value of the 1987 Regulations and to reflect what the USPC

perceived as the "unstructured discretionary departures" that the D.C. Parole Board "frequently ordered . . . to compensate for an inadequate violence prediction ('type of risk' scale)," 63 Fed. Reg. at 39173, to the factors used in calculating D.C. Code offenders' SFS and type of risk score.

113.  For the SFS calculation in the 2000 Guidelines, which, like the 1987 Regulations, classify a parole candidate by risk of recidivism according to a point score (the higher the SFS, the lower the risk that the candidate would become a recidivist), the USPC, among other things, removed the one point increase that a D.C. Code offender could earn under the 1987 Regulations if the offender did not have a history of heroin or opiate addiction and replaced it with a one point increase that only offenders who were 41 years of age or older at the time of their offenses could earn.  *Compare* 28 C.F.R. § 2.20 salient factor scoring manual *with* 28 D.C. Mun. Regs. app. 2-1.  These changes to the SFS negatively impacted some D.C. Code offenders, i.e., those under the age of 41 with no history of heroin or opiate addiction, by depriving them of an SFS point they otherwise would have had under the 1987 Regulations.  *See* 28 C.F.R. § 2.20 salient factor scoring manual.

**The USPC's Changes to the "Type of Risk" Evaluation Were Far More Drastic than its Changes to the SFS Calculation.**

114.  Like the 1987 Regulations, the 2000 Guidelines provide for a "type of risk" analysis by taking the number of points identifying the degree of risk a parole candidate posed (as shown by the candidate's SFS score:  an SFS between 10-8 resulted in no points, between 7 and 6 in 1 point, between 5 and 4 in 2 points, and three or below in 3 points) and adjusting these points based on the parole candidate's history of violence, the use of a weapon, and/or the death of a victim as a result of the candidate's crime.  *See* 28 C.F.R. § 2.80(f).

115.  Unlike the 1987 Regulations, under which the most points a parole candidate could obtain for the "type of risk" factor was a single point, the 2000 Guidelines treated the candidate's history of violence, use of a weapon, and/or the death of a victim as distinct factors,

each of which the USPC could use to contribute points to a parole candidate's Base Point Score. In total, the 2000 Guidelines enabled the USPC to give a parole candidate as many as 7 points based on the "type of risk" factor, compared to the 1 point the 1987 Regulations permitted. *Compare* 28 D.C. Mun. Regs. Appendix 2-1 *with* 28 C.F.R. § 2.80(f).

116.  Each point of the Base Point Score in excess of three points increased the period of incarceration that a parole candidate had to serve in excess of his or her minimum sentence to be entitled to a presumption that he or she was suitable for parole.  *See* 28 C.F.R. § 2.80(h).

117.  The 2000 Guidelines divided the 1987 Guidelines "type of risk" analysis into two categories.  *See* 28 C.F.R. § 2.80(f).  Allegedly as a result of findings made in the recidivism study that the USPC commissioned, *see* 63 Fed. Reg. at 39172, the USPC used Category II of the "type of risk" analysis to adjust a parole candidate's Base Point Score by adding points based on whether the candidate had a history of violence, either in the current and/or in prior offenses, or used a firearm in the current offense.  *See* 28 C.F.R. § 2.80(f).

118.  If a parole candidate had two or more prior felony offenses involving violence and the current offense involved violence, the USPC added four points to the Base Point Score in Category II.  28 C.F.R. § 2.80(f).

119.  If a parole candidate had one prior felony offense involving violence and the current offense involved violence, the USPC added three points to the Base Point Score in Category II.  *Id.*

120.  If a parole candidate's current offense involved violence or a firearm, but the candidate had no prior felony offenses involving violence, the USPC added two points to the candidate's Base Point Score in Category II.  *Id.*

121.  If the candidate's current offense did not involve violence or the possession of a firearm, but the candidate had a prior offense involving violence, the USPC added one point to the Base Point Score.  *Id.*

122.  In Category III of the Base Point Score calculation, the USPC added three points to the Base Point Score if a parole candidate's current offense involved violence that resulted in the death of the victim.  *Id.*

123.  If the candidate's offense involved attempted murder, conspiracy to murder, solicitation of murder, or any willful violence where death of the victim was the most probable result of the crime, the USPC added two points to the Base Point Score.  *Id.*

124.  If a parole candidate's current offense involved "high level violence," such as arson, forcible rape, kidnapping, and carjacking, where death of the victim was not the most probable result of the crime, the USPC added one point to the candidate's Base Point Score.  *Id.*

125.  For the Category III adjustments, the USPC did not offer any empirical findings supporting its decision to increase a parole candidate's Base Point Score, as it had for Category II.  Instead, the USPC, without any factual or legal support in the D.C. Parole Board's regulations, policies, or practices, "decided that [extremely violent crimes such as murder and rape] present implied risk levels that would either justify [1] repeated departures, or [2] the inclusion of the relevant factors in the guideline system itself," which is what the USPC asserted it had chosen to do.  63 Fed. Reg. at 39173.

126.  For any parole candidate who was serving a sentence for a crime of violence that had resulted in the death of the victim, such as Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, and Benson West-El, the 2000 Guidelines automatically increased the Base Point Score by ***at least*** five points.  *See* 28 C.F.R. § 2.80(f).  This translated into ***at least*** 18-24 months added onto the period that the candidate would have had to serve to establish a

31

presumption of suitability for parole under the 1987 Regulations.  *See*  28 C.F.R. § 2.80(h).  If such a candidate had any prior convictions for violent offenses, the Base Point Score would increase even more than 5 points, as would the additional period the candidate had to serve to establish presumptive suitability for parole.  *See* 28 C.F.R. § 2.80(f) and (h).

127.  The USPC's use of the Base Point Score necessarily increases the period of incarceration that any D.C. Code offender with a Base Point Score in excess of three has to serve to establish that he or she is presumptively suitable for parole.  *See id.*

128.   On their face, the 2000 Guidelines, potentially could increase an offender's presumptive suitability for parole by 110 – 140 months.

129.  Under the 1987 Regulations, a 21 year old offender, who committed two prior residential burglaries of empty homes, committed involuntary manslaughter in the current offense, and has no disciplinary infractions and no sustained program achievement, would be presumptively suitable for parole after serving his minimum sentence.  This hypothetical offender will be discussed in Paragraphs 130 – 135 below, and will be referred to as the "Offender."

130.  Under the 2000 Guidelines, the Offender would have to serve an additional 110 – 140 months to become presumptively suitable for parole.

131.  Under the 1987 Regulations, the Offender's SFS would be 6 points, comprised of:

> a.  1 point for having two or three prior adult or juvenile convictions;
>
> b.  1 point for having one or two prior commitments for more than thirty days;
>
> c.  1 point for being 20-25 years of age at the time of the current offense;
>
> d.  1 point for having a recent commitment free period of three years;
>
> e.  1 point for not being on probation, confinement, or escape status during the commission of the current offense; and

     f.  1 point for having no history of heroin/opiate dependence.

28 D.C. Mun. Regs. app. 2-1.

132.  Under the 1987 Regulations, the SFS of 6 points, would translate into a fair risk category and a baseline point score of 1.  *Id.*  The Offender would receive one additional point for the "type of risk" for the involuntary manslaughter and residential burglary under the 1987 Regulations.  With a final point score of 2, the offender, under the 1987 Regulations, would be presumed suitable for parole at his/her initial hearing, that is, after serving his minimum sentence.  28 D.C. Mun. Regs. app. 2-1.  He would be presumptively suitable for parole.  *See id.*

133.  Under the 2000 Guidelines, the Offender would not be presumed suitable for parole after serving his minimum sentence; instead, he would need to serve an additional 110 – 140 months above his minimum sentence to be presumed suitable for parole.  *See* 28 C.F.R. § 2.80(f) and (h).

134.  Under the 2000 Guidelines, the Offender's SFS would be 5 points, comprised of:

     a.  1 point for having two or three prior adult or juvenile convictions;

     b.  1 point for having one or two prior commitments for more than thirty days;

     c.  1 point for being 20-25 years of age at the time of the current offense;

     d.  1 point for having a recent commitment free period of three years; and

     e.  1 point for not being on probation, confinement, or escape status during the commission of the current offense; and

     f.  0 points for being under 41 years of age at the commencement of the current offense.  28 C.F.R. § 2.20.  He would not receive 1 point as he would have under the 1987 Regulations for having no history of heroin/opiate dependence.

135.  Under the 2000 Guidelines, the SFS of 5 points also would translate into a fair risk category, but a baseline point score of 2 (not 1 as he had under the 1987 Regulations).  Under the 2000 Guidelines, involuntary manslaughter and residential burglary ***are*** crimes of

violence. *See* 28 C.F.R. § 2.80(g)(4)(ii), (vi). Under Category II, the Offender would receive 4

additional points for "[v]iolence in the current offense and…felony violence in two…prior

offenses." 28 C.F.R. § 2.80(f). Under Category III, the Offender would receive 3 additional

points because the "[c]urrent offense involved violence (high level violence or other violence)

with death of [the] victim resulting." *Id.* The Offender would receive 7 points in addition to his

SFS Category Point Score of 2, for a total Base Point Score of 9 points. *Id.* The Base Point

Score of 9 would be converted into a Base Guideline Range of 110 – 140 months,

28 C.F.R. 2.80(h), meaning that under the 2000 Guidelines, the Offender would be required to

serve 110 – 140 months in addition to his minimum sentence to be presumed suitable for parole.

Under the 1987 Regulations, this same Offender would have been presumed suitable for parole

after serving his minimum sentence. That is a longer guaranteed sentence of 9 years and 2

months to 11 years and 8 months under the 2000 Guidelines.

   136. The USPC asserted that its use of the Category III enhancement to the Base

Point Score was justified because the D.C. Parole Board departed "frequent[ly] for cases of

'unusual cruelty to victims'" (which the USPC believed correlated with "high level violence")

because the D.C. Parole Board's "point score table assign[ed] a one point enhancement for

violence, regardless of the nature and seriousness of the crime." 63 Fed. Reg. at 39172. The

USPC cited absolutely no factual support for this assertion. *See id.*; 1998 Memorandum at 3, 7

(noting that the D.C. Parole Board's guidelines focus exclusively on risk and that "the research

results did not justify the conclusion that current homicides statistically predict for future

homicides," but nevertheless justifying the two point enhancement in Category III on the ground

that including the factor would "structure discretion that would otherwise be used in decisions

outside the guidelines based on the fact that a victim was done to death").

**In the 2000 Guidelines, the USPC Uses a Parole Candidate's Negative Institutional Behavior to Increase the Period of Incarceration the Candidate Has to Serve to Establish Presumptive Parole Suitability**

137.  The 2000 Guidelines, like the 1987 Regulations, take a parole candidate's institutional behavior into account for purposes of parole determinations.

138.  Unlike the 1987 Regulations, the 2000 Guidelines determine a range of months under the provisions of 28 C.F.R. § 2.36 "for any significant disciplinary infractions since the beginning of confinement on the current offense in the case of an initial hearing, and since the last hearing in the case of a rehearing."  28 C.F.R. § 2.80(j).[3]

139.  The USPC then adds the range of months it calculates under 28 C.F.R. § 2.36 to the parole candidate's Base Guideline Range and minimum sentence, i.e. parole eligibility period, to determine the period of incarceration that the candidate must serve to establish his/her presumptive suitability for parole.  *Id.*

140.  Unlike the 1987 Regulations, 28 C.F.R. §§ 2.80(j) and 2.36 do not limit consideration at initial parole hearings to the parole candidate's institutional behavior within the three years before the parole hearing for all but the most serious infractions.  *Compare* 28 C.F.R. §§ 2.80(j) and 2.36 *with* 1991 Policy Guideline at 2.

141.  The USPC's use of the 2000 Guidelines instead of the 1987 Regulations have allowed the Defendants to increase the periods of incarceration that a parole candidate "may expect to serve" before being considered suitable for parole based on disciplinary infractions that

---

[3] Although the USPC regulations state that the USPC only considers "significant" disciplinary infractions, the Defendants' practice is to add months to a D.C. Code offender's minimum sentence and Base Guideline Range for every disciplinary infraction the offender receives, regardless of how insignificant or old the disciplinary infraction is.  Husk Dep. at 47; Deposition of Paul Howard ("Howard Dep.") at 27-28 (excerpts attached as Exhibit 11).

the D.C. parole practices would not have considered at all.[4]  *Compare* 28 C.F.R. § 2.36 *with* 1991 Policy Guideline at 2.

### The 2000 Guidelines, Unlike the 1987 Regulations, Do Not Reward a Parole Candidate's Ordinary Program Achievement By Improving the Candidate's Prospects of Parole

142.  Pursuant to section 2.80(e)(1) of the 2000 Guidelines, the USPC assesses whether a parole candidate "has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense."  28 C.F.R. 2.80(e)(1).

143.  The 2000 Guidelines give the USPC the sole discretion of determining whether the parole applicant's work and program achievements are to be considered "superior" or "ordinary."  *See* Howard Dep. at 66-68.

144.  Per the USPC's guidelines, "if superior achievement is found, the award for superior program achievement shall be one-third of the number of months during which the prisoner demonstrated superior program achievement."  28 C.F.R. § 2.80(e).

145.  Under the 1987 Regulations and the D.C. parole practices, the D.C. Parole Board used an objective standard, set forth in the 1991 Policy Guideline, to reward "Sustained Program Achievement or Work Assignment Achievement."  1991 Policy Guideline at 3.

---

[4] Even where a parole candidate's institutional misconduct may have been considered by the D.C. Parole Board because it occurred within the three years prior to the candidate's initial hearing, that misconduct would not necessarily have added any period of incarceration to the time the candidate had to serve to establish presumptive parole suitability.  The 2000 Guidelines, on the other hand, automatically add a period of months to a parole candidate's parole eligibility period for any but the most minor infractions.

**Under the 2000 Guidelines, the USPC Has Significantly Changed the Bases on which the D.C. Parole Board Could Depart from the Presumption that a D.C. Code Offender Was Suitable for Parole**

146.  The 2000 Guidelines defined "unusual circumstances" as those "case-specific factors that are not fully taken into account in the guidelines, and that are relevant to the grant or denial of parole."  28 C.F.R. § 2.80(n).

147.  The 2000 Guidelines provided examples of "unusual circumstances" similar to those utilized by the D.C. Parole Board, like an "[u]nusually persistent failure under supervision" or an "[u]nusually extensive prior record," but they did not define the criteria necessary to establish the applicability of those "unusual circumstances."  28 C.F.R. § 2.80(n)(2).

148.  In the 1991 Policy Guideline, the D.C. Parole Board defined the criteria necessary to establish the applicability of "unusual circumstances."  *See* 1991 Policy Guideline at 6-9.

149.  The USPC's General Counsel required the USPC to apply the 1991 Policy Guideline to determine the applicability of "unusual circumstances," after it was ordered in 1988 to apply the D.C. Parole Board's guidelines to D.C. Code offenders housed in federal prisons. 1992 Stover Mem. at 4 ("When considering reasons for a departure from the point score or rehearing guidelines, always consult the [D.C. Parole Board] Policy Guidelines.") (emphasis in original); s*ee also* Chickinell Dep. at 105.

150.  The 1987 Regulations permitted departures from the presumption of parole suitability in "unusual circumstances" only by applying the written, objective standards in the 1991 Policy Guideline.  *See* 1991 Policy Guideline at 6-9.

151.  The 2000 Guidelines left it to the subjective whims of the USPC Hearing Examiners and/or Commissioners to identify a factor for which the USPC did not add a point to the Base Point Score and deem it an "unusual circumstance."  Husk Dep. at 91-92.

152. Even in their interrogatory responses, the Defendants admitted that the USPC has unfettered discretion to interpret and apply the term "unusual circumstances." Defendants' Answer to Plaintiffs' First Set of Interrogatories ("Defendants' Interrogatories Answer") ¶ 10(j) ("whether 'unusual circumstances' exist – this is a discretionary determination for which no formal criteria exist") (attached as Exhibit 12). Indeed, the 2000 Guidelines left it to the subjective whims of the USPC Hearing Examiners and/or Commissioners to interpret and apply the 2000 Guidelines to D.C. Code offenders. *See id.* ¶ 10(a)-(k).

153. The Defendants admitted that whether a D.C. Code offender has an "unusual propensity to inflict unproved and potentially homicidal violence" is a "discretionary determination for which no formal criteria exist." *Id.* ¶ 10(d).

154. Whether a D.C. Code offender has demonstrated "unusual cruelty to the victim (beyond that accounted for by scoring the offense high level violence)," according to the USPC, is "a discretionary determination for which no formal criteria exist." *Id.* ¶ 10(e).

155. Whether a D.C. Code offender has "been found guilty of committing significant disciplinary infractions while under confinement for the current offense," is "generally a discretionary determination for which no formal criteria exist." *Id.* ¶ 10(g).

156. Whether a D.C. Code offender has an "unusually extensive prior record (sufficient to make the offender a poorer risk than indicated by the total point score)," in the USPC's view, is "a discretionary determination for which no formal criteria exist." *Id.* ¶ 10(k).

157. The 2000 Guidelines did not place any limit whatsoever on the type of circumstance the USPC could deem "unusual," except to the extent that the circumstance could not have been "fully taken into account in the guidelines." 28 C.F.R. § 2.80(n); *see also* Husk Dep. at 132, 141.

38

158.  In Plaintiff Carlton Martin's case, the USPC used this almost limitless definition of "unusual circumstances" to depart on the ground that it was an "unusual circumstance" for Mr. Martin, who currently is serving a sentence for Manslaughter While Armed, to have been convicted in a prior drug offense of possessing a firearm.  Stephen Husk, the USPC's current Case Operations Administrator, testified that it is not "unusual" for an individual convicted of manslaughter to have a prior conviction involving the possession of a firearm, but because the 2000 Guidelines did not allow the USPC to increase Mr. Martin's Base Point Score on the basis of his prior conviction of a crime involving a firearm (thus, making this a factor not accounted for by the guidelines), this factor qualifies as an "unusual circumstance" under 28 C.F.R. § 2.80(n), even though it was not unusual compared to other similar offenders.  *See* Husk Dep. at 213-214.

159.  In Mr. Martin's case, the Executive Reviewer involved in Mr. Martin's March 2006 parole request, who wrote the explanation used by the USPC in its April 12, 2006 Notice of Action, described her rationale for that explanation in the Hearing Summary as follows:  "The [hearing] examiner is recommending release after approximately 15.5 years.  This is not sufficient accountability for the death of the victim in addition to possession of a firearm during a drug offense."  Martin Statement ¶ 16.

160.  In Plaintiff Tony Sellmon's case, the USPC has twice departed from the 2000 Guidelines' presumption that Mr. Sellmon is suitable for parole, resulting in Mr. Sellmon serving almost six years in excess of his minimum sentence.  On both occasions, the Defendants identified the "unusual circumstance" in Mr. Sellmon's case warranting a departure as the fact that Mr. Sellmon had inflicted a "massive head trauma" by beating his victim to death.  Mr. Husk testified that it is not unusual for a murder victim to suffer a massive head trauma, *see* Husk Dep. at 228, but because the 2000 Guidelines do not include a factor in the Base Point Score

calculation reflecting that the parole candidate caused a "massive head trauma" by beating the victim to death, this factor qualifies as an "unusual circumstance" on which the USPC can rely to deny Mr. Sellmon's requests for parole, even though it was not unusual compared to other similar offenders.  *See* Husk Dep. at 132, 141.  Mr. Sellmon, who has no prior convictions, has served six years more than his minimum sentence as a result of this "unusual circumstance" under the USPC's interpretation of that term in the 2000 Guidelines.  *See* Sellmon Statement ¶¶ 10, 18.

161.  In Mr. Sellmon's case, the Hearing Examiner at Mr. Sellmon's August 2, 2005 parole hearing focused solely on the severity of Mr. Sellmon's offense and accountability for that offense when he explained his reasons for denying parole as follows:

> This Examiner believes that *accountability* for the offense behavior not only *is a consideration of* the factors that go into the guideline calculation, but also *factors that are outside of that calculation.  That would include the brutality exhibited by an offender in committing a murder.*  In this case, our subject chose to beat a female victim to death by beating her in the head with a gun, thereby, causing massive head trauma and her ultimate death.  This methodology is extremely brutal.  I do not believe that it is captured by guidelines, which would suggest that the subject be paroled at a maximum guideline range of 110 months (9 years and 2 months).  Further, I do not believe that the extreme brutality of the offense is captured by his current service of nearly 14 years, or even by the next Reconsideration Hearing date, which would be scheduled after service of approximately 17 years . . . .

*Id.* ¶ 18.

162.  The USPC has applied a similar definition of "unusual circumstances" for D.C. Code offenders who had an initial parole hearing before August 5, 1998, and to which the USPC asserts it continues to apply the 1987 Regulations.  *See* 28 C.F.R. § 2.80(a)(4).

163.  Applying this new definition, the USPC has denied the requests for parole of Plaintiffs Curtis Eason and James Gambrell on offense severity grounds for which the USPC asserts the 1987 Regulations do not account.  *See* Eason Statement ¶¶ 9, 11-12, 14-15; Gambrell

Statement ¶¶ 7, 20-22.  The D.C. Parole Board assumed that the sentencing court's sentence addressed offense severity characteristics.  D.C. Guidelines Report at 2-4.

164.  In Mr. Eason's case, the USPC denied Mr. Eason's March 2007 request for parole on the ground that Mr. Eason's crime allegedly "was planned and an act of revenge." Eason Statement ¶ 14.  The USPC "determined that additional time incarcerated is necessary for accountability purposes."  *Id.* ¶¶ 14, 16.  The Executive Reviewer of Mr. Eason's parole described the USPC's position as follows:  "the subject should serve much more time on this term, possibly as long as 25 – 30 years.  A decision less than that, would, in my opinion, depreciate the seriousness of the offense behavior and promote disrespect for the law."  *Id.* ¶¶ 14-15.

165.  The standard applied by the Executive Reviewer in Mr. Eason's case ("depreciate the seriousness of the offense behavior and promote disrespect for the law") is the exact same standard applied to determine federal prisoners' suitability for parole under the federal parole guidelines.  *See* 28 C.F.R. § 2.18 (based on the former parole statute at 18 U.S.C. § 4206, which was repealed in 1987).  The D.C. Parole Board expressly rejected this standard in 1985.  *See Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1003 (D.D.C. 1988); D.C. Guidelines Report at 17 ("The Board, however, did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale.  It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant.").

166.  Because the USPC applied such offense severity factors in Mr. Eason's case, Mr. Eason, who was sentenced to 14 years to life by Judge Gladys Kessler in 1988 has served almost ten years more than his minimum sentence.  Eason Statement ¶¶ 2, 7, 19.  The D.C.

Parole Board assumed under its policies and practices that Mr. Eason's minimum sentence satisfied his accountability for his offense.  *Id.* ¶ 2.

167.  In Mr. Gambrell's case, the USPC denied Mr. Gambrell's 2006 parole request based on his history of convictions of crimes involving violence (the same basis on which the USPC had denied Mr. Gambrell's requests for parole in 1999 and 2003 and essentially the same basis on which the D.C. Parole Board had denied his 1998 parole request) and gave Mr. Gambrell, who turns age 59 in 2008, a one year set-off.  Gambrell Statement ¶ 12.

168.  Mr. Gambrell continued his exemplary institutional conduct during the one-year setoff.  *Id.* ¶¶ 19-20, 26.

169.  After the one-year setoff, the USPC denied Mr. Gambrell's July 2007 parole request because of his "prior record of convictions for assaultive behaviors" and the "exceptional gravity" of Mr. Gambrell's current offense.  *Id.* ¶ 24.  The Executive Reviewer in Mr. Gambrell's case, who had agreed in 2006 – before Mr. Gambrell filed this lawsuit – that Mr. Gambrell only needed a one-year setoff, stated, "19 years is simply not enough time for an individual to serve for a crime of this nature and I believe that release at this time, or any time in the near future, would depreciate the seriousness of the offense behavior and promote disrespect for the law."  *Id.* ¶ 22.  The Executive Reviewer then gave Mr. Gambrell a five-year set off without citing any new facts that occurred between his 2006 parole hearing and his 2007 parole hearing.  *Id.* ¶ 24.

170.  The USPC's new interpretation of the term "unusual circumstances" has allowed the USPC to create bases for departure that the D.C. Parole Board explicitly rejected as permissible under the 1987 Regulations.  *Compare* 28 C.F.R. § 2.80(n)(2) with 1991 Policy Guideline at 6-9.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

TONY R. SELLMON, et al.,            :
                                    :
            Plaintiffs,             :
                                    :
      v.                            :  Civil Action No. 06-1650 (ESH)
                                    :
EDWARD F. REILLY, JR., et al.,      :
                                    :
            Defendants.             :
_____ :

**PLAINTIFF CURTIS EASON'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.   On November 9, 1988, the Honorable Gladys Kessler, then of the D.C. Superior

Court, sentenced Plaintiff Curtis Eason to imprisonment for a term of 14 years to life for the

single crime of Murder in the Second Degree while Armed.  *See* D.C. Super. Ct. Judgment &

Commitment/Probation Order of Curtis D. Eason (Nov. 9, 1988) (attached as Exhibit 1).

2.   Under District of Columbia law, Mr. Eason became eligible for parole on March

18, 1998.  *See* District of Columbia Board of Parole, Parole Determination Record ("D.C.

Hearing Summary") at 2 (Mar. 11, 1998) (attached as Exhibit 2).  Under the District of Columbia

Board of Parole ("D.C. Parole Board") regulations, guidelines, policies, and practices ("D.C.

parole practices"), Mr. Eason satisfied accountability for his offense after serving his minimum

sentence, that is, on his eligibility date.  *See* 1992 Stover Mem. at 2-3 ("[T]he D.C. guidelines

use the minimum term of the sentence (less good time) as the basic measure of accountability for

the offense . . . ." (attached as Exhibit 3 to Plaintiffs' Joint Statement of Undisputed Material

Facts[1] ("Plaintiffs' Joint Statement")); *see also* D.C. Guidelines Report at 17 (attached as Exhibit

1 to Plaintiffs' Joint Statement).

_____

[1] "Plaintiffs' Joint Statement of Undisputed Material Facts" refers to the Joint Statement filed
with the Memorandum in Support of the Joint Motion of Plaintiffs Carlton Martin, Charles

(footnote continued on next page)

3.  On February 20, 1998, the D.C. Parole Board held Mr. Eason's initial hearing. D.C. Hearing Summary at 1.  Mr. Eason had a Point Assignment Grid Score ("total point score") of 3 under the D.C. parole guidelines, which indicated that he was not presumed suitable for parole and that parole should be denied at his initial hearing.  *Id.* at 7.

4.  The D.C. Parole Board denied Mr. Eason parole on November 23, 1998 – a decision within the D.C. parole guidelines.  *See* D.C. Bd. Parole Notice of Board Order (Feb. 23, 1998) (attached as Exhibit 3).

5.  The D.C. Parole Board gave Mr. Eason a 1 year set-off, setting a rehearing date for March 18, 1999, and stating two special instructions for reconsideration: (1) "program participation" and (2) "no new disciplinary reports."  *See id.*

6.  On August 5, 1998, the United States Parole Commission and the Defendants and/or their predecessors (collectively the "USPC") assumed the responsibility for making parole release decisions for all eligible D.C. Code offenders, including Mr. Eason.  *See* National Capital Revitalization and Self-Government Act, Pub. Law. No. 105-133 § 11231(c), 111 Stat. 712 (1997).

7.  On March 9, 1999, a USPC Pre-Hearing Assessment Reviewer prepared a reconsideration prehearing assessment for Mr. Eason and computed a total point score of 2.  *See* D.C. Reconsideration Prehearing Assessment at 1 (Mar. 9, 1999) (attached as Exhibit 4).  In considering whether Mr. Eason was suitable for parole, the Reviewer's only concern was whether Mr. Eason had satisfied the accountability for his offense:  "[Mr. Eason] is now within the parolable guidelines with a total point score of 2.  The issue is whether or not 11 years in custody is adequate accountability for the taking of a life during a robbery offense."  *See id.* at 3.

---

Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El for Partial Summary Judgment on their Ex Post Facto Claims.

8.  The USPC conducted Mr. Eason's first rehearing on March 30, 1999.  *See* D.C. Reconsideration Hearing Summary at 1 (Mar. 30, 1999) (attached as Exhibit 5).  Mr. Eason's total point score, as calculated by the Pre-Hearing Reviewer and the Hearing Examiner, was a 2, indicating that Mr. Eason was presumed suitable for parole and that parole should be granted. *See id.* at 3-4.

9.  After noting that Mr. Eason had continued programming well and had no new disciplinary infractions – the two "special instructions for reconsideration" listed by the D.C. Parole Board when it denied Mr. Eason parole in 1998 within the D.C. guidelines – the Hearing Examiner at Mr. Eason's 1999 parole rehearing recommended that the USPC depart from the D.C. parole guidelines and deny Mr. Eason parole.  *See id.* at 3.  The Hearing Examiner explained that his recommendation was based on the view that Mr. Eason had not satisfied accountability for his crime:

> The prisoner is still doing extremely well in terms of programming and conduct, however, in this examiner's opinion, the prisoner's favorable institutional adjustment does not outweigh the issues of risk or accountability.  This examiner would believe that that for the nature of the prisoner's instant offense some minimal sentence service up to 20 years would be indicated or possibly even more.  It appears that the prisoner has served between 10 and 11 years in continuous custody at this juncture and again in this examiner's opinion, it simply would not be sufficient for purposes of accountability not to mention the issue of risk.  *Id.*

10.  The USPC adopted the Hearing Examiner's conclusions and recommendation to deny Mr. Eason parole.  *See* Notice of Action ("1999 Notice of Action") at 1 (Apr. 23, 1999) (attached as Exhibit 6).  The USPC also gave Mr. Eason a five year set-off, setting a rehearing date for March 2004.  *Id.*

11.  The USPC conducted Mr. Eason's second rehearing on March 2, 2004.  *See* Hearing Summary at 1 (Mar. 2, 2004) (attached as Exhibit 7).  The Hearing Examiner first reduced Mr. Eason's total point score by one point for program achievement since his last hearing for a total point score of 1, which indicated that Mr. Eason was presumed suitable for

parole and that parole should be granted.  *See id.* at 3.  The Hearing Examiner, therefore,

recommended that the Commissioners make a decision within the guidelines and grant parole.

*Id.*  The Executive Reviewer for Mr. Eason's March 2004 parole rehearing, however, rejected the

Hearing Examiner's recommendation and instead recommended that the USPC deny Mr.

Eason's parole request.  *See id.* at Addendum to Hearing Summary.  The Executive Reviewer

explained his decision as follows:

> A review of file documents reveals that although the offender was
> permitted to plead to the reduced offense of Murder II, the offense
> behavior has all of the elements of Murder I.  There was planning
> aforethought, etc.  The offender brought to the table a serious
> assault/violent criminal history and must still be considered threat to the
> public safety.  Although he has made a generally good inst[itutional]
> adjustment, *the behavior accountability factor has not been met.*  In many
> jurisdictions release for a case of this magnitude would not be seriously
> considered until, at least 20 years had been served.  It is noted also that at
> the 1999 hearing the USPC imposed the maximum "setoff" (5 yrs) and
> would possibly have made a more lengthy one if permitted.

*Id.*

   12.   The USPC rejected the Hearing Examiner's recommendation, adopted the

Executive Reviewer's recommendation, and departed from the D.C. parole guidelines, denying

Mr. Eason's request for parole.  Notice of Action at 1 (Apr. 1, 2004) ("2004 Notice of Action")

(attached as Exhibit 8).  On the 2004 Notice of Action, the USPC explained that it denied Mr.

Eason's request for parole because it determined that he had not yet satisfied accountability for

his crime: "additional time incarcerated is necessary for accountability purposes."  *Id.*  The

USPC gave Mr. Eason a three year set-off, setting a rehearing date for March 2007.  *Id.*

   13.   The USPC conducted Mr. Eason's third rehearing on March 13, 2007.  *See*

Hearing Summary at 1 (Mar. 13, 2007) (attached as Exhibit 9).  The Hearing Examiner reduced

Mr. Eason's total point score from his last rehearing by one point for program achievement since

his last hearing for a total point score of 0, which indicated that Mr. Eason was presumed

suitable for parole and that parole should be granted. *See id.* at 3. The Hearing Examiner recommended that the USPC make a decision within the guidelines and grant parole. *Id.*

14. Executive Reviewer Jeffrey Kostbar, however, disagreed and recommended a decision outside the guidelines and a denial of parole. *Id.* Mr. Kostbar wrote that he believed Mr. Eason had not satisfied accountability for his crime because the facts of the crime were more similar to the elements of first-degree murder than of second-degree murder, even though Mr. Eason had been sentenced to serve fourteen years to life in 1988 by Judge Kessler for the offense of second-degree murder, ***not*** first-degree murder:

> This is a highly aggravated case and outside the "heartland" of a 2nd degree murder case. ***The case specifics are more closely associated with a 1st degree, premeditated murder.*** Consequently I believe that the subject should serve much more time on this term, possibly as long [as] 25 – 30 years. A decision less than that, would, in my opinion, depreciate the seriousness of the [offense] behavior and promote disrespect for the law… your behavior is more serious than your conviction to Murder II in that the murder was planned and an act of revenge. Consequently, the Commission has determined that additional time incarcerated is necessary for accountability purposes.

*Id.* at 3-4 (emphasis added).

15. One of the justifications Mr. Kostbar offered for recommending that the USPC deny Mr. Gambrell's request for parole – that granting the request would "depreciate the seriousness of the [offense] behavior and promote disrespect for the law" – is the standard that the USPC applies to U.S. Code offenders, and it does not apply to D.C. Code offenders. *Compare* 28 C.F.R. § 2.18 *with* 28 C.F.R. § 2.73.

16. The USPC adopted Mr. Kostbar's recommendation, departed from the D.C. parole guidelines, and denied Mr. Eason's request for parole. Notice of Action at 1 (Mar. 23, 2007) ("2007 Notice of Action") (attached as Exhibit 10). On the 2007 Notice of Action, the USPC explained that it denied Mr. Eason parole because it determined that he had not yet

satisfied accountability for his crime: "additional time incarcerated is necessary for accountability purposes." *Id.*

17. Under the 1987 Regulations, Mr. Eason was presumed suitable for parole at his first rehearing on March 9, 1999 with a total point score of 2, at his second rehearing on March 2, 2004 with a total point score of 1, and at his third rehearing on April 2007 with a total point score of 0. *See* 28 DCMR § 204.18.

18. Under the 1987 Regulations, Mr. Eason satisfied accountability for his offense in 1998 when he completed his minimum sentence. *See* para. 2, supra.

19. The USPC has denied Mr. Eason parole at each of his three rehearings, in 1999, 2004, and 2007, on the ground that he has not satisfied accountability for his crime and on the belief that Mr. Eason committed a more serious offense than the one for which Judge Kessler sentenced him in 1988. *See* 1999 Notice of Action; 2004 Notice of Action; 2007 Notice of Action.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

TONY R. SELLMON, et al.,                     :
                                             :
            Plaintiffs,                      :
                                             :
    v.                                       : Civil Action No. 06-1650 (ESH)
                                             :
EDWARD F. REILLY, JR., et al.,               :
                                             :
            Defendants.                      :
_____     :

**PLAINTIFF JAMES GAMBRELL'S STATEMENT OF UNDISPUTED MATERIAL**
**FACTS**

1.    On January 3, 1991, the Honorable Henry H. Kennedy, Jr., then of the D.C.

Superior Court, sentenced Plaintiff James Gambrell to imprisonment for a term of 12 years to life

for Murder II Whiled Armed.  *See* D.C. Super. Ct. Judgment & Commitment/Probation Order of

James Gambrell (Jan. 13, 1991) (attached as Exhibit 1).

2.    Under District of Columbia law, Mr. Gambrell became eligible for parole on

November 26, 1999.  *See* Sentence Monitoring Computation Data of James Gambrell at 3 (Jun.

11. 2007) (attached as Exhibit 2).  Under the District of Columbia Board of Parole ("D.C. Parole

Board") regulations, guidelines, policies, and practices ("D.C. parole practices"), Mr. Gambrell

satisfied accountability for his offense after serving his minimum sentence, that is, on his

eligibility date.  *See* 1992 Stover Mem. at 2-3 ("[T]he D.C. guidelines use the minimum term of

the sentence (less good time) as the basic measure of accountability for the offense . . . ."

(attached as Exhibit 3 to Plaintiffs' Joint Statement of Undisputed Material Facts[1] ("Plaintiffs'

_____

[1] "Plaintiffs' Joint Statement of Undisputed Material Facts" refers to the Joint Statement filed
with the Memorandum in Support of the Joint Motion of Plaintiffs Carlton Martin, Charles
Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El for Partial Summary
Judgment on their Ex Post Facto Claims.

Joint Statement")); *see also* D.C. Guidelines Report at 17 (attached as Exhibit 1 to Plaintiffs'
Joint Statement).

      3.  The D.C. Parole Board held Mr. Gambrell's initial parole hearing and denied Mr.
Gambrell's request for parole on July 14, 1998.  *See* D.C. Bd. Parole Notice of Board Order of
James Gambrell (Jul. 14, 1998) (attached as Exhibit 3).  The D.C. Parole Board gave Mr.
Gambrell a one year set-off, setting a rehearing date for August 20, 1999.  *Id.*

      4.  On August 5, 1998, the United States Parole Commission and the Defendants
and/or their predecessors (collectively the "USPC") assumed the responsibility for making parole
release decisions for all eligible D.C. Code offenders, including Mr. Gambrell.  *See* National
Capital Revitalization and Self-Government Act, Pub. Law. No. 105-133 § 11231(c), 111 Stat.
712 (1997).

      5.  On December 9, 1999, a USPC Pre-Hearing Assessment Reviewer prepared a
reconsideration prehearing assessment for Mr. Gambrell.  *See* D.C. Reconsideration Prehearing
Assessment of James Gambrell at 1 (Dec. 9, 1999) (attached as Exhibit 4).  In considering
whether Mr. Gambrell was suitable for parole, the Reviewer's concern was whether Mr.
Gambrell had satisfied the accountability for his offense:  "The major issued [sic] is whether this
is sufficient accountability for the murder of an unarmed guard during a robbery."  *See id.* at 3.

      6.  The USPC conducted Mr. Gambrell's first rehearing on December 14, 1999.  *See*
D.C. Reconsideration Hearing Summary of James Gambrell ("1999 Rehearing Summary") at 1
(Dec. 14, 1999) (attached as Exhibit 5).  The Hearing Examiner first reduced Mr. Gambrell's
Point Assignment Grid Score ("total point score") score by one point for sustained program
achievement since his last hearing for a total point score of 0, which indicated that Mr. Gambrell
was presumed suitable for parole and that parole should be granted.  *See id.* at 3-4.

7.  The Hearing Examiner then noted that Mr. Gambrell had programmed well since his incarceration, had received no disciplinary infractions, and had a total point score of 0, which indicated that Mr. Gambrell should be recommended for parole. *Id.* at 2.  Nonetheless, the Hearing Examiner recommended that the USPC depart from the D.C. parole guidelines and deny Mr. Gambrell's parole request.  *See id.* at 3.  The Hearing Examiner explained that his recommendation was based on his view that Mr. Gambrell had not satisfied accountability for his crime:

> The grid point score in this case would clearly indicate that parole be recommended, however, **a close review of the crime itself** as well as the subject's history would suggest that he represents a clear threat to the community and should not be released at this time.

*Id.* at 2 (emphasis added).

8.  On January 18, 2000, the USPC adopted the Hearing Examiner's conclusions and recommendation, and denied Mr. Gambrell's request for parole – the USPC's first decision outside and above the guidelines.  *See* Notice of Action of James Gambrell ("1999 Notice of Action") at 1 (Apr. 23, 1999) (attached as Exhibit 6).  The USPC also gave Mr. Gambrell a four year set-off, setting a rehearing date for August 2003.  *Id.*

9.  The USPC conducted Mr. Gambrell's second rehearing on July 1, 2003.  *See* Rehearing Summary of James Gambrell ("2003 Rehearing Summary") at 1 (Jul. 1, 2003) (attached as Exhibit 7).  The Hearing Examiner subtracted one point from Mr. Gambrell's total point score for sustained program achievement since his last hearing, but since a total point score of minus one is not an option under the 1987 Regulations, Mr. Gambrell's score remained at 0. *Id.* at 2.  This again indicated that Mr. Gambrell was presumed suitable for parole and that parole should be granted.  *See id.* at 3.  The Hearing Examiner, however, again recommended that the USPC should deny Mr. Gambrell's parole request, listing the same reasons as the previous denial, which also was outside and above the guidelines.  *See id.*

3

10. On July 29, 2003, the USPC again adopted the Hearing Examiner's conclusions and recommendation, and denied Mr. Gambrell's request for parole – the USPC's second decision outside and above the guidelines. *See* Notice of Action ("2003 Notice of Action") at 1 (Jul. 29, 2003) (attached as Exhibit 8). The USPC gave Mr. Gambrell a three year set-off, setting a rehearing date for July 2006. *Id.* This set-off was one year shorter than the set-off the USPC had given Mr. Gambrell at his prior rehearing. *See* 1999 Notice of Action at 1.

11. On July 25, 2006, the USPC conducted Mr. Gambrell's third rehearing. *See* Rehearing Summary of James Gambrell ("2006 Rehearing Summary") at 1 (Jul. 25, 2006) (attached as Exhibit 9). The Hearing Examiner again subtracted one point from Mr. Gambrell's total point score for sustained program achievement since his last hearing, but since a total point score of minus one is not an option under the 1987 Regulations, Mr. Gambrell's score remained at 0. *Id.* This again indicated that Mr. Gambrell was presumed suitable for parole and that parole should be granted. *See id.* The Hearing Examiner, however, again recommended that the USPC should deny Mr. Gambrell's parole request, listing the same reasons as the previous denial, which also was outside and above the guidelines. *Id.* at 4.

12. On August 29, 2006, the USPC for the third time adopted the Hearing Examiner's conclusions and recommendation, and denied Mr. Gambrell's request for parole – the USPC's third decision outside and above the guidelines. *See* Notice of Action ("2006 Notice of Action") at 1 (Aug. 29, 2006) (attached as Exhibit 10). The USPC gave Mr. Gambrell a one year set-off, setting a rehearing date for July 2007. *Id.* This set-off was two years shorter than the set-off the USPC had given Mr. Gambrell at his prior rehearing. *See* 2003 Notice of Action.

13. The set-offs that the USPC gave Mr. Gambrell progressively became shorter at each subsequent hearing. *See* 1999 Notice of Action; 2003 Notice of Action; 2006 Notice of Action.

14. At his first hearing conducted by the USPC (Mr. Gambrell's first rehearing), Mr. Gambrell received a four year set-off (even though the D.C. parole practices provided that Mr. Gambrell was presumed suitable for parole). *See* 1999 Notice of Action.

15. Between his first and second hearings, Mr. Gambrell continued sustained program achievement and received no disciplinary hearings. *See* 2003 Rehearing Summary.

16. At his second hearing conducted by the USPC (Mr. Gambrell's second rehearing), Mr. Gambrell received a three year set-off (even though the D.C. parole practices provided that Mr. Gambrell was presumed suitable for parole). *See* 2003 Notice of Action.

17. Between his second and third hearings, Mr. Gambrell continued sustained program achievement and received no disciplinary hearings. *See* 2006 Rehearing Summary.

18. At his third hearing conducted by the USPC (Mr. Gambrell's third rehearing), Mr. Gambrell received a one year set-off (even though the D.C. parole practices provided that Mr. Gambrell was presumed suitable for parole). *See* 2006 Notice of Action.

19. Between his third and fourth hearings, Mr. Gambrell continued sustained program achievement and received no disciplinary hearings. *See* Rehearing Summary of James Gambrell ("2007 Rehearing Summary") at 2 (Jul. 24, 2007) (attached as Exhibit 11). **He also exercised his First Amendment right and brought this action against Defendants.**

20. On July 24, 2007, the USPC conducted Mr. Gambrell's fourth rehearing. *See id.* at 1. Mr. Gambrell had completed the Challenge Program between hearings, which the USPC had requested he complete during his one year set-off. *Id.* at 2. He received no disciplinary infractions. *Id.* The Hearing Examiner recommended parole, writing that Mr. Gambrell "is remorseful for his instant offense and said that he has demonstrated that through his corrective action and programming. This examiner believes giving the subject a parole date at this juncture

is appropriate and would not lessen the severity of the offense.  It would hold him accountable

for his actions and the subject has done everything possible in order for him to succeed." *Id.*

      21.  Executive Reviewer Kostbar, however, disagreed and recommended that Mr.

Gambrell's request for parole be denied and that he be given a **<u>five year set-off</u>**.  *Id.* at 3.

      22.  Mr. Kostbar's recommendation for a five year set-off came after three shorter set-

offs: a four year set-off, a three year set-off, and a one year set-off, each followed by continued

positive programming and no disciplinary infractions.  *See supra* ¶¶ 8-12.  Mr. Kostbar,

moreover, focused on accountability in recommending that the USPC deny parole and give Mr.

Gambrell such a lengthy set-off:

> 19 years is simply not enough time for an individual to serve for a
> crime of this nature and I believe that release at this time, or any time
> in the near future, **<u>would depreciate the seriousness of the offense
> behavior and promote disrespect for the law</u>**.  Consequently, I am
> recommending a Decision Above the 12 month Rehearing Range
> AND Above the Grid Score "guideline" of 0.  The recommendation is
> 60 months for a rehearing.
> This will put him around 24 1/2 years of custody at the time of his
> next hearing.

2007 Rehearing Summary at 3 (emphasis added).

      23.  Mr. Kostbar's justification for recommending that the USPC deny Mr.

Gambrell's request for parole – that granting the request "would depreciate the seriousness of the

offense behavior and promote disrespect for the law" – is the standard that the USPC applies to

U.S. Code offenders, and it does not apply to D.C. Code offenders.  *Compare* 28 C.F.R. § 2.18

*with* 28 C.F.R. § 2.73.

      24.  On August 10, 2007, the USPC, nonetheless, adopted Mr. Kostbar's conclusions

and recommendation and denied Mr. Gambrell's request for parole – the USPC's fourth decision

outside and above the guidelines.  *See* Notice of Action of James Gambrell ("2007 Notice of

Action") at 1 (Aug 10, 2007) (attached as Exhibit 12).  In its Notice of Action, the USPC

included the exact same reasons for departing from the guidelines as in its Notices of Action at

Mr. Gambrell's first, second, and third parole rehearings: Mr. Gambrell's "prior record of convictions for assaultive behaviors" and the "exceptional gravity" of Mr. Gambrell's current offense. *Id.*; *see also* 1999 Notice of Action; 2003 Notice of Action; 2006 Notice of Action.  In addition to denying parole, the USPC adopted Mr. Kostbar's recommendation and gave Mr. Gambrell a five year set-off, setting a rehearing date for July 2012. *Id.*  By July 2012, Mr. Gambrell will be age 63 and will have served 258 months – 21 years and 6 months – in prison. That is 148 months, or 12 years and 4 months, longer than Mr. Gambrell's minimum sentence.

25.  At every stage in Mr. Gambrell's incarceration he has programmed successfully, and **in 18 years of incarceration, he has not received a single disciplinary infraction**. *See* 1999 Rehearing Summary; 2003 Rehearing Summary; 2006 Rehearing Summary; 2007 Rehearing Summary.

26.  The only changes in Mr. Gambrell's conduct between his July 2006 and July 2007 parole hearings was that he continued to successfully complete more and more programs, as the USPC had requested. *See* 2007 Rehearing Summary at 2.

27.  Since appearing before the USPC for parole rehearings, Mr. Gambrell has been denied parole and setoff for a total of 13 years. *See* 1999 Notice of Action; 2003 Notice of Action; 2006 Notice of Action; 2007 Notice of Action.  In each parole rehearing before the July 2007 rehearing, the setoff Mr. Gambrell received was getting shorter and shorter. *See* 1999 Notice of Action; 2003 Notice of Action; 2006 Notice of Action.

28.  In November 2006, however, Mr. Gambrell exercised his First Amendment right and brought this action against Defendants.

29.  At his July 2007 parole rehearing, despite the fact that he had completed the programs that the USPC asked him at his 2006 rehearing to complete, Mr. Gambrell received **a five year set-off, the longest set-off the USPC has given him throughout his entire**

**incarceration**.  *See* 2007 Notice of Action; *see also* 1999 Notice of Action; 2003 Notice of

Action; 2006 Notice of Action.