## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TONY R. SELLMON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil Action No. 06-1650(ESH)** |
| ) | |
| **EDWARD F. REILLY, Jr.,** ) | |
| **Chairman of the United** ) | |
| **States Parole Commission,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

### DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND OR IN THE ALTERNATIVE TO TRANSFER AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Edward F. Reilly, Jr., Chairman, United States Parole Commission ("USPC"), Cranston J. Mitchell, Deborah Spagnoli, Patricia Cushwa and Isaac Fulwood, Jr., Commissioners, USPC, in their official capacities (collectively "Defendants"), by and through the undersigned hereby submit this Motion to Dismiss with Prejudice pursuant to Fed. R. Civ. P. 12(b)(1) and a Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c).

In support of this motion, Defendant respectfully refers the Court to the accompanying memorandum.[1] Dismissal is proper because, in light of Plaintiffs' heinous criminal backgrounds and identical USPC's and District of Columbia Parole Board guidelines, Plaintiffs are unable to present facts to withstand Defendants' Motion for Judgment on the Pleadings by creating a genuine issue of fact. In addition, because it is not a person within the meaning of the statute, Plaintiffs cannot maintain an action against the USPC under 42 U.S.C. 1983. Correspondingly,

---

[1] Defendants sought and obtained Plaintiffs' consent to negligibly exceeds the page requirements pursuant to LCvR 7(e).

Plaintiffs' only relief is to bring a *habeas* petition because, if they prevail, their claim will

necessarily result in a reduced incarceration.

Dated: February 20, 2008                     Respectfully Submitted,


                                             _/s/_____
                                             JEFFREY A. TAYLOR, D.C. BAR # 498610
                                             United States Attorney


                                             _/s/_____
                                             RUDOLPH CONTRERAS, D.C. BAR #434122
                                             Assistant United States Attorney


                                             _/s/_____
                                             KENNETH ADEBONOJO
                                             Assistant United States Attorney
                                             555 Fourth Street, N.W.
                                             Washington, D.C.  20530
                                             (202) 514-7157
                                             kenneth.adebonojo@justice.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TONY R. SELLMON, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )      **Civil Action No. 06-1650(ESH)** |
| | ) |
| **EDWARD F. REILLY, Jr.,** | ) |
| **Chairman of the United** | ) |
| **States Parole Commission,** | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Edward F. Reilly, Jr., Chairman, United States Parole Commission ("USPC"), Cranston J. Mitchell, Deborah Spagnoli, Patricia Cushwa and Isaac Fulwood, Jr., Commissioners, USPC, in their official capacities (collectively "Defendants"), by and through the undersigned, submit this memorandum of points and authorities in support of their Motion for Judgment on the Pleadings and in opposition to Plaintiffs' Motion for Summary Judgment.

### I.    INTRODUCTION AND SUMMARY

Tony Sellmon, commenced this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights under the *ex post facto* clause of the United States Constitution. Subsequently, the action was joined by Carlton Martin, Charles Phillips, Darius Smith, Daru Swinton, Benson West-El, Curtis Eason and James Gambrell (collectively "Plaintiffs"). Plaintiffs are violent D.C. Code offenders convicted of multiple crimes such as murder, manslaughter and rape, who committed their crimes over a three-decade era.

In their complaint, Plaintiffs allege that, by applying the USPC's 2000 parole guidelines instead of the District of Columbia Parole Board's ("Parole Board") 1987 guidelines at their initial parole hearings, Defendants significantly increased the risk that they would be incarcerated longer.  In other words, Plaintiffs alleged that they would have been paroled if their initial parole hearings were conducted pursuant Parole Board guidelines in effect when their crimes were committed.  Accordingly, Plaintiffs request that this Court require the USPC to apply the 1987 Parole Board guidelines passed pursuant to statute and in effect when they became eligible for an initial parole hearing.

The parole statutes chartering both the USPC and the Parole Board clearly reflect a legislative intent to confer the USPC and the Parole Board with plenary discretion to achieve their legislative objectives.  In light of this broad discretion and especially where Plaintiffs committed such heinous crimes, it is almost impossible to predict how the Parole Board would have acted on Plaintiffs' initial parole applications versus the USPC's actual determinations. This Circuit's jurisprudence evidences clearly that Parole Board decisions were not predictable expressly because it retained the right, pursuant to statute, to depart from numerical constraints in unusual circumstances.  Under this rubric, it is virtually impossible for Plaintiffs to establish that, in light of their heinous conduct, they would have obtained more favorable treatment from the Parole Board than the USPC and the required showing that their incarceration has been increased.  Accordingly, Defendants are entitled to judgment on the pleadings as a matter of law. In opposition to Plaintiffs' motion for summary judgment, application of the USPC's 2000 guidelines, which embodied the Parole Board's 1987 guidelines and its practice of departing therefrom in cases such as Plaintiffs', at their initial parole hearings, did not significantly increase

the risk Plaintiffs would be incarcerated longer.  Therefore, Plaintiffs' Motion for Summary

Judgment should be denied.

## II.     PLAINTIFFS' CRIMINAL BACKGROUND

Each Plaintiff presented a unique criminal background and the USPC considered each

Plaintiff for initial parole application accordingly.  Other than the fact that there is no dispute that

they are violent D.C. Code offenders convicted of multiple crimes such as murder, assault,

manslaughter and rape, Plaintiffs are not a monolithic group.  Indeed, some Plaintiffs committed

their crimes before the 1987 guidelines were enacted by the Board.  Others committed their

crimes after the adoption of 1987 guidelines, but prior to the adoption of the informal policy

guidelines and still some others committed their crimes after the Parole Board passed the 1987

guidelines and adopted the informal policy guidelines in 1991.  Another difference between the

Plaintiffs is that the USPC considered two of the Plaintiffs under the Parole Board's 1987

guidelines and the remaining under the 2000 guidelines.  In all Plaintiffs' cases, the Commission

assessed each Plaintiffs' case individually and exercised its discretion based upon the unique

factors presented in each Plaintiff's case.

### A.     Plaintiffs Considered Under the Parole Board's 1987 Guidelines

Plaintiff Gambrell

Gambrell is currently serving an aggregate life prison sentence for his convictions on rape

and assault with a deadly weapon in Superior Court Case No. F-1956-68; and second degree

murder while armed in Superior Court Case No. F-1989-89. Statement of Material Facts ¶ 6.

("SOMF") Sentence Computation, *Ex*. A-1.  In 1968, Gambrell and a co-conspirator robbed two

individuals, raped a female victim, and stole a victim's car.  SOMF ¶ 7, Presentence Report at 2,

*Ex.* A-2.  For this crime, Gambrell received an 18-year D.C. Code sentence.  *Ex.* A-1 at 1.

Gambrell was released on parole from that sentence on June 20, 1973.  SOMF ¶ 8,  Parole

Certificate, *Ex.* A-3.  While on parole, Gambrell committed a bank robbery in the Eastern District

of Michigan, was convicted of that offense and sentenced to 35 years.  SOMF ¶ 9, Bureau of

Prison Letter, *Ex.* A-4.  Upon receipt of this information, the Parole Board issued a violator

warrant for Gambrell's arrest.  SOMF ¶ 10, Board Order, *Ex.* A-5.  That warrant was executed

and Gambrell received a parole revocation hearing before the United States Board of Parole.[2]

SOMF ¶ 11, Hearing Summary, *Ex.* A-6.  Accordingly, the Parole Board revoked Gambrell's

D.C. parole and he was returned to custody.  SOMF ¶ 12, Board Order, *Ex.* A-7.

Gambrell was released on parole on June 6, 1985, with a sentence expiration date of

December 22, 2002.  SOMF ¶ 13, Parole Certificate, *Ex.* A-8.  On May 18, 1989, the Parole

Board revoked Gambrell's parole because he failed to respond for supervision and had

outstanding criminal charges.  SOMF ¶ 14, *See* Gambrell *Ex.* A-9, D.C. Board order and hearing

summary.  Gambrell was subsequently convicted of second degree murder after he pleaded

guilty.  He committed that offense on February 13, 1989 by twice shooting an armored express

company employee with a .22 caliber automatic pistol.  SOMF ¶ 15,  *See* Gambrell *Ex.* A-10,

presentence report.   On January 3, 1991, the Honorable then-Superior Court judge Henry

Kennedy imposed a life prison sentence.  SOMF ¶ 16, *See* Gambrell *Ex.* A-11.  His outstanding

sentences were then aggregated into a single life prison sentence.

---

[2]  Plaintiff Gambrell was then incarcerated at the U.S. Penitentiary in Lewisburg, Pennsylvania, and he came under Defendants' predecessor, the United States Board of Parole's jurisdiction.

4

In early 1998, Gambrell was considered for parole from his aggregate life prison sentence by the D.C. Board, which denied him parole and continued him to a reconsideration hearing in 1999. SOMF ¶ 17, *See* Gambrell *Ex.* A-12. On December 14, 1999, he appeared before a U.S. Parole Commission hearing examiner for his rehearing. SOMF ¶ 18, *See* Gambrell *Ex.* A-13, Commission hearing summary. At this hearing, the Commission applied the 1987 guidelines. Following the hearing the Commission denied Gambrell parole and continued him to rehearing in August 2003, a decision above his parole and rehearing guidelines. SOMF ¶ 19, *See* Gambrell *Ex.* A-14, Commission notice of action.

Gambrell received his five-year reconsideration on July 1, 2003. SOMF ¶ 20, *See* Gambrell *Ex.* A-15, Commission hearing summary. At this hearing, the Commission continued to apply the 1987 guidelines to his case. *Id.* The presiding hearing examiner determined that, even though the guidelines suggested parole be granted and that he receive a rehearing after 12 months, a continued departure was warranted based upon the risk he posed, as reflected by his extensive and violent criminal conduct committed under supervision. *Id.* at 2. The Commission agreed with the hearing examiner's assessment, denied Gambrell parole, and continued him to a rehearing in July 2006. SOMF ¶ 21, *See* Gambrell *Ex.* A-16.

The Commission heard Plaintiff Gambrell for his most recent hearing on July 24, 2007. SOMF ¶ 22, *See* Gambrell *Ex.* A-17, Commission hearing summary. Following this hearing, the Commission determined Gambrell to be a more serious risk than indicated by the 1987 guidelines. SOMF ¶ 23, *See Ex.* A-18, Commission notice of action. The Commission denied him parole and ordered that he receive a rehearing in July 2012, after the service of an additional 60 months. *Id.* The USPC's reasons for its determination to set a hearing date above the

guidelines were that Gambrell continued to pose a risk to the public safety because of his propensity to commit violent crimes while under supervision and the escalating nature of his criminal conduct. *Id.*

Plaintiff Eason

Plaintiff Eason is also serving a life prison sentence for his conviction for second degree murder in Superior Court Case No. F-14566-87. SOMF ¶ 24, *See* Eason *Ex.* B-1, sentence computation and SOMF ¶ 24, Eason *Ex.* B-2, judgment and commitment order. Eason committed his offense in May 1987 by stealing a watch from a victim and then intentionally shooting the victim as the victim lay on the ground. SOMF ¶ 25, *See* Eason *Ex.* B-3, presentence report. Eason pleaded guilty to second degree murder, and on November 9, 1988, the Honorable then-Superior court Judge Gladys Kessler imposed the life sentence. SOMF ¶ 26, *See* Eason *Ex.* B-2.

Eason became eligible for parole release from his life sentence on September 8, 1998. SOMF ¶ 27, *See* Eason *Ex.* B-1 at 2. On February 20, 1998, Eason appeared before the D.C. Board of Parole for his initial parole hearing. SOMF ¶ 28, *See* Eason *Ex.* B-4, Board hearing summary. Following this hearing, the Board denied Eason parole and continued him to a rehearing by March 18, 1999. SOMF ¶ 29, *See* Eason *Ex.* B-5. This was a decision within the 1987 guidelines.

On March 30, 1999, Eason appeared before the Commission for his reconsideration hearing. SOMF ¶ 30, *See* Eason *Ex.* B-6, Commission hearing summary. At this hearing, the Commission continued to apply the 1987 guidelines. Although the 1987 guidelines suggested that parole be granted, the presiding hearing examiner found Eason to be a more serious parole

6

risk than indicated by the parole guidelines because of his lengthy offense history of violent and

assaultive offenses reflected in his presentence report, SOMF ¶ 30,  Eason *Ex.* B-3.  Eason *Ex.* B-

6 at 3.  On April 23, 1999, the Commission denied Eason parole, a decision above the 1987

guidelines. SOMF ¶ 31,  *See* Eason *Ex.* B-7, Commission notice of action.  In support of its

above-the-guidelines decision, the Commission provided the following reasons:

> You are a more serious risk than indicated by your total
> point score in that your prior history reflects convictions for
> assault and battery in 1983; robbery in 1985; robbery with a
> deadly weapon and assault with intent to murder in 1987.
> Moreover, while on probation from the 1987 conviction,
> you committed the instant offense involving murder while
> armed, receiving a life sentence.

*Id.*  The Commission continued Eason to a rehearing in March 2004.  *Id.*

At petitioner's rehearing on March 2, 2004, the presiding hearing examiner considered

Eason's case for parole, and that examiner recommended that petitioner be paroled effective June

3, 2004.  SOMF ¶ 32, *See* Eason *Ex.* B-8, Commission hearing summary.  Upon administrative

review, another hearing examiner disagreed with that recommendation, finding that the

premeditated nature of Eason's offense was serious.  *Id.* at 3.  The Commission adopted the

second examiner's recommendation, finding that, because Eason's offense was planned and

carried out as an act of revenge, Eason needed a longer period of incarceration.  SOMF ¶ 33, *See*

Eason *Ex.* B-9, Commission notice of action.  The Commission scheduled Plaintiff Eason for a

rehearing in March 2007.  *Id*.

Plaintiff Eason received his most recent hearing with the Commission on March 13,

2007.  SOMF ¶ 34,  *See* Eason *Ex.* B-10.  The Commission continued to apply the 1987

guidelines of the D.C. Board of Parole to Eason's case.  At the conclusion of this hearing, the

presiding hearing examiner again recommended parole. *Id.* at 3.  However, upon administrative

review, the executive reviewer found that the facts of Eason's case extraordinary in that Eason

committed a premeditated murder as an act of revenge. *Id.* at 3-4.  That reviewer recommended a

denial of parole and a rehearing after the service of an additional 12 months. *Id.*  On March 23,

2007, the Commission denied parole and continued Eason to a 12-month reconsideration hearing.

SOMF ¶ 35, *See Ex.* B-11, Commission notice of action.

### B.    Plaintiffs Considered Under the USPC's 2000 Guidelines

#### 1.    Crimes Committed Before Publication of the 1987 Guidelines

Plaintiffs Phillips and West-El both committed their crimes prior to the official

publication of the 1987 guidelines, and the Commission heard them utilizing the 2000 guidelines.

<u>Plaintiff Phillips</u>

Plaintiff Phillips is currently serving an aggregate life prison sentence for his convictions

for assault with a deadly weapon and second degree murder in Superior Court Case No. 44975-

77 and second degree murder while armed, carrying a pistol without a license and unlawful entry

in Superior Court Case No. 113774-77.  SOMF ¶ 37, *See* Phillips *Ex.* C-1, sentence computation

and SOMF ¶ 37,  Phillips *Exs.* C-2 and C-3, judgment and commitment orders.  Phillips

committed one of the murders on May 28, 1977 by killing an acquaintance of his ex-girlfriend

with a butcher knife. SOMF ¶ 38, *See* Phillips *Ex.* C-4, presentence report.  He committed the

other murder by shooting a police officer inside his ex-girlfriend's apartment. SOMF ¶ 38, *See*

Phillips *Ex.* C-5, presentence report.  For this conduct, Phillips received two consecutive life

sentences, with a minimum term of 30 years, 66 months.  SOMF ¶ 39,  *See* Phillips *Exs.* C-2 and

C-3.

Phillips became eligible for parole (with good time credits) on February 8, 2003. SOMF ¶ 40, *See* Phillips *Ex.* C-1 at 3.  Phillips applied for parole on July 15, 2002. SOMF ¶ 41, *See* Phillips *Ex.* C-6, parole application.  He received his initial parole hearing with a Commission hearing examiner on November 19, 2002. SOMF ¶ 42, *See* Phillips *Ex.* C-7, hearing summary. At this hearing, the presiding hearing examiner noted that Phillips had had nine disciplinary reports and had programmed well during a portion of his incarceration.  *Id.* at 1-2.  The examiner applied the 2000 guidelines to Phillips case, granted him an award for program achievement, and determined that his total guideline range was 306-342 months to be served before a presumptive release.  *Id.* at 2.  The presiding hearing examiner recommended a rehearing after the service of 36 months, a decision within Phillips' guidelines.   *Id.* at 3.

The Commission Executive Hearing examiner administratively reviewed Phillips' case. *Id.* at 3.  This examiner agreed with a parole denial and the recommendation continuing Phillips to a three-year reconsideration hearing but disagreed with the examiner's assessment of Phillips' parole guidelines.  *Id.*  On December 13, 2002, the Commission denied Phillips parole and continued him to a three-year reconsideration hearing. SOMF ¶ 44, *See* Phillips *Ex.* C-8, notice of action.  The Commission found Phillips' guidelines to be 304-334 months and determined that he had been in custody for a total of 300 months as of the hearing.  *Id.*  Because the Commission's decision was a decision above the 2000 guidelines, the Commission provided the following reasons:

> After a consideration of all factors and information
> presented, a decision above the Total Guideline Range is
> warranted because you are a more serious risk than
> indicated by your Base Point Score of 5.  On May 28, 1977,
> you stabbed an individual to death after luring him to your
> ex-girlfriend's apartment.  You the [sic] seriously assaulted

9

her by stabbing her in the left side and cutting her on the wrist. After being arrested on the offense and released from custody, you broke into your ex-girlfriend's apartment on December 22, 1977, confronted her and her companion and shot her companion to death after an altercation. Your Base Point Score of 5 reflects 2 point assessed in Category II for violence and 3 point in Category II for death of a victim. However, the addition of these points capture only the murder which occurred on May 28, 1977; stabbing your ex-girlfriend on May 28, 1977, breaking and entering her apartment on December 22, 1977 and murdering her companion on the same date are not reflected in the Base Point Score. The Commission at your next hearing will consider the risk you pose to the community based on your homicidal acts not captured in the Base Point Score.

*Id.* As in the previous Plaintiffs' cases, in exceeding the guidelines, the Commission thus expressed its desire to protect the public safety in making this above-the-guidelines decision.

Phillips received his rehearing on October 27, 2005 at the U.S. Penitentiary where he is incarcerated. SOMF ¶ 45, *See* Phillips *Ex.* C-9, hearing summary. At this consideration, the presiding hearing examiner did not find any institutional misconduct or superior program achievement. *Id.* at 1-2. The presiding hearing examiner did not modify Phillips' guidelines, but the examiner recommended a presumptive after the service of 370 months, still a decision above the 2000 guidelines. *Id.* On review, the Executive Reviewer disagreed with a parole grant at this consideration. *Id.* According to the Executive Reviewer, Phillips still remained a more serious risk than indicated by the 2000 guidelines because his assaultive and murder conduct was not adequately captured in the guidelines. *Id.* On November 18, 2005, the Commission adopted the Executive Reviewer's recommendation, denied Phillips parole, and continued him to another three-year reconsideration hearing. SOMF ¶ 46, *See* Phillips *Ex.* C-10, Notice of Action. The USPC provided substantially similar reasons for its departure at this consideration as before. *Id.*

10

Plaintiff West-El

Plaintiff West-El is incarcerated for attempted robbery while armed, first degree murder while armed, armed robbery, attempted robbery, and carrying a pistol without a license.  SOMF ¶ 47,  *See* West-El *Ex.* D-1, Sentence Computation and West-El *Ex.* D-2, Judgment and c Commitment order.  He has a life sentence with a minimum term of 20 years. SOMF ¶ 47,  *See* West-El *Ex.* D-1.

West-El committed his offenses during a robbery on January 5, 1990. SOMF ¶ 48,  *See* West-El *Ex.* D-3, presentence report.  West-El and several other individuals approached a pick-up truck that was stopped at a street light and announced that "it was a hold-up."  *Id.* at 3.  There were two female victims and one male victim in the truck.  *Id.*  The two female victims were harassed and molested by the group.  *Id.* at 4.  When the male victim attempted to stop this unlawful activity, West-El shot him.  *Id.*  West-El admitted shooting the victim and pleaded guilty to his offense of conviction.  *Id.*; SOMF ¶ 48, West-El *Ex.* D-2.  West-El received an aggregate life prison sentence for this conviction. SOMF ¶ 48,  *See* West-El *Ex.* D-1 at 2.

West-El became eligible for parole on the aggregate sentence on January 5, 2003. SOMF ¶ 49,  *See* West-El *Ex.* D-1 at 2.  He received his initial parole hearing before a USPC hearing examiner on April 29, 2002. SOMF ¶ 50,  *See* West-El *Ex.* D-4, hearing summary.  At this hearing, West-El disputed the factual background of his offense.  He claimed that the incident was a drug deal that "went bad," but he admitted that he was individual who shot the victim.  *Id.* at 1.  The examiner discussed West-El's institutional adjustment with him.  The examiner noted that West-El had several institutional misconduct reports including an assault on a correctional officer and threatening an officer in an incident where he stated in a loud and boisterous voice,

11

"f*** that sh**, c**k a**, mother f***er ... I', going to kick your mother f***er a**." *Id.* at 2.
The examiner recommended a denial of parole and a continuance to a five-year rehearing in April
2007, a decision within West-El's 287-315 month guideline range. *Id.* at 3.  Upon administrative
review, another examiner agreed with the parole denial, but pursuant to the USPC's regulations,
recommended a rehearing after four years.  SOMF ¶ 51, *See* West-El *Ex.* D-5, addendum.  On
May 29, 2002, the USPC denied West-El parole and continued West-El to a rehearing after 48
months. SOMF ¶ 52, *See* West-El *Ex.* D-6, notice of action.

West-El received that rehearing on March 22, 2006. SOMF ¶ 53 *See* West-El *Ex.* D-7,
hearing summary.  At this hearing, the presiding hearing examiner corrected West-El's
guidelines to reflect the mandatory minimum nature of West-El's offense (as communicated to
the USPC from the federal Bureau of Prisons), and the examiner recommended a reduction of 16
months from those guidelines for program achievement.  *Id.* at 3.   On April 12, 2006, the USPC
determined that West-El's guidelines were 284-312 months to be served, and noted as of the
rehearing, West-El had only been in custody for 278 months.  SOMF ¶ 54, *See* West-El *Ex.* D-8,
notice of action.  The USPC denied West-El parole and ordered that he be paroled after the
service of 312 months, a decision at the top of his new guideline range.  *Id.*

Through this litigation, an ambiguity in the USPC's decision was brought to light.  SOMF
¶ 55, *See* West-El *Ex.* D-9, USPC Legal Memorandum.  The USPC resolved this ambiguity by
clarifying that the USPC did indeed order West-El paroled after the service of 312 month, which,
including West-El's jail credit, is currently scheduled for January 5, 2009. SOMF ¶ 56,  *See*
West-El *Ex.* D-10, USPC order.  The USPC is currently preparing an official notice of action to
officially inform West-El of this action.  *Id.*

### 2.    Crimes Committed After the Publication of the 1987 Guidelines

Plaintiffs Sellmon and Martin

Plaintiffs Sellmon and Martin committed their crimes after the D.C. Board of Parole published the 1987 guidelines but before the Board adopted the informal 1991 policy guidelines. The USPC considered them with the 2000 guidelines.

<u>Plaintiff Sellmon</u>

Plaintiff Sellmon is serving a life prison sentence imposed in Superior Court Case No. F-3347-91 for his convictions for second degree murder while armed and possession of a firearm during a crime of violence. SOMF ¶ 57, *See* Sellmon *Ex.* E-1, sentence computation and Sellmon *Ex.* E-2, judgment and commitment order. Sellmon committed that crime by beating a prostitute about the head with a handgun. SOMF ¶ 58, *See* Sellmon *Ex.* E-3, presentence report. Sellmon pleaded not guilty to the offense but was convicted. He received an aggregate life prison sentence, with a minimum term of 15 years, for the offenses. SOMF ¶ 58, *See* Sellmon *Ex.* E-2.

Plaintiff Sellmon became eligible for parole from that aggregate sentence on May 13, 2003. SOMF ¶ 59, *See* Sellmon *Ex.* E-1 at 2. Sellmon received his initial hearing with the USPC on August 7, 2002. SOMF ¶ 60, *See* Sellmon *Ex.* E-4, hearing summary. After applying the 2000 guidelines to Sellmon's case, the presiding hearing examiner determined that Sellmon's guideline range was 111-117 months to be served and recommended that Sellmon be paroled after the service of 136 months, a recommendation above the guidelines. *Id.* at 2. Upon administrative review, another hearing examiner disagreed with the guidelines computation and the recommendation to parole Sellmon. SOMF ¶ 60, *See* Sellmon *Ex.* E-5, hearing summary

addendum.  That examiner determined Sellmon's guideline range to be 154-160 months and

recommended a three-year reconsideration hearing.  *Id.*  The USPC adopted the second

examiner's recommendation, denied Sellmon parole, and ordered a three-year reconsideration

hearing.  SOMF ¶ 61,  *See* Sellmon *Ex.* E-6, notice of action.  Because this was a decision above

the 154-160 month guideline range, the USPC provided reasons for its decision.  *Id.*

Plaintiff Sellmon subsequently filed a petition for writ of *habeas corpus* in the Western

District of Virginia, and following resolution of the matter, the USPC ordered a new initial

parole hearing to reconsider Sellmon's program achievement. SOMF ¶ 62,  *See* Sellmon *Ex.* E-7,

USPC memorandum and Sellmon *Ex.* E-8, notice of action.  Sellmon received his new initial

hearing on June 22, 2004.  SOMF ¶ 63,  *See* Sellmon *Ex.* E-9, hearing summary.  At the

conclusion of this new initial hearing, the presiding hearing examiner recomputed Sellmon's

guidelines as 104-110 months to be served and recommended a parole decision above the 2000

guidelines.  *Id.* at 3.  The administrative review at this consideration agreed with the new

guidelines computation of 104-110 months to be served, but disagreed with the parole

recommendation.  *Id.* at 4.  The USPC's Executive Hearing Examiner agreed with the

administrative reviewer's recommendation, and the case was forwarded to the USPC for an

official Commissioner vote.  *Id.* at 5.

On July 24, 2004, the USPC denied Sellmon parole and continued him to another three-

year reconsideration to occur in August 2005. SOMF ¶ 64, *See* Sellmon *Ex.* E-10, notice of

action.  Although the USPC considered Sellmon's request for program achievement, and in fact

granted him an award of superior program achievement, the USPC determined that the brutality

of Sellmon's crime warranted a departure from the guidelines.  The USPC subsequently gave its

14

reasons for the departure: "[A] decision above the Current Total Guideline Range is warranted because you brutally beat the female victim with a gun causing massive head trauma. The victim died as result of the injuries you inflicted. While you have programmed well, your claim that you were the victim of a robbery or an attempted robbery is not supported by the evidence." SOMF ¶ 64, *See* Sellmon *Ex.* E-11, corrected notice of action.

The USPC heard Plaintiff Sellmon for his three-year reconsideration hearing on August 5, 2005 SOMF ¶ 65, *See* Sellmon *Ex.* E-12, hearing summary. The presiding examiner at this consideration found no change in Sellmon's guidelines and found no program achievement warranting a reduction in the guidelines, and the examiner recommended not granting Sellmon parole. *Id.* at 3. On August 11, 2005, the USPC denied Sellmon parole and continued him to another three-year reconsideration hearing. SOMF ¶ 66, *See* Sellmon *Ex.* E-13, notice of action. Because the USPC's decision was an above-the-guidelines decision, the USPC provided the following reasons for its decision: "[A] decision above your new total guideline range is warranted because the murder that you committed while armed was extremely brutal, as evidenced by the massive trauma you inflicted on the victim." *Id.* Sellmon is scheduled for a reconsideration hearing in August 2008. *Id.*

Plaintiff Martin

Plaintiff Martin is in custody serving an aggregate sentence for several offenses committed in 1990. SOMF ¶ 67, *See* Martin *Ex.* F-1, sentence computation and SOMF ¶ 67, Martin *Exs.* F-2 and F-3, judgment and commitment orders. Martin committed an intentional murder on April 20, 1990 by shooting a victim multiple times in the head. SOMF ¶ 68, *See* Martin *Ex.* F-4, presentence report at 3-4. In the Fall of 1990, Martin committed numerous other

15

crimes, including assault with intent to commit rape and possession of cocaine with intent to distribute. *Id.* at 4-5. Martin was ultimately convicted of possession with intent to distribute cocaine and possession of a firearm in Superior Court Case No. F-13712-90 and manslaughter while armed in Superior Court Case No. F-4670-90. SOMF ¶ 69, *See* Martin *Exs.* F-2 and F-3. He is currently serving an aggregate life sentence, with a 15-year minimum term for these convictions. SOMF ¶ 70, *See* Martin *Ex.* F-1 at 3.

Martin became eligible for parole from his life sentence on June 14, 2003. *Id.* Prior to his parole eligibility date, Martin executed a parole application form, requesting parole consideration with the USPC. SOMF ¶ 71, *See* Martin *Ex.* F-5, parole application. He received his initial parole hearing before a USPC hearing examiner on January 21, 2003. SOMF ¶ 72, *See* Martin *Ex.* F-6, hearing summary. At this hearing, the USPC applied the 2000 guidelines to Martin's case. The presiding hearing examiner determined Martin's salient factor score and base point score under the guidelines, assessed the applicable guideline range for those computations, and determined a base guideline range. *Id.* at 2. The examiner awarded Martin 10 months of program achievement for completing a GED and other vocational programs and added 0-2 months to his total guideline range for an institutional infraction. *Id.* The examiner recommended finding a total guideline range of 182-202 months to be served and recommended a denial of parole and continuance to a three-year reconsideration hearing. *Id.* at 2-3. On February 13, 2003, the USPC adopted the hearing examiner's recommendation and continued Martin to a three-year reconsideration hearing. SOMF ¶ 73, *See* Martin *Ex.* F-7, notice of action. This was a decision within Martin's guidelines.

On March 22, 2006, Martin appeared before another USPC hearing examiner for his three-year reconsideration hearing.  SOMF ¶ 74, *See* Martin *Ex.* F-8, hearing summary.  This examiner assessed Plaintiff Martin's institutional adjustment and program achievement.  The examiner found that Martin had been active in programs since his last hearing with the USPC. *Id.* at 2.  The examiner recommended granting Martin 13 months of program achievement for his accomplishments, and the examiner recommended a presumptive parole date after 189 months, a decision within Martin's new 179-199 month guideline range.  *Id.* at 3.  Upon executive review, another examiner disagreed with the recommendation.  *Id.* at 3-4.  That examiner found Martin's homicide offense to be much more severe than indicated by his offense of conviction, and the examiner found that Martin had been untruthful in explaining his involvement in the offense to the USPC. SOMF ¶ 75,  *Id.*  The examiner was also particularly troubled that, in a separate offense, Martin had received a conviction for possession of another weapon.  *Id.* at 4.  The examiner found that Martin was a serious parole risk, a more serious risk than the guidelines expressed he was.  *Id.*  Accordingly, the examiner recommended a denial of parole and a continuance to another three-year reconsideration hearing.  *Id.*

The USPC ultimately denied Martin parole again and continued him to a three-year reconsideration hearing to occur in March 2009, adopting the executive reviewer's recommendation. SOMF ¶ 76,  *See* Martin *Ex.* F-9, notice of action.  In making this decision, the USPC found that Martin's new guideline range was 179-199 months and found that a decision above the guidelines was warranted, stating

17

> After consideration of all factors and information presented, a decision above the new total guideline range is warranted because you are a more serious risk than indicated by the guidelines. You were involved in a shooting that resulted in the death of the victim. Although you stated that death was not the intended result, that is unlikely since the victim was shot multiple times in the head. In addition, while involved in a drug offense, you were in possession of a firearm. The guidelines do not take into consideration your possession of a second weapon. Your propensity to possess and use weapons makes you a serious threat to the community.

*Id.* The USPC thus expressed its desire to protect the public in making this decision.

### 3.    Crimes Committed After Publication of Informal 1991 Guidelines

Plaintiffs Swinton and Smith committed their crimes after official publication of the 1987 guidelines and informal 1991 policy guidelines, and the USPC considered them with the use of the 2000 guidelines.

Plaintiff Swinton

Plaintiff Swinton is currently serving a life prison sentence for his conviction for armed robbery and attempted kidnapping in Superior Court Case No. F-9125-97. SOMF ¶ 79, *See* Swinton *Ex.* G-1, sentence computation and Swinton *Ex.* G-2, judgment and commitment order. He committed that offense on September 19, 1996 by kidnapping a female victim and her children with the use of a gun, ordering the female victim to drive to several ATMs over a multiple hour period to withdraw cash, and taking the money. SOMF ¶ 80, *See* Swinton *Ex.* G-3, presentence report. Swinton pleaded guilty to the offense, and on May 8, 1998, the Superior Court imposed a life sentence with a minimum term of 10 years. SOMF ¶ 81, *See* Swinton *Ex.* G-2. Swinton became eligible for parole from the aggregate sentence on July 22, 2004. SOMF ¶ 82, *See* Swinton *Ex.* G-1 at 2.

18

Plaintiff appeared for his initial parole hearing before a USPC hearing examiner on December 3, 2003. SOMF ¶ 83, *See* Swinton *Ex.* G-4, hearing summary. At this hearing, the presiding hearing examiner applied the 2000 guidelines to Swinton's case. The examiner found that Swinton had committed several disciplinary infractions, requiring 12-16 months to be added to his guidelines, but the examiner also found that Swinton deserved an 8-month award for program achievement. *Id.* at 3. One of the disciplinary infractions committed by Swinton involved the possession of a sharpened instrument in a toothpaste tube. SOMF ¶ 84, *See* Swinton *Ex.* G-5, incident report. The examiner recommended a continuance to a three-year reconsideration hearing. SOMF ¶ 85, *See* Swinton *Ex.* G-4 at 3. On administrative review, the Executive Hearing examiner disagreed, noting that the USPC should obtain additional information about Swinton's offense behavior before making a decision in his case. *Id.* at 4.

The USPC ultimately deferred a final decision in Swinton's case pending receipt of additional information. SOMF ¶ 86, *See* Swinton *Ex.* G-6, USPC order and Swinton *Ex.* G-7, USPC notice of action. The USPC subsequently received some of the information requested and made a parole decision on-the-record. SOMF ¶ 87, *See* Swinton *Ex.* G-8, USPC memorandum and Swinton *Ex.* G-9, notice of action. The USPC found that Swinton's guidelines were 102-112 months to be served before release, and the USPC denied him parole and continued him to a three-year reconsideration in December 2006, a decision within those guidelines. SOMF ¶ 88, *See* Swinton *Ex.* G-9.

Swinton received his rehearing on October 23, 2006, where the presiding hearing examiner added 0-2 months to his guideline range, subtracted 4 months for program achievement, and recommended that he be paroled after 110 months, a recommendation within

19

Swinton's new guidelines. SOMF ¶ 89, *See* Swinton *Ex.* G-10, hearing summary. The Executive reviewer disagreed with the presiding hearing examiner's assessment of Swinton's institutional conduct, however. That reviewer found that Swinton had not had excellent prison conduct, as Swinton had possessed the sharpened instrument that he tried to conceal in a tube of toothpaste. *Id.* at 3-4. The reviewer recommended a decision above the guidelines, based upon the risk Swinton posed, as reflected in his offense of conviction (which involved three victims, including children), the overall nature of the offense, and his institutional misconduct, including Swinton's propensity to carry weapons illegally. *Id.* at 4.

The USPC agreed, and denied Swinton parole. SOMF ¶ 90, *See* Swinton *Ex.* G-11. The USPC found Swinton to be a more serious parole risk than indicated by the guidelines, as reflected by the nature of his offense, his propensity to carry illegal weapons, and his prior record of weapon possession. *Id.* The USPC continued Swinton to a reconsideration hearing after the service of three additional years. *Id.*

<u>Plaintiff Smith</u>

Plaintiff Smith is currently serving a life prison sentence imposed in Superior Court Case No. F-12101-92 for his convictions for second degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. SOMF ¶ 91, *See* Smith *Ex.* H-1, sentence computation and Smith *Ex.* H-2, judgment and commitment order. Smith committed that offense, along with a codefendant, by shooting a victim in a car. SOMF ¶92, *See* Smith *Ex.* H-3, hearing summary. Although Smith contested the charges at trial, he was found guilty, and the Superior Court imposed an aggregate fifteen year to life prison sentence for the convictions. SOMF ¶ 92, *See* Smith *Ex.* H-2. Smith became eligible for parole from the

20

sentence on February 26, 2005.  SOMF ¶ 93,  *See* Smith *Ex.* H-1 at 2.

On June 22, 2004, Smith appeared before a USPC hearing examiner for his initial parole hearing.  SOMF ¶ 94,  *See* Smith *Ex.* H-3.  At this hearing, the examiner applied the 2000 guidelines to Smith's case.  The examiner found that Smith had three institutional misconduct reports, including one for assaulting an inmate with a homemade knife and two for possession of a weapon.  *Id.* at 2.  Smith admitted all of these violations.  *Id.*  The examiner assessed Smith's programming in the institution and found that he had programmed well.  SOMF ¶ 95,  *Id.* at 2-3.  The examiner then computed Smith's 2000 guidelines, finding that Smith should have 88-124 months added to his guideline range for his assaultive and violent conduct in prison, and the examiner recommended a deduction of 12 months for Smith's programming.  *Id.*  The examiner recommended that Smith receive a three-year reconsideration hearing in June 2009, a recommendation within Smith's total guideline range of 234-276 months.  *Id.*

On July 24, 2004, the USPC agreed with the examiner's recommendation, denied Smith parole and ordered a reconsideration hearing in June 2009.  SOMF ¶ 96,  *See* Smith *Ex.* H-4, Notice of Action.

In opposition to Plaintiffs' Statement of Material Fact in Support of their Motion for Summary Judgment, Defendants contend that said facts are not material and are speculative at best.  Nevertheless, along with this motion and memorandum of law, Defendants also submit the attached opposition to Plaintiffs' joint and individual statement of facts.

### III.    LEGAL BACKGROUND

**A.    Statute and Regulation**

**1.    Parole Board Statutory Obligations and Practice**

The Parole Board was created pursuant to District of Columbia parole statute, which

granted the Parole Board discretion to determine whether an inmate was suitable for parole. 9

D.C.R.R. §105-1(a)-(f). Subsequently, the District of Columbia parole statute was updated to

provide that:

> Whenever it shall appear to the Board of Parole that there is
> a reasonable probability that a prisoner will live and remain
> at liberty without violating the law, that his release is not
> incompatible with the welfare of society, and that he has
> served the minimum sentence imposed . . . the Board may
> authorize his release on parole upon such terms and
> conditions as the Board shall from time to time prescribe.
>
> D.C. Code §24-404(a); *Murray v. Stempson*, 633 A.2d 48
> (D.C. 1993).

"The statutory language is phrased in discretionary terms, and leaves it to the Board to

determine whether the prisoner is likely to be a responsible citizen if he is returned to the

community and whether release on parole is consistent with public safety." *White v. Hyman*, 647

A.2d 1175, 1179 (D.C. 1994). Protection of the public safety in parole decision making, as

determined by the Parole Board, is therefore the paramount consideration under D.C. law.

On May 5, 1987, the D.C. Board promulgated parole guidelines for the exercise of its

discretion under the D.C. parole statute. Plaintiffs' Motion for Summary Judgment, *Ex*. B. The

D.C. Board amended these guidelines on September 4, 1987 and January 22, 1988. These

guidelines were in effect until the termination of the Board's parole function in 1998, and are

described in detail in *Ellis v. District of Columbia*, 84 F.3d 1413, 1415-17 (D.C. Cir.

22

1996)(rejecting prisoners' argument that due process rights attached to the D.C. Parole Statute because it conferred the Parole Board with broad discretion to deny parole when release was incompatible with the public welfare even when the numerical factors suggested release was appropriate). In brief, the 1987 guidelines required the calculation of a Total Point Score ("TPS') based on the prisoner's Salient Factor Score ("SFS") and additional risk points.[3] The SFS is "an actuarial parole prognosis aid to assess the degree of risk posed by a parolee." *Ellis*, *supra*, 84 F.3d1413 at 1418-19 (quoting 28 D.C.M.R. 204.3). The prisoner's TPS indicates the risk level presented by the prisoner. If the Total Point Score was 2 or less at the initial hearing, the prisoner would ordinarily be granted parole. *Id*. If the Total Point Score was 3 or more at the initial hearing, parole would ordinarily be denied and the prisoner would be continued for a rehearing. *Id*. At rehearings, a score of 3 or less would indicate that parole should ordinarily be granted. Because points were subtracted from the TPS at rehearings for positive prison programming, a well-behaved prisoner with good program performance could work his score down to a 3 after one or more rehearings. *Id*. In a case where parole was denied, the ordinary continuance to a rehearing ("set off") would be one year. *Id*. at 1420.

---

[3] As the court explained in *Ellis*:

The Board modifies a prisoner's risk category by adding or subtracting points for pre- and post-incarceration factors. Points are added if:

–The prisoner's current conviction involved violence against a person, the use of a dangerous weapon, or drug distribution; or if the prisoner has two or more previous convictions for these types of crimes; or

–The prisoner has committed serious disciplinary infractions.

84 F.3d at 1416.

The 1987 guidelines, however, merely formalized the manner in which the Board exercised the discretion conferred upon it by the D.C. parole statute, and the Board had plenary discretion to override the guidelines and deny parole notwithstanding a favorable TPS, and also to order a much longer "set off" than the ordinary one-year continuance. 28 D.C.M.R. §204.22 and §104.11. *Davis v. Henderson*, 652 A.2d 634, 636 (D.C. 1995). As explained in *Ellis*, *supra*, "[t]he calculations done under the regulations are intended to 'enable the [Parole] Board to exercise its discretion when, and only when, release is not incompatible with the safety of the community." 84 F.3d 1413 at 1418 (quoting 28 D.C.M.R. 204.1). In other words, under the 1987 guidelines, the Parole Board always retained its broad discretion to deny parole and determine that there was no reasonable probability that an inmate would live in and remain at liberty without violating the law or that release would be incompatible with the welfare of society." *McRae v. Hyman*, 667 A.2d 1356 (D.C. 1995). Successive rehearings were no guarantee that parole would be granted.

In 1991, four years after the official publication of the 1987 guidelines, the Parole Board adopted informal policy guidelines to assist the Board in defining terms used in the guidelines. Plaintiffs' Motion for Summary Judgment, *Ex.* B. These informal guidelines were promulgated in order to facilitate consistency in the terminology used in parole decision-making. *Id.* at 1. These guidelines were not intended to limit the Board's discretion with regard to aggravating and mitigating factors utilized to deny parole, and the Board modified these guidelines. *Holloway v. Quick*, 1996 WL 556636 (D.D.C. Sept. 25, 1996). Because these informal guidelines were not officially published in the District of Columbia Register, they did not have the same force of law as that of the 1987 guidelines.

24

Consistent with the provisions of the 1987 guidelines, the Parole Board's actual practice under these guidelines was to frequently depart from its numerical prognoses. 63 Fed. Reg. 39172 (July 21, 1998). When the USPC assumed the parole responsibilities of the D.C. Board in 1998, it found that the Board departed from its guidelines in more than half of its cases. *Id.* The reasons for those departures varied greatly from suggested reasons for departure noted in its 1991 Policy Guidelines to reasons not specifically delineated in any guideline, policy guideline, or policy statement. *See, e.g. Davis v. Henderson*, 652 A.2d 634 (D.C. 1995) (departure for negative institutional conduct and because inmate "blurred the line between perceived and real"); *Smith v. Quick*, 680 A.2d 396 (D.C. 1996)(inmate initially denied parole on the basis of psychologist report); *White v. Hyman*, 647 A.2d 1175 (D.C. 1994)(departure for negative institutional conduct). The Parole Board's practice in all its discretionary decision-making was to exercise its discretion under the parole statute and determine if the offender constituted a risk to the public safety, regardless of what the guidelines suggested.

Prior to assuming the D.C. paroling function for all D.C. Code parole-eligible inmates in 1998, the USPC applied the 1987 guidelines to D.C. Code inmates in federal custody. D.C. Code § 24-409.[4] The USPC's practice under the 1987 guidelines was to exercise its discretion to depart from the 1987 guidelines in cases where the unique factors of an inmate's background constituted a risk to the community. Similar to the Parole Board's practice under the guidelines, the USPC departed from the guidelines, both for reasons noted in the Board's policies and for

_____

[4] The USPC was required to apply the Parole Board's 1987 guidelines to D.C. code violators housed in federal prisons. *Cosgrove v. Thornburgh*, 703 F. Supp. 995 (D.D.C. 1988). It is noteworthy that this requirement was prior to the USPC adopting the 2000 guidelines, which would have obviated the *Cosgrove* decision.

reasons not specifically stated in those guidelines or policy statements. *Stevens v. Quick*, 678

A.2d 28 (D.C. 1996); *Duckett v. U.S. Parole Comm'n*, 795 F. Supp. 133 (M.D.Pa. 1992); Exhibit

3 attached to Plaintiffs' Motion for Summary Judgment, Memorandum of Michael A. Stover at 4

("The [Parole Board] does not observe any limit to the length of time an inmate may be

continued for a rehearing, and continuances have been ordered for rehearing dates up to nine

years in the future...use *individualized discretion* in determining the actual rehearing date ... the

rehearing date should reflect a decision that all aggravating factors identified in the decision have

been fully accounted for at the time.")

        In essence, the Board's and the USPC's *practice* was to frequently dispense with the 1987

guidelines where appropriate and fall back to its broad discretion under the D.C. parole statute to

determine if release of a particular inmate was compatible with the public welfare and make a

predictive judgment whether an inmate was likely to live at liberty without violating the law.

### 2.    Transfer of Jurisdiction and the USPC's 2000 Guidelines

        Plaintiffs' claims arise in the context of the transfer of paroling authority from the Parole

Board (abolished August 5, 2000) to the USPC under the 1997 Revitalization Act. *See Franklin*

*v. District of Columbia*, 163 F.3d 625, 632 (D.C. Cir. 1998). The Revitalization Act required the

USPC to exercise its authority "pursuant to the parole laws and regulations of the District of

Columbia," but also gave it "exclusive authority to amend or supplement any regulation

interpreting or implementing the parole laws of the District of Columbia with respect to felons . .

. ." D.C. Code §24-1231(a)(1) and (c)(1999), *recodified as* D.C. Code §24-131(a)(1) and (c)

(2001). In 1998, pursuant to its "amend and supplement" authority under the Revitalization Act,

the USPC adopted a revised version of the 1987 guidelines ( "1998 guidelines"). The USPC's

intentions were to clarify procedures to increase fairness and administrative efficiency, and to

improve the point score by incorporating factors into the score that had been frequently used by

the D.C. Board as grounds for upward departures from the 1987 guidelines.  The USPC stated:

> [T]he Commission has supplemented the existing parole
> guidelines of the Board of Parole by adopting an improved
> point score system to replace the [1987] scoring system . ..
> The continued use of this [1987] point score system by the
> D.C. Board of Parole has resulted in a high rate of upward
> departures from the guidelines.  For example, in a random
> sample of 100 cases decided by the D.C. Board of Parole in
> 1997, the Commission found departures in more than half
> of the cases.  Factors cited by the Board to justify
> departures most often appear to involve aspects of the
> prisoner's current offense or criminal history that indicate a
> risk of violent recidivism. The guidelines set forth below
> retain the basic framework of the Board's guidelines, but
> incorporate factors that would otherwise be expected to
> result in decisions outside the guidelines.  The Commission
> intends this improved point score system to serve the
> Board's original purpose of predicting violent crime and
> incapacitating offenders with a high probability of serious
> recidivism.  It is also intended to reduce the potential for
> unwarranted disparity that can be produced by the frequent
> exercise of unguided discretion.

> 63 Fed. Reg. 39172 (July 21, 1998)(citation omitted)

Accordingly, the 1998 guidelines expanded the TPS to include the degree of violence in

the prisoner's current offense and the number of violent crimes on the prisoner's prior record

previously considered by the D.C. Board in its actual practice under the 1987 guidelines. The

USPC also replaced the annual rehearing schedule with specific guideline ranges for the timing

of rehearings, keyed to the prisoner's Base Point Score (a higher score resulted in a higher

rehearing range).  In addition, the USPC's 1998 guidelines improved the SFS, eliminating the

item regarding whether the offender had a history of opiate dependence, and substituting for it a

27

more sophisticated evaluation of the interaction of the offender's age at time of offense with his number of prior commitments.[5]  63 Fed. Reg. 39172, 39176 (July 21, 1998).

In the 1998 guidelines, the USPC maintained the Parole Board's basic standards for determining which scores indicated a favorable decision (for example,  3 points or less indicates parole at a rehearing in the ordinary case), as well as the essential character of the Parole Board's guidelines as a risk-based measure of suitability for parole that applies after a prisoner has served his minimum term and becomes eligible for parole. The USPC also maintained the same flexibility the Board had under the 1987 guidelines to depart from the guidelines (either by denying parole when a score indicated parole in the usual case, and/or by setting the case off for a longer continuance than the rehearing guidelines called for) when circumstances warranted such action.[6]

_____

[5] The USPC noted that:

> [R]esearch indicated that the predictive power of the [SFS], which is currently used by both the Parole Board and the D.C. Board of Parole, would be significantly enhanced by increasing the weight given to Item C (age at the commencement of the current offense), from a maximum of 2 points to a maximum of 3 points.  The SFS is therefore to differentiate better between offenders on the basis of their age at the commencement of the current offense.  Taken together, age at the commencement of the current offense and the number of prior convictions and commitments function to predict recidivism by providing a measure of the rate of the offender's past criminal conduct.

> 63 Fed. Reg. 39172, 39173 (July 21, 1998).

[6] *Compare* 28 D.C.M.R. §204.22 (repealed)(quoted in *Ellis*, 84 F.3d at 1416 n.2).

In 2000, the USPC again amended and supplemented the Parole Board's regulations, promulgating revised guidelines ("2000 guidelines"). 28 C.F.R. §2.80 (2001), originally published at 65 Fed. Reg. 70663 (November 27, 2000). The 2000 guidelines maintained the same paroling policies expressed in the 1998 and 1987 guidelines, merely converting the rehearing range(s) that would have been applied sequentially at each successive annual parole rehearing into a Total Guideline Range that would be calculated at the first hearing. The Total Guideline Range is based on the point score calculations derived from the 1998 guidelines, carried across the number of rehearings a prisoner would normally expect (after completing his minimum term) if he maintained good behavior.

The Total Guideline Range is based on the point score calculations contained in the 1998 guideline, anticipating what the reductions in that score would be at successive hearings, over the number of rehearings a prisoner would normally expect if he maintained good behavior. The

---

> The Board may, in unusual circumstances, waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

*And* 28 D.C.M.R. §104.11:

> Notwithstanding any other provision of this section, the Board may order a parole reconsideration date it determines to be appropriate.

*With* 28 C.F.R. Appendix §2.80(o)(1):

> The Commission may, in unusual circumstances, waive the Salient Factor Score and the pre- and post-incarceration factors set forth in this section to grant or deny parole to a prisoner notwithstanding the guidelines, or to schedule a reconsideration hearing at a time different from that indicated [in the rehearing guidelines]. * * *

29

USPC explicitly stated in promulgating the rule that:

> The 2000 guidelines convert the rehearing ranges into a single range indicating the total prison time that may be served by the inmate, and authorize the setting of presumptive release dates up to 36 months from the date of the parole hearing. *However, the Point Assignment Table [contained in the prior rules] remains the basis upon which the guidelines are determined.* . . . [T]he 2000 rule contains a presumptive credit for "ordinary program achievement," which currently [i.e., under the prior rule] must be determined on a case-by-case basis, in the guideline range itself. Hence, inmates will now receive the benefit of having their "ordinary program achievement" points credited in advance.

> * * *

> The [rule] eliminates . . . the system of determining at each hearing (based on the Total Point Score) whether the inmate qualifies for parole at that time. It substitutes the following decisionmaking procedure.

> Under Step 1, a Base Guideline Range is determined from the Base Point Score. There is no change from the Base Point Score used in [the previous rule]. The time expected for *the inmate to qualify for parole (assuming no disciplinary infractions and ordinary program achievement) is simply made explicit.*

> 65 Fed. Reg. at 70663 [emphasis added].

In summary, the 2000 guidelines "convert the rehearing ranges [under both prior rules] into a single range indicating the total prison time that may be served by the inmate, and authorize the setting of presumptive release dates up to 36 months from the date of the parole hearing." 65 Fed. Reg. 70663 (November 27, 2000). The 2000 guidelines thus kept the pre- and post-incarceration factors, incorporated previous D.C. Board practice, and converted the

30

rehearing guidelines into presumptive prison time ranges.

### 3.    The Ex Post Facto Clause and Recent Supreme Court Cases

The *ex poste facto* language, *U.S. Const., Art. 1, §10, Cl. 1*, forbids Congress or the States from passing any "*ex post facto* Law." *California Dep't of Corrections v. Morales*, 514 U.S. 499, 504 (1995); 1981); *Miller v. Florida*, 482 U.S. 423, 429 (1987) *Warren v. United States Parole Comm'n*, 659 F.2d 183, 186 (D.C. Cir.)(Citing *Calder v. Bull*, 3U.S. 386 (1798)). The *ex post facto* prohibition encompasses:

> 1st. Every law that makes an action before the passing of
> the law, and which was innocent when done, criminal, and
> punishes such action. 2d. Every law that aggravates a
> crime, or makes it greater than it was, when committed. 3d.
> Every law that changes punishment, and inflicts a greater
> punishment, than the law annexed to the crime, when
> committed. 4th. Every law that alters the legal rules of
> evidence, and receives less, or different testimony, than the
> law required at the time of the commission of the offense,
> in order to convict the offender.

> *Calder*, *supra.*

The *Ex Post Facto* Clause is meant "to assure that legislative Acts give fair warning of their effect to individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). The Supreme Court has been very clear that "lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated" are critical to relief under the *ex post facto* clause. *Id*. at 30; *Rogers v. Tennessee*, 532 U.S. 451 (2001). Courts have upheld this principle with regard to the USPC's statutes, regulations and general jurisdiction over federal offenders. *Warren*, *supra*, 659 F.2d at 188; *Bledsoe v. United States*, 384 F.3d 1232, 1239-40 (10th Cir. 2004).

31

In its two most-recent pronouncements on the *ex post facto* clause in the parole context, the Supreme Court explained that the clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *Morales*, *supra*, 514 U.S. at 504 (quoting *Calder*, *supra*); *Jones v. Garner*, 529 U.S. 244, 249 (2000). In *Morales*, the Court wrestled with whether a statutory change in the frequency of parole reconsiderations for prisoners convicted of more than one homicide from annually to up to every three years violated the *ex post facto* clause. In *Garner*, the change in frequency of parole reconsiderations for prisoners serving life sentences was from every three years to "at least every eight years." 529 U.S. 244 at 247. In both cases, the Court said that the central question in evaluating the constitutionality of potential *ex post facto* violations is whether the change produces a significant risk of increasing the prisoner's incarceration. 514 U.S. at 509; *Garner*, *supra*, 529 U.S. at 251. The Court affirmed the dismissal of the *habeas* petition in *Morales* and, although it remanded in *Garner*, it noted that a violation of the *ex post facto* clause was unlikely because of the prisoner's criminal history. 529 U.S. 244 at 254-44.[7]

In reaching these conclusions, the Court made observations that are relevant to the instant matter. Although the Court noted that the paroling entities had almost unbridled discretion to determine the timing of parole reconsiderations, *Morales*, 514 U.S. at 512; *Garner*, 529 U.S. at 253, it noted that the exercise of discretion was still subject to the *ex post facto* clause. *Id*.

---

[7] While the USPC desired to continue the policy of the Parole Board, the Georgia Board of Pardons and Parole in *Garner* "steadily and consistently amended and refined its guidelines to provide for lengthier prison service for violent criminals." *Garner*, 529 U.S. at 261-62 (Souter, dissenting)(quoting the Georgia Board of Pardons and Parole's website). Remand served the purpose of enabling the prisoner to explore these statutory changes and any potential adverse effects.

Nevertheless, whether a change in the use of discretion violates the *ex post facto* clause is a matter of degree. *Garner* at 250. Otherwise, the judiciary would be charged with "micromanag[ing] [] an endless array of legislative adjustments to parole and sentencing procedures including such innocuous adjustments as a change to the membership of the board... [and] reductions in the duration of parole hearings...." *Morales* at 508.

Notably, the Court observed that, despite *ex post facto's* notice requirements, it is inherent that discretion in the parole context "is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insight into the accuracy of predictions about the offense and risk of recidivism consequent upon the offenders release, along with the complex of other factors, will inform parole decisions." *Garner*, 529 U.S. at 253. The Court concluded that the statutory changes in both cases passed constitutional muster because they did not change the standard for determining the initial date of parole eligibility,[8] the paroling entities had discretion to decrease the time between reconsiderations,[9] the changes affected a small number of inmates whose likelihood of being paroled based on their criminal conduct was remote and enabled a "better exercise of discretion that it had from the outset." *Garner* at 254-55. Ultimately, the Court concluded in both cases that neither prisoner had demonstrated that the changes increased the length of incarceration. *Morales* at 514; *Garner* at 255. In *Morales*, the Court characterized

---

[8] A distinction between parole eligibility and parole suitability must be noted. Parole eligibility is fixed by statute and a prisoner's minimum term. See D.C. Code § 24-404(a). Parole suitability, on the other hand, is a discretionary determination made by the parole authority.

[9] An inmate under the jurisdiction of the USPC may seek an earlier hearing date pursuant to 28 C.F.R. §§2.15 and 2.28.

the prisoner's claims as "speculative and attenuated."  514 U.S. 499 at 513.

Although a reparole case, the D.C. Circuit adopted the *Morales/Garner* admonition that, when a statutory change does not by its own terms show a significant risk of increasing the prisoner's incarceration, a prisoner may exhibit that risk by conducting an examination of the rule change's practical implementation.  *Fletcher v. Reilly*, 433 F.3d 867, 877 (D.C. Cir. 2006) (citing *Garner*, *supra*).  *Fletcher* clearly recommends a "searching comparison" of the *practical effect* of the exercise of discretion under differing parole regimes to determine whether there is a significant risk of increased punishment as a result of the adoption of new parole guidelines.  *Id*. at 879 (noting that the USPC adopted the Parole Board's parole regulations entirely in developing its own after the Parole Board became defunct).

While a searching comparison of the practical effect is a viable means of establishing an *ex post facto* violation in many case, such an exercise is futile in the instant case where the Parole Board retained discretion to depart from numerical guidelines and frequently did, and the USPC modified its own guidelines to reflect the Parole Board's guidelines in the ordinary course.  This paradigm has been recognized through out the Country.  In *Pindle v. Poteat*, a *habeas* petitioner raised the exact same claims Plaintiffs raised here except that he had what appeared to be a less violent criminal background.  360 F.Supp.2d 17, 18-19 (D.D.C. 2003).  Consistent with *Garner*, initially the court permitted discovery but later reversed itself and dismissed the petition.  In doing so, the court concluded that the petitioner was not entitled to *habeas* relief because he could not show that he was disadvantaged by the USPC because the Parole Board retained discretion to exceed its guidelines.  *Id*. at 21.  The court also noted that, in addition to the Parole Board's discretion, the District of Columbia Council replaced "shall" with the Parole Board

34

"may" grant parole even when the prisoner satisfied the numerical requirements. *Id*. at 20.

In the Third Circuit, similar *habeas* petitions filed by D.C. Code offenders housed at United States Penitentiary in Lewisburg, Pennsylvania. In *Hargrow v. Minor*, 2007 U.S. Dist. Lexis 51583 (M.D. Pa 2007), a D.C. Code offender filed a *habeas* petition alleging that his initial parole determination was affected by the reliance on the USPC's updated guidelines instead of the Parole Board's. *Id*. at 1-2. The court dismissed the petition because the prisoner's claims amounted to no more than speculation since the Parole Board frequently departed from its guidelines just as the USPC did in the petitioner's case. *Id*. at 11; *see also Scott-El v. United States Parole Comm'n*, 2006 U.S. Dist. Lexis. 66649 (M.D. Pa 2006)(denying *habeas* relief because both guidelines enabled denial of parole notwithstanding the numerical guidelines).

Similar decisions have been rendered in other Circuits: *Seagroves v. Tenn. Bd of Probation and Parole*, 86 Fed. Appx. 45 (6th Cir. 2003)(dismissing petitioner's claim that the change of parole statutes significantly increased the risk of increased punishment especially in light of the petitioner's criminal background); *Glascoe v. Bezy*, 421 F.3d 543 (7th Cir. 2005) (affirming dismissal of a D.C. Code offender's *habeas* petition because it was clear based on the petitioner's violent past that discretionary departure from numerical guidelines was warranted regardless of guideline used); *Moore v. O'Brien*, 2007 U.S. Dist. Lexis 34381 (W.D. Va 2007)(denial of D.C. Code offender's *habeas* on same grounds); *Skinner v. Hastings*, 2006 U.S. Dist. Lexis 59739 (W.D. Ky 2006)(denial of D.C. Code offender's *habeas* on same grounds) ; *Bennett v. LaManna*, 2007 WL 781679 * 7 (D.S.C. March 13, 2007)(noting that "many of the factors regarding whether to depart upward are substantially similar under both sets of guidelines.

35

## IV.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(c), a motion for judgment on the pleadings shall be granted if the moving party demonstrates that "no material fact is in dispute and that it is 'entitled to judgment as a matter of law.' " *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002) (quoting *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992)). In considering a motion for judgment on the pleadings, the Court should "accept as true the allegations in the opponent's pleadings" and "accord the benefit of all reasonable inferences to the non-moving party." *Id.* (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987)). The appropriate standard for reviewing a motion for judgment on the pleadings is the same as that applied to a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Robinson-Reeder v. Am. Council on Ed.*, 2008 U.S. Dist. Lexis 5979 (D.D.C. 2008). Accordingly, a court will grant a Fed. R. Civ. P. 12(c) motion when the factual allegations raise a right to relief beyond speculation. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1967 (2007). (The complaint must plead "enough facts to state a claim for relief that is plausible on its face"). The Court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).[10]

---

[10]    Generally speaking, the Court should not consider matters beyond the pleadings without converting it to a motion for summary judgment. Fed. R. Civ. P. 12(b)(6). Nonetheless, there are important exceptions to this general principle. The Court may properly take judicial notice of court records without converting a motion to dismiss into a motion for summary judgment. *Baker v. Henderson*, 150 F. Supp. 2d 17, 19 n.1 (D.D.C. 2001)("in determining whether a complaint fails to state a claim, the court may. . . take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one

Defendants are entitled to judgment as a matter of law because under the particular dynamics of the transfer of paroling authority from the Parole Board to the USPC that has been repeatedly acknowledged in this Circuit, it is virtually impossible for these Plaintiffs to present any factual scenario where Defendants' actions disadvantaged them by subjecting them to increased incarceration. Moreover, Defendants contend that Plaintiffs' Motion for Summary Judgment should be denied because the facts upon which they rely are infinitely speculative and immaterial in light of the Parole Board's and USPC's broad discretion to deny parole to an applicant in the type of unusual circumstances that characterize Plaintiffs' application.

## V.    ARGUMENT

### A.    Plaintiffs Cannot Maintain this Action under 42 U.S.C. 1983

Plaintiffs' cannot maintain an action against the USPC or its commissioners because neither are "persons" as contemplated by 42 U.S.C. 1983. *Settles v. United States Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005)(noting that while the question of whether the commission was acting under state law had been answered the question of whether the commission or commissioners were persons was not). Moreover, unlike *Fletcher*, which is a *reparole* case, Plaintiffs' exclusive remedy is *habeas* because the relief they seek under 1983 necessarily implies an earlier release. *Fletcher v. Reilly*, 370 F.3d 1223, 1227 (D.C. Cir. 2004)(noting that *Fletcher* could proceed because the relief he sought did not necessarily imply a speedier release). As demonstrated in actions brought by D.C. inmates cited above, Plaintiffs' exclusive remedy is *habeas* because, given the Supreme Court precedent cited above, Plaintiffs

---

for summary judgment."); *Himmelman v. MCI Communications*, 104 F. Supp. 2d 1, 3 (D.D.C. 2000)("The court may consider [on a motion to dismiss] the allegations of the complaint, documents attached to or specifically referred to in the complaint, and matters of public record.")

allegations are necessarily premised on a claim that application of the earlier guidelines would almost certainly result in an earlier release.

Whether Plaintiffs may maintain an action against Defendants pursuant to 42 U.S.C. 1983 remains an unanswered question in this Circuit. Officers of the United States who acted in their official capacities are not persons within the meaning of §1983 because Congress did not intend to encompass federal entities among those persons who could be exposed to § 1983 liability. *Ngiraingas v. Sanchez*, 495 U.S. 182 (1990). Moreover, the Parole Commission and Reorganization Act, 18 U.S.C.S. § 4201 *et seq.*, created the USPC, an independent federal agency vested with the power to promulgate rules and regulations establishing guidelines with respect to the exercise of its discretionary authority to parole federal prisoners. 18 U.S.C.S. § 4203(a). *Wichman v. United States Parole Comm'n*, 780 F.2d 1024, 1025-26 (6th Cir. 1985); *Elliot v. Fed. Dep. Ins. Corp.*, 305 F.Supp.2d 79, (D.D.C. 2004)(noting that the Federal Deposit Insurance Corporation is a federal agency not subject to liability as a person under 1983); *see also Al Fayed v. CIA*, 229 F.3d 272 (D.C. Cir.2000)(the government is not a person with regard to a subpoena). Plaintiffs cannot maintain this action under 42 U.S.C. 1983 and Plaintiffs' exclusive remedy is *habeas*. *Moore v. Reilly*, 2005 U.S. Dist. Lexis 3084 (D.D.C. 2005) (rejecting Plaintiff's claim against the USPC under 1983). As demonstrated above, the bulk of claims brought by inmates challenging Defendants' alleged actions under the *ex post facto* clause are brought under *habeas* and not 1983. These actions are generally brought under *habeas* because, like here, they "necessarily imply or automatically result in a speedier release." *Fletcher v. Reilly*, 370 F.3d at 1227. Because the crux of Plaintiffs' claims imply a speedier release, their complaint should be dismissed because *habeas* actions should be brought against

38

Plaintiffs' custodian-the only proper defendant in a *habeas* action. *Fletcher*, *supra*, 433 F.3d at 874. In other words, Plaintiffs' 1983 complaint is barred because Defendants and the USPC are not "persons" under 1983 and Plaintiffs' complaint should be dismissed because their exclusive remedy is *habeas*. *Settles*, *supra*, 429 F.3d 1106.[11]

### B.    Defendants are Entitled to Judgment as a Matter of Law

Defendants posit the following in support of their Motion for Judgment on the Pleadings and in opposition to Plaintiffs' Motion for Summary Judgment.

### 1.    The Parole Board and USPC guidelines do not Differ on their Face

The USPC not only adopted similar factors to those the 1987 guidelines considered, but it also incorporated the Board's *actual practice* under the 1987 guidelines in amending those guidelines. 63 Fed. Reg. 39172-73 (July 21, 1998). As noted above, when the USPC adopted the first set of guidelines in 1998 and the final set of guidelines in 2000 (65 Fed. Reg.70663 (November 27, 2000)), the USPC incorporated all of the factors of the 1987 guidelines and expanded them to comport with Board practice. The facial similarity of these guidelines is therefore without question. *Fletcher v. Reilly*, 433 F.3d 867, 871 (D.C. Cir. 2006) (noting that the USPC's parole guidelines "incorporate[d]" the Parole Boards'); *Glascoe*, *supra*, 421 F.3d at

---

[11] Should the Court agree that Plaintiffs' exclusive remedy is habeas, the habeas statute addresses the venue issue under 28 U.S.C. 2241(d). However, should the Court permit the Plaintiffs to proceed under 42 U.S.C. 1983, this action should instead be transferred to the judicial district where the prisoner is incarcerated, pursuant to 28 U.S.C. §1404(a). *Starnes v. McGuire*, 512 F.2d 918, 926 (D.C. Cir. 1974) (en banc). In considering the *Starnes* factors, i.e. (1) the prisoner's difficulty of communication with counsel; (2) difficulty of transferring the prisoner; (3) availability of witnesses and files; (4) speed of final resolution; and (5) whether the case involves issues of national policy that require the testimony of high-level administrators located in Washington, D.C., it is clear that Plaintiffs' actions should be brought either where they are incarcerated or in the District of Maryland where the USPC is located.

547 (where the same factors are kept, but extended, no *ex post facto* violation).

   2.    **The D.C. Board's and the USPC's prior practice under the 1987
guidelines was not substantially different from the USPC's practice under
the 2000 guidelines**.

   Plaintiffs have not and cannot demonstrate that the USPC's practice under the 2000

guidelines have resulted in a longer period of incarceration or significantly risk a longer period of

incarceration than practice under the 1987 guidelines. Plaintiffs have failed to demonstrate,

through discovery any *actual practice* of the D.C. Board under the 1987 guidelines, and the

reported and non-reported judicial cases of record refute their claims that they are placed at a

significant risk of increased punishment under the 2000 guidelines. Because the practice of the

D.C. Board of Parole under the 1987 guidelines was frequently to depart from the guidelines in

cases such as Plaintiffs', they cannot demonstrate that the application of the 2000 guidelines for

D.C. Code offenders to their cases resulted in a significant risk of increased punishment.[12]

   In their lengthy pleadings, Plaintiffs posit and speculate what their respective D.C. point

scores would have been under the 1987 guidelines of the D.C. Board of Parole, and they argue

that, under those "scores," the 1987 guidelines would have suggested a parole grant and that the

USPC, applying those guidelines, would have ordered them paroled. Such claims are merely

speculative regarding fact-finding and prospective predictive judgments that *would have* been

made. The members of the Parole Board were and the USPC are quasi-judicial decision-makers

vested with the discretion to make individualized factual findings and predictive judgments under

the D.C. parole statute. *Pate v. United States*, 277 F. Supp. 2d 1, 10 (D.C. 2003); *Walrath v.*

_____

   [12] Of Course, with respect to Plaintiffs Gambrell and Eason, the 1987 guidelines have
been applied throughout.

*United States*, 35 F.3d 277, 281-82 (7th Cir. 1994). Plaintiffs can no more predict what the factual findings of the USPC or the Board would be than predict the judgments of the Court. Thus, Plaintiffs' mere speculation about what the Parole Commissioners would have found or predicted about Plaintiffs' suitability for release into the community must be rejected.[13]

Plaintiffs have not provided any evidence of how the Board or the USPC actually practiced implementation of the 1987 guidelines, beyond testimony regarding what the guidelines appear on their face to require.[14] However, the *ex post facto* analysis under *Garner* and *Fletcher* does not end with a decision on what the guidelines state, suggest, or dictate. Rather, the Court must explore what the actual practices under the former and current regimes are and whether the current practice differs so much as to establish a substantial risk of increased punishment. "Without any evidence of how current parole practices differ from [previous] practices, plaintiffs cannot establish a violation of the *Ex Post Facto* Clause." *Michael v. Ghee*, 498 F.3d 372, 384 (6th Cir. 2007). Plaintiffs have had an adequate opportunity to discover the Board's and the USPC's practices under the 1987 guidelines, but they simply have not shown what the actual

---

[13] In their memorandum of law, Plaintiffs cite to the depositions of several USPC hearing examiners and the USPC's General Counsel for what some Plaintiffs' "scores" would have been under the various guidelines. As these staff members are not decision-makers, their assessment cannot be taken as official USPC pronouncements. *Lynch v. U.S. Parole Comm'n*, 768 F.2d 491, 497 (2d Cir. 1985)("It is the USPC and not the Examiners which is vested with the responsibility to make the parole decision."). Relying on these individuals' assessments is similar to relying upon a judicial law clerk's assessment of how a U.S. District Court Judge may rule in a particular case and thus must be dismissed as speculation. The record in Plaintiffs' own cases illustrates that the USPC has in the past disagreed with the examiners.

[14] In support of their claims, Plaintiffs cite to the deposition testimony of Gladys W. Mack, a former D.C. Board of Parole Member in the case of *Cosgrove v. Meese*, Case No. 80-0516, dated March 18, 1988. This testimony provides no support for Plaintiffs' claims, as it related only to what this particular Board member believed the 1987 guidelines stated and did not provide any information about the *actual practice* of the D.C. Board under the 1987 guidelines.

practices were.  At the most, Plaintiffs have shown only remote speculation about the risk of increased punishment as a result of the institution of the 2000 guidelines, which does not meet the *Garner* standard.  *Henderson v. Scott*, 260 F.3d 1213, 1217 (10th Cir. 2001).

The judicial and legal record of the D.C. Board's actual practice under the 1987 guidelines, on the other hand, illustrates that in cases of individuals similarly situated to Plaintiffs (i.e., extremely violent offenders), the practice of the Board was to frequently exceed the 1987 guidelines.  For violent offenders such as Plaintiffs, the Parole Board regularly exceeded the timeframes recommended by the 1987 guidelines, and courts routinely upheld those departures under the D.C. parole statute.  In *Hall v. Henderson*, 672 A.2d 1047 (D.C. 1996), the D.C. Board exceeded the 1987 guidelines for a violent offender with negative institutional conduct, even though the inmate had "completed various educational programs while in prison, had a favorable work history, and had a good working relationship with staff."  652 A.2d at 1050.  The D.C. Board departed from the 1987 guidelines on numerous other occasions, usually based upon the predictive judgment that an inmate was a risk to society or upon the unusual nature of the inmate's crime.  *Smith v. Quick*, 680 A.2d 396 (D.C. 1996)(inmate initially denied parole on the basis of psychologist report); *McRae v. Hyman*, 667 A.2d 1356 (D.C. 1995)(departure for criminal history and failure under supervision); *Davis v. Henderson*, 652 A.2d 634 (D.C. 1995)(departure for negative institutional conduct and because inmate "blurred the line between perceived and real"); *White v. Hyman*, 647 A.2d 1175 (D.C. 1994)(departure for negative institutional conduct).

Prior to assuming D.C. parole jurisdiction, the USPC's practice under the 1987 guidelines displayed a similar pattern of departures from the 1987 guidelines in cases such as Plaintiffs.  In

42

*Stevens v. Quick*, 678 A.2d 28 (D.C. 1996), the USPC denied parole to a D.C. Code inmate who had committed two murders.  In that case, the inmate argued that the USPC had not properly followed the 1987 guidelines because the USPC exceeded the guidelines, continuing him to a five-year set-off.  678 A.2d at 30.  The USPC also departed from the 1987 guidelines in *Bryant v. U.S. Parole Comm'n*, 1993 WL 108593 (D.D.C. March 31, 1993), on the basis of the seriousness of one murder offense.  In that case, this Court upheld the USPC's departure from the guidelines, noting that the 1987 guidelines do not "ordain but only suggest" when a prisoner should be paroled or receive reconsideration.  1993 WL 108593 * 2.  Other cases show that the USPC's practice under the 1987 guidelines was to depart when appropriate as well.  *Mason v. U.S. Parole Comm'n*, 768 A.2d 591 (D.C. 2001); *Duckett v. U.S. Parole Comm'n*, 795 F. Supp. 133 (M.D.Pa. 1992).  All of these cases illustrate that both the Parole Board and the USPC understood that, given the discretion conferred upon D.C. paroling authority under the D.C. parole statute, the paroling authority was not bound by the suggestions of the 1987 guidelines, especially in extremely violent and criminally repetitive cases such as those at the case at bar.

The USPC's own random sampling[15] of one-hundred D.C. Board of Parole cases confirmed the practice of these reported cases.  When the USPC assumed the parole responsibilities of the D.C. Board in 1998, it found that the Board departed from its guidelines in more than half of its cases.  63 Fed. Reg. 39172 (July 21, 1998).  Simply put, the Board's actual practice under the 1987 guidelines was to frequently depart upwardly from the guidelines,

---

[15]  Defendants provided Plaintiffs access to this random sample in discovery, and Plaintiffs took advantage of this access, copying voluminous documents from other inmate's parole files.  Plaintiffs do not analyze the Board's practice under the 1987 guidelines from this random sample in their memorandum of law.

especially in the cases of violent offenders.  Accordingly, Plaintiffs cannot argue that the application of the 2000 guidelines to their cases have resulted in a significant risk of increased punishment beyond what would occur under the 1987 guidelines.

Plaintiffs' real complaint with the USPC is that the it exercised its discretion under the D.C. parole statute to deny them parole, in some cases, above the 1987 guidelines and the 2000 guidelines.  Plaintiffs cast this complaint under the umbrella of an *ex post facto* violation, arguing that a risk of increased punishment exists that is not evident in the record of this case or in the judicial and legal record of D.C. parole decision-making.  In essence, Plaintiffs attempt to have this Court micro-manage the parole procedures of the District of Columbia by *ex post facto* litigation so as to obtain the parole result they desire.  *Cf. Garner*, 529 U.S. at 252, *citing Morales*, 514 U.S. at 508 (*Ex Post Facto* Clause should not be used to micro-manage parole changes).  *See also Brandon v. D.C. Board of Parole*, 828 F.2d 644, 649 (D.C. Cir. 1987)("We decline to 'federalize' - indeed 'constitutionalize' - every deviation from state procedures.").  Because the USPC's current practice does not create a significant risk of increased punishment from the USPC's and Board's prior practice under the 1987 guidelines, the Court should decline the invitation to micro-manage the USPC's parole procedures.

Implicit in Plaintiffs' arguments in support of their Motion for Summary Judgment is that the Parole Board would have granted parole based on their numerical profile.  In other words, the argument assumes that the Parole Board always issues lower scores than the USPC.  The fallacy of this argument is exposed in *Blair-Bey*, *supra*.  That case involved, an inmate with an extensive criminal background, including two homicides and juvenile rape, destruction of property etc. *Blair-Bey*, supra, 151 F.3d at 1037.  Using the Parole Board's numerical system, a USPC hearing

44

officer found the inmate had a score of 2 that favored parole but recommended denial. *Id*.

Conversely, the Parole Board conducted its own analysis and found the inmate had an

unfavorable score of 4 that did not merit parole. The Parole Board appeared "to have counted

Blair-Bey's numerous juvenile offenses in making its calculation." *Id*. at 1038. Moreover, the

Parole Board applied a set off and scheduled the inmate for a rehearing after five years. *Id*.

Accordingly, Blair-Bey contradicts the very core of Plaintiffs' argument that the Parole Board

always followed their numerical guidelines and were more lenient than the USPC. On the other

hand, *Blair-Bey* buttresses Defendants' argument that the Parole Board could and did frequently

depart from their parole guidelines. 63 Fed. Reg. 39172; *Ellis, supra,* at 1418 (noting that the

Parole Board rejected an inmate's parole application despite numerical mandates because of the

inmate's brazen attempts to circumvent the guidelines by improving his institutional behavior in

time for his parole hearing); *Washington v. Williams*, 2002 U.S. App. Lexis 12492, *2 (D.C. Cir.

2002)(noting that in addition to the numerical guidelines the Parole Board had the discretion to

consider the facts of the underlying offense).

### 3.    Plaintiffs have not and cannot demonstrate an *ex post facto* violation on the basis of the facts in the record.

To the extent that Plaintiffs claim a general class of grievances actionable under the *Ex

Post Facto* Clause, their claims have no merit. The specific dates of most Plaintiffs' criminal

conduct illustrate that they cannot legitimately argue for an *ex post facto* expectation, thus

foreclosing their claims at the outset.   If they can meet this initial threshold, Plaintiffs must not

only prove that some "speculative and attenuated" risk of punishment exists for some type of

inmates, but Plaintiffs must establish that there is a *significant risk* of increased punishment for

their own particular cases. *Richardson v. Penn. Board of Probation and Parole*, 423 F.3d 282,

284 (3d Cir. 2005).  In Plaintiffs' cases, they must establish a significant risk of increased

punishment for themselves -  violent offenders who committed crimes such as murder, rape, and

repeated assaults.  Plaintiffs have failed to establish such a substantial increased risk, and the

reported cases and 1998 random sampling noted above illustrate that they cannot do so.

Because the facts underlying Plaintiffs' heinous acts inform the *ex post facto* analysis for

each particular Plaintiff claiming an *ex post facto* violation, each Plaintiff in this case represents a

wholly separate case for judicial review.  Under the *Ex Post Facto* jurisprudence under <u>Garner</u>

and *Fletcher*, each individual Plaintiff must demonstrate that the application of the particular

parole guidelines in his particular case resulted in a significant risk of increased incarceration

beyond whatever the practice was under former guidelines that were in effect when he committed

his crime.  Although viewed as a whole, all Plaintiffs' claims fail as a matter of law, each

Plaintiff's individual case does not have merit on its own under *Fletcher*, and because each

Plaintiff's case presents a unique factual scenario as to when the Plaintiff committed his crime

and where, Defendants will address each of these Plaintiffs separately according to the following

analytical factors: (1) the year in which the Plaintiff committed his crime; (2) the nature of his

crime, criminal history, institutional conduct, and other factors relevant to the parole decision; (3)

the guidelines (if any) that were in effect when he committed his crime and practice under those

guidelines; (4) the guidelines that the USPC considered in making the decision in his case; and

(5) the USPC's decision and the reasons therefor.

Furthermore, in a majority of the Plaintiffs' cases, the USPC exceeded the 2000

guidelines.  The USPC's departure from the allegedly harsher 2000 guidelines illustrates that the

USPC is in fact exercising its discretion under the D.C. parole statute to make independent

determinations of parole suitability, and that is the heart of this litigation.   Plaintiffs' complaint

is not with the guidelines the USPC considered to assess Plaintiffs' parole suitability, but the

actual exercise of the USPC's discretion in denying them parole.   Thus, Plaintiffs' claims are not

so much an *ex post facto* challenge to the use of guidelines, but a direct attack on the USPC's

finding that Plaintiffs are not suitable for parole outside of the guidelines.   In this way, their

claims wind up being "ordinary" challenges to the USPC's fact finding and exercise of

discretion, items which sound in habeas and, thus, are not appropriately brought in this action.

a.    <u>Plaintiffs Gambrell and Eason</u>

Plaintiff Gambrell and Eason's *ex post facto* claims fail on the basis of the facts unique to

their specific cases for several reasons.   First, they both committed their crimes prior to the

enactment of any formal D.C. parole guidelines.   Second, the record demonstrates that the USPC

actually applied the 1987 guidelines to their cases.   Finally, to the extent that these Plaintiffs

challenge the USPC's decisions under the 1987 guidelines, such claims are not appropriate for

this action and must be brought in *habeas corpus* in a different judicial district.

Plaintiff Gambrell committed his offenses of rape, robbery, unauthorized use of a vehicle,

and assault with a dangerous weapon in 1968, almost twenty years before the D.C. Board of

Parole enacted any formal parole guidelines.   He committed his offense of second degree murder

in 1991, prior to the D.C. Board adopting the 1991 policy guidelines.   Plaintiff Eason committed

his offense of second degree murder while armed in May 1987, prior to the official publication of

the 1987 guidelines and well before enactment of the informal 1991 policy guidelines.   Because

these Plaintiffs committed their crimes before the publication of any formal parole guidelines or

policy guidelines, they cannot claim an expectation of *ex post facto* protection from the 1987

guidelines. *Rogers v. Tennessee*, 532 U.S. 451 (2001); *Bledsoe v. United States*, 384 F.3d 1232, 1239-40 (10th Cir. 2004).

Plaintiff Gambrell and Eason's *ex post facto* claims also fail because the record shows that the USPC actually applied the very guidelines (i.e., the 1987 guidelines) that Plaintiffs insist the USPC is required to apply. Plaintiffs' claims in this regard are not *ex post facto* challenges at all but challenges to the USPC's application of the 1987 guidelines in their cases. In the most favorable light, Plaintiffs argue that the USPC did not consider all of the factors[16] in the 1987 guidelines. Plaintiffs' claims can also be viewed as a straight-up challenge to the USPC's discretionary decision making under the 1987 guidelines. In either case, Plaintiffs Gambrell and Eason are not making an ex post challenge but are challenging the merits of the USPC's decisions or are making a procedural due process argument,[17] arguing for a speedier release, issues which may not be brought in a § 1983 action. *Ellis*, *supra*, 84 F.3d 1413, 1419-20 (D.C. Cir. 1996)(no due process liberty interest in parole under D.C. parole statute); *Price v. Barry*, 53 F.3d 369 (1995)(same); *Anyanwutaku v. Moore*, 151 F.3d 1053, 1056 (D.C. Cir. 1998).

---

[16]  Plaintiffs also claim that the USPC did not consider the "practices" of the D.C. Board in making decisions in their cases. Although a searching comparison of practice under different parole guidelines may be authorized, nothing in *ex post facto* jurisprudence requires that a parole authority consider prior "practices" of a former parole authority in making decisions. Furthermore, as noted above, Plaintiffs do not state what the actual practices under the 1987 guidelines were.

[17]  The record shows that the USPC applied the 1987 guidelines, denied Plaintiffs parole, departed from those guidelines, and provided reasons for the departures. The USPC therefore complied with D.C. parole law and provided Plaintiffs all the process they were due under D.C. law. *McRae v. Hyman*, 667 A.2d 1356 (D.C. 1995). The reasons for the departures - Gambrell's multiple assaultive offenses, including rape, murder, kidnapping, and his propensity to commit crimes while under supervision and the unique nature of Eason's murder offense - illustrate the USPC's desire to protect the public safety, legitimate concerns under D.C. law. *White v. Hyman*, 647 A.2d 1175 (D.C. 1994).

Plaintiffs Gambrell and Eason therefore must bring their claims in a petition for writ of *habeas corpus* in the districts in which they are incarcerated, the Middle District of Pennsylvania and the Western District of Virginia, respectively. *Guerra v. Meese*, 786 F.2d 414 (D.C. Cir. 1986).

Plaintiffs Gambrell and Eason's inclusion in the instant action demonstrates that Plaintiffs are not so much concerned about the application of a particular set of guidelines under an *ex post facto* theory. Rather, Plaintiffs expressly challenge the manner in which the USPC exercised its discretion under the D.C. parole statute, regardless of what set of guidelines the USPC utilized. Plaintiffs specifically state that the USPC considered impermissible factors under the 1987 guidelines, when Plaintiffs Gambrell and Eason cannot even contend for *ex post facto* protection under any set of guidelines. The USPC expressly noted in its notices of action to these plaintiffs that it considered the 1987 guidelines and provided reasons for the USPC's above the guidelines decisions, granting these plaintiffs all the process they are due.[18] *White v. Hyman, supra*, 647 A.2d 1175. Regardless of their complaints, judicial review of the merits of the USPC's decision in their cases may not be taken as a challenge to the merits of the USPC's decisions and is not authorized in § 1983 or *habeas*. *Stevens v. Quick, supra*.

Simply put, Gambrell and Eason cannot claim an expectation of *ex post facto* protection from the guidelines, the USPC actually considered them under the 1987 guidelines, and these

---

[18] Plaintiffs also ask this Court to probe the mind of the Commissioners and find that the USPC has used "federal" standards. This type of review is not permitted. The USPC's official notice of action plainly state the USPC's reasons for its decisions, and review of USPC decision-making should be limited to the officially stated reasons. *Walker v. Prisoner Review Board*, 769 F.2d 396 (7th Cir. 1985)(review of parole denial is limited to officially stated reasons); *Solomon v. Elsea*, 676 F.2d 1982)(same). *Castaldo v. U.S. Parole Comm'n*, 725 F.2d 94 (10th Cir. 1984). In Plaintiff Gambrell and Eason's cases, the USPC departed from the 1987 guidelines based upon the seriousness of their offenses and violent histories, illustrating that they constitute risks to the public safety. Gambrell *Ex*. A-18 and Eason *Ex*. B-9, B11.

plaintiffs' extensive criminal history and heinous crimes warranted a parole denial under the D.C.

parole statute, regardless of the guidelines the USPC employed.

        b.    <u>Plaintiffs Phillips and West-El</u>

Plaintiffs Phillips and West-El claim that the application of the 2000 guidelines to their

cases violated the *Ex Post Facto* Clause, but like Plaintiffs Gambrell and Eason, they committed

their crimes in 1977 and 1983, respectively, years before even the D.C. Board adopted its formal

guidelines. It is well-established that individuals such as these are not entitled to *ex post facto*

protection from the application of guidelines to their cases. *Warren v. U.S. Parole Comm'n*, 659

F.2d 183, 193-95 (D.C. Cir. 1981)(where parole guidelines did not exist when inmate committed

crime, no *ex post facto* violation with adoption and implementation of guidelines). As is the case

with Plaintiffs Gambrell and Eason, Plaintiffs West-El and Phillips can also not claim an

expectation of *ex post facto* protection of the 1987 guidelines. *Rogers*, *supra*, 532 U.S. 451

(2001); *Bledsoe*, *supra*, 384 F.3d 1232, 1239-40 (10th Cir. 2004). Plaintiffs Phillips and West-El

thus cannot establish a violation under the *Ex Post Facto* Clause. Unlike Gambrell and Eason,

Phillips and West-El were not initially heard by the D.C. Board of Parole, but because of their

lengthy minimum terms, they were initially heard by the USPC; the USPC used the 2000

guidelines in making a decision in their cases.

In Phillips' case, the USPC exceeded even those guidelines because it found that Phillips

was a more serious risk than indicated by the 2000 guidelines. Phillips *Ex*. C-10. It is

counterintuitive for Phillips to argue that he was substantially placed at a greater risk of increased

punishment under the alleged harsher 2000 guidelines, when the USPC ultimately departed

upwards from those guidelines as well. *A fortiori*, if the USPC departed from the allegedly

harsher 2000 guidelines, it necessarily would have departed from the 1987 guidelines.  The
USPC ultimately reverted back to its broad discretion under the statute, finding that Phillips  was
too great a risk to the community to release, regardless of the guidelines.  Phillips'  claims thus
end up being a challenge to the merits of the USPC's decision, which is not permitted.

Even if Plaintiff West-El had an *ex post facto* expectation of assessment under the 1987
guidelines, his claim would fail.  Plaintiff West-El's case is a classic case of a violent offender
convicted of murder, attempted murder, armed robbery, and carrying a pistol without a license
with a history of assaultive conduct in the institution, including an assault on a correctional
officer and possession of a sharpened instrument.  West-El *Ex*. D-4 at 2-3.  Such considerations
would warrant a departure from 1987 guidelines, had they been applied in his case.  *Davis v.
Henderson*, 652 A.2d 634 (D.C. 1995); *White v. Hyman*, 647 A.2d 1175 (D.C. 1994).
Accordingly, even if West-El was entitled to an *ex post facto* comparison between the 1987 and
2000 guidelines, his claims would fail as well.

c.   Plaintiffs Sellmon and Martin

Plaintiffs Sellmon and Martin have not and cannot demonstrate as a matter of law an *ex
post facto* violation.  In addition to the general *ex post facto* considerations explained above,
Defendants note that  regardless of which set of guidelines were employed in these plaintiffs'
cases, the USPC had cause to depart and make the parole decision directly from the parole statute
because of the risk these plaintiffs pose to society and because of the extraordinary nature of their
crimes.  As documented above, the 1987 guidelines permitted departures from those guidelines
in extraordinary circumstances.  Both Plaintiff's cases present extraordinary circumstances not
contemplated by the 1987 guidelines, and both Plaintiffs constitute a risk to the public beyond

what the 1987 guidelines anticipate in the "heartland" of cases.

In Plaintiff Martin's case, the USPC specifically departed from the 2000 guidelines because it found (i.e. made a predictive judgment under the parole statute) that Martin was a risk to the community.  Martin *Exs*. F7, F9.   Again, if the USPC departed from the allegedly harsher 2000 guidelines based upon risk and exercised its discretion under the statute to find Martin to be a more serious risk than those guidelines, logic dictates that the USPC would do the same under the allegedly more permissive guidelines.  In essence, the USPC told Martin that he is not suitable for parole at this time according to the determination that the USPC must make under the D.C. parole statute.   However, a departure would also have been authorized under the 1987 guidelines, as the factors the USPC considered in departing from the 2000 guidelines were not factors present in the 1987 guidelines, either (i.e., the use of a second weapon in an offense and Martin's propensity to use weapons in violent offenses.)  Thus, even under the allegedly more lenient 1987 parole guidelines, it cannot be said that there is a significant probability that Martin would not have been paroled, and he therefore cannot establish that application of the 2000 guidelines resulted in a significant risk of increased punishment.

Plaintiff Sellmon's case is similar.  The USPC upwardly departed from the 2000 guidelines in his case based upon the extreme brutality of his crime, an indication of future criminality.  Sellmon *Exs*. E-6, E-8, E-11, E-13.  It is well established that the brutality of a crime, especially when coupled with other factors, is an indication of propensity to commit future crimes.  *Jones v. United States*, 687 A.2d 574, 575 (D.C. 1996).  In Sellmon's case, he committed an extremely brutal crime by killing a prostitute with whom he sought to visit, smashing her skull with the butt of a handgun.  Although he ostensibly admitted that he killed the

victim, at his parole hearings, he has continually minimized his role in the offense, at one point stating that his memory of the crime was vague (Sellmon *Ex*. E-1) and at another claiming that he was the victim of a robbery and assault during the crime. Sellmon *Ex*. E-12. The USPC's predictive judgment that the nature of his crime warranted a departure from the 2000 guidelines was thus warranted and is buttressed by Sellmon's own denials of the breadth of his involvement in the crime, thus illustrating that the USPC was not utilizing "materially harsher" guidelines to deny him parole.

To the extent that both of these Plaintiffs rely upon the informal 1991 policy guidelines to bolster their argument that the USPC could not have kept them in custody under the 1987 guidelines, that reliance is misplaced. Plaintiffs have not and cannot demonstrate that the 1991 policy guidelines were meant to be retroactive because they are unpublished, informal policy guidelines not meant to have legal effect. *White v. Hyman*, 647 A.2d 1175, 1178-79 (D.C. 1994). Plaintiffs Sellmon and Martin, who committed their crimes in 1990, also cannot ask for the benefit of *ex post facto* protection regarding the 1991 guidelines. Accordingly, the definitions or alleged restrictions on discretion in these policy guidelines to which Plaintiffs point cannot apply to Sellmon's and Martin's cases, even if they carried the weight of law.

In the end, Plaintiffs Sellmon and Martin argue that the USPC is holding them in custody for factors not expressly noted in the 1987 guidelines, and they allege a significant risk of increased punishment as a result. The latter is factually untrue, for the record in both of their cases illustrates that the reasons they are in custody is that the USPC exercised its discretion to find that they are risks to the community, apart from reference to any particular set of guidelines. These plaintiffs, like all the others, are not really making an *ex post facto* argument. Rather, they

53

are merely disappointed that they have not been released on parole, and are simply challenging the merits of the USPC's decisions and the USPC's exercise of discretion in finding that they are threats to the public safety and are not suitable for release into the community.

       d.     <u>Plaintiffs Swinton and Darius Smith</u>

Plaintiffs Swinton and Smith, who both committed their crimes after the publication of the 1987 guidelines and after the adoption of the informal policy guidelines, also cannot make out a successful *ex post facto* argument on the record.

Plaintiff Swinton is a armed robber and kidnapper who abducted a mother and her two children so that he could obtain money to "get his father out of jail." Swinton *Ex*. G-3 at 2-3. The USPC found that on the basis of his offense of conviction and his propensity to possess weapons, he was a more serious risk than indicated by the 2000 guidelines, and the USPC denied him parole. After assessing his entire record, the USPC specifically found that he was a "serious risk to the safety of the community," and the USPC exercised its discretion under the D.C. parole statute to deny Swinton parole. Swinton *Exs*. G-7, G-9, G-11. Plaintiff Swinton cannot demonstrate that this denial of parole violated the *Ex Post Facto* Clause simply because the USPC considered, and then departed from, the 2000 guidelines.

First, the USPC departed from the 2000 guidelines. The same analysis for the plaintiffs above applies here. Instead of adhering to any set of guidelines, the USPC exercised its discretion to depart upwardly,[19] and this departure would have likely occurred regardless of the guidelines employed. Second, the facts of Swinton's case show that a departure would have been

---

[19] Again, to the extent Swinton is challenging the departure, such challenge is a challenge to the merits, not an *ex post facto* challenge. The Parole Board retained discretion to depart, and this discretion cannot be circumscribed.

warranted under the 1987 guidelines and even the informal, non-binding policy guidelines.  The USPC departed from the 2000 guidelines in this case, in large part, on the nature of Swinton's crime.  Swinton's crime was unusually cruel in that he abducted not just an adult, but he also kidnapped a five-year old child for multiple hours.  Swinton *Ex*. G-3 at 3.  The USPC stated this as a factor in its decision.  Swinton *Ex*. G-10.  Even under the very 1987 guidelines *and* informal policy guidelines Plaintiffs seek to invoke, such a departure would be warranted.  Plaintiffs' Motion for Summary Judgment, *Ex*. 2, at 7 (instant offense involved unusual cruelty to victims - especially vulnerable victims).  Swinton therefore cannot establish a significant risk of increased punishment as a result of the USPC's consideration of the 2000 guidelines in his case, even if the informal policy guidelines were utilized and were binding.[20]

Finally, Plaintiff Smith also has not and cannot establish an *ex post facto* violation on the basis of the facts of his case.  Plaintiff Smith is a murderer who has a history of possessing weapons and committing assaults in the institution.  Smith *Exs*. H-3, H-4.  In one of his institutional misconduct incidents, Smith swung a homemade knife at another inmate.  *Id*.  The USPC considered this conduct assault with a deadly weapon with serious bodily injury intended.  On two other separate occasions, Smith was found with similar weapons in his possession.  *Id*.  This overall conduct in the institution, coupled with his original offense of conviction in which he used a gun, illustrates a risk to the community that is strikingly similar to the offense and institutional history of the inmate in *White v. Hyman*, 647 A.2d 1175, 1181 (D.C. 1994), where

---

[20]  Of course, Swinton could not show an *ex post facto* violation merely by demonstrating that the policy guidelines did not proscribe a departure for this type of conduct; he would have to show that the actual practice under the prior guidelines was different from the later regime.  Since the Board subsequently expressed that the policy guidelines did not limit its ability to consider aggravating or mitigating factors, however, this is of no consequence.

the D.C. Board departed from the 1987 guidelines and the D.C. Court of Appeals upheld the

departure.  Smith has not put forward any evidence of the actual practice of the D.C. Board (or

the USPC) in cases like his, but the judicial record provides an analogous case for the Court to

consider.  Should the Court utilize the *Fletcher* analysis in assessing Smith's case, Smith's claim

would thus fail.

## VI.   CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' Motion for Summary

Judgment and grant Defendants' for Judgment on the Pleadings instead.  In light of their violent

criminal histories, Plaintiffs cannot demonstrate that a significant risk of a longer incarceration

resulted from Defendants' action.  Moreover, Plaintiffs' action under 1983 is barred and their

only avenue of relief, if any, is under *habeas*.

Dated: February 20, 2008                     Respectfully Submitted,


                                             _/s/_____
                                             JEFFREY A. TAYLOR, D.C. BAR # 498610
                                             United States Attorney

                                             _/s/_____
                                             RUDOLPH CONTRERAS, D.C. BAR #434122
                                             Assistant United States Attorney


                                             _/s/_____
                                             KENNETH ADEBONOJO
                                             Assistant United States Attorney
                                             555 Fourth Street, N.W.
                                             Washington, D.C.  20530
                                             (202) 514-7157
                                             kenneth.adebonojo@justice.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing Motion for Judgment on the Pleadings and Opposition to Plaintiffs' Motion for Summary Judgment was sent by e-mail to:

Jason D. Wallach, Esq.
DICKSTEIN SHAPIRO, LLP
1825 Eye Street, NW
Washington, D.C. 20006

at wallachj@dicksteinshapiro.com

on this 20th day of February, 2008.

  /s/
KENNETH ADEBONOJO
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.,
Washington, DC  20530
(202) 514-7157
kenneth.adebonojo@usdoj.gov