# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        :
**TONY R. SELLMON, et al.,**             :
                                        :
              **Plaintiffs,**             :
                                        :
       **v.**                            : **Civil Action No. 06-1650 (ESH)**
                                        :
**EDWARD F. REILLY, JR., et al.,**        :
                                        :
              **Defendants.**             :
                                        :
_____


## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND OR IN THE ALTERNATIVE TO TRANSFER AND REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT


Dated:  March 19, 2007

Jason D. Wallach (Bar No. #456154)
Jared Rodrigues (Bar No. #496125)
Avner E. Mizrahi (Bar No. #500772)
DICKSTEIN SHAPIRO, LLP
1825 Eye Street, NW
Washington, D.C. 20006
(202) 420-2268
(202) 420-2201 facsimile

Attorneys for Plaintiffs

DSMDB-2408743

## TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ................................................................................... 5

I.      LEGAL BACKGROUND FOR *EX POST FACTO* CLAUSE VIOLATIONS................. 6

II.     PLAINTIFFS' CLAIMS AND EVIDENCE OF DEFENDANTS' *EX POST
        FACTO* CLAUSE VIOLATIONS ...................................................................... 7

III.    DEFENDANTS' MOTION ................................................................................ 11

ARGUMENT ....................................................................................................... 12

I.      STANDARD FOR JUDGMENT ON THE PLEADINGS............................................. 12

II.     DEFENDANTS' MOTION DOES NOT STATE A BASIS FOR DISMISSAL
        BECAUSE OF A LACK OF SUBJECT MATTER JURISDICTION ............................ 13

III.    THE LAW OF THIS CIRCUIT CLEARLY RECOGNIZES THAT
        DEFENDANTS ARE "PERSONS" UNDER 42 U.S.C. § 1983...................................... 13

IV.     PLAINTIFFS' CLAIMS ARE PROPER UNDER 42 U.S.C. § 1983 .............................. 15

        A.      *Wilkinson v. Dotson* Makes Clear that Inmates Can Bring *Ex Post Facto*
                Clause Challenges to Parole Suitability Decision Making Under 42 U.S.C.
                § 1983............................................................................................................ 16

        B.      Under *Wilkinson*, Plaintiffs' Claims in This Case May Proceed Under 42
                U.S.C. § 1983................................................................................................ 18

V.      THE FACIAL DIFFERENCES BETWEEN THE 2000 GUIDELINES AND 1987
        REGULATIONS PROVE THAT DEFENDANTS HAVE CREATED A
        SIGNIFICANT RISK THAT THE USPC GUIDELINE PLAINTIFFS WILL BE
        INCARCERATED LONGER ......................................................................... 20

        A.      The 2000 Guidelines Created a Significant Risk of Prolonging the USPC
                Guideline Plaintiffs' Incarceration by Reversing the Presumption of Parole
                Suitability that Would Have Applied Under the 1987 Regulations.................... 20

        B.      The 2000 Guidelines Created a Significant Risk of Prolonging the
                Incarceration of Certain Plaintiffs by Increasing the Period They Must
                Serve to Establish a Presumption of Parole Suitability Based on
                Disciplinary Reports that the Board Would Not Have Used ................................ 22

        C.      The 2000 Guidelines Created a Significant Risk of Prolonging the USPC
                Guideline Plaintiffs' Incarceration by Eliminating Any Impact that

i

Ordinary Program Achievement Had on the Bottom of These Plaintiffs' Guideline Ranges ...................................................................................... 23

D.  The 2000 Guidelines Created a Significant Risk of Prolonging the USPC Guideline Plaintiffs' Incarceration by Eliminating the D.C. Parole Board's Assumption that These Plaintiffs' Minimum Sentences Satisfied the Punishment Aspects of Their Sentences ............................................................. 24

E.  The 2000 Guidelines Created a Significant Risk of Prolonging the USPC Guideline Plaintiffs' Incarceration by Re-Defining the Factors the Board Considered as "Unusual Circumstances" Countervailing a Grant of Parole ........ 24

VI.  DEFENDANTS' PRACTICAL IMPLEMENTATION OF THE 2000 GUIDELINES AND USPC PAROLE PRACTICES CREATED A SIGNIFICANT RISK OF PROLONGING PLAINTIFFS' INCARCERATION ........... 27

A.  Plaintiffs' Memoranda Identify the Board's Policies and Practices and Defendants' Motion Concedes that Plaintiffs Have Provided Evidence of Those Policies and Practices ................................................................................... 28

B.  The Six Cases Regarding Decisions of the D.C. Parole Board Cited in Defendants' Motion Do Not Prove Any Board Practice ..................................... 31

C.  The USPC's 1998 Study of D.C. Parole Board Decisions Does Not Support Defendants' Changes to the 1987 Regulations ....................................... 33

1.  The USPC's representations concerning its 100 case sample. ................. 35

2.  The USPC's 100 case sample did not support the USPC's public comments or representations to the courts. ............................................... 37

VII.  EACH PLAINTIFF HAS DEMONSTRATED THAT DEFENDANTS' USE OF THE USPC PAROLE PRACTICES INSTEAD OF THE D.C. PAROLE PRACTICES IN HIS CASE CREATED A SIGNIFICANT RISK OF INCREASING HIS INCARCERATION ........................................................................... 42

A.  The Administrative Records in Plaintiffs' Cases Demonstrate that Defendants Denied Plaintiffs' Requests for Parole on Offense Accountability Grounds ......................................................................................... 43

B.  Defendants Improperly Applied Federal Parole Standards and Criteria at the Parole Rehearings of Plaintiffs Eason and Gambrell ...................................... 47

C.  The USPC Guideline Memorandum Demonstrated that Defendants Violated the *Ex Post Facto* Clause by Applying the 2000 Guidelines at the Parole Hearings of Plaintiffs Martin, Phillips, Sellmon, Smith, Swinton, and West-El ................................................................................................................ 52

CONCLUSION ........................................................................................................................ 57

DSMDB-2408743

Plaintiffs Curtis Eason, James Gambrell, Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El (collectively, "Plaintiffs") submit this memorandum in opposition and to Defendants' motion for judgment on the pleadings in reply to Defendants' opposition to Plaintiffs' motion for summary judgment. The Court should deny Defendants' motion and grant summary judgment to Plaintiffs because the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and the undisputed facts establish that Defendants' application of new parole guidelines and practices to Plaintiffs violates the *Ex Post Facto* Clause of the Constitution of the United States.[1]

## **INTRODUCTION**

Plaintiffs are currently serving sentences for violating the District of Columbia Code at a time when the District of Columbia Board of Parole (the "D.C. Parole Board" or "Board") had jurisdiction over parole proceedings for District of Columbia Code offenders. They subsequently have been denied parole by the United States Parole Commission (the "USPC"), which assumed jurisdiction over parole proceedings for D.C. Code offenders in 1998. In denying Plaintiffs' requests for parole, the USPC applied its own parole guidelines and practices, which differed from the Board's guidelines and practices. Under *Garner v. Jones*, 529 U.S. 244

---

[1] Defendants' memorandum in support of their motion for judgment on the pleadings combines Defendants' arguments in support of their motion with their arguments in opposition to Plaintiffs' motions for summary judgment. In further support of their motion and in opposition to Plaintiffs' motions, Defendants submitted a statement of material facts and numerous exhibits from Plaintiffs' parole files. In opposition to Defendants' motions to dismiss and for judgment on the pleadings ("Defendants' Motion"), Plaintiffs incorporate herein the arguments and evidence presented in the Memorandum in Support of the Joint Motion of Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El for Partial Summary Judgment on Their Ex Post Facto Claims (the "USPC Guideline Memorandum"), the Memorandum in Support of the Motion of Plaintiffs Curtis Eason and James Gambrell for Partial Summary Judgment on Their Ex Post Facto Claims ("1987 Regulations Memorandum") (collectively, the USPC Guideline Memorandum and the 1987 Regulations Memorandum are referred to as "Plaintiffs' Memoranda"), and the statements of undisputed material facts accompanying those memoranda. *See* Docket Entries #45 and #46.

(2000), and *Fletcher v. Reilly*, 433 F.3d 867 (D.C. Cir. 2006), the application of revised parole guidelines violates the *Ex Post Facto* Clause if "the retroactive application of the change in [] law" "creates a significant risk of prolonging [an inmate's] incarceration." 529 U.S. at 250-51; *see* 433 F.3d at 878. Accordingly, the question presented is whether the Defendants' retrospective application of their own parole guidelines and practices, instead of the Board's guidelines and practices, creates a significant risk of prolonging Plaintiffs' incarceration. If it does, Plaintiffs are entitled to a judgment declaring Defendants' application of the USPC's guidelines and practices to them unconstitutional and an order directing Defendants to re-hear Plaintiffs' parole requests under the Board's guidelines and practices.

In our opening papers, Plaintiffs demonstrated that the Board's parole policies and practices deemed a D.C. Code offender to have satisfied accountability for his crimes (i.e., society's interests in punishment, retribution, and general deterrence) once he served the minimum sentence imposed and was eligible for parole. The Board's articulated reason for this policy was that it was the province of the sentencing court to determine the offender's punishment. Thus, once a D.C. Code offender became eligible for parole, the only remaining issues considered by the Board under its policies and practices were (1) whether to *presume* that the candidate was suitable for parole, and (2) if so, whether that presumption was overcome by "unusual circumstances" that indicated the parole candidate was not suitable for parole, i.e., the candidate would not "live and remain at liberty without violating the law" and the candidate's "release was incompatible with the welfare of society." D.C. Code § 24-204 (1996).

The Board's presumption of parole suitability depended on a simple point calculation described at paragraphs 35 to 57 of Plaintiffs' Joint Statement of Undisputed Material Facts ("Plaintiffs' Joint Statement"). To determine whether "unusual circumstances" existed, the Board looked solely at whether the circumstances of a candidate's (i) prior crimes and current

DSMDB-2408743

offense and (ii) the candidate's positive and/or negative institutional behavior indicated that he had been rehabilitated and could abide by society's laws or whether he posed a risk to public safety.  Consistent with its policy and practice, the Board did not consider whether the candidate's service of his minimum sentence constituted sufficient punishment for his crimes.

Six Plaintiffs – Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El (the "USPC Guideline Plaintiffs") – showed that they would have been presumed *suitable* for parole under the Board's parole guidelines, but under the guidelines applied by Defendants these plaintiffs were presumed *unsuitable* for parole.  It simply cannot be gainsaid that changing a presumption in favor of parole to a presumption against parole does not create "a significant risk of prolonging [Plaintiffs'] incarceration."  This change effectively shifts the burden of proof and production.  Instead of the burden being on the USPC to identify "unusual circumstances" warranting a denial of parole, Plaintiffs had the burden to establish "unusual circumstances" warranting a grant of parole.  Such burden shifting is presumed to have a significant impact.  *See Miller v. Florida*, 482 U.S. 423, 432-33 (1987) (change in presumptive sentence from between 3 1/2 years and 4 1/2 years to between 5 1/2 years and 7 years violated *Ex Post Facto* Clause, because under earlier law, to impose sentence greater than presumptive sentence, judge had to provide written reasons justifying a departure from the presumption and under new law, no departure was necessary).

In response, Defendants argue, in essence, that the presumption of parole suitability does not matter because the USPC performed a study that showed that the Board routinely identified "unusual circumstances" and denied parole in more than half of the cases where inmates were presumed suitable for parole.  But that argument proves too much, for if the Board denied parole one-half of the time, it granted parole the other one-half of the time.  Under the USPC's guidelines, few, if any, parole applicants who are presumed unsuitable are paroled.  *See*

DSMDB-2408743

*Pindle v. Poteat*, 360 F. Supp. 2d 17, 19 (D.D.C. 2003) (indicating that, according to the USPC, of the D.C. Code offenders considered for parole by the USPC between October 1, 1999 and June 30, 2000, "[n]o inmates whose scores indicated that parole should be denied were granted parole").  In short, even if the USPC's study were admissible and persuasive (it is not, *see infra* Part VI.C), switching the presumption transforms a 50-50 chance of obtaining parole into a remote possibility.[2]  Regardless of whether the USPC's procedure is appropriate for those convicted after it was announced, it is unconstitutional to apply it retroactively to D.C. Code offenders like the USPC Guideline Plaintiffs, who committed their crimes at a time the old regime was in place, because the Defendants' change in policies and practice creates a significant risk that such offenders will spend more time deprived of their liberty.

     With respect to Plaintiffs Eason and Gambrell, who received initial parole hearings from the Board prior to August 1998, the USPC applied the Board's 1987 Regulations and found them presumptively suitable for parole at their first parole rehearing.  Similarly, by the time four USPC Guideline Plaintiffs (Carlton Martin, Charles Phillips, Tony Sellmon, and Daru Swinton) came before Defendants for their parole rehearings, these plaintiffs also had served long enough to qualify for a favorable presumption under the Defendants' 2000 Guidelines.  Nevertheless, as to each of these Plaintiffs, Defendants (1) applied their own practices (which allow the USPC to deny parole where a prisoner's release would *depreciate the seriousness of the prisoner's offense or promote disrespect of the law*, *see* 28 C.F.R. § 2.18), (2) determined that these plaintiffs' minimum sentences did not adequately punish them for their crimes, and (3) denied their requests for parole.  As shown by the administrative record in each Plaintiff's case (*see* USPC

---

[2]     Furthermore, had Defendants applied the Board's guidelines and presumed these plaintiffs were suitable for parole, it is impossible to know the result of the USPC Guideline Plaintiffs' parole requests.  In its decisions, the USPC did not reference any of the aggravating factors that the Board would have recognized as "unusual circumstances" that might justify a departure from the presumption.

DSMDB-2408743

Guideline Memorandum at 42-45; 1987 Regulations Memorandum at 17-21; *infra* Part VII), the reason for these denials was to increase the punishment the sentencing court imposed to reflect Defendants' view of the appropriate sentence for Plaintiffs' crimes.  Not only is that manifestly inconsistent with the Board's policies and practices, which honored the sentencing court's judgment as to the appropriate term of imprisonment needed to appropriately punish Plaintiffs, but it is a *per se* increase in Plaintiffs' "punishment".

In response to the evidence presented by Plaintiffs in their summary judgment motions, Defendants simply assert that Plaintiffs' evidence does not prove the Board's policies or practices.  As we demonstrate below, this assertion is meritless.

Furthermore, Defendants' other arguments in support of their motion for judgment on the pleadings are spurious.  As the Supreme Court has recognized, this is not, and need not be a habeas corpus case for the simple reason that Plaintiffs do not seek an order releasing them from prison; they only seek a rehearing under guidelines that do not significantly increase their risk of a longer prison term than would have been the case had the Board's policies and practices remained unchanged.  Nor can Defendants prevail on the notion that they are not "persons" under 42 U.S.C. § 1983, as that argument has been explicitly rejected by the United States Court of Appeals for the District of Columbia Circuit.

## **FACTUAL BACKGROUND**

Plaintiffs provide a detailed description of the factual background in this case in their memoranda in support of their motions for summary judgment and the accompanying statements of material facts not in dispute, and Plaintiffs incorporate those memoranda and statements herein by reference.  Plaintiffs, therefore, provide below only a brief summary of the key facts relevant to Defendants' arguments in support of their motion and in opposition to Plaintiffs'.

DSMDB-2408743

# I.    LEGAL BACKGROUND FOR *EX POST FACTO* CLAUSE VIOLATIONS

The *Ex Post Facto* Clause of the United States Constitution prohibits a retroactive increase in the punishment for a crime after its commission.  *See* U.S. Const. art. I, § 9, cl. 3; *Fletcher v. Reilly*, 433 F.3d 867, 877 (D.C. Cir. 2006) [hereinafter, "*Fletcher II*"].  "Central to the *ex post facto* prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'"  *Miller v. Florida*, 482 U.S. 423, 430 (1987) (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)).  The ban of the *Ex Post Facto* Clause "also restricts governmental power by restraining arbitrary and potentially vindictive legislation."  *Weaver*, 450 U.S. at 29.

Significantly, "[t]he presence or absence of an affirmative, enforceable right is not relevant" to whether the *Ex Post Facto* Clause prohibits governmental action.  *Id.* at 30.  "Thus, even if a statute merely alters penal provisions *accorded by the grace of the legislature*, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense."  *Id.* at 30-31 (emphasis added).  Nor do the protections of the *Ex Post Facto* Clause turn on whether a retrospective change in law affects an inmate's technical sentence, a single determinant of the inmate's prison term, or punitive conditions outside the sentence.  *See id.* at 32.  And "when the sentence is at issue," a law may fall within the *ex post facto* prohibitions "not only if it alters the length of the sentence, but also if it changes the maximum sentence from discretionary to mandatory."  *Id.* at 32 n.17 (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)).

Because "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed," *id.* at 32, the Supreme Court has recognized that "[r]etroactive changes in laws governing parole of prisoners" violate the proscriptions of the *Ex Post Facto* Clause if they "create[] a significant risk of prolonging [an inmate's] incarceration."  *Garner v. Jones*, 529

DSMDB-2408743

U.S. 244, 250-51 (2000); *see Fletcher II*, 433 F.3d at 876-77.  To demonstrate that the retroactive application of a change in parole policy creates a "significant risk" an inmate must:  (1) establish that "there are facial distinctions between the old and new parole/reparole regimes"; or (2) introduce "'evidence drawn from the rule's practical implementation by the agency'" showing that "'retroactive application [of the policy] will result in a longer period of incarceration than under the earlier rule.'"  *Id.* at 877 (quoting *Garner*, 529 U.S. at 255).

To determine whether the retroactive application of a new parole regime violates the *Ex Post Facto* Clause, the D.C. Circuit requires "a searching comparison" of the two parole regimes.  *Fletcher II*, 433 F.3d. at 879.  The Court must then use the information gleaned from this comparison to determine whether the USPC's application of its policies and practices instead of the D.C. Parole Board's policies and practices "created a significant risk that [Plaintiffs would] be subjected to a lengthier incarceration than [they] would have been if the Commission had adhered to the rules and practices of the D.C. Board."  *Id.* at 879.  The "controlling inquiry 'is one of practical effect.'"  *Id*. at 877.

## II.    PLAINTIFFS' CLAIMS AND EVIDENCE OF DEFENDANTS' *EX POST FACTO* CLAUSE VIOLATIONS

Defendants are the Commissioners and Chairman of the United States Parole Commission.  *See* Amended Complaint (Docket Entry #4) ¶¶ 11-16.  The USPC is not a defendant in this case.

Pursuant to the National Capital Revitalization and Self-Government Improvement Act (the "Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712 (1997), in August 1998, Defendants assumed responsibility for determining whether to parole D.C. Code offenders, including Plaintiffs.  *See* Plaintiffs' Joint Statement ¶¶ 5, 13, 14.  Prior to August 1998 and at the time Plaintiffs committed the crimes for which they are incarcerated, the D.C. Parole Board had

DSMDB-2408743

primary responsibility for parole decisions for D.C. Code offenders.  *See* Plaintiffs' Joint

Statement ¶¶ 3, 16.

      At issue in this case are substantial changes the USPC made to the policies and

practices that the D.C. Parole Board applied (the "D.C. Parole Practices") to determine D.C.

Code offenders' suitability for parole.  *See* Plaintiffs' Joint Statement ¶¶ 112-70. .  Although the

USPC made these changes after Plaintiffs committed their crimes, Defendants have applied the

changes retroactively to Plaintiffs' cases.  *See* Plaintiffs' Joint Statement ¶¶ 14, 15. .

      For D.C. Code offenders like Plaintiffs Curtis Eason and Charles Gambrell, who

received an initial parole hearing prior to August 5, 1998, the USPC purports to apply the

Board's 1987 guidelines, which the Board promulgated in 1985 and published in the District of

Columbia Municipal Regulations in 1987 (the "1987 Regulations").  *See* Plaintiffs' Joint

Statement ¶ 12.  For D.C. Code offenders like Plaintiffs Carlton Martin, Charles Phillips, Tony

Sellmon, Daru Swinton, and Benson West-El, who became eligible for parole after August 5,

1998, Defendants apply guidelines the USPC promulgated in 1998, 1999, and 2000 (the "2000

Guidelines"), which can be found in Title 28 of the Code of Federal Regulations.  *See* Plaintiffs'

Joint Statement ¶ 10.

      In their summary judgment motions, Plaintiffs demonstrated that, under the 1987

Regulations and D.C. Parole Practices, the Board:

1.    assumed that the minimum sentence imposed by the sentencing judge satisfied
a parole candidate's offense accountability and, therefore, did not consider, in
determining the candidate's suitability for parole, whether the candidate had
been punished enough for his offense; Plaintiffs' Joint Statement ¶ 7

2.    presumed that a parole candidate with a total point score at his or her initial
parole hearing of two or less was suitable for parole and only ignored that
presumption if "unusual circumstances" existed indicating that the parole
candidate, if paroled, would not "live and remain at liberty without violating
the law" or that the candidate's "release was incompatible with the welfare of
society";  Plaintiffs' Joint Statement ¶¶ 55, 56; *see* D.C. Code § 24-204
(1996);

DSMDB-2408743

3.      presumed that a parole candidate with a total point score at his or her parole rehearings of three or less was suitable for parole and only ignored that presumption if "unusual circumstances" existed indicating that the parole candidate was not suitable for parole;  Plaintiffs' Joint Statement ¶ 57;

4.      only adjusted a parole candidate's point score upward at his or her initial parole hearing based on the candidate's negative institutional conduct if the conduct was (i) significant, i.e., a Class I offense or two Class II offenses, and occurred in the three years prior to the candidate's hearing or (ii) involved murder, manslaughter, kidnapping, armed robbery, or first degree burglary; Plaintiffs' Joint Statement ¶¶ 47-54

5.      adjusted a parole candidate's point score downward at his parole hearing whenever the candidate demonstrated sustained program or work assignment achievement during the period before the parole hearing;  Plaintiffs' Joint Statement ¶¶ 51-54 and

6.      applied the criteria in the 1991 Policy Guideline to determine whether "unusual circumstances" justified a denial of parole despite the presumption of suitability established by a parole candidate's total point score, Plaintiffs' Joint Statement ¶ 58.

Plaintiffs' motions also demonstrated that if the Defendants had applied the 1987

Regulations and D.C. Parole Practices, including the Policy Guideline that the Board adopted in

1991 to define the terms in the Appendices to the 1987 Regulations (the "1991 Policy

Guideline") (attached as Exhibit 8 to Plaintiffs' Joint Statement):

1.      the USPC Guideline Plaintiffs would have been presumed suitable for parole at their initial parole hearings because their total point scores would have been 2 or less, Plaintiffs' Joint Statement ¶ 55;

2.      the disciplinary reports received by Plaintiffs Martin, Phillips, Smith, and West-El would not have affected these plaintiffs' total point score because the reports did not satisfy the criteria in the 1991 Policy Guideline for a finding of negative institutional behavior, Plaintiffs' Joint Statement ¶¶ 47-50, 71-73; and

3.      each of the Plaintiffs would have been entitled to a downward adjustment in their total point score for their sustained program and work assignment achievement, Plaintiffs' Joint Statement ¶¶ 74-75.

Furthermore, Plaintiffs motions proved that, given the D.C. Parole Board's policy that a parole

candidate's offense accountability is satisfied when the candidate becomes eligible for parole,

DSMDB-2408743

whether Plaintiffs needed additional punishment would not have been considered under the D.C.

Parole Practices in determining the candidate was suitable for parole.

Finally, Plaintiffs' motions demonstrated that, when Defendants (and the USPC)

applied the 2000 Guidelines and USPC Parole Practices to Plaintiffs' cases, Defendants:

1.    presumed that the USPC Guideline Plaintiffs were *unsuitable* for parole at their initial parole hearings because Defendants added a range of months (based on a "Base Point Score" that Defendants calculated) to these plaintiffs' minimum sentences that these plaintiffs had to serve to be presumed suitable for parole; Plaintiffs' Joint Statement ¶ 109

2.    presumed that Plaintiffs Martin, Phillips, Smith, and West-El were *unsuitable* for parole at their initial parole hearings because Defendants added a range of months to these plaintiffs' minimum sentences that these plaintiffs had to serve to be presumed suitable for parole based on disciplinary reports these plaintiffs received more than three years before their initial parole hearing or for minor infractions; Martin Statement ¶ 5; Phillips Statement ¶ 6; Smith Statement ¶ 6; West-El Statement ¶ 6

3.    either did not reward the USPC Guideline Plaintiffs for their sustained program and work assignment achievement or depreciated the weight that the D.C. Parole Practices accorded to program achievement; USPC Guidelines Mem. at 20, 21; and

4.    denied the parole requests of Plaintiffs Eason, Gambrell, Martin, Phillips, Sellmon, and Swinton because Defendants believed these plaintiffs' minimum sentences (or even the additional amount of time that Defendants added to these sentences using the "Base Point Score" and disciplinary reports) did not sufficiently punish these plaintiffs and that their release on parole would depreciate the seriousness of their offenses or promote disrespect of the law, USPC Guidelines Mem. at 42-45; 1987 Regulations Mem. at 17-22.

As Plaintiffs' Memoranda proved, the facial distinctions between the 1987

Regulations, 1991 Policy Guideline, and D.C. Parole Practices (e.g., presumed suitable), on the

one hand, and the 2000 Guidelines and USPC Parole Practices (e.g., presumed unsuitable), on

the other hand, are self-evident. Nor can Defendants dispute that these distinctions create a

significant risk of prolonging Plaintiffs' incarceration. Furthermore, Defendants' practical

implementation of their 2000 Guidelines and the USPC Parole Practices in Plaintiffs' cases

demonstrated that, absent the existence of "unusual circumstances" under the D.C. Parole

DSMDB-2408743

Practices, Defendants have increased Plaintiffs' incarceration.  These facial distinctions between the D.C. Parole Practices and the USPC Parole Practices and the difference between the Defendants' practical implementation of the USPC Parole Practices and how the D.C. Parole Board exercised its discretion establish that Plaintiffs are entitled to new parole hearings under the D.C. Parole Practices.

## III.    DEFENDANTS' MOTION

Defendants make several arguments in opposition to Plaintiffs' summary judgment motions and in support of their motion to dismiss or for judgment on the pleadings.  First, Defendants challenge Plaintiffs' ability to bring this action under 42 U.S.C. § 1983 on the grounds that Defendants allegedly are not "persons" under § 1983 and that Plaintiffs' sole remedy for their alleged claims is through a habeas corpus lawsuit. *See* Defs. Mot. at 37.

Next, Defendants assert that Plaintiffs have failed to (and cannot) demonstrate any actual practice of the D.C. Parole Board or that any difference exists between the Board's policies and practices and those of Defendants and the USPC.  *See* Defs. Mot. at 40.  In fact, Defendants assert, the D.C. Parole Board's actual practice was to deny parole frequently on any or no bases in cases like Plaintiffs and regardless of the presumption of parole suitability established by the total point score under the 1987 Regulations.  *See* Defs. Mot. at 40.

Defendants then argue that Plaintiffs' assertions regarding the scores they would have received under the 1987 Regulations are mere speculation regarding fact-finding and predictive judgments.  Defendants also argue that certain Plaintiffs cannot claim any expectation that the 1987 Regulations or 1991 Policy Guideline would inform the decision maker at their parole hearings because those Plaintiffs committed their crimes before 1987.  Defs. Mot. at 21.  Finally, Defendants argue that Plaintiffs cannot demonstrate that Defendants' use of the USPC Parole Practices created a significant risk of increased punishment because Defendants allegedly denied

DSMDB-2408743

parole based on "unusual circumstances," as they, allegedly could have done under the 1987 Regulations.

## ARGUMENT

As Plaintiffs demonstrate below, all of Defendants' arguments fail. The Supreme Court and D.C. Circuit have rejected arguments identical to those that Defendants make regarding the scope of 42 U.S.C. § 1983. Furthermore, Plaintiffs presented evidence of the D.C. Parole Board's policies and actual practices that demonstrated that the Defendants' use of the 2000 Guidelines and the USPC Parole Practices in Plaintiffs' parole hearings, instead of the 1987 Regulations and D.C. Parole Practices, created a significant risk of prolonging Plaintiffs' incarceration. As a result, the Court should deny Defendants' motions and grant Plaintiffs' motions for summary judgment with respect to their claims based on the *Ex Post Facto* Clause.

## I.        STANDARD FOR JUDGMENT ON THE PLEADINGS

Defendants have moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. The standard for a motion under Rule 12(c) is virtually identical to the standard for a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See Robinson-Reeder v. Am. Council on Ed.*, 2008 U.S. Dist. Lexis. 5979 (D.D.C. 2008). The Court therefore should "accept as true the allegations" in Plaintiffs' complaint and "accord [Plaintiffs] the benefit of all reasonable inferences." *Id.* (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987)). Put differently, Defendants, as the moving party, "impliedly admit[] the truth of [Plaintiffs'] allegations and the falsity of [their] own assertions that have been denied by [Plaintiffs]." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1370 (2008). Thus, the Court should treat as true all allegations in Plaintiffs' complaint and as false all of Defendants' assertions that Plaintiffs have denied. Moreover, because Defendants are not moving for summary judgment,

DSMDB-2408743

but instead for a judgment on the pleadings, Defendants cannot put forth any new facts and must restrict their arguments to the facts laid out in Plaintiffs' complaints. For this reason alone, the Court should disregard all portions of Defendants' memorandum that rely on facts other than those alleged in Plaintiffs' complaint and the entirety of Defendants' Statement of Material Facts.

## II.    DEFENDANTS' MOTION DOES NOT STATE A BASIS FOR DISMISSAL BECAUSE OF A LACK OF SUBJECT MATTER JURISDICTION

In their motion, Defendants ask the Court to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1), but nowhere do Defendants explain the basis for this request.[3] In fact, the Court has subject matter jurisdiction in this case under: 1) 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States; 2) 28 U.S.C. § 1334(a)(3), because this is an action to redress the deprivation of constitutional rights under the color of state law; and 3) 28 U.S.C. § 1334(a)(4), because this is an action to secure equitable relief under an Act of Congress providing for the protection of civil rights.

## III.    THE LAW OF THIS CIRCUIT CLEARLY RECOGNIZES THAT DEFENDANTS ARE "PERSONS" UNDER 42 U.S.C. § 1983

Defendants assert that Plaintiffs cannot "maintain an action against the USPC or its commissioners because neither are 'persons' as contemplated by 42 U.S.C. § 1983." Defs. Mot. at 37. Plaintiffs, however, brought this action for injunctive relief only against the Chairman and Commissioners of the USPC in their official capacities and not against the USPC, as the D.C. Circuit, has recognized Plaintiffs could do. *See Fletcher v. Reilly*, 370 F.3d 1223, 1227 n.* (D.C. Cir. 2004) [hereinafter, "*Fletcher I*"]; *Settles*, 429 F.3d at 1104.

---

[3] To the extent Defendants intended to challenge the Court's jurisdiction on the ground that they allegedly are not "persons" under 42 U.S.C. § 1983, the D.C. Circuit has made clear that such an argument is not jurisdictional. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005) ("[W]hether the Commission is a 'person' under § 1983 is not a jurisdictional question. It is a statutory one.").

13

In *Fletcher I*, the USPC argued that a D.C. Code offender could not prosecute his *ex post facto* claim against the USPC under 42 U.S.C. § 1983 because the USPC does not act under color of state law and is not a "person" under 42 U.S.C. § 1983. *See id.* at 1227 & n.*. The D.C. Circuit rejected both arguments. *See id.*

First, the D.C. Circuit held that the members of the USPC act under color of state law whenever they act pursuant to the Revitalization Act. *See id.* at 1227. Second, the D.C. Circuit construed the *pro se* plaintiff's complaint as naming the individual members of the USPC and not the USPC itself and, therefore, declined to address the issue of whether the USPC is a "person" under § 1983. *See id.* at 1227 n.*. As the D.C. Circuit concluded: "[W]e have no doubt the defendant members of the United States Parole Commission are amenable to suit under § 1983 for actions taken pursuant to [the Revitalization] Act." *Id.* at 1227; *see Settles*, 429 F.3d at 1104 (noting that "[l]eft standing is the holding in *Fletcher I* that a cause of action under § 1983 will lie against the individual members of the Commission when acting pursuant to the Revitalization Act," but declining to construe the plaintiff's complaint as naming the members of the USPC because the plaintiff was represented by counsel).[4]

In this case, Plaintiffs have sued only the Chairman and Commissioners of the USPC, and have done so for acts taken by Defendants under the Revitalization Act. Defendants cannot seriously contend, as their motion suggests, that the D.C. Circuit would decline to address the issue of whether the USPC is a person under § 1983 by construing the *Fletcher I* complaint as

---

[4] *See also Hindes v. FDIC*, 137 F.3d 148, 158 (3d Cir. 1998) ("It is a well-established principle, however, that federal officials are subject to section 1983 liability when sued in their official capacity where they have acted under color of state law . . . ."); *Cabrera v. Martin*, 973 F.2d 735, 741 (9th Cir. 1992) (rejecting the Secretary of Labor's argument that she could not be considered a "person" under § 1983, because "[i]t is well settled that federal officials sued in their official capacity are subject to injunctive relief under § 1983" in some circumstances).

DSMDB-2408743

naming the individual members of the USPC if the court believed those individuals also did not

qualify as "persons" under § 1983.  None of the cases cited by Defendants suggest otherwise.[5]

## IV.    PLAINTIFFS' CLAIMS ARE PROPER UNDER 42 U.S.C. § 1983

In an attempt to increase the burden for Plaintiffs, and to avoid having the court in the

jurisdiction where Plaintiffs' claims have the most significant impact address those claims,

Defendants assert that Plaintiffs cannot pursue their claims under 42 U.S.C. § 1983 and are

limited to seeking writs of habeas corpus in the jurisdictions in which they are incarcerated.[6]  In

support of these assertions, Defendants argue that Plaintiffs' claims necessarily imply the

invalidity of their incarceration or a speedier release from incarceration because (1) Plaintiffs

allegedly assert that they would have been paroled at their initial hearings by the D.C. Parole

Board, and (2) Plaintiffs' "real complaint" allegedly is that they disagree with the Defendants'

predictive judgments that Plaintiffs are not suitable for parole.  The Supreme Court, however,

---

[5] *See Ngiraingas v. Sanchez*, 495 U.S. 182 (1990) (a U.S. territory and its officials did not constitute "persons" under § 1983); *Elliot v. FDIC*, 305 F. Supp. 2d 79 (D.D.C. 2004) (addressing a claim against the FDIC, not any of its officers, and finding no allegation that the FDIC acted under color of state law).

[6] Defendants also suggest that, even if the Court finds that Plaintiffs can pursue their claims under § 1983, the Court should transfer Plaintiffs' cases under 28 U.S.C. § 1404(a) to the districts in which Plaintiffs are incarcerated or where the USPC is located.  Section 1404(a) permits a transfer of venue "[f]or the convenience of parties and witnesses."  None of the parties, however, are inconvenienced by venue in this Court.  Plaintiffs chose to bring this action in this Court because this jurisdiction and its citizens have the most significant interest in the outcome of the litigation.  Furthermore, none of the factors identified in Defendants' Motion as informing the Court's decision to transfer under § 1404 apply in this case (i.e., Plaintiffs have no difficulty communicating with counsel; Plaintiffs' counsel does not, at this time, anticipate that there will be any need for Plaintiffs to be transferred to the Court for any purposes; all of the key witnesses live or work and the pertinent documents are housed within a ten-mile radius of the Court; and this Court is better suited to address Plaintiffs' claims in a timely manner than the various courts to which Defendants suggest the Court should transfer Plaintiffs' cases).  Nor are Defendants, whose business address is less than 1000 feet from the District of Columbia border and no more than nine miles from this Court, inconvenienced in any manner by this Court retaining jurisdiction.

DSMDB-2408743

addressed identical arguments and found that claims like those asserted by Plaintiffs in this case can be brought under 42 U.S.C. § 1983 and are not limited to habeas corpus actions.

    **A.**    *Wilkinson v. Dotson* **Makes Clear that Inmates Can Bring** *Ex Post Facto* **Clause Challenges to Parole Suitability Decision Making Under 42 U.S.C. § 1983**

In *Wilkinson v. Dotson*, 544 U.S. 74, 76 (2005), William Dotson and Rogerico Johnson brought actions under 42 U.S.C. § 1983 challenging the State of Ohio's parole procedures. Dotson challenged Ohio's procedures for determining his *eligibility* for parole, and Johnson, like Plaintiffs in this case, challenged the State's procedures for determining his *suitability* for parole. *See id.* at 77. Specifically, Johnson, who began serving a prison sentence in 1992, asserted that the Ohio parole board's use of parole guidelines that it adopted in 1998, which Johnson alleged were harsher than the guidelines in effect prior to 1998, violated the *Ex Post Facto* Clause. *See id.* As relief for the *Ex Post Facto* Clause violation, Johnson's complaint sought "a new parole hearing conducted under constitutionally proper procedures and an injunction ordering the State to comply with constitutional due process and *Ex Post Facto* requirements in the future." *Id.*

The federal district court dismissed both Dotson's and Johnson's complaints because it determined they could only pursue their claims through a habeas corpus suit. *See id.* The United States Court of Appeals for the Sixth Circuit reversed, finding that the inmates could proceed under § 1983. *See id.* The State of Ohio then appealed to the Supreme Court.

In the Supreme Court, Ohio argued that Dotson and Johnson "attack their parole-eligibility proceedings (Dotson) and parole-suitability proceedings (Johnson) only because they believe that victory on their claims will lead to speedier release from prison." *Id.* at 78. Such claims, Ohio contended, "in effect, collaterally attack the *duration* of their confinement" and, under Supreme Court precedent, had to be brought as habeas corpus lawsuits. *Id.* Ohio also

DSMDB-2408743

argued that its parole proceedings were part of Dotson's and Johnson's sentences, which the inmates' § 1983 lawsuits, if successful, would invalidate. *See id.* at 83. As a result, Ohio argued that the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), precluded the lawsuits under § 1983, because "a prisoners' § 1983 damages action cannot lie where a favorable judgment would 'necessarily imply the invalidity of his conviction *or sentence*.'" *Wilkinson*, 544 U.S. at 83 (quoting *Heck*, 512 U.S. at 487).

    The Supreme Court rejected each of Ohio's arguments and concluded that "the connection between the constitutionality of the prisoners' parole proceedings and release from confinement [wa]s too tenuous [] to achieve Ohio's legal door-closing objective." *Id.* at 78. As a result, the Court held that both Dotson's parole-eligibility challenge and Johnson's parole-suitability challenge could proceed under 42 U.S.C. § 1983. *See id.* at 76.

    In reaching its decision, the Supreme Court first noted that "[t]he problem in Ohio's argument lies in its jump from a true premise (that in all likelihood the prisoners hope the[ir] actions will help bring about earlier release) to a faulty conclusion (that habeas is their sole avenue of relief." *Id.* at 78. The Court then reviewed its prior decisions addressing whether a plaintiff's claims are limited to a habeas corpus suit and summarized those decisions as follows:

> Throughout the legal journey from *Preiser* [411 U.S. 475 (1973)] to *Balisok* [520 U.S. 641 (1997)], the Court has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement – either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody. Thus, *Preiser* found an implied exception to § 1983's coverage where the claim seeks – not where it simply "relates to" – "core" habeas corpus relief, *i.e.*, where a state prisoner requests present or future release. *Wolff* [418 U.S. 539] makes clear that **§ 1983 remains available for procedural challenges where success in the action *would not necessarily* spell immediate or speedier release for the prisoner**. *Heck* specifies that a prisoner cannot use § 1983 **to obtain damages** where success *would necessarily* imply the unlawfulness of a (not previously invalidated) conviction or sentence. And *Balisok*, like *Wolff*, demonstrates that **habeas remedies do not**

DSMDB-2408743

> **displace § 1983 actions where success in the civil rights suit would not necessarily vitiate the legality of (not previously invalidated) state confinement**.

544 U.S. at 81-82 (citation omitted; bold emphasis added).

Applying these principles to the cases of Dotson and Johnson, the Supreme Court concluded that the inmates' claims could be brought under § 1983. *See id.* Specifically, the Court noted that "Dotson and Johnson seek relief that will render invalid *the state procedures* used to deny parole eligibility (Dotson) and parole suitability (Johnson)," and that "[n]either respondent seeks an injunction ordering his immediate or speedier release into the community." *Id.* "Success for Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term." *Id.* Because the Supreme Court found that "neither prisoner's claim would necessarily spell speedier release," the Court determined that "neither [claim] lies at 'the core of habeas corpus,'" and therefore, could proceed under § 1983. *Id.* (quoting *Preiser*, 411 U.S. at 489).

## B.    Under *Wilkinson*, Plaintiffs' Claims in This Case May Proceed Under 42 U.S.C. § 1983

The Supreme Court's decision in *Wilkinson* squarely rejects the very arguments that Defendants have made in this case, and there is nothing unique about Plaintiffs' claims that distinguishes *Wilkinson*. Like Johnson (the plaintiff in *Wilkinson* challenging Ohio's application of new parole suitability regulations under the *Ex Post Facto* Clause), Plaintiffs' claims allege that the Defendants have violated the *Ex Post Facto* Clause by applying the 2000 Guidelines and the USPC Parole Practices instead of the 1987 Regulations and the D.C. Parole Practices. *See* Am. Compl. ¶ 160. Also like Johnson, Plaintiffs' only seek an injunction requiring Defendants to give Plaintiffs new parole hearings under the 1987 Regulations and the D.C. Parole Practices. *See id.* at 43-44. Because Plaintiffs' claims will not necessarily spell speedier release and do not imply the invalidity of their convictions or sentences, Plaintiffs properly brought those claims

DSMDB-2408743

against Defendants in an action under 42 U.S.C. § 1983. *See Wilkinson*, 544 U.S. at 82; *see Fletcher I*, 370 F.3d at 1226-27 (D.C. Code offender's *ex post facto* challenge to the USPC's use of its own reparole guidelines instead of those of the D.C. Parole Board could be brought under § 1983, because a ruling in the offender's favor would not necessarily affect the date on which the offender would be paroled).[7]

Nowhere do Plaintiffs assert that the Board would have paroled Plaintiffs at their initial parole hearings or that they would have been paroled if the Defendants applied the D.C. Parole Practices at their hearings.[8] Plaintiffs only allege that Defendants, like the State in *Wilkinson*, applied improper policies and practices at their parole hearings. Plaintiffs challenge the Defendants' use of parole suitability criteria that are inconsistent with the D.C. Parole Board's criteria. They do not challenge Defendants' actual parole determinations, because Defendants have made no such determinations in accordance with the D.C. Parole Practices.[9]

---

[7] *See also Anyanwutaku v. Moore*, 151 F.3d 1053, 1055-56 (D.C. Cir. 1998) ("[C]hallenges to state parole procedures whose success would not necessarily result in immediate or speedier release need not be brought in habeas corpus, even though the prisoners filed their suits for the very purpose of increasing their chances of parole.").

[8] Only Plaintiff Benson West-El asserted, in Plaintiffs' summary judgment motions, that the D.C. Parole Board would have paroled him if the Board had conducted his *parole rehearing*, and Mr. West-El based this assertion solely on the fact that the USPC, by establishing a presumptive parole date for Mr. West-El, necessarily determined that Mr. West-El was suitable for parole. Even so, the only relief Mr. West-El has requested is that the Court order Defendants to reconsider his requests for parole using the D.C. Parole Practices instead of the USPC Parole Practices. *See* Am. Compl. at 43.

[9] Defendants appear to base their arguments that Plaintiffs' challenges necessarily imply the invalidity of Plaintiffs' sentences on their unproven belief that the D.C. Parole Board had and exercised unbridled and unfettered discretion to deny prisoners' parole requests. Thus, Defendants essentially argue that because the D.C. Parole Board allegedly could and did deny parole for any or no reason, any challenge by Plaintiffs to the Defendants' use of their own criteria for determining parole suitability is a challenge to the validity of Plaintiffs' continued incarceration and necessarily implies the invalidity of that incarceration. Defendants, however, have presented absolutely no evidence that the Board was unbound in exercising its discretion by any limitations. As discussed below, neither the court decisions addressing the Board's exercise of its discretion nor Defendants' own analysis in 1998 of Board decisions establish that the Board had limitless power to deny parole. At a minimum, the D.C. Parole Board's discretion, as (footnote continued on next page)

DSMDB-2408743

Because Plaintiffs only challenge the procedures by which Defendants made parole

determinations in Plaintiffs' cases, Plaintiffs properly brought their claims under § 1983.

## V.    THE FACIAL DIFFERENCES BETWEEN THE 2000 GUIDELINES AND 1987 REGULATIONS PROVE THAT DEFENDANTS HAVE CREATED A SIGNIFICANT RISK THAT THE USPC GUIDELINE PLAINTIFFS WILL BE INCARCERATED LONGER

In addition to the legal arguments regarding Plaintiffs' capacity to sue Defendants

under § 1983, Defendants' Motion asserts that the Court should grant Defendants judgment on

the pleadings and deny Plaintiffs' summary judgment motions because the 2000 Guidelines are

"facially similar" to the 1987 Regulations.  In the USPC Guidelines Memorandum, however, the

USPC Guideline Plaintiffs established that the 2000 Guidelines differed, on their face, from the

1987 Regulations in at least five ways.

### A.    The 2000 Guidelines Created a Significant Risk of Prolonging the USPC Guideline Plaintiffs' Incarceration by Reversing the Presumption of Parole Suitability that Would Have Applied Under the 1987 Regulations

First, the 2000 Guidelines increased the period of incarceration under the 1987

Regulations that D.C. Code offenders like Plaintiffs Carlton Martin, Charles Phillips, Tony

Sellmon, Darius Smith, and Benson West-El, whose current offenses involve violence and the

death of the victim, had to serve to be presumed suitable for parole.  *See* USPC Guidelines Mem.

at 24.  As a result of this change in the 2000 Guidelines, it is impossible for a D.C. Code offender

convicted of a crime of violence that resulted in the death of the victim to be presumed suitable

for parole after he serves his minimum sentence, as he could have been under the 1987

Regulations.  *See id.* at 25.  Instead, all such offenders are *presumed unsuitable* for parole under

---

demonstrated by the Board's actual practices, was limited by the D.C. parole statutes and the Board's own internal regulations, policies, and guidelines.  *See also Davis v. Henderson*, 652 A.2d 634, 636 (D.C. 1994) (noting that the "statutory mandate for determining parole for federal prisoners . . . provided for a much broader exercise of discretion than the District's parole guidelines").

DSMDB-2408743

the 2000 Guidelines when they first become eligible for parole, and the USPC does not have to exercise its discretion in their cases.  *See id.* at 26.  Such a change in the applicable presumption and shift of the burden demonstrates that the 2000 Guidelines, on their face, created a significant risk of increasing the USPC Guideline Plaintiffs' incarceration.  *See Miller v. Florida*, 482 U.S. 423, 432-33 (1987) (holding that the retrospective application of a change to the presumptive term of imprisonment for a crime, i.e., the range that was "'assumed to be appropriate for the composite score of the offender,'" from 3 1/2 – 4 1/2 years to 5 1/2 – 7 years, violated the *Ex Post Facto* Clause, even though the sentencing judge could depart from the presumptive term, because to depart under the "old guidelines" and impose a 7-year sentence, the sentencing judge would have had to provide written reasons for the departure whereas under the new law, she or he could impose a 7-year sentence without providing any reasons).[10]

When the USPC Guideline Plaintiffs committed their crimes, the D.C. parole statute provided that they would be eligible for parole after serving their minimum sentence.  These plaintiffs certainly did not have "fair warning" at that time that the paroling authority could determine, by virtue of the very facts considered by the sentencing judge in setting their minimum sentence (i.e., the nature of their current offense, particularly the fact that they committed a crime of violence that resulted in the death of the victim), that their minimum sentences were not a sufficient length of imprisonment and increase the punishment for their

---

[10] *See also Weaver v. Graham*, 450 U.S. 24, 33-34 (1981) (holding that a retrospective reduction in the number of monthly "gain-time" credits an inmate could earn for abiding by prison rules and adequately performing his or her assigned tasks violated the *Ex Post Facto* Clause, even though other changes increased the availability of other "gain-time" deductions); *Lynch v. U.S. Parole Comm'n*, 768 F.2d 491, 500-01 (2d Cir. 1985) (ordering a new parole hearing under old parole guidelines where the USPC's delay in providing an inmate with a pre-sentence report resulted in the USPC applying new guidelines that increased the recommended minimum term of incarceration for the inmate from 78 months to 100 months and rejecting the USPC's argument that a new hearing was not required because it could have exceeded the minimum term of 78 months and given the inmate 100 months under the old guidelines).

DSMDB-2408743

crimes by labeling it a "risk" assessment. *See Weaver*, 450 U.S. at 28-29 ("[T]he Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed."). The *Ex Post Facto* Clause simply does not permit the paroling authority to target a particular class of offenders and, based on society's changing view that additional retribution is required for such offenders, extend the length of the entire class's incarceration. *See id.* at 311("[I]t is the effect, not the form, of the law that determines whether it is *ex post facto*. The critical question is whether the law changes the legal consequences of acts completed before its effective date.").

> **B.    The 2000 Guidelines Created a Significant Risk of Prolonging the Incarceration of Certain Plaintiffs by Increasing the Period They Must Serve to Establish a Presumption of Parole Suitability Based on Disciplinary Reports that the Board Would Not Have Used**

Second, the USPC Guideline Memorandum demonstrated that, under the 2000 Guidelines, at a parole candidate's initial parole hearing, Defendants use institutional disciplinary reports to add a range of months to the period that the candidate must serve to be presumed eligible for parole, as they did at the initial hearings of Plaintiffs Smith and West-El. *See* USPC Guidelines Mem. at 27. Thus, unlike the 1987 Regulations, under which Plaintiff Smith's and Plaintiff West-El's negative institutional behavior did not affect the presumption of parole suitability, under the 2000 Guidelines, the Defendants presumed that Plaintiffs Smith and West-El were *unsuitable* for parole until they served the additional range of months Defendants added for the disciplinary reports. *See id.* at 27-28.

Moreover, the 2000 Guidelines do not limit the disciplinary reports that Defendants can use to increase the period a parole candidate must serve to be presumed suitable for parole. Thus, Defendants used six-year-old infractions to increase the period Mr. Smith had to serve to be presumed suitable for parole by 88 months and twelve-year-old disciplinary infractions to increase Mr. West-El's parole eligibility period by 24 months. *See id.* Under the D.C. Parole

DSMDB-2408743

Practices, on the other hand, at initial parole hearings, the Board only considered significant disciplinary reports within the three years preceding a parole candidate's initial parole hearing and infractions involving murder, manslaughter, kidnapping, armed robbery, or first degree burglary, of which Mr. Smith and Mr. West-El had none. *See id.*

> **C.     The 2000 Guidelines Created a Significant Risk of Prolonging the USPC Guideline Plaintiffs' Incarceration by Changing the Weight Accorded to Ordinary Program Achievement Under the 1987 Guidelines**

Third, the 2000 Guidelines changed the weight that ordinary program and work assignment achievement had on the USPC Guideline Plaintiffs' ability to establish a presumption that they were suitable for parole. *See* USPC Guidelines Mem. at 29. For example, under the 1987 Regulations, each of the USPC Guideline Plaintiffs could have used his ordinary program achievement to negate a point in his total point score that might have been added through the type of risk assessment or as a result of negative institutional behavior – by negating one of these points, the USPC Guideline Plaintiffs would have had a lower total point score, thus making it more likely that they would be presumed suitable for parole at their initial and subsequent parole hearings. *See id.* Under the 2000 Guidelines, however, the USPC Guideline Plaintiffs' ordinary program achievement has no impact on the additional incarceration added by Defendants for the Base Point Score and the plaintiffs' disciplinary reports. *See id.* at 30. As a result, Defendants can add years to D.C. Code offenders' minimum sentences based on the Base Point Score and negative institutional behavior and the inmate's ordinary program achievement will do nothing, except, according to the USPC, prevent Defendants from requiring offenders to serve to the maximum of their Total Guideline Range. *See* 28 C.F.R. § 2.80(e)(2).

DSMDB-2408743

**D. The 2000 Guidelines Created a Significant Risk of Prolonging the USPC Guideline Plaintiffs' Incarceration by Eliminating the D.C. Parole Board's Assumption that These Plaintiffs' Minimum Sentences Satisfied the Punishment Aspects of Their Sentences**

Fourth, the 2000 Guidelines eliminated the assumption under the 1987 Regulations and the D.C. Parole Practices that the minimum sentence imposed by the sentencing court satisfied the USPC Guideline Plaintiffs' offense accountability. *See* USPC Guideline Mem. at 31. Instead, the 2000 Guidelines turn that assumption into a presumption that Defendants can overcome in "exceptional cases" based on the "gravity of the offense." *See id.* at 32 (quoting 28 C.F.R. § 2.73). As a result, the 2000 Guidelines allowed Defendants, contrary to the Board's stated policies, to deny the USPC Guideline Plaintiffs' parole requests based solely on the alleged seriousness of these plaintiffs' offenses and accountability grounds. *See id.* In fact, through the Defendants' adoption of the Base Point Score methodology in the 2000 Guidelines, Defendants, in essence, classified an entire class of parole candidates, i.e., those whose current offenses involved violence and the death of the victim, as "exceptional cases" warranting a denial of parole despite the fact that they had served their minimum sentence. *See id.*

**E. The 2000 Guidelines Created a Significant Risk of Prolonging the USPC Guideline Plaintiffs' Incarceration by Re-Defining the Factors the Board Considered as "Unusual Circumstances" Countervailing a Grant of Parole**

Finally, the 2000 Guidelines also facially differ from the 1987 Regulations because the 2000 Guidelines do not contain any "formal criteria" for determining whether "unusual circumstances" exist that justify denying the 2000 Guideline Plaintiffs' requests for parole for those plaintiffs presumed suitable for parole. *See id.* at 33. Instead, the 2000 Guidelines permit Defendants to treat as an "unusual circumstance" any factor that they can identify as allegedly not having been accounted for by the Total Guideline Range. *See* 28 C.F.R. § 2.80(n)(1). Under the 1987 Regulations, on the other hand, the D.C. Parole Board adopted a written policy statement setting forth formal criteria and parameters for determining the applicability of certain

24

factors countervailing a grant of parole. *See id.* By leaving it to the unfettered discretion of Defendants to determine when a particular factor countervailing a grant of parole applied in the USPC Guideline Plaintiffs' cases, as opposed to using the specific, narrow criteria adopted by the Board, the 2000 Guidelines created a significant risk that the USPC Guideline Plaintiffs will be incarcerated longer. Furthermore, the 2000 Guidelines, contrary to Defendants' alleged basis for revising the 1987 Regulations, have led to unstructured departures based on factors that are not at all unusual, such as a person convicted of a homicide having a prior gun charge, which is the "unusual circumstance" on which Defendants purport to rely to deny Carlton Martin's request for parole.

Despite these concrete examples of how the 2000 Guidelines, on their face, created a significant risk that the USPC Guideline Plaintiffs will be incarcerated longer, Defendants' sole response in their motion is that the USPC adopted "similar factors [in the 2000 Guidelines] to those the 1987 guidelines considered" and "incorporated the Board's *actual practice* under the 1987 guidelines in amending those guidelines." Defs. Mot. at 39.[11]  The fact that the 2000 Guidelines and 1987 Regulations contain "similar factors," however, does not mean that the two are facially indistinct, nor does such a fact impact the analysis required by the *Ex Post Facto* Clause. Any "facial distinctions between the old and new parole/reparole regulations" that

_____

[11] In support of their assertion that they did not violate the *Ex Post Facto* Clause by applying the 2000 Guidelines to the USPC Guideline Plaintiffs, Defendants cites to cases in which the courts addressed whether particular D.C. Code offenders had established an *ex post facto* violation based on the Defendants' application of the 2000 Guidelines in those offenders' cases. All of these cases are inapposite. None of the cases address the specific arguments that Plaintiffs make in their summary judgment motions, each case limits its determination to the showings made by the specific plaintiff or petitioner in the case, and in some, the courts rely on Defendants' misrepresentations concerning the USPC's findings from its 100 case sample to support their decisions. *See, e.g.*, *Pindle v. Poteat*, 360 F. Supp. 2d 17, 21 (D.D.C. 2003) ("petitioner has not demonstrated that he has been deprived of a mandatory right to parole"); *Hargrow v. Minor*, No. 1:CV:06-0683, 2007 U.S. Dist. LEXIS 51583, at *10 (M.D. Pa. July 16, 2007) ("Petitioner fails to produce any evidence that the change in the federal parole guidelines negatively affected his parole status.").

DSMDB-2408743

demonstrate that the new regulations create a significant risk of prolonging Plaintiffs'
incarceration are sufficient to establish Plaintiffs' *Ex Post Facto* claims. *Fletcher II*, 433 F.3d at
877.[12]

Moreover, Defendants offer absolutely no evidence to support their assertion that the
USPC's revisions to the D.C. Parole Board's regulations merely "incorporated the Board's
*actual practice*." Defs. Mot. at 39. Instead, Defendants repeatedly cite to the USPC's
description of the findings of a study it conducted of the Board's decisions, which Defendants
allege proves that the D.C. Parole Board upwardly departed from its own guidelines in more than
half of the cases it considered. *See* Defs. Mot. at 25, 27, 39, 43 (citing 63 Fed. Reg. 39172-73
(July 21, 1998)).

Apart from the study's flawed methodology and erroneous conclusions, *see infra* Part
VI.C, the study is inadmissible under the Best Evidence Rule because the Defendants have not
proffered the study to the Court. *See* Fed. R. Evid. 1002. Evidence offered in support or
opposition to a motion for summary judgment must be capable of admission at trial. *See Bortell
v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 11-12 (D.D.C. 2005); *Solis v. Prince George's County*, 153
F. Supp. 2d 793, 798 (D. Md. 2001). Evidence concerning the facts and conclusions of the study

---

[12] Defendants rely on *Fletcher II* and *Glascoe v. Bezy*, 421 F.3d 543 (7th Cir. 2005), to support
their assertion that the 1987 Regulations and 2000 Guidelines are facially similar. *Fletcher II*
only addressed the differences between the Board's reparole guidelines and the USPC's reparole
guidelines. In rejecting the USPC's argument that *Glascoe* supported the district court's
dismissal of the *Fletcher* plaintiff's habeas petition, the D.C. Circuit merely noted that the 2000
Guidelines, like the 1987 Regulations, take into account post-incarceration behavior, unlike the
USPC's reparole guidelines. *See* 433 F.3d at 878. In *Glascoe*, the Seventh Circuit compared the
USPC's 1999 guidelines, not the 2000 Guidelines, to the 1987 Regulations and found the two
sets of guidelines considered many of the same factors. *See* 421 F.3d at 547. The USPC's 1999
guidelines are similar, but not identical to the 2000 Guidelines. Furthermore, the Seventh Circuit
accepted the USPC's contention that, "in an effort to increase uniformity and predictability," the
USPC's changes to the 1987 Regulations simply attempted to quantify factors that the Board
allegedly considered. *Id.* As demonstrated below, the USPC contention on which the Seventh
Circuit relied is unsupported by any evidence.

DSMDB-2408743

are inadmissible in support of Defendants' Motion because Defendants seek to prove the study's

contents and conclusions without actually offering the study to the Court. *See* 31 Charles Alan

Wright & Victor James Gold, *Federal Practice and Procedure* § 7184 (2000); *Jinks-Umstead v.*

*England*, No. 99-2691, 2005 WL 3312947, at *5-*6 (D.D.C. Dec. 7, 2005). The Court,

therefore, should either exclude the alleged findings of the study offered by Defendants or

require Defendants to produce the actual study if it exists.

Furthermore, the USPC's description of its study in the Federal Register is

inconsistent with the actual study findings. *See infra* Part VI.C.2. In fact, it appears as though

the USPC invented the findings it reported in the Federal Register to justify its desire to

incorporate federal parole criteria, i.e., offense accountability, into D.C. parole considerations

and further punish D.C. Code offenders who were incarcerated for offenses resulting in the death

of the victim.

**VI.    DEFENDANTS' PRACTICAL IMPLEMENTATION OF THE 2000**
**GUIDELINES AND USPC PAROLE PRACTICES CREATED A**
**SIGNIFICANT RISK OF PROLONGING PLAINTIFFS' INCARCERATION**

In addition to the facial distinctions between the 2000 Guidelines and the 1987

Regulations described above, Plaintiffs' Memoranda established that Defendants' practical

implementation of the 2000 Guidelines and use of the USPC Parole Practices, which permit

Defendants to deny parole based on offense accountability factors, created a significant risk of

prolonging Plaintiffs' incarceration. Defendants' Motion, nevertheless, asserts that Plaintiffs

have failed to (and cannot) prove any actual practice of the D.C. Parole Board or that any

difference exists between the Board's policies and practices and those of Defendants and the

27

USPC.  *See* Defs. Mot. at 40.  As a result, Defendants contend, the Court should dismiss

Plaintiffs' claims.[13]

These arguments, like Defendants' other arguments, are meritless.  Plaintiffs'

Memoranda and the materials submitted with those memoranda establish beyond any doubt the

D.C. Parole Practices and clearly demonstrate the differences between the D.C. Parole Board's

practices and Defendants'.

> **A.    Plaintiffs' Memoranda Identify the Board's Policies and Practices and Defendants' Motion Concedes that Plaintiffs Have Provided Evidence of Those Policies and Practices**

Plaintiffs' Memoranda and the materials submitted in support of their summary

judgment motions clearly identify that the D.C. Parole Board's policies and practices under the

1987 Regulations were to, among others things:

- not consider retribution or general deterrence in making its parole decisions,  see Plaintiffs' Joint Statement ¶ 26;[14]

- assume that the sentencing court addressed offense accountability (society's punishment and deterrence interests) at sentencing, see id. ¶ 34;

- presume a parole candidate was suitable for parole at the candidate's initial parole hearing if the candidate's total point score was two or less, CITE;

---

[13] Defendants also argue that the Court should dismiss Plaintiffs' claims because "Plaintiffs have had an adequate opportunity to discover the Board's . . . practices under the 1987 guidelines," but have not shown what those actual practices were.  *Id.*  If the Court determines that Plaintiffs have not proven the D.C. Parole Board's practices, Plaintiffs ask that the Court allow them to renew their motion to extend the close of discovery, so that Plaintiffs can pursue the numerous outstanding discovery requests that Defendants failed to address during discovery.

[14] In response to Plaintiffs' Joint Statement, Defendants submitted to the Court the Defendants' Statement of Genuine Issues in Response to Plaintiffs' Joint Statement of Material Facts ("Defendants' Statement").  Although Defendants' Statement disputed some of the parole policies and practices documented in Plaintiffs' Statement and the exhibits attached thereto, Defendants failed to provide any reference to the record that supported their statement, as required by Local Civil Rule 7(h).  As a result, the Court may deem Plaintiffs' description of such parole policies and practices as admitted by Defendants.

28

- adhere to the presumption of parole suitability unless "unusual circumstances," as defined by its regulations and policy guidelines applied, CITE;

- only consider as "unusual circumstances" warranting a denial of parole those countervailing factors that demonstrated that a parole candidate would not "live and remain at liberty without violating the law" and that the candidate's "release was incompatible with the welfare of society," D.C. Code § 24-204 (1996); see Plaintiffs' Joint Statement ¶¶ 58, 61;

- for purposes of determining whether to adjust a parole candidate's point score at an initial parole hearing based on the candidate's institutional behavior, only consider significant institutional offenses committed by a candidate in the twelve months preceding a parole hearing or in the last half of a parole candidate's minimum sentence, up to a period of three years, except where a parole candidate had committed the offenses of murder, manslaughter, kidnapping, armed robbery, or first degree burglary while serving his or her sentence, see id. ¶ 72;

- apply the criteria in the 1991 Policy Guideline to determine the applicability of certain aggravating or mitigating factors when determining whether "unusual circumstances" existed, *see id.* ¶¶ 76-80; and

- adjust an inmate's point score by deducting one point if the inmate demonstrated sustained program or work assignment achievement, see id. ¶ 54.

Defendants' Motion, in fact, concedes that Plaintiffs have provided evidence "regarding what the [D.C. Parole Board] guidelines appear on their face to require." Defs. Mot. at 41. Plaintiffs offered evidence of each of these policies and practices (and the D.C. Parole Board's other policies and practices) in the form of written statements of policy prepared by the Board. Plaintiffs' Joint Statement ¶ 32-34. As the Supreme Court recognized in *Garner v. Jones*, "[a]bsent a demonstration to the contrary, [the Court] presume[s] the Board follows its statutory commands and internal policies in fulfilling its obligations." 529 U.S. at 256.[15]

---

[15] Defendants also assert that Plaintiffs cannot rely on the deposition testimony of USPC hearing examiners, the USPC's General Counsel, or the USPC's Rule 30(b)(6) witness, because those individuals are not parole decision makers. *See* Defs. Mot. at 41 n.13. It was, however, Defendants who refused to make themselves available for deposition. Despite numerous (footnote continued on next page)

DSMDB-2408743

Significantly, nowhere in Defendants' Motion do Defendants dispute Plaintiffs' contention or address Plaintiffs' evidence that the D.C. Parole Board's policy and practice was to not deny parole based on offense accountability factors. In fact, the words "accountability" and "retribution" do not appear anywhere in Defendants' Motion. The only place Defendants address this contention is in their response to Plaintiffs' statement of undisputed facts, in which Defendants simply dispute that the D.C. Parole Board "never denied parole based upon offense accountability." Defendants' Statement ¶ 39. Notably, Defendants do not refer to any evidence in the record that supports their position and do not address the bounty of evidence that Plaintiffs submitted regarding the D.C. Parole Board's policy concerning offense accountability. *See* Defs. Mot. at 3-21 .

Although Defendants claim that court decisions and a 1998 "sample" of D.C. Parole Board decisions demonstrate that the Board's practice was to depart regularly on any or no bases in cases like Plaintiffs, regardless of the presumption of parole suitability established by the total point score under the 1987 Regulations, *see* Defs. Mot. at 40-42, neither the court decisions nor the study support Defendants' arguments. Thus, Defendants have made no showing that the D.C. Parole Board did not follow its statutory commands and internal policies and, therefore, Plaintiffs' proof of the Board's policies and practices is undisputed.

---

requests since July and August 2007 for dates for Defendants' deposition, Defendants never provided a single date for their depositions. Furthermore, when Plaintiffs moved to extend the close of discovery to allow them to compel Defendants' depositions, *see* Docket Entry #40, Defendants opposed Plaintiffs' motion on the ground that it was improper for Plaintiffs to depose Defendants, *see* Docket Entry #43. Defendants cannot have it both ways. If the Court determines that Plaintiffs have failed to demonstrate the Board practices or that the testimony of Defendants' hearing examiners and General Counsel is not admissible to show the manner in which the Board's and Defendants' policies and practices applied, the Court should deny both sides' dispositive motions and re-open discovery to allow Plaintiffs to depose Defendants.

DSMDB-2408743

**B.    The Six Cases Regarding Decisions of the D.C. Parole Board Cited in Defendants' Motion Do Not Prove Any Board Practice**

In their motion, Defendants contend that various court decisions demonstrate that the D.C. Parole Board denied parole frequently for inmates in circumstances like Plaintiffs' and for a variety of reasons despite a presumption that a parole candidate was suitable for parole. *See id.* at 42. Defendants essentially contend that these decisions demonstrate that the Board, in fact, had no policies or practices when it came to exercising its discretion and, therefore, Defendants assert, they are free to adopt whatever parole regulations or guidelines they desire.

As an initial matter, Defendants' premise is flawed. The absence of any limitations on the D.C. Parole Board's discretion does not negate any possibility that a change in the parole regulations violates the *Ex Post Facto* Clause. *See Garner*, 529 U.S. at 13 (noting "the broad discretion the Parole Board possesses in determining whether an inmate should receive early release," but clarifying that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause"); *Fletcher II*, 433 F.3d at 876-77 ("[T]he existence of discretion is not dispositive. The controlling inquiry under *Garner* is how the Board or the Commission exercises discretion in practice, and whether differences between the exercise of discretion in two systems actually 'create[] a significant risk of prolonging [an inmate's] incarceration.'" (quoting *Garner*, 529 U.S. at 251) (alterations in original)). Furthermore, Defendants' purported evidence of the Board's practices offer proves little.

The fact that the D.C. Parole Board may have found that unusual circumstances existed in six cases proves nothing more than that the Board denied parole at times even though the 1987 Regulations presumed the candidate was suitable for parole. Each of the cases that Defendants' Motion cites as evidence of the Board's actual practice, in fact, supports two of Plaintiffs' positions. First, the cases demonstrate that the D.C. Parole Board did not depart from the presumption created by a parole candidate's total point score unless "unusual circumstances"

DSMDB-2408743

existed.  Second, they prove that the Board did not consider whether a candidate had satisfied

offense accountability to be an "unusual circumstance."  Thus, to the extent these cases establish

a Board practice of departing in the cases of some violent offenders, as Defendants suggest, they

similarly establish a Board practice not to depart based on offense accountability.

Notably, in none of the six cases that Defendants cite as evidence of the Board's

practice of denying parole to violent offenders (*Hall v. Henderson*, *Smith v. Quick*, *McRae v.*

*Hyman*, *Davis v. Henderson*, and *White v. Hyman*) did the Board automatically deny a parole

candidate's request for parole based on the fact that the candidate's crime involved violence and

the death of the victim, which is the effect of the presumption that Defendants' automatically

apply under the 2000 Guidelines to all offenders convicted of a homicide.[16]  Instead, once the

Board determined that a parole candidate was presumed suitable for parole based on his or her

total point score, the Board looked at the candidate's particular circumstances and assessed

whether unusual circumstances were present that indicated that the candidate would not "live and

remain at liberty without violating the law" and the candidate's "release was incompatible with

---

[16] *See Hall v. Henderson*, 672 A.2d 1047, 1050 (D.C. 1996) (Board did not need to depart, because the "District's scoring system for determining parole eligibility" indicated that the offender should not be paroled); *Smith v. Quick*, 680 A.2d 396, 398 (D.C. 1996) (Board denied parole because unusual circumstances, including the offender's "need for rehabilitative services as well as his history of assaultive criminal behavior," warranted the offender's continued incarceration); *McRae v. Hyman*, 667 A.2d 1356, 1361 (D.C. 1995) (Board denied parole because the following aggravating factors applied:  "repeated failure under supervision; a history of criminally related alcohol abuse; extensive record; the offense of conviction involved unusual cruelty; [] although given the opportunity, [the offender] had made little or no effort toward rehabilitation;" and "that the inmate needed appropriate services to 'minimize risk to the community when actually released to parole'"); *Davis v. Henderson*, 652 A.2d 634, 634 (D.C. 1995) (Board denied parole at the offender's initial parole hearing because of the offender's negative institutional behavior and at the offender's parole rehearing because the offender escaped from a halfway house the year before his parole rehearing and remained at large for 235 days and because of the offender's mental state); *White v. Hyman*, 647 A.2d 1175, 1177 (D.C. 1994) (Board denied parole based on offender's negative institutional behavior where, while on pre-parole work release in 1990, the offender escaped for 17 days and received a major disciplinary report for possession of contraband upon his return to custody, and following his parole hearing in 1991, escaped again and remained at large for 133 days).

DSMDB-2408743

the welfare of society."  D.C. Code § 24-204 (1996).  These cases, therefore, do not justify any changes made by the USPC to the 1987 Regulations based on "frequent" or "regular" departures. Nor do they rebut Plaintiffs' evidence demonstrating that the Board's policy and practice was to not consider offense accountability in the parole suitability calculus.[17]

### C.    The USPC's 1998 Study of D.C. Parole Board Decisions Does Not Support Defendants' Changes to the 1987 Regulations

In support of their assertion that the Board frequently departed from its numerical guidelines, Defendants also point the Court to the USPC's description in the Federal Register of an analysis it conducted in 1998 regarding a "random sampling" of 100 of the D.C. Parole Board's past decisions.  *See* Defs. Mot. at 43 (citing 63 Fed. Reg. 39172 (July 21, 1998)).[18]  This sample, Defendants' Motion contends, found that "the Board departed from its guidelines in more than half of its cases."  *Id.*  As a result, Defendants argue, the sample established that "the Board's actual practice under the 1987 guidelines was to frequently depart upwardly from the guidelines, especially in the cases of violent offenders."  *Id.* at 43-44.[19]

---

[17] Defendants' Motion also cites to cases discussing the USPC's application of the 1987 Regulations.  *See* Defs. Mot. at 42-43.  These cases, however, are not instructive regarding the *ex post facto* analysis in this case, which requires the Court to conduct "a searching comparison of the old and new []parole regimes in order to determine whether the [USPC's] application of [its] regulations . . . created a significant risk that [Plaintiffs] will be subjected to a lengthier incarceration than [they] would have been if the [USPC] had adhered to the rules and practices of the D.C. Board."  *Fletcher II*, 433 F.3d at 879.  To the extent the USPC's application of the 1987 Regulations differed from the D.C. Parole Board's, the USPC failed to comply with this Court's decision in *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1003-04 (D.D.C. 1988).

[18] As Defendants' Motion correctly notes, *see* Defs. Mot. at 43 n.15, Plaintiffs' Memoranda did not analyze the Board's practices under the 1987 Regulations based on the "random sample" of 100 Board cases, nor was there any reason to do so.  As Plaintiffs' USPC Guideline Memorandum noted, the USPC's analysis of this sample suffered from various data and process deficiencies.  *See* USPC Guideline Memorandum at 12-13.  As a result, Plaintiffs did not expect Defendants to rely on their flawed analysis in opposition to Plaintiffs' summary judgment motions.

[19] In addition to not even presenting the actual sample study for the Court's consideration, the USPC and Defendants have never provided any evidence, either when they adopted the 2000 Guidelines or in this case, that the USPC's "random sample" of 100 D.C. Parole Board decisions
(footnote continued on next page)

DSMDB-2408743

Even if the Court assumes that Defendants' study demonstrated that the D.C. Parole Board departed in more than half of the 100 cases allegedly analyzed by the USPC, it does not follow that the USPC can then apply its 2000 Guidelines retrospectively to disadvantage an entire class of parole candidates based on that alleged finding. Defendants cannot dispute that by doing so, they have disadvantaged, and significantly increased the risk of prolonging the incarceration of, the parole candidates in whose cases the Board would not have departed. Even so, as demonstrated below, the Board did not, in fact, depart in more than half of the 100 cases from the action indicated under the 1987 Regulations for the total point score.

An analysis of the only report regarding the USPC's random sample of 100 decisions, *see* Chicknell Dep. 64:6 – 67:16, and of the USPC's own work product from that sample demonstrates that the USPC misrepresented the findings of the sample analysis when it published its interim rules in July 1998 and in its final rules in 2000, and has continued to do so in court pleadings ever since. Not only did the D.C. Parole Board not depart in more than half of the cases analyzed by the USPC, but in only a small minority of its departures was an offender's violence in the current or a past offense a factor noted as the basis for the Board's departure. The USPC simply decided to revise the Board's 1987 Regulations to increase the punishment for a certain class of prisoners (violent offenders, particularly those whose offense was a homicide of one sort or another) by making it harder for such prisoners to obtain parole, undertook a study in an attempt to justify its decision, and when the study failed to do so, misstated the results of the study.

_____

is statistically significant and representative of the Board's practices in the thousands of other cases it decided. The USPC's use of the study to justify the changes to the 1987 Regulations, therefore, is arbitrary and capricious.

DSMDB-2408743

1.    The USPC's representations concerning its 100 case sample.

In July 1998, the USPC published its interim rules for D.C. Code offenders.  *See* 63 Fed. Reg. 39172 (July 21, 1998).  In its interim rules, the USPC reported that in its analysis of "a random sample of 100 cases decided by the D.C. Board of Parole in 1997, the Commission found departures in more than half of the cases."  *Id.*  The USPC went on to state that the study demonstrated that the "[f]actors cited by the Board to justify departures most often appear to involve aspects of the prisoner's current offense or criminal history that indicate a risk of violent recidivism."  *Id.*  In this case, Defendants specifically cite the study to support the USPC's expansion of the total point score "to include the degree of violence in the prisoner's current offense and the number of violent crimes on the prisoner's prior record previously considered by the D.C. Board in its actual practice under the 1987 guidelines."  Defendants' Mem. at 27.

In explaining the basis for its changes to the 1987 Regulations, the USPC stated that because the USPC found that the Board departed frequently "for cases of 'unusual cruelty to victims,'" the USPC felt justified in including the "relevant factors" (i.e., the Base Point Score enhancement for the death of the victim that Defendants applied in the cases of the USPC Guideline Plaintiffs) associated with "extremely violent crimes (murder, rape, etc.)" into its new guidelines.  *Id.* at 39173.[20]  It did so because it "decided that such cases present implied risk levels that would either justify repeated departures," including the factors in the Base Point Score.  *Id.*  It also did so despite the fact that the frequency of such crimes in its recidivism analysis was  too small "to yield empirical research results," *id.*, and despite the fact that its own recidivism analysis demonstrated that including "a 3-point increase . . . for the death of a victim, and a 1-point increase for other 'high level of violence'" showed "*les*s predictive power" of

---

[20] The USPC contended that the D.C. Parole Board had frequently departed for cases of "unusual cruelty to victims" because "[t]he Board of Parole's [] point score table assign[ed] a one point enhancement for violence, regardless of the nature and seriousness of the crime."  *Id.* at 39173. This contention, however, is belied by the USPC's own 100 sample study, *see infra* Part VI.C.

violent recidivism than a risk assessment that did not distinguish between crimes involving a

"high level" and those involving other violence.  Parole-Eligible D.C. Prisoners Released in

1992:  A Study of the Proposed U.S. Parole Commission Guidelines for D.C. Code Offenders

at 16 (June 28, 1998) [hereinafter, "USPC Recidivism Report"] (attached as Exhibit A); *see also*

1998 Stover Mem. at 7 (attached as Exhibit 4 to Plaintiffs' Joint Statement) (noting that the "two

point enhancement for death resulting from a crime of 'high level violence' was retained . . . ,

even though the research results did not justify the conclusion that current homicides statistically

predict for future homicides," but justifying the enhancement because it allegedly would

"structure discretion that would otherwise be used in decisions outside the guidelines based on

the fact that a victim was done to death").[21]  The USPC justified its use of point enhancements

---

[21] In addition to the 100 case sample study, the USPC retained a consultant to determine "(1) whether the proposed parole release base point score is more predictive of violent recidivism than the published D.C. Board of Parole base point score; (2) whether the proposed parole release base point score might be modified to increase its ability to predict violent recidivism; and (3) whether the proposed parole release base point score is more highly correlated with actual D.C. parole decisions than the published proposed point score."  USPC Recidivism Report at 1.  The USPC Recidivism Report purported to address the first two questions, but it was plagued with data deficiencies that the USPC's consultant, Peter Hoffman, acknowledged "reasonably could be expected to reduce the strength of any associations found."  *Id.* at 16-17.  Of the 1,000 cases identified for the recidivism analysis, "[o]nly 556 cases were suitable for the followup study.  Two hundred and eighty-two cases were deleted from the sample because the case file could not be found, or because a substantial part of the case file was missing . . . ."  *Id.* at 8.  "In addition, the quality of the data recorded in the case files is also suspect in certain respects.  Not infrequently, the presentence report, a primary source of data, was noted as missing or limited in detail regarding the current offense."  *Id.*  Furthermore, Mr. Hoffman expressed concern about the coding work performed by some D.C. Parole Board staff and noted that, although some quality control steps were taken to address the problem, "it is unlikely to have completely cured it."  *Id.*  As a recent study commissioned by the USPC found, Mr. Hoffman's concerns were valid.  *See* James Austin, Ph.D & Roger Ocker, Evaluation and Re-Validation of the U.S. Parole Guidelines Risk Instrument at 2-3 (attached as Exhibit B) (finding that the USPC's 2000 Guidelines "overall scale [] has a weak association with recidivism" and recommending that "[t]he USPC needs to determine the extent to which it wishes to extend parole eligibility dates based solely on offense severity and history of violence ["which are not related to recidivism"]; especially given the long period of incarceration DC sentenced prisoners are now serving *and the lack of a relationship between length of time served and recidivism*").

DSMDB-2408743

for violence and the death of the victim on the grounds that they would "render unnecessary the *unstructured discretionary departures that were frequently ordered* by the D.C. Board of Parole in the past *to compensate for an inadequate violence prediction ('type of risk') scale*."  63 Fed. Reg. at 39173 (emphasis added).

Since publishing its interim rules for D.C. Code offenders in 1998 and the 2000 Guidelines, the USPC has defended itself in various courts, as Defendants do in this case, by pointing to the USPC's alleged finding in its 100 case sample that the D.C. Parole Board frequently departed as justification for the USPC's changes to the 1987 Regulations.  *See* Defs. Mot. at 25, 27, 43-44; *Hargrow v. Minor*, No. 1:CV-06-0683, 2007 U.S. Dist. LEXIS 51583, at *11 (M.D. Pa. July 16, 2007) (accepting argument that "[i]n amending the original D.C. Parole Board's guidelines, the USPC . . . incorporat[ed] factors upon which the D.C. Board relied to upwardly depart from its guidelines" and that "[t]he changes basically codified unofficial discretionary factors that had been previously utilized by the D.C. Board to substantiate upward departures"); *Skinner v. Hastings*, No. 7:05-370-DCR, 2006 WL 2457934, at *1 (noting that USPC revised the 1987 Regulations "to bring its regulations closer in line to the actual practice of the D.C. Board of Parole").  For example, in this case, Defendants assert that the "searching comparison" required by *Fletcher II*, *see* 433 F.3d at 877, is "futile" because the D.C. Parole Board "retained discretion to depart from numerical guidelines and frequently did, and the USPC modified its own guidelines to reflect the Parole Board's guidelines in the ordinary course."  Defs. Mot. at 34.  The USPC sample study, however, belies Defendants' assertions and representations to the courts.

### 2.  The USPC's 100 case sample did not support the USPC's public comments or representations to the courts.

Contrary to the USPC's representations in the Federal Register and to various courts, the 100 case sample does not support a finding that the D.C. Parole Board departed from its

numerical guidelines in more than half of its cases, that its practice was to depart primarily based on an inmate's current offense or history violence, or that it departed frequently based on "unusual cruelty to the victim".  Moreover, there is absolutely no support for Defendants' arguments that the Board's practice was to depart from the numerical guidelines in the cases of offenders convicted of a crime of violence any more so than in the cases of offenders convicted of non-violent crimes.

In discovery, Defendants produced one "report" regarding the USPC's 100 case sample, which the USPC's General Counsel identified as the only report he has ever seen regarding the sample, even though it is labeled as a preliminary report and only provides information regarding fifty of the 100 cases.  Chicknell Dep. 64:6 – 67:16.  Defendants also produced 34 coding forms for cases in the sample in discovery.  Some of the coding forms are for the individuals listed on the "report" and the other 29 are for individuals not listed in any report.  Plaintiffs have not located any coding forms for the remaining 21 individuals in the 100 case sample.

In an effort to confirm the USPC's representations to this Court and the public regarding the significance of the 100 case sample, Plaintiffs' counsel recorded the information from the USPC's "preliminary report" and each of the coding forms that described the nature of each offender's offense and the reasons for the Board's decision in each case.[22]  Plaintiffs' counsel then identified those inmates whose total point score at their initial parole hearings was three or more, *see* 28 D.C.M.R. § 204.19 (1 or more if the inmate was sentenced under the Youth Rehabilitation Act, *see* 28 D.C.M.R. § 204.20) and noted that the Board's decisions in those cases, to the extent it denied parole, were consistent with the action indicated for such scores in

---

[22] The Declaration of Jason D. Wallach (attached as Exhibit C) explains Plaintiffs' counsel's methodology in greater detail.

DSMDB-2408743

the 1987 Regulations.  For the inmates with an initial point score of two or less (or of 0 for

inmates sentenced under the Youth Rehabilitation Act) at their initial parole hearings, Plaintiffs'

counsel noted the codes identified for each inmate for the Board's departures and the Board's

description for those codes.

Plaintiffs' counsel then organized the 79 inmates in the study into the following

categories:

1.    Unknown Decision;

2.    Decision Consistent with the Action Indicated in 28 D.C.M.R. §§ 204.19 or
       204.20 of 1987 Regulations for the Total Point Score;

3.    Departure Reason Not Recorded;

4.    Departure Based on Unusual Cruelty to the Victim;

5.    Departure Based on a Prior Record of Violent Behavior;

6.    Departure Based on Ongoing Criminal Behavior; and

7.    Departure Based Solely on Negative Institutional Behavior or Programming
       Deficiencies.

Although the Board often identified multiple reasons for departing in a particular case, Plaintiffs'

counsel placed each inmate into the first of the seven categories listed above into which the

inmate fell, e.g., an inmate for whom the Board denied parole based on its belief that he or she

had a Prior Record of Violent Behavior and had a history of Ongoing Criminal Behavior would

have been placed in Category 5 and not Category 6.  Plaintiffs' counsel separated the sample

cases into these categories to identify those inmates in the USPC's 100 case sample to whom the

Board denied parole based on the "degree of violence in the prisoner's current offense and the

number of violent crimes on the prisoner's prior record previously considered by the D.C. Board

in its actual practice under the 1987 guidelines."  Defs. Mot. at 27.  Plaintiffs' counsel treated

inmates falling into categories 4 and 5 as having been denied parole by the Board despite their

total point score based on the violence in either their current or past offenses.

DSMDB-2408743

The chart below shows the number of inmates from the USPC's 100 case sample that fell into each of the above eight categories:

| | |
|---|---|
| **Unknown Decision** | **2** |
| Decision Consistent with the Action Indicated in 28 D.C.M.R. §§ 204.19 or 204.20 of 1987 Regulations for the Total Point Score | **49** |
| **Total Departures** | **28** |
| Departures Where No Reasons Recorded by USPC | 5 |
| **Departures Based on Unusual Cruelty to the Victim** | **4** |
| **Departures Based on Prior Record of Violence** | **3** |
| Departure Based on Ongoing Criminal Activity | 4 |
| Departures Based Solely on Negative Institutional Behavior or Needed Programming | 12 |

As the above chart demonstrates, according to the documents produced by Defendants regarding the 100 case sample study of D.C. Parole Board decisions, out of a total of 77 cases for which Defendants produced information, the Board followed the action indicated in 28 D.C.M.R. §§ 204.19 or 204.20 for a parole candidate's total point score in 49 instances (or in 63.64% of the cases) and only in 28 (36.36%) cases did the Board identify unusual circumstances warranting a departure from the action indicated in Sections 204.19 or 204.20. Furthermore, when the Board departed from the action indicated in Sections 204.19 or 204.20, it did so based on the level of violence in the candidate's current offense only four (4) times and based on the candidate's history of violent crimes only three (3) times. Combined, these two categories account for only 7.14% of the cases in the entire sample and only 25% of the cases in which the Board departed from the numerical indicators in Sections 204.19 and 204.20.[23] How the USPC determined that the Board departed in more than half of the 100 cases in the USPC's

---

[23] For purposes of these calculations, Plaintiffs' counsel did not consider the two cases in which the Board's decision was unknown. If the missing 21 members of the sample are eliminated from the analysis, like the two cases in which the Board's decision is unknown, the cases involving the Board's departure based on violence in the current offense or a history of violence are only 9.09% of the 77 members for which Plaintiffs located information in the Defendants' discovery.

DSMDB-2408743

sample and that the Board's practice was to depart regularly based on the level of violence in an inmate's current offense or the inmate's history of violent crimes is a mystery.[24]  Although its 100 case sample certainly does not support those conclusions, the USPC, nevertheless, has represented to this Court and others that its sample demonstrates that the USPC merely revised the Board's 1987 Regulations to account for the Board's alleged practice of departing regularly from the presumption of parole suitability based on the level of violence in an offender's current offense or an offender's history of violence.[25]  There is no truth to that representation.

Nor is there any support for the USPC's assertion that the Board frequently departed from the action indicated for by a parole candidate's total point score based on "unusual cruelty to the victims" in the cases of inmates convicted of a crime that the USPC considered to involve "high level violence," *see* 28 C.F.R. § 2.80(g)(2).  Of the 79 inmates in the sample for which Defendants produced information, 26 were convicted of crimes that appear to qualify as involving "high level violence."  At the initial parole hearings of these 26 inmates, the USPC's

---

[24] The Board would have had to depart from the total point score in every one of the 21 cases for which Defendants did not produce information for Defendants to have been able to represent that the Board departed in more than half of the cases in the 100 case sample.

[25] There were two ways in which the Board historically departed from its 1987 Regulations. First, if a parole candidate's total point score established that the candidate was presumed suitable for parole under Sections 204.19 or 204.20, the Board could identify "unusual circumstances" warranting a denial of parole notwithstanding the presumption.  *See* 28 D.C.M.R. § 204.22.  If a candidate's total point score under Sections 204.19 or 204.20 indicated that the Board should deny parole, 28 D.C.M.R. §§ 104.1 and 104.2 provided the "ordinary" setoff for the parole candidate, i.e., the time that the candidate would have to serve before his or her next parole hearing, but the Board could "depart" from the "ordinary" setoff periods.  Such "departures," however, are not instructive regarding whether it was the Board's practice to overcome the presumption of parole suitability under Sections 204.19 or 204.20.  They simply show how the Board viewed particular candidates who were either presumed unsuitable for parole under Sections 204.19 or 204.20 or for whom the Board determined that "unusual circumstances" existed warranting a departure from the presumption of parole suitability.  To the extent the USPC treated the Board's departures from the setoff periods under Sections 104.1 and 104.2 as "departures" in the USPC's 100 case sample, the USPC's use of such "departures" as an excuse to increase the time candidates had to serve to establish a presumption of parole suitability is unsupported by any rational basis.

DSMDB-2408743

information shows that the Board's parole determination was consistent with the action indicated

by Sections 204.19 or 204.20 for fourteen (14) inmates and the Board departed from the

numerical guidelines based on "unusual cruelty to the victim" in only three of the remaining

twelve cases.  Again, in light of the information regarding the 100 case sample produced in

discovery, it is unclear how the USPC concluded that the sample supported the USPC's

"distinction between 'high level' and 'other violence' in the current offense . . . because it

incorporates a traditional reason for departing from the guidelines (frequently used by the D.C.

Board of Parole under the heading of 'unusual cruelty to victims')."  1998 Stover Mem. at 6

(Exhibit 4 to Plaintiffs' Joint Statement).

       In addition to demonstrating that the D.C. Parole Board did not frequently depart

from its numerical guidelines "to compensate for an inadequate violence prediction ('type of

risk') scale," 63 Fed. Reg. at 39173, the above chart proves that the D.C. Parole Board's

departures were anything but "unstructured," as the USPC asserted, *id.*  Although the USPC did

not record a basis for five of the 28 departures, the USPC found at least one specific basis for the

departure in every one of the other 27 departures.  Moreover, many of these bases, in fact, are

described in the 1991 Policy Guideline, which the D.C. Parole Board adopted and implemented

for the express purpose of maintaining consistency in and structuring its exercise of discretion

when departing.  *See* ; Plaintiffs' Joint Memorandum at 11; Plaintiffs' Joint Statement ¶¶ 65-70.

Defendants simply have not presented any evidence to contradict Plaintiffs' evidence regarding

the D.C. Parole Board practices.

VII.    **EACH PLAINTIFF HAS DEMONSTRATED THAT DEFENDANTS' USE OF
        THE USPC PAROLE PRACTICES INSTEAD OF THE D.C. PAROLE
        PRACTICES IN HIS CASE CREATED A SIGNIFICANT RISK OF
        INCREASING HIS INCARCERATION**

       In their motion, Defendants assert that each plaintiff has failed to prove that the

Defendants' application of the USPC's policies and practices in that particular plaintiff's case, as

DSMDB-2408743

opposed to the policies and practices of the D.C. Parole Board in effect when the plaintiff

committed his crime, created a significant risk of prolonging that plaintiff's incarceration.  *See*

Defs. Mot. at 46.  Moreover, Defendants assert that Plaintiffs cannot prove that Defendants

increased Plaintiffs' incarceration because even though the Plaintiffs may have been presumed

suitable for parole under the guidelines applied by Defendants, the Defendants departed from the

guidelines in their cases based on the risk the Plaintiffs posed to society if released.  *See* Defs.

Mot. at 6-21.[26]  None of these assertions is accurate.  As demonstrated above and summarized

below, Plaintiffs' motions for summary judgment and statements of undisputed fact demonstrate

that Defendants' use of the USPC Parole Practices, instead of the D.C. Parole Practices that

applied when Plaintiffs committed their crimes, created a significant risk of prolonging

Plaintiffs' incarceration, and Defendants' pretextual reasons and post-hoc rationalizations for

denying Plaintiffs' parole requests do not protect their actions.

**A.    The Administrative Records in Plaintiffs' Cases Demonstrate that Defendants Denied Plaintiffs' Requests for Parole on Offense Accountability Grounds**

As Plaintiffs' Memoranda and statements of undisputed fact demonstrate, at

Plaintiffs' parole hearings and rehearings, the Defendants' focus in their parole suitability

determinations was on Plaintiffs' offense accountability.  Nevertheless, Defendants suggest that

the Court look only to the "officially stated reasons" in the "official notice of action" and ignore

the evaluations, rationale, and recommendations of the hearing examiners and executive

reviewers to which Defendants delegated the responsibility of applying the USPC Parole

---

[26] In the case of Darius Smith, Defendants presumed Plaintiff Smith was unsuitable for parole based on his Total Guideline Range and, therefore, exercised no discretion at his initial parole hearing.  Smith Statement ¶ 7   Similarly, in the case of Benson West-El, Defendants found Plaintiff West-El suitable for parole at his last parole rehearing, but determined, without providing any reasons, that he should remain incarcerated until January 2009. West-El Statement ¶ 8.

DSMDB-2408743

Practices in Plaintiffs' cases and on which Defendants relied for their notice of action.  *See* Defs.

Mot. at 49 n.18.

Defendants, however, cannot hide behind labels they construct to mask the

impermissible offense accountability factors they and their underlings clearly are applying in

Plaintiffs' cases.  As the Supreme Court recognized in *Cummings v. Missouri*, 71 U.S. 277, 325

(1866) (emphasis added):

> [W]hat cannot be done directly cannot be done indirectly.  *The
> Constitution deals with substance, not shadows.  Its inhibition was levelled
> at the thing, not the name.  It intended that the rights of the citizen should
> be secure against deprivation for past conduct by legislative enactment,
> under any form, however disguised.*  If the inhibition can be evaded by the
> form of the enactment, its insertion in the fundamental law was a vain and
> futile proceeding.

Defendants and their hearing examiners and executive reviewers are well aware that

they cannot apply federal parole standards to D.C. Code offenders and that their official Notices

of Action for such offenders cannot refer to the federal parole standards – the courts have told

them so.  *See* Report of Magistrate at 9, *Williams-El v. U.S. Parole Comm'n*, No. 3:CV-90-0649

(July 24, 1990) (finding that the USPC improperly cited the parole "factors provided for by

federal statute" instead of "the District of Columbia parole guidelines as required by Cosgrove,"

where USPC's Notice of Action indicated that they denied a D.C. Code offender's request for

parole based on "their finding that the release of the petitioner would 'depreciate the seriousness

of this new offense behavior and promote disrespect for the law,'") (attached with the

Memorandum and Order adopting the Report of Magistrate as Exhibit D).  Thus, it is not

surprising that, even though Defendants' hearing examiners and executive reviewers find in their

hearing summaries that Defendants should deny parole because Plaintiffs' release would

depreciate the seriousness of their offenses and promote disrespect of the law, the

DSMDB-2408743

"recommendation" sections of the hearing summaries do not mention offense accountability and Defendants do not include offense accountability findings in the official Notice of Action.

Furthermore, Defendants do not even follow the rule that they suggest to the Court. In response to the Plaintiffs' claims, the Defendants support their arguments with citations to hearing summaries and executive reviewer comments; the very same documents that Defendants ask the Court to ignore with respect to Plaintiffs' claims. Defs. Mot. at 5-21. In several instances, the Defendants clearly state that when they agreed with a hearing officer or executive reviewer, they "adopted" the recommendation and reasoning. Defs. Mot. at 10, 14, 16, 17. For example, in arguing that they properly denied Tony Sellmon's requests for parole, Defendants assert that the USPC found that Mr. Sellmon's case presented "extraordinary circumstances" and that Mr. Sellmon was a risk to the community. Defs. Mot. at 51, 53. Defendants' Motion then points to the brutality of Mr. Sellmon's crime as alleged evidence of his propensity for crime and his alleged continual minimization of his role in the offense. *See* Defs. Mot. at 52-53. Nowhere in the official Notices of Action, however, does the USPC assert that Mr. Sellmon minimized his involvement in the offense. Furthermore, none of the Notices of Action in Mr. Sellmon's case state that Mr. Sellmon is a risk to the community. Sellmon Statement ¶¶ 7, 11, 19.

Similarly, Defendants argue that the USPC denied Daru Swinton's request for parole because it concluded that his "crime was unusually cruel." Defendants' official Notices of Action in Mr. Swinton's case, however, never mention the words "unusually" or "cruel." Swinston Statement ¶¶ 6, 13.

Defendants' parole decisions regarding Mr. Eason prove beyond any doubt that when the Defendants agree with a hearing officer or executive reviewer's decisions, they are adopting the entirety of the finding including any unlawful reasoning. For example, in 2004, a reviewer recommended that Defendants deny Mr. Eason's request for parole because "[t]he Commission

DSMDB-2408743

has determined additional time incarcerated is necessary for accountability purposes." Defs. Eason Exh. B8. The Defendants' official Notice of Action then merely copied the reviewer's recommendation. *See* Defs. Eason Exh. B9. Again in 2007, a reviewer and the Defendants relied upon an unlawful factor in again denying Mr. Eason's request for parole. In his comments, the executive reviewer stated: "Consequently, I believe that the subject should serve much more time on this term, possibly as long as 25-30 years. A decision less than that, would, in my opinion, depreciate the seriousness of the offense behavior and promote disrespect for the law." Defs. Eason Exh. B10. The Defendants adopted the prohibited reasoning. *See* Defs. Eason Exh. B11.

Additionally, in reviewing USPC parole decisions, courts consistently have looked past the Notice of Action to the entirety of a parole applicant's record. *See United States ex rel. Farese v. Luther*, 953 F.2d 49, 53 (3d. Cir. 1992); *Campbell v. United States Parole Commission*, 704 F.2d 106, 113-14 (3d Cir. 1983); *Muhammad v. Mendez*, 200 F. Supp. 2d 466, 468-70 (M.D. Pa. 2002); *Knight v. United States Parole Commission*, 721 F. Supp. 974, 982-83 (N.D. Ill. 1989); *Scott-El v. United States Parole Commission*, No. 4:CV-04-491, 2006 WL 2671399, *2-*3 (M.D. Pa. Sept. 18, 2006); *Hughes v. Hastings*, No. 06-cv-125, 2006 WL 1868487 (E.D. Ky. July 3, 2006); *Ketchens v. Anderson*, No. 01-939, 2002 WL 32658481 (D. Minn. Jan. 18, 2002).[27]

---

[27] The cases cited by the Defendants in support of their assertion that the Court is limited to considering the reasons stated in Defendants' Notices of Action are not controlling and easily distinguishable. In *Walker v. Prisoner Review Board*, 796 F.2d 396, 399-400 (7th Cir. 1985), the court found that the presence of newspaper articles in the prisoner's parole file implicating him in crimes for which he was not convicted was not a due process violation. The court specifically found "[n]o mention was made of the newspaper articles" in the parole board's hearing summary or decision. As a result, the court affirmed the district court's holding that the parole board properly relied upon "grounds set forth in the Illinois parole statute in denying plaintiff parole." *Id.* at 399. In contrast, Plaintiffs do not complain about the presence of newspaper articles in their files, but rather, the consideration and adoption by Defendants' representatives of impermissible factors in denying Plaintiffs' requests for parole. Likewise, *Solomon v. Elesa*, 676 (footnote continued on next page)

DSMDB-2408743

Finally, Defendants cannot deny that offense accountability considerations underlie the reasons stated in the official Notices of Action.  At every one of Plaintiffs' parole hearings and rehearings, the USPC's official Notice of Action has adopted the "recommendation" and specific language of either the hearing examiner or executive reviewer.  (see jrod insert).  In nineteen (19) total parole considerations for Plaintiffs, the USPC has not added or altered a word in the underlying recommendation it adopted for its Notice of Action.  Defendants' suggestion that this Court cannot review the true bases on which Defendants based their decisions because the sanitized Notices of Action do not reflect those bases is like telling the D.C. Circuit that it cannot look to a federal magistrate's report to determine the basis of the district court's decision and can only consider the district court's memorandum and order adopting the magistrate's report.

> **B.**    **Defendants Improperly Applied Federal Parole Standards and Criteria at the Parole Rehearings of Plaintiffs Eason and Gambrell**

In their motion for summary judgment, Plaintiffs Eason and Gambrell proved that, although Defendants asserted that they applied the 1987 Regulations at these plaintiffs' parole rehearings, the Defendants used federal parole standards to determine these plaintiffs' suitability for parole.  Eason Statement ¶¶ 17-19; Gambrell Statement ¶¶ 19-22.  Plaintiffs Eason and Gambrell also proved that, in making parole determinations, the D.C. Parole Board, as demonstrated by its policy and practice, did not consider offense accountability or the need to

---

F.2d 282, 290 (7th Cir. 1982), is distinguishable because the court did not hold that a review of a USPC parole decision is limited to the Notice of Action.  Rather, the court found its power of review extended to "the facts which constitute significant factors in the Commission's decision."  *Id*.  In Plaintiffs' case, evidence of the USPC's consideration of improper factors, such as offense accountability and respect for the law, is present throughout the parole suitability consideration and forms the basis for Defendants' unlawful decisions.  Finally, *Castalso* is not controlling because nowhere in the case does the court hold that a review of the USPC's decisions is limited to the officially stated reasons.  *Castalso v. U.S. Parole Comm'n*, 725 F.2d 94, 96 (10th Cir. 1984).

DSMDB-2408743

punish an inmate further based on his offenses. Thus, Defendants' use of such factors in determining these plaintiffs' parole suitability violated the *Ex Post Facto* Clause.

Defendants' Motion, however, asserts that Plaintiffs Eason and Gambrell had no legitimate "expectation of *ex post facto* protection from the 1987 guidelines," because they committed their crimes before the Board adopted those guidelines. Defs. Mot. at 47-48. Defendants also argue that these plaintiffs are not truly bringing an *ex post facto* challenge, but are challenging the Defendants' discretionary decision making under the 1987 Regulations and, therefore, may only proceed in a habeas corpus lawsuit. *See id.* at 48. Furthermore, Defendants assert that their reasons for departing from the numerical guidelines in Plaintiff Eason's case (i.e., "the unique nature of Eason's murder offense") and Plaintiff Gambrell's case (i.e., Mr. Gambrell's multiple assaultive offenses and propensity to commit crimes while under supervision) demonstrate the USPC's desire to protect the public safety. *Id.* at 48 n.17.

There is no merit to any of Defendants' arguments. First, Plaintiffs Eason and Gambrell challenge Defendants' use of federal parole standards and criteria that permit Defendants to consider offense accountability, which the D.C. Parole Board's policies and practices prohibited because such considerations were inconsistent with the statutory commands of the D.C. parole statute. 1987 Regulations Mem. at 26 n. 6; Plaintiffs' Joint Statement ¶ 34. It was the Board's policy before adopting the 1987 Regulations to treat the sentencing court's minimum sentence as the measure of accountability for an inmate's offense.[28] Plaintiffs' Joint Statement ¶¶ 18-29, 32-34. As the D.C. Court of Appeals recognized in *Davis v. Henderson*,

---

[28] In their motion, Defendants argue that "nothing in *ex post facto* jurisprudence requires that a parole authority consider prior 'practices' of a former parole authority in making decisions." Defs. Mot. at 48 n.16. *Garner*, however, makes clear that any change in practice that creates a significant risk of increasing an inmate's incarceration can result in an *ex post facto* violation. **Jones v. Garner, 529 U.S. 244, 255 (2000)**. Furthermore, Defendants' argument suggests that a legislature could gut the protections of the *Ex Post Facto* Clause simply by transferring parole authority from one entity to another. The *Ex Post Facto* Clause is not so narrowly interpreted.

DSMDB-2408743

652 A.2d 634 (D.C. 1994), the 1987 Regulations formalized the manner in which the D.C. Parole

Board had exercised its discretion prior to the regulations. *See id.* at 636.[29]  The 1987

Regulations merely changed the Board's exercise of discretion "from informal factor

consideration *to virtually the same* formalized salient factor scoring system." *Id.* at 637

(emphasis added).[30]  Thus, Plaintiffs Eason and Gambrell did have an expectation under the D.C.

parole regime in effect when they committed their crimes that the punishment/offense

accountability aspect of their sentence would be satisfied when they became eligible for parole

and that their suitability for parole at that time would turn solely on the D.C. Parole Board's

primary goals of rehabilitation and treatment which focused on whether parole candidates would

live in society without violating the law and whether their release was consistent with public

---

[29] In support of this argument, Defendants cite to *Warren v. U.S. Parole Comm'n*, 659 F.2d 183, 193-95 (D.C. Cir. 1981), which Defendants assert stands for the proposition that "where parole guidelines did not exist when [an] inmate committed [his] crime, no *ex post facto* violation [occurred] with adoption and implementation of guidelines." Defs. Mot. at 50. *Warren*, however, involved the USPC's adoption of *federal parole guidelines* that "grew directly out of the [USPC's predecessor's] past practice," 659 F.2d at 193, under a "statutory mandate for determining parole for federal prisoners . . . [that] provided for a much broader exercise of discretion than the District's parole guidelines," *Davis*, 652 A.2d at 636. Thus, in *Warren*, the D.C. Circuit found no *ex post facto* violation because the USPC's parole guidelines for federal prisoners simply formalized the USPC's prior practices with respect to such prisoners, like the 1987 Regulations do with respect to the Board's pre-1987 policies and practices.

[30] Defendants also cite *Rogers v. Tennessee*, 532 U.S. 451 (2001), and *Bledsoe v. U.S.*, 384 F.3d 1232 (10th Cir. 2004), in support of the proposition that Plaintiffs who committed their crimes prior to the Board's adoption of the 1987 Regulations have no legitimate expectation of *ex post facto* protections based on any change in the regulations. *See* Defs. Mot. at 48, 50. Neither case supports this proposition. *Rogers* involved a judicial change in a common law doctrine, and the Supreme Court concluded that, even though the "common law . . . presupposes a measure of evolution," a judicial alteration of a common law doctrine can still violate "the principle of fair warning . . . where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" 532 U.S. at 461-62. In *Bledsoe*, the Tenth Circuit rejected arguments by federal prisoners sentenced before the adoption of the Sentencing Reform Act of 1984 ("SRA") that Congress violated the *Ex Post Facto* Clause when it passed a statute clarifying that the SRA would not apply to persons sentenced before the SRA's adoption. *See* 384 F.3d at 1233-34. In this case, the *Bledsoe* prisoners' argument would be like Plaintiffs arguing that a decision by Defendants to repeal the 2000 Guidelines and apply the 1987 Regulations violated the *Ex Post Facto* Clause. Plaintiffs have made no such argument.

DSMDB-2408743

safety.  Plaintiffs' Joint Statement ¶¶ 32-34. ; *see also* Policy Guideline, D.C. Parole Board (May

8, 1995) (attached as Exhibit E) ("[O]ne of the primary goals of parole in the District of

Columbia is to enable offenders to return to and remain in the community crime-free.

Rehabilitation and treatment-oriented programs and services, both in prison and the community,

are key stepping stones towards achieving this goal.").[31]

Second, Plaintiffs Eason and Gambrell have not challenged the Defendants'

discretionary determinations; rather, these plaintiffs have challenged the Defendants' ability to

make such discretionary determinations using criteria (offense accountability) that is contrary to

the parole policies and practices in effect when these plaintiffs committed their crime and that

specifically has the effect of increasing their punishment, and as discussed above, *see supra*

Parts III, IV, they properly brought this challenge under 42 U.S.C. § 1983.  Even Defendants'

regulations recognize that the D.C. Parole Board's policy and practice was to treat D.C. Code

offenders' minimum sentence as the measure of punishment for the offenders' offenses.  *See* 28

C.F.R. § 2.73.  Thus, Defendants cannot, under the D.C. parole statute, utilize offense

accountability as a basis to depart from the 1987 Regulations' numerical guidelines without

necessarily increasing the punishment of Plaintiffs Eason and Gambrell.

Finally, the Defendants' post-hoc explanations for their departures in the cases of

Plaintiffs Eason and Gambrell do not cure Defendants' violations of the *Ex Post Facto* Clause.

The administrative records of both Plaintiffs Eason and Gambrell demonstrate that the basis for

the Defendants' decisions was offense accountability.  Gambrell Statement ¶¶ 22-24 ("release at

this time, or any time in the near future, would depreciate the seriousness of the offense behavior

---

[31] Defendants assert that Plaintiffs Charles Phillips and Benson West-El also had no expectation of *ex post facto* protection because they, like Plaintiffs Eason and Gambrell, committed their crimes before the D.C. Parole Board adopted the 1987 Regulations.  *See* Defs. Mot. at 50.  As demonstrated above, however, the 1987 Regulations merely formalized the virtually identical policies and practices applied by the Board prior to 1987**.**

DSMDB-2408743

and promote disrespect for the law."); Eason Statement ¶¶ 9, 10, 14-16 ("additional time incarcerated is necessary for accountability purposes").   Defendants' Motion now attempts to characterize the Defendants' actions with respect to these plaintiffs as based on "the seriousness of their offenses and violent histories," which Defendants now contend "illustrat[e] that they constitute risks to the public safety."  Defs. Mot. at 49 n.18.  The official Notice of Action for Mr. Eason's last two parole rehearings, however, specifically indicates that Defendants are denying his request for parole based on accountability and not risk grounds.  Eason Statement ¶¶ 12, 16.

And in Mr. Gambrell's case, one year before Mr. Gambrell's 2007 parole rehearing, Defendants, including Chairman Reilly and Commissioner Fulwood, adopted the hearing examiner's recommendation, with which the executive reviewer (J. Kostbar) agreed, to deny parole and give Mr. Gambrell a one-year setoff to allow Mr. Gambrell to complete a prison program in which he was involved.  Gambrell Statement ¶¶12, 13.   Despite the fact that Mr. Gambrell completed the prison program and maintained good institutional conduct, at his 2007 parole rehearing, Defendants, including Commissioner Fulwood (who one year earlier indicated that a one-year setoff was appropriate for Mr. Gambrell), adopted the recommendation of J. Kostbar (the executive reviewer who one year earlier had indicated that a one-year setoff was appropriate), who recommended a denial of parole and a five-year setoff.  Gambrell Statement ¶¶ 12, 13. Although Mr. Kostbar's comments to the 2007 hearing summary focused almost entirely on the gravity of Mr. Gambrell's offense and expressed Mr. Kostbar's views that "19 years is simply not enough time for an individual to serve for a crime of this nature and I believe that release at this time, or any time in the near future, would depreciate the seriousness of the offense behavior and promot disrespect for the law," his recommendation, which the Defendants liberally copied from , was careful to not mention accountability or the federal parole standard

that he had applied in Mr. Gambrell's case.  Gambrell Statement ¶ 29.  Defendants ought not to

be able to hide behind their official "Notices of Action," where it is obvious from the

administrative record as a whole that Defendants denied Mr. Gambrell's parole request because

they believed he needed to be punished more.[32]

> **C.     The USPC Guideline Memorandum Demonstrated that Defendants
> Violated the *Ex Post Facto* Clause by Applying the 2000 Guidelines at the
> Parole Hearings of Plaintiffs Martin, Phillips, Sellmon, Smith, Swinton,
> and West-El**

As with the cases of Plaintiffs Eason and Gambrell, Defendants assert that the USPC

Guideline Plaintiffs failed to demonstrate an *ex post facto* violation for several reasons.  First,

Defendants argue that most of these plaintiffs (Plaintiffs Martin, Phillips, Sellmon, and West-El)

cannot rely on the D.C. Parole Board's 1991 Policy Guideline as the basis for an *Ex Post Facto*

Clause violation, because they all committed their crimes before the Board adopted that

guideline.  Second, Defendants assert that the 1991 Policy Guideline cannot be the basis for an

*Ex Post Facto* Clause violation because the policy guidelines "are unpublished, informal policy

guidelines not meant to have legal effect," Defs. Mot. at 53 (citing *White v. Hyman*, 647 A.2d

1175 (D.C. 1994), as allegedly evidenced by the Board's subsequent indication that the "policy

guidelines did not limit its ability to consider aggravating or mitigating factors," *id.* at 55 n.20.

Finally, Defendants contend that they would have denied the USPC Guideline Plaintiffs'

requests for parole regardless of which guidelines Defendants applied, and as a result, there can

be no *Ex Post Facto* Clause violation in these plaintiffs' cases.  Defendants' arguments again

lack any basis in law or fact.

---

[32] Plaintiff James Gambrell also believes that Defendants' denial of his parole request and
issuance of a five-year setoff at his 2007 parole rehearing, just one year after Defendants denied
his 2006 parole request and determined that a one-year setoff was appropriate, demonstrates
vindictiveness based on his participation in this lawsuit.

DSMDB-2408743

In 1991, the D.C. Parole Board adopted the 1991 Policy Guideline to clarify the Board's policies and procedures to "ensure consistency and equity in the parole decision-making process." Declaration of Gladys Mack ¶ 5 (attached as Exhibit F). The Board applied the 1991 Policy Guideline in all cases requiring Board action in which the 1987 Regulations applied. *See* 1991 Policy Guideline at 1 (attached as Exhibit 8 to Plaintiffs' Joint Statement). Thus, the evident purpose of the 1991 Policy Guideline was to formalize the criteria the Board had applied in practice when making decisions under the 1987 Regulations, like the 1987 Regulations formalized the Board's parole practices prior to 1987, *see Davis*, 652 A.2d at 636, and the federal parole guidelines at issue in *Warren* formalized the USPC's parole practices under the federal parole statute prior to 1976, *see* 659 F.2d at 193. As a result, under *Garner* and *Fletcher II*, the USPC Guideline Plaintiffs are entitled to *ex post facto* protection from any changes by the USPC to these D.C. Parole Board policies and practices that create a significant risk of prolonging these plaintiffs' incarceration.

Nor can Defendants avoid the *ex post facto* protections afforded to Plaintiffs for the 1991 Policy Guideline by labeling the policy guideline as "informal" and "not meant to have legal effect." Defs. Mot. at 53. As the Supreme Court made clear in *Garner*, such informal, internal policy statements "provide important instruction as to how the Board interprets its enabling statute and regulations." 539 U.S. at 256. Furthermore, "[a]bsent any demonstration to the contrary," the Court should "presume the Board follow[ed] its . . . internal policies in fulfilling its obligations." *Id.* Like the policy that the Supreme Court held the court of appeals erred in failing to consider in *Garner*, the 1991 Policy Guideline is a "formal, published

DSMDB-2408743

statement as to how the Board intends to enforce its Rule." *Id.* at 256-57 (holding that it was error for the Court of Appeals to not consider the parole board's internal policy statement).[33]

Finally, Defendants cannot avoid their *Ex Post Facto* Clause violations by merely asserting that their impermissible consideration of offense accountability can be ignored because they would have made the same decisions under the 1987 Regulations. Defendants, in fact, assert in their own motion that no one can state with any certainty what fact-finding and predictive judgments Defendants would make in Plaintiffs' cases under the 1987 Regulations and D.C. Parole Practices.[34] Defs. Mot. at 2. Furthermore, Defendants' reliance on their pretextual

---

[33] Without citing any support whatsoever, Defendants' Motion suggests that the D.C. Parole Board indicated that the "policy guidelines did not limit its ability to consider aggravating or mitigating factors." Defs. Mot. at 55 n.20. Nor does the Board's amendment to policy guideline it adopted in 1991 and amended in 1992 addressing setoffs (the "Setoff Policy Guideline"), *see* 1992 Stover Mem. (attached as Exhibit 3 to Plaintiffs' Joint Statement) (attaching Letter from E. Hyman, Chairman, D.C. Parole Board, to C. Getty, Chair, USPC (May 7, 1992) and policy guideline regarding "Reconsideration Hearings – Establishing Dates" as amended April 27, 1992), support this suggestion. In 1992, the Board amended the Setoff Policy Guideline to make clear that the policy guidelines did not limit the factors the Board could consider in establishing a setoff period for a parole candidate. *See Hall v. Henderson*, 672 A.2d 1047, 1051, 1053 (D.C. 1996) ("The [Setoff] Guidelines . . . do not limit the Board's decision-making authority when deviating from the prescribed set-offs by forcing it to consider only the factors specifically articulated in the [Setoff] Guidelines. Before setting out the factors in § VI(A)(2), the [Setoff] Guidelines expressly say that '[t]he aggravating factors considered by the Board *include but are not limited to* the following.'"). Notably, the Board did not make similar changes to the 1991 Policy Guideline, which does not include any language indicating that the aggravating factors therein "include but are not limited" to the listed factors. *See* 1991 Policy Guideline at 6-9. The Board's conscious decision to amend the Setoff Policy Guideline to include language making explicit that the guideline did not affect the Board's discretion and to not similarly amend the 1991 Policy Guideline demonstrates the Board's intent to be bound by the 1991 Policy Guideline.

[34] Plaintiffs dispute this assertion to the extent Defendants suggest that it is impossible to apply the undisputed facts of Plaintiffs' criminal history and institutional conduct to the objective criteria in the 1987 Regulations and 1991 Policy Guideline. Plaintiffs, however, agree that it is impossible to state with any certainty (except in the case of Plaintiff Benson West-El, who the Defendants already have determined is suitable for parole) whether Defendants would have identified "unusual circumstances" warranting a denial of parole had they applied the 1987 Regulations and D.C. Parole Practices at Plaintiffs' parole hearings. It is for this very reason that Plaintiffs' requested relief is an order compelling Defendants' to conduct new parole hearings for Defendants under the 1987 Regulations and D.C. Parole Practices.

DSMDB-2408743

statements of "risk" in their official Notices of Action and/or the hearing summaries and recommendations on which they based those notices are insufficient to demonstrate a determination by Defendants that any of the "unusual circumstances" described in the 1991 Policy Guideline applied in Plaintiffs' cases.   Nor can Defendants save their decisions in Plaintiffs' cases by creating post-hoc reasons not reflected anywhere in Defendants' decision making process regarding Plaintiffs' cases.  *See Mickens-Thomas v. Vaughn*, 355 F.3d 294, 309 (3d. Cir. 2004).

Among the post-hoc justifications that Defendants note in their motion are Benson West-El's twelve-year old disciplinary reports, which Defendants suggest warranted departures under the 1987 Regulations.  *See* Defs. Mot. at 51.  None of the Notices of Action or hearing summaries for Mr. West-El, however, cite to his disciplinary reports as a reason for requiring him to serve to the maximum of his Total Guideline Range.  West-El Statement ¶¶ 6, 8, 20.

Similarly, in Darius Smith's case, Defendants denied Mr. Smith's request for parole simply because he had not served the time they added to his minimum sentence to be presumed suitable for parole.  Nevertheless, Defendants' Motion urges the Court to consider his case as analogous to *White v. Hyman* and ignore the fact that Defendants completely deprived Mr. Smith of any exercise of their discretion at his initial parole hearing in 2004 and for five years after that hearing, which is the setoff Defendants gave Mr. Smith.  *See* Defs. Mot. at 55.  Even if *White v. Hyman* is analogous, which it is not, the Court should decline to sanction Defendants' invitation to do their job for them.[35]

---

[35] In *White v. Hyman*, the D.C. Court of Appeals addressed, among other things, arguments by a D.C. Code offender that D.C. parole laws created a liberty interest in parole and that the D.C. Parole Board was obligated to apply its 1992 Setoff Policy Guideline retroactively to the offender's October 1991 parole hearing to determine the appropriate setoff for the offender.  *See* 647 A.2d at 1177.  The offender in *White* in January 1990, while on pre-parole work release, failed to return to his halfway house and was on escape status for seventeen days until he was apprehended.  *See id.*  Prior to his escape, the offender had committed a crime in the halfway (footnote continued on next page)

DSMDB-2408743

house. *See id.* at 1181. When he returned to custody, he received a major disciplinary report for possession of contraband. *See id.* at 1177. At his 1991 parole hearing, the hearing examiner noted the offender's escape and serious disciplinary report from the prior year. *See id.* The day after his 1991 parole hearing, the offender escaped again and remained at large for 133 days. *See id.* In the meantime, the Board denied the offender's request for parole and imposed a five-year setoff. *See id.* The Board's reasons for the setoff were that the offender "committed a crime while in the halfway house setting, escaped from custody while housed at that facility, and committed a 'major' disciplinary violation" when he was returned to custody. *See id.* at 1181. These facts are nothing like Mr. Smith's circumstances, whose negative institutional behavior would not have been considered under the Board's 1991 Policy Guideline.

DSMDB-2408743

## **CONCLUSION**

For the reasons stated herein, Plaintiffs' motion for partial summary judgment should be granted.

Dated:  March 19, 2007                    Respectfully Submitted,


                                  By:    */s/ Jason D. Wallach*
                                          Jason D. Wallach (Bar No. #456154)
                                          Jared Rodrigues (Bar No. #496125)
                                          Avner E. Mizrahi (Bar No. #500772)
                                          DICKSTEIN SHAPIRO, LLP
                                          1825 Eye Street, NW
                                          Washington, D.C. 20006
                                          (202) 420-2268
                                          (202) 420-2201 facsimile

                                          Attorneys for Plaintiffs

DSMDB-2408743

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

TONY R. SELLMON, et al.,                :
                                        :
             Plaintiffs,                :
                                        :
      v.                                :  **Civil Action No. 06-1650 (ESH)**
                                        :
EDWARD F. REILLY, JR., et al.,          :
                                        :
             Defendants.                :
_____:


**PLAINTIFFS' STATEMENT OF GENUINE ISSUES IN DISPUTE IN OPPOSITION TO
DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADING**

        Plaintiffs Curtis Eason, James Gambrell, Carlton Martin, Charles Phillips, Tony

Sellmon, Darius Smith, Daru Swinton, and Benson West-El hereby submit this Statement of

Genuine Issues in Dispute in Opposition to Defendants' Statement of Material Facts in Support

of Defendants' Motion for Judgment on the Pleading ("Defendants' Statement of Material

Facts").

        As an initial matter, it is not clear to Plaintiffs why Defendants submitted a statement

of material facts, given that Defendants moved the Court to dismiss this case for lack of subject

matter jurisdiction or to grant them judgment on the pleadings.  If Defendants are, in fact,

moving for judgment on the pleadings, Defendants' Statement of Material Facts is irrelevant to a

determination of that motion.  The Court, therefore, should not consider the facts alleged in

Defendants' Statement of Material Facts in deciding Defendants' motion.

        Second, Defendants purport to submit their statement of material facts under Local

Civil Rule 7(h), which is the rule applicable to motions for summary judgment.  Insofar as

Defendants are moving for summary judgment in the guise of a motion for a judgment on the

pleadings, Defendants must contend under Local Civil Rule 7(h) that there is no genuine issue as

DSMDB-2409919

to the facts in their statement of material facts.  Defendants have not done so.  For that reason, the Court should ignore Defendant's Statement of Material Facts.

Third, to the extent that the Court finds Defendants' Statement of Material Facts to be properly submitted, Plaintiffs assert that the Defendants' Statement of Material Facts is misleading, incomplete, erroneous, intentionally prejudicial, and, in one instance, blatantly dishonest.  Plaintiffs submit the following statement of genuine issues in dispute and statements of fact in opposition to the correspondingly numbered paragraphs of Defendant's Statement of Material Facts:

Genuine Issues In Dispute of Defendants' General Material Statement of Facts

    1.  Undisputed.

    2.  Undisputed.

    3.  Undisputed.

    4.  Disputed that the D.C. parole statute grants the United States Parole Commission ("USPC") unbridled discretion to determine Plaintiffs' suitability for parole.  The statute grants the D.C. Council the power to promulgate parole rules and regulations.  *See* D.C. Code § 24-404; 28 D.C. Mun. Regs. §§ 204.1-204.18.  The D.C. Council exercised this power and limited the discretion of the D.C. Board of Parole and, accordingly, of the USPC.  *See* D.C. Code § 24-404; 28 D.C. Mun. Regs. §§ 204.1-204.18; *Davis v. Henderson*, 652 A.2d 634, 636 (D.C. 1995) (noting that the D.C. parole guidelines provided for a much narrower exercise of discretion than the federal statutory mandate for parole in effect before the USPC's adoption of the federal parole guidelines).  Otherwise, undisputed.

Genuine Issues in Dispute of Defendants' Statements About Plaintiff Gambrell

    5.  Undisputed.

DSMDB-2409919

6.  Undisputed.

7.  Undisputed.

8.  Undisputed.

9.  Undisputed.

10.  Undisputed.

11.  Disputed to the extent that the "Board" refers to the D.C. Board of Parole.  The U.S. Board of Parole, not the D.C. Board of Parole, revoked Mr. Gambrell's D.C. parole. *See* Defendant's Ex. A-7, at 1.  Otherwise, undisputed.

12.  Undisputed.

13.  Undisputed.

14.  Undisputed.

15.  Undisputed.

16.  Undisputed.

17.  Undisputed.

18.  Disputed in that this statement is incomplete because it does not discuss the hearing examiner's recommendation.  The hearing examiner recommended that the USPC deny Mr. Gambrell's request for parole, a decision outside and above the guidelines, because he believed that Mr. Gambrell had not yet satisfied accountability for his offense; the hearing examiner based his recommendation on "a close review of the crime itself."  Defendants' Ex. A-13.  Otherwise, undisputed.

19.  Undisputed.

20.  Disputed that Mr. Gambrell received a five year set-off from his previous parole hearing.  Mr. Gambrell received a four-year set-off.  *See* Defendants' Ex. A-13, at 2; Defendants' Ex. A-14, at 6.  Otherwise, undisputed.

DSMDB-2409919

21.  Undisputed.

22.  Disputed in that this statement is incomplete and therefore misleading because it neglects to mention Mr. Gambrell's July 25, 2006 rehearing.  In that July 2006 rehearing, the USPC again rewarded Mr. Gambrell for his sustained program achievement and again departed from the guidelines to deny Mr. Gambrell parole.  July 25, 2006 Rehearing Summary of James Gambrell, at 4 ("Gambrell 2006 Rehearing Summary") (attached as Exhibit 9 to Plaintiff James Gambrell's Statement of Undisputed Material Facts).  The USPC gave Mr. Gambrell a one-year set-off, which was two years shorter than his prior set-off, and three years shorter than his initial set-off.  *Compare id.* at 4 *with* Defendants' Ex. A-14, at 1 *and* Defendants' Ex. A-16, at 1.  In their exhibits related to Plaintiff Gambrell, Defendants do not include a copy of the July 2006 rehearing summary or the Notice of Action that followed that July 2006 rehearing.  The only reasonable explanation for Defendants' omission of any information relating to the July 2006 rehearing is that the Defendants did not want to point out that the USPC (a) continuously shortened Mr. Gambrell's set-offs at each subsequent hearing (from four years to three years to one year), and (b) again commended Mr. Gambrell for his continued superb programming and the continued absence of even a single disciplinary infraction.  Gambrell 2006 Rehearing Summary, at 3.  Mr. Gambrell's next rehearing took place in July 2007, after Mr. Gambrell initiated this lawsuit against the Defendants.  *See* Defendants' Ex. A-17, at 1.  At that rehearing, the USPC denied Mr. Gambrell's request for parole, a decision outside and above the guidelines, this time giving him a <u>five year</u> set-off, his highest set-off to date and a set-off <u>four years longer</u> than the one he was given at his prior rehearing, even though (1) Mr. Gambrell received progressively lower set-offs from year to year before initiating this lawsuit, (2) Mr. Gambrell continued his sustained program achievement, (3) Mr. Gambrell continued a perfect prison record with zero disciplinary infractions, and (4) the Executive Reviewer at Mr. Gambrell's 2006

DSMDB-2409919

parole hearing and Commissioner Isaac Fulwood, Jr. agreed with the one-year setoff, but a year later, after Mr. Gambrell had nothing but positive institutional conduct, these same individuals decided that Mr. Gambrell needed to serve an additional five years. *See* Gambrell August 10, 2007 Notice of Action, at 1, 3 ("Gambrell 2007 Notice of Action") (attached as Exhibit 12 to Plaintiff James Gambrell's Statement of Undisputed Material Facts); Defendants' Ex. A-17, at 1-2; Gambrell August 29, 2006 Notice of Action, at 1, 3 ("Gambrell 2006 Notice of Action") (attached as Exhibit 10 to Plaintiff James Gambrell's Statement of Undisputed Material Facts); Gambrell 2006 Rehearing Summary, at 3. Otherwise, undisputed.

23.  Disputed that the USPC ordered that Mr. Gambrell receive a rehearing in July 2007. The USPC ordered a rehearing for July 2012, a five-year set-off. Defendants' Ex. A-18. Further disputed that the USPC denied Mr. Gambrell's request for parole based on the reasons provided in its Notice of Action; rather the USPC issued a decision outside and above the guidelines for Mr. Gambrell, because it believed that releasing Mr. Gambrell would "depreciate the seriousness of the offense behavior and promote disrespect for the law." Defendants' Ex. A-17, at 3. Moreover, this justification for denying Mr. Gambrell's request for parole is the standard that the USPC applies to U.S. Code offenders, and it does not apply to D.C. Code offenders. *Compare* 28 C.F.R. § 2.18 *with* 28 C.F.R. § 2.73. Plaintiff Gambrell also asserts that the USPC's actions were in retribution against Mr. Gambrell for initiating this lawsuit. There can be no explanation or justification for this abrupt five-year set-off other than retribution against Mr. Gambrell for initiating this lawsuit. Mr. Gambrell had received a one-year set-off at his previous hearing. Gambrell Rehearing Summary, at 4. During that year, he continued his stellar prison record, again programming positively and again not receiving a single disciplinary infraction. Defendants' Ex. A-17, at 1-2. The same two USPC employees, Executive Reviewer Jeffrey Kostbar and Commissioner Isaac Fulwood Jr., who in July 2006 thought a one-year set-

5

DSMDB-2409919

off was sufficient for Mr. Gambrell, one year later (after Mr. Gambrell initiated this lawsuit) suddenly believed that Mr. Gambrell needed a five-year set-off even though Mr. Gambrell had no negative behavior and continued his positive programming during that year. *Compare* Gambrell 2006 Rehearing Summary, at 3, *and* Gambrell 2006 Notice of Action, at 1, 3 *with* Defendants' Ex. A-17, at 1-3, *and* Gambrell 2007 Notice of Action, at 1, 3. Plaintiff Gambrell understands that this is a serious charge but believes that no other explanation can justify or explain these facts.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff Eason

24. Undisputed.

25. Disputed that Mr. Eason intentionally shot the victim as the victim lay on the ground. The victim was "found laying on the ground suffering from a gunshot wound to the abdomen." Defendants' Ex. B-3, at 2 (emphasis added). Witness-1 saw the victim shot in the stomach and then fall to the ground. *Id.* Since the victim was found with one gunshot wound and the witness stated that the victim fell to the ground as a result of that single gunshot, it is not possible that Mr. Eason intentionally shot the victim as the victim lay on the ground. Defendants have misled the Court to prejudice Mr. Eason further in the eyes of the Court. Otherwise, undisputed.

26. Disputed in that this statement is incomplete. Mr. Eason was sentenced to 14 years to life. Defendants' Ex. B-1, at 1; Defendants' Ex. B-2, at 1.

27. Undisputed.

28. Undisputed.

29. Undisputed.

30. Disputed in that this statement is incomplete and therefore misleading in its description of the presiding hearing examiner's findings. Despite finding that Mr. Eason had

DSMDB-2409919

been "doing extremely well in terms of programming," the presiding hearing examiner explained that his recommendation that the USPC deny Mr. Eason's request for parole, a decision outside and above the guidelines, was based on the hearing examiner's view that Mr. Eason had not yet satisfied accountability for his offense. Defendants' Ex. B-6, at 3. Specifically, the hearing examiner stated that, "for the nature of the prisoner's instant offense some minimal sentence service up to 20 years would be indicated or possibly even more," and that even though Mr. Eason was eligible for parole, the amount of time he had served "simply would not be sufficient for purposes of accountability." *Id.* Further disputed that Defendants Exhibit A-6, a document from Mr. Gambrell's parole file, supports this statement in any way. Otherwise, undisputed.

31. Disputed that the USPC's officially stated reasons are the only reasons that the USPC denied Mr. Eason's request for parole, a decision outside and above the guidelines. The USPC adopted the conclusions and recommendations of the presiding hearing examiner who based his recommendation on his view that Mr. Eason had not yet satisfied accountability for his offense. *See id.* Otherwise, undisputed.

32. Disputed in that this statement is incomplete and therefore misleading in its description of the executive reviewer's recommendation. The executive reviewer recommended that the USPC deny Mr. Eason's request for parole because he believed that Mr. Eason had not yet satisfied accountability for his offense and because he believed that Mr. Eason committed an offense that Mr. Eason did not in fact commit. Defendants' Ex. B-8. The executive reviewer based his recommendation on his determination that Mr. Eason committed Murder I, even though Mr. Eason's offense was Murder II. *See* Hearing Summary of Curtis Eason, at Addendum to Hearing Summary (attached as Exhibit 7 to Plaintiff Curtis Eason's Statement of Undisputed Material Facts). Plaintiff Eason cites to the hearing summary attached as an exhibit

to his own statement of undisputed facts because the Defendants inexplicably did not include the executive reviewer's summary in their copy of the hearing summary.

33. Disputed in that this statement is incomplete and therefore misleading in its description of the USPC's stated reasons for denying parole. The USPC denied parole on the ground that "additional time incarcerated is necessary for accountability purposes." Defendants' Ex. B-9, at 1 (emphasis added).

34. Disputed in that this statement is incomplete and therefore misleading in its description of the executive reviewer's recommendation. The executive reviewer recommended that the USPC deny Mr. Eason's request for parole because he believed that Mr. Eason had not yet satisfied accountability for his offense and because he believed that Mr. Eason committed an offense that Mr. Eason did not in fact commit. Defendants' Ex. B-10, at 3. The executive reviewer based his recommendation on his determination that Mr. Eason committed Murder I, even though Mr. Eason's offense was Murder II. *Id.* The executive reviewer further determined that Mr. Eason should be incarcerated for a term as long as 25-30 years to satisfy accountability for the offense of first degree murder, an offense that Mr. Eason did not commit. *Id.* at 4. Otherwise, undisputed.

35. Undisputed.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff Phillips

36. Undisputed.

37. Undisputed.

38. Disputed in that this statement is intentionally misleading in its characterization of Mr. Phillips's offense. The presentence report explains that Mr. Phillips encountered the victim in his ex-girlfriend's apartment and did not know that the victim was a police officer.

DSMDB-2409919

Defendants' Ex. C-5, at 3.  The only possible reason the Defendants mention this fact is to prejudice Mr. Phillips further in the eyes of the Court.  Otherwise, undisputed.

39.  Undisputed.

40.  Undisputed.

41.  Undisputed.

42.  Disputed in that this statement is incomplete and therefore misleading regarding Mr. Phillips's disciplinary reports.  Mr. Phillips received the nine disciplinary infractions in 1987 or earlier, more than fifteen years before his initial hearing.  Defendants' Ex. C-7, at 1-2.  All nine disciplinary infractions were minor, which is why the USPC added only 0-24 months to Mr. Phillips's minimum sentence for all of the infractions combined.  *Id.*  Since 1987, Mr. Phillips has programmed well with no disciplinary problems whatsoever.  *Id.*

43.  Disputed in that this statement is incomplete and therefore misleading because it implies that the Executive Hearing Examiner's disagreement with the hearing examiner's assessment was detrimental to Mr. Phillips, when in fact it was beneficial.  The Executive Hearing Examiner recommended that 16 months should be subtracted from Mr. Phillips's total guideline range for his superior program achievement, while the hearing examiner had recommended that only 8 months be reduced.  Defendants' Ex. C-7, at 6.  Otherwise, undisputed.

44.  Disputed that the USPC's reason for denying Mr. Phillips's request for parole, a decision outside and above the guidelines, was to protect the public safety.  The USPC denied Mr. Philips request for parole because it believed that Mr. Phillips had not yet satisfied accountability for his offense.  *See* Defendants' Ex. C-8, at 1.  Otherwise, undisputed.

45.  Disputed that the Executive Reviewer's reason for recommending that Mr. Phillips's request for parole be denied, a decision outside and above the guidelines, was that Mr. Phillips remained a more serious risk than indicated by the 2000 guidelines.  The Executive

DSMDB-2409919

Reviewer recommended that Mr. Philips's request for parole be denied because he believed that Mr. Phillips had not yet satisfied accountability for his offense.  Ex C-9, at 3.  Indeed, the Executive Reviewer stated, "Thirty-six [additional] months is not sufficient sanction for a second degree murder and aggravated assault."  *Id.*  Otherwise, undisputed.

46.  Disputed that the USPC's reason for denying Mr. Phillips's request for parole, a decision outside and above the guidelines, was to protect the public safety.  The USPC adopted the hearing examiner's recommendation, denying Mr. Phillips's request for parole because it believed that Mr. Phillips had not yet satisfied accountability for his offense.  *See id.*  Otherwise, undisputed.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff West-El

47.  Undisputed.

48.  Disputed that Mr. West-El committed his offense on January 5, 1990.  He actually committed his offense on January 5, 1983.  Defendants' Ex. D-3.  Otherwise, undisputed.

49.  Undisputed.

50.  Disputed in that the statement regarding Mr. West-El's disciplinary reports is incomplete and therefore misleading.  All of the disciplinary infractions noted, including the one described in detail, were received by Mr. West-El in 1992 or earlier, more than ten years before his initial hearing.  Defendants' Ex. D-4, at 1-3.  The only possible reason the Defendants quote the language from a statement that Mr. Eason made sixteen years ago is to prejudice Mr. Eason further in the eyes of the Court.  Otherwise, undisputed.

51.  Undisputed.

52.  Undisputed.

53.  Undisputed.

DSMDB-2409919

54. Undisputed.

55. Undisputed.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff Sellmon

56. Undisputed.

57. Undisputed.

58. Undisputed.

59. Undisputed.

60. Undisputed.

61. Disputed in that this statement is incomplete and therefore misleading because it does not state that the USPC's reason for denying Mr. Sellmon's request for parole, a decision outside and above the guidelines, was that it believed that Mr. Sellmon had not yet satisfied accountability for his offense. *See* Defendants' Ex. E-5, at 1. Otherwise, undisputed.

62. Disputed in that this statement is incomplete and therefore misleading because it does not state how Mr. Sellmon's petition for a writ of habeas corpus was resolved. Mr. Sellmon successfully challenged the USPC's refusal to grant him credit for his Superior Program Achievement. Defendants' Ex. E-7, at 1-3. In response to the federal court action, the USPC vacated the August 27, 2002 Notice of Action and ordered that a new hearing be scheduled to deduct months from Mr. Sellmon's total guideline range for the Superior Program Achievement that Mr. Sellmon had performed. Defendants' Ex. E-8, at 1. Otherwise, undisputed.

63. Disputed in that this statement is incomplete and therefore misleading because it does not state that the Executive Hearing Examiner's reason for recommending that the USPC deny Mr. Sellmon's request for parole, a decision outside and above the guidelines, was that the Executive Hearing Examiner believed that Mr. Sellmon had not yet satisfied accountability for his offense. Defendants' Ex. E-9, at 5. Otherwise, denied.

DSMDB-2409919

64.  Disputed in that this statement is incomplete and therefore misleading because it neglects to mention that the USPC's initial Notice of Action gave no reason, though it was required to, for denying Mr. Sellmon's request for parole, a decision outside and above the guidelines.  *See* Defendants' Ex. E-10, at 1.  The USPC issued a "corrected" Notice of Action listing reasons for the departure, but it did not do so until almost nine months later in April 2005.  Defendants' Ex. E-11, at 1.  Otherwise, undisputed.

65.  Disputed that the USPC conducted Mr. Sellmon's rehearing on August 5, 2005.  The rehearing actually took place on August 2, 2005.  *See* Defendants' Ex. E-12.  Otherwise, undisputed.

66.  Disputed that the USPC's reason for denying Mr. Sellmon's request for parole, a decision outside and above the guidelines, was as stated.  The USPC denied Mr. Sellmon's request for parole because it believed that Mr. Sellmon had not yet satisfied accountability for his offense, that he had not yet served a long enough sentence to account for the seriousness or severity of the offense.  Defendants' Ex. E-12, at 3.  The USPC did not at all base its decision on any risk Mr. Sellmon might pose to the public.  *See* Defendants' Ex. E-13.  Otherwise, undisputed.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff Martin

67.  Undisputed.

68.  Disputed that Mr. Martin committed an intentional murder.  Further disputed that Mr. Martin committed an assault with intent to commit rape.  Mr. Martin was not convicted of either of those offenses.  Mr. Martin did not plead guilty to either of those offenses.  *See* Defendants' Ex. F-1, at 1-2; Defendants' Ex. F-2, at 1; Defendants' Ex. F-3, at 1.  Mr. Martin was convicted of manslaughter while armed, possession with intent to distribute cocaine, and possession of a firearm during the commission of a crime of violence.  *See* Defendants' Ex. F-1,

DSMDB-2409919

at 1-2; Defendants' Ex. F-2, at 1; Defendants' Ex. F-3, at 1. The Defendants' statements are erroneous, improper, intentionally prejudicial, and blatantly dishonest.

69. Undisputed.

70. Undisputed.

71. Undisputed.

72. Disputed in that this statement is incomplete and therefore misleading because it does not state that the institutional infraction was an extremely minor non-drug related infraction. *See* Defendants' Ex. F-6, at 1-2. Otherwise, undisputed.

73. Disputed that the USPC adopted the hearing examiner's recommendation. The USPC actually disagreed with the hearing examiner's recommendation to reduce 10 months for superior program achievement from Mr. Martin's total guideline range. *See* Defendants' Ex. F-7. The USPC calculated a total guideline range of 192-202, not a total guideline range of 182-202, as the hearing examiner had recommended. *Compare* Defendants' Ex. F-7 *with* Defendants' Ex. F-6. Otherwise, undisputed.

74. Undisputed.

75. Disputed that the Executive Reviewer's reasons for recommending that the USPC deny Mr. Martin's request for parole, a decision outside and above the guidelines, were those listed in this statement. The Executive Reviewer recommended that the USPC deny Mr. Martin's request for parole, a decision outside and above the guidelines, because he believed that Mr. Martin had not yet satisfied accountability for his offense. Defendants' Ex. F-8, at 4. In making his recommendation, the Executive Reviewer also treated Mr. Martin as though he committed an offense for which he was not convicted. *Id.* at 3-4. Otherwise, undisputed.

76. Disputed that the USPC's reason for denying Mr. Martin's request for parole, a decision outside and above the guidelines, was as stated. The USPC denied Mr. Martin's request

DSMDB-2409919

for parole because it believed that Mr. Martin had not yet satisfied accountability for his offense. *See* Defendants' Ex. F-9.  Otherwise, undisputed.

77.  Disputed that the USPC's reason for denying Mr. Martin's request for parole, a decision outside and above the guidelines, was to protect the public safety.  The USPC denied Mr. Martin's request for parole because it believed that Mr. Martin had not yet satisfied accountability for his offense.  *See* Defendants' Ex. F-9.  Otherwise, undisputed.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff Swinton

78.  Undisputed.

79.  Undisputed.

80.  Undisputed.

81.  Disputed that Mr. Swinton's minimum term of imprisonment was 10 years.  Mr. Swinton's minimum term was 5 years 20 months (or 6 years and 8 months).  Defendants' Ex. G-1, at 1; Defendants' Ex. G-2, at 1; Defendants' Ex. G-4, at 2.  Otherwise, undisputed.

82.  Undisputed.

83.  Disputed that the examiner found that Mr. Swinton had committed "several" disciplinary infractions.  The examiner found that Mr. Swinton had received <u>one</u> disciplinary infraction.  Defendants' Ex. G-4, at 2-3.  Otherwise, undisputed.

84.  Disputed that Mr. Swinton received more than one disciplinary infraction.  The examiner found that Mr. Swinton had received <u>one</u> disciplinary infraction.  Defendants' Ex. G-4, at 2-3.

85.  Undisputed.

86.  Undisputed.

87.  Disputed in that this statement is incomplete and therefore misleading because it implies that the additional information that the USPC received prompted the USPC to make a

DSMDB-2409919

finding that was different, and more detrimental to Mr. Swinton, than the hearing examiner's finding. This is not true. The hearing examiner recommended a total guideline range of 102-111 months and a set-off of 3 years for Mr. Swinton. Defendants' Ex. G-4, at 3. The USPC made the exact same finding. Defendants' Ex. G-9, at 1. Otherwise, undisputed.

88. Disputed in that this statement is incomplete and therefore misleading because it does not indicate that the USPC adopted the hearing examiner's recommendation, and instead implies that the additional information that the USPC received prompted the USPC to make a finding that was different, and more detrimental to Mr. Swinton, than the hearing examiner's finding. This is not true. The hearing examiner recommended a total guideline range of 102-111 months and a set-off of 3 years for Mr. Swinton. Defendants' Ex. G-4, at 3. The USPC made the exact same finding. Defendants' Ex. G-9, at 1. Otherwise, undisputed.

89. Disputed in that this statement is incomplete and therefore misleading because it does not state that the institutional infraction was an extremely minor non-drug related infraction. Defendants' Ex. G-10, at 1-2. Further disputed that the executive reviewer's reasons for recommending that the USPC deny Mr. Swinton's request for parole, a decision outside and above the guidelines, were those listed in this statement. The executive reviewer recommended that Mr. Swinton's request for parole be denied, a decision outside and above the guidelines, because he believed that Mr. Swinton had not yet satisfied accountability for his offense. *See id.* at 4. Otherwise, undisputed.

90. Disputed that the USPC's reasons for denying Mr. Swinton's request for parole, a decision outside and above the guidelines, were those listed in this statement. The USPC denied Mr. Martin's request for parole because it believed that Mr. Swinton had not yet satisfied accountability for his offense. *See* Defendants' Ex. G-11, at 1. Otherwise, undisputed.

Genuine Issues in Dispute of Defendants' Statements about Plaintiff Smith

DSMDB-2409919

91.  Undisputed.

92.  Undisputed.

93.  Undisputed.

94.  Disputed in that the statement regarding Mr. Smith's disciplinary infractions is incomplete and therefore misleading.  All of the disciplinary infractions occurred in 1998 or earlier, more than six years before Mr. Smith's initial hearing.  Defendants' Ex. H-1, at 1-2. Otherwise, undisputed.

95.  Undisputed.

96.  Undisputed.

DSMDB-2409919

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
:
TONY R. SELLMON, et al.,                :
                                        :
            Plaintiffs,                 :
                                        :
        v.                              : Civil Action No. 06-1650 (ESH)
                                        :
EDWARD F. REILLY, JR., et al.,          :
                                        :
            Defendants.                 :
_____:

<u>PLAINTIFFS' REPLY STATEMENT OF GENUINE ISSUES IN SUPPORT OF
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT</u>

Plaintiffs Curtis Eason, James Gambrell, Carlton Martin, Charles Phillips, Tony

Sellmon, Darius Smith, Daru Swinton, and Benson West-El hereby submit this Reply Statement

of Genuine Issues In Support of Plaintiffs' Motions for Summary Judgment and in response to

Defendants' Statement of Genuine Issues in Response to Plaintiffs' Joint Statement of Material

Facts ("Defendants' Response to Joint Statement") and Defendants' Statement of Genuine Issues

in Response to Plaintiffs' Individual Statements of Material Facts ("Defendants' Response to

Individual Statements") (collectively "Defendants' Response Statements").

In their statements, Defendants rarely "dispute" any of the material facts that Plaintiffs

identify as undisputed.  Although Local Rule 7(h) requires Defendants to provide a "concise

statement of genuine issues setting forth all material facts" as to which Defendants contend

"there exists a genuine issue necessary to be litigated," Defendants rarely do so in Defendants'

response statements.  Local Civil Rule 7(h).  Instead, Defendants simply "object" to certain of

Plaintiffs' facts.  Because Defendants do not dispute Plaintiffs' facts, the Court should deem all

facts in Plaintiffs' statements of undisputed material facts as admitted.  *See id.*  Plaintiffs address

below the "objections" that Defendants lodge throughout Defendants' Response Statements to

the undisputed material facts Plaintiffs include in their statements.

      A.    Objections Without Factual Support in the Record

      In many instances where Defendants "object" to certain of Plaintiffs' factual

statements, Defendants actually appear to be disputing those statements; yet Defendants, except

in a few instances, ignore the requirements of Local Civil Rule 7(h).  Local Civil Rule 7(h)

requires Defendants to provide references to the parts of the record on which they rely to support

their contentions about Plaintiffs' facts that they dispute.  Local Civil Rule 7(h).  Defendants do

not do this.  For example, Defendants often simply state that "Defendants object to paragraph

[X] because it is not supported by the record," "there is no factual basis for [Plaintiffs']

assertions," the statement "does not accurately portray the record," or "Defendants dispute that

the Board never denied parole based upon offense accountability."  Defendants often make those

assertions without citing any portion of the record, without indicating why the evidence to which

Plaintiffs cited in support of their statements of undisputed material facts is not sufficient, and

without making any factual statement to the contrary.  Thus, pursuant to Local Rule 7(h), the

Court should rule that Defendants have admitted all material facts to which Defendants object

without citing any factual support.  Those facts are stated in paragraphs 11, 31, 32-34, 51-64, 68-

80, 83, 90, 96, and 100-105 of Plaintiffs' Joint Statement[1] and paragraphs 25-26 of Plaintiff

Gambrell's Individual Statement.[2]

---

[1] Defendants object to these facts in paragraphs 8, 15-16, 20-24, 26, 28, 32, 37, and 39 of
Defendants' Response to Joint Statement.

[2] Defendants object to these facts in paragraph 4 of Defendants' Response to Individual
Statements.

DSMDB-2410715vv2

    B.    <u>Legal Question / Not Supported by Documentation</u>

Defendants assert in numerous instances that Plaintiffs' factual statements actually are not factual but are opinions of law.  For example, in many instances, Defendants object that a particular statement "addresses a question law," is or calls for a "legal conclusion," or is "purely a conclusion of law and bereft of facts."  Defendants further contend that even if Plaintiffs' assertions are factual in nature, they are not supported by documentation.  For example, Defendants frequently contend that it is either a legal question what the District of Columbia Board of Parole's ("D.C. Parole Board" or "Board") actual practices were or that Plaintiffs have not put forth sufficient evidence to support Plaintiff's factual claims about the Board's actual practices.  Defendants are mistaken on both points.  What Defendants consider to be legal conclusions actually are factual statements that Defendants have not – and cannot – dispute and that are supported by ample documentation that satisfies the evidentiary requirements of Supreme Court precedent.

*Fletcher v. Reilly*, 433 F.3d 867, 879 (D.C. Cir. 2006), requires this Court to conduct a searching comparison of the D.C. Parole Board's parole regime and the U.S. Parole Commission's ("USPC") regime.  This searching comparison is a factual one, and Plaintiffs have provided facts and documentation describing the Board's parole regime.  Plaintiffs' descriptions of the D.C. Parole Board's policies and practices are factual statements, supported by evidence from the Board's written regulations, policies, and reports regarding its guidelines.  In the absence of any evidence to the contrary, such materials are the best evidence of the D.C. Parole Board's parole practices.  *See Garner v. Jones*, 529 U.S. 244, 256 (2000) ("Absent a demonstration to the contrary, we presume the Board follows its statutory commands and internal policies in fulfilling its obligations.") ("*Garner*").  Defendants' assertions to the contrary are without merit.  Plaintiffs' citations to and descriptions of the Board's regulations, policies, guidelines, and reports are statements of fact and are supported by sufficient documentation.

DSMDB-2410715vv2

Plaintiffs, however, have even gone a step further.  Plaintiffs not only have supported their factual statements with enough evidence to create a presumption under *Garner* of the Board's parole practices, thereby shifting the burden to Defendants to prove otherwise, but Plaintiffs also have supplied additional evidence describing the Board's actual practices, for example: (a) a memorandum written by the USPC's General Counsel describing the Parole Board's policies and practices; and (b) excerpts from a deposition of the former Chairwoman of the D.C. Board of Parole testifying about the Parole Board's policies and practices.  By objecting to these factual statements on the ground that they are somehow legal conclusions or are not supported by documentation, the Defendants simply are side-stepping the factual statements because Defendants have no credible support for any contrary position.

For these reasons, the court should disregard any "legal question" and "not supported by documentation" objections put forth by Defendants and rule that Defendants have admitted the facts regarding the D.C. Parole Board's practices that Plaintiffs identify in their statements of undisputed material facts.  Those facts are stated in paragraphs 7, 11, 29, 35-57, 59-64, 68-80, 83, 91-93, 97-128, 141, and 150-151 of Plaintiffs' Joint Statement[3]; paragraph 2 of Plaintiff Gambrell's Individual Statement[4]; paragraphs 2 and 5-6 of Plaintiff Phillips's Individual Statement[5]; paragraphs 17-19 of Plaintiff Eason's Individual Statement[6]; paragraphs 2, 5-6, and

---

[3] Defendants object to these facts in paragraphs 4, 8, 13, 17-21, 23-24, 26, 28, 33-35, 38-43, 48, and 51 of Defendants' Response to Joint Statement.

[4] Defendants object to this fact in paragraph 2 of Defendants' Response to Individual Statements.

[5] Defendants object to these facts in paragraphs 14 and 16 of Defendants' Response to Individual Statements.

[6] Defendants object to these facts in paragraph 12 of Defendants' Response to Individual Statements.

4

18 of Plaintiff West-El's Individual Statement[7]; paragraphs 2 and 13 of Plaintiff Sellmon's

Individual Statement[8]; and paragraph 2 of Plaintiff Swinton's Individual Statement.[9]

      C.     Objections Without Stated Ground

      In two instances, Defendants object to Plaintiffs' undisputed facts without giving a

ground for the objection.  For example, Defendants twice simply say, "Defendants object to

paragraph [X]."  Plaintiffs assert that such a general objection with no basis is insufficient and

should be disregarded by the Court.  For that reason, Plaintiffs contend that the Court should find

that Defendants have admitted the facts stated in paragraph 16 of Plaintiff West-El's Individual

Statement[10] and paragraph 10 of Plaintiff Martin's Individual Statement.[11]

      D.     Non-Objections with Caveat

      In certain instances, Defendants explicitly state that they do not object to some of

Plaintiffs' undisputed facts, but then follow the non-objection with a caveat by stating, "but," and

then making an assertion.  For example, in some instances Defendants state that "Defendants do

not object to paragraph [X] but note that this paragraph contains a legal conclusion."  In other

instances, Defendants do not object to Plaintiffs' statement, but nevertheless make a factual

statement (without citing to any support in the record) of which they assert the Court should take

note.  The Court should ignore all of these non-objections and caveats and rule that Plaintiffs'

corresponding factual statements have been admitted by Defendants.  Those facts are stated in

---

[7] Defendants object to these facts in paragraphs 23, 25, and 30 of Defendants' Response to Individual Statements.

[8] Defendants object to these facts in paragraphs 34 and 36 of Defendants' Response to Individual Statements.

[9] Defendants object to this fact in paragraph 49 of Defendants' Response to Individual Statements.

[10] Defendants object to this fact in paragraph 28 of Defendants' Response to Individual Statements.

[11] Defendants object to this fact in paragraph 44 of Defendants' Response to Individual Statements.

DSMDB-2410715vv2

paragraphs 32-34, 80-81, 137, and 159 of Plaintiffs' Joint Statement[12] and paragraphs 10-12 and 16 of Plaintiff Eason's Individual Statement.[13]

     E.    <u>Speculation</u>

     Throughout Defendants' Response Statements, Defendants object that Plaintiffs' factual statements incorporating the D.C. Parole Board's guidelines, in particular Appendices 2-1 and 2-2 of the 1987 Regulations, are based on speculation. Defendants incorrectly argue that Plaintiffs are speculating when Plaintiffs calculate the total point scores that they would have received under the D.C. Parole Board's regulations. In those material factual statements, Plaintiffs are using the undisputed factual findings that the USPC applied in its own guidelines, and simply inputting those factual findings into the objective criteria set forth in the Board's guidelines. Thus, these factual statements are not at all based on speculation; they simply are the factual application of the D.C. Parole Board's objective formulas – laid out in Appendices 2-1 and 2-2 to the 1987 Regulations – to the USPC's undisputed factual findings about each unique Plaintiff.[14] Under Defendants' view, the Court never could conduct the searching comparison

---

[12] Defendants object to these facts in paragraphs 16, 27, 46, and 56 of Defendants' Response to Joint Statement.

[13] Defendants object to these facts in paragraphs 8-9 and 11 of Defendants' Response to Individual Statements.

[14] Defendants also object on speculation grounds to the facts in paragraphs 129-135 of Plaintiffs' Joint Statement, which through a hypothetical scenario detail the facial differences between the D.C. parole guidelines and the USPC's 2000 Guidelines. The purpose of those paragraphs is to show factually that the formula used by the D.C. Parole Board is facially different from the one used by the USPC. Those paragraphs demonstrate that the USPC's formula necessarily creates a significant risk of prolonging the incarceration of a violent offender whose offense resulted in the death of the victim because the USPC's formula automatically adds at a minimum 18-24 months to the length of time the inmate would have had to serve to be presumed suitable for parole under the Board's formula. The reason that the facial difference does not <u>automatically</u> increase a parole candidate's incarceration is that the USPC has discretion to depart from the 2000 Guidelines and grant parole, but the stark facial difference still creates a <u>significant risk</u> that the candidate's incarceration will be prolonged. The Defendants argue that because it is a hypothetical and does not take into account the unique characteristics of each inmate, the Plaintiffs speculate as to how the USPC and Board would have exercised their fact-finding discretion. Defendants' objection, however, misses the point. Because Plaintiffs input the same

DSMDB-2410715vv2

required by *Fletcher* because it always would be faced with Defendants' arguments that any determination of how the D.C. Parole Board would have acted is speculation.

Defendants further erroneously assert that not only is the factual application of the objective formulas speculative, but so is the outcome; i.e., Defendants argue that Plaintiffs' conclusion that Plaintiffs would have been presumed suitable for parole under the objective, numerical formulas in the D.C. guidelines is based on speculation. Plaintiffs respond that this is not speculation. The 1987 Regulations explicitly state and the D.C. Parole Board's practice was that, absent the existence of unusual circumstances warranting a denial of parole despite a presumption of parole suitability, an inmate was to be paroled if his formulaic outcome resulted in a point score of two or less at his initial parole hearing. Plaintiffs' statements regarding the application of the undisputed facts of their cases to the objective criteria in the 1987 Regulations are factual statements based on the record, and Defendants cannot simply avoid addressing such statements by arguing that they are based on speculation.

The Defendants had ample opportunity to dispute these factual assertions by reference to the record but did not do so – because they cannot. They, thus, resort to labeling these material facts as speculative. The Court should not permit Defendants to do so, and instead, should find that Defendants have admitted all of these facts. Those facts are stated in paragraphs 8, 91, and 129-135 of Plaintiffs' Joint Statement[15]; paragraphs 10-13 and 18-19 of Plaintiff Phillips's Individual Statement[16]; paragraphs 11-15, 17, and 21-24 of Plaintiff West-El's

---

unique facts into both the D.C. Parole Board's and the USPC's objective formulas, the unique fact-finding powers of the parole examiners are already taken into account and are not ignored. Therefore, there can be no dispute.

[15] Defendants object to these facts in paragraphs 5, 33, and 44 of Defendants' Response to Joint Statement.

[16] Defendants object to these facts in paragraphs 19 and 21 of Defendants' Response to Individual Statements.

7

Individual Statement[17]; paragraphs 14-16 and 19-21 of Plaintiff Sellmon's Individual Statement[18]; paragraphs 9, 11-14, and 22-23 of Plaintiff Martin's Individual Statement[19]; paragraphs 8-10 and 15-18 of Plaintiff Swinton's Individual Statement[20]; and paragraphs 10-16 of Plaintiff Smith's Individual Statement.[21]

      F.    Describes Legal Developments / Document Speaks for Itself

      Defendants object to several of Plaintiffs' undisputed material facts on the ground that they "describe legal developments" or that the "document speaks for itself." Plaintiffs maintain that these actually are factual developments that came about because new laws were passed; they are not merely legal developments. For example, Defendants assert that the USPC taking over jurisdiction for D.C. Code offenders from the D.C. Board of Parole under the Revitalization Act is a legal development. Although the change came about because of a new law, from a factual standpoint, the USPC had new duties that are material to this case. Defendants, moreover, do not appear to dispute the truth of Plaintiffs' statements but simply argue that the Court should decide what these new legal developments mean or should look to the contents of the documents and read the documents. Plaintiffs agree that the Court should read the documents, but they maintain that the factual developments in these legal documents, which may speak for themselves, tell the story that Plaintiffs are, and should be, allowed to tell. The Court, therefore, also should rule that Defendants have admitted these facts. Those facts are

---

[17] Defendants object to these facts in paragraphs 27, 29, and 32 of Defendants' Response to Individual Statements.

[18] Defendants object to these facts in paragraphs 37 and 39 of Defendants' Response to Individual Statements.

[19] Defendants object to these facts in paragraphs 43, 45, and 47 of Defendants' Response to Individual Statements.

[20] Defendants object to these facts in paragraphs 53 and 55 of Defendants' Response to Individual Statements.

[21] Defendants object to these facts in paragraphs 57 of Defendants' Response to Individual Statements.

DSMDB-2410715vv2

stated in paragraphs 13-17, 19-28, 86-88, 94-95, 112-126, 136, 138-140, 142-151, 157, and 170 of Plaintiffs' Joint Statement.[22]

     G.    <u>Mischaracterization</u>

     In several instances, Defendants argue that Plaintiffs have mischaracterized the record. However, it is not enough for Defendants to say that Plaintiffs have mischaracterized the facts without explaining which facts have been mischaracterized and how Plaintiffs allegedly mischaracterized them. Because of the incompleteness in these objections, Plaintiffs assert that Defendants' "mischaracterization" objections should be disregarded.

     Nonetheless, to the extent that Defendants assert that by stating the reasons given by the hearing examiners for departing from the guidelines, the Plaintiffs have somehow mischaracterized the USPC's officially stated reasons for departure, Plaintiffs direct the Court to Sections VII.A-B of their memorandum. To the extent that Defendants argue that the Plaintiffs mischaracterize what the hearing examiners' or USPC actually stated, Plaintiffs dispute Defendants' contention and assert that Defendants are wrong. For these reasons, the Court should ignore all of these "mischaracterization" objections and rule that Plaintiffs' factual statements have been admitted by Defendants. Those facts are stated in paragraphs 149, 158, 160-161, 164,-166, and 169 of Plaintiffs' Joint Statement[23]; paragraphs 17-19 of Plaintiff Eason's Individual Statement[24]; paragraphs 14-17 of Plaintiff Phillips's Individual Statement[25];

---

[22] Defendants object to these facts in paragraphs 10, 12, 30, 36, 42, 45, 47, 49, 50-51, 54, and 63 of Defendants' Response to Joint Statement.

[23] Defendants object to these facts in paragraphs 50, 55, 57, 59-60, and 62 of Defendants' Response to Joint Statement.

[24] Defendants object to these facts in paragraph 12 of Defendants' Response to Individual Statements.

[25] Defendants object to these facts in paragraph 20 of Defendants' Response to Individual Statements.

DSMDB-2410715vv2

paragraphs 19-20 of Plaintiff West-El's Individual Statement[26]; paragraphs 18-19 of Plaintiff

Sellmon's Individual Statement[27]; paragraphs 5 and 15-21 of Plaintiff Martin's Individual

Statement[28]; paragraphs 5 and 11-14 of Plaintiff Swinton's Individual Statement.[29]

      H.    Use of D.C. Parole Laws and Regulations

      In certain instances, Defendants object to Plaintiffs' factual statement that the USPC

has applied its own parole practices in determining whether to grant or deny Plaintiffs' requests

for parole. Defendants assert that they have always used and applied the D.C. parole laws and

regulations in all Plaintiffs' cases. This contention is laughable. Defendants have used their own

practices and guidelines, as detailed in 28 C.F.R. § 2.80, in making parole determinations in

Plaintiffs' cases, with the exception of Plaintiffs Gambrell and Eason. For Plaintiffs Gambrell

and Eason (and several of the other Plaintiffs), Defendants applied what they have conceded is

the standard that applies to U.S. Code offenders – whether granting a parole request would

"depreciate the seriousness of the offense behavior and promote disrespect for the law" – not to

D.C. Code offenders. *See* Defendants' Response to Individual Statements ¶¶ 3, 10 (not objecting

to paragraph 23 of Plaintiff Gambrell's Individual Statement or to paragraph 15 of Plaintiff

Eason's Individual Statement). The court should disregard these objections and rule that

Defendants have admitted the facts in paragraphs 9, 10, 12, and 18 of Plaintiffs' Joint

Statement.[30]

---

[26] Defendants object to these facts in paragraph 31 of Defendants' Response to Individual Statements.

[27] Defendants object to these facts in paragraph 38 of Defendants' Response to Individual Statements.

[28] Defendants object to these facts in paragraphs 41 and 46 of Defendants' Response to Individual Statements.

[29] Defendants object to these facts in paragraphs 51 and 54 of Defendants' Response to Individual Statements.

[30] Defendants object to these facts in paragraphs 6-9 and 11 of Defendants' Response to Joint Statement.

DSMDB-2410715vv2