# Exhibit B



**The JFA Institute**
Washington, D.C./Austin, Texas

*Conducting Justice and Corrections Research for Effective Policy Making*

# Evaluation and Re-Validation of the
# U.S. Parole Guidelines Risk Instrument

Submitted by

James Austin, Ph.D.
Roger Ocker

*[handwritten notes:]*
① Time length of time — ( out of prison )
② For Technical Violations
③ Salient factor
   Spend longer time
   they went
   fair to gaol
   — more t
① Does it matter

*5 Walter Houp Court, NE Washington, DC 20002   Ph. 202-544-4454*    *www.JFA-Associates.com*

# Acknowledgments

A number of individuals contributed to this report.  First, we would like to thank Edward F. Reilly, the Chair of the United States Parole Commission and fellow Commissioners Patricia K. Cushwa and Cranston J. Mitchell for their continued support and assistance throughout the project. James Beck and Mary Anna Portner-Brown helped draw the sample and complete the very detailed data collection effort.  Nancy Ware, Director and Mannone Butler, Legal Advisor and Program Analyst for the DC Criminal Justice Coordinating Council provided staff assistance for the inputting of the data as well as overall guidance in the production of this report. Kim Hunt, Executive Director of the DC Sentencing and Code Revision Commission, provided data on past and current sentencing practices.

Funding for this study was generously provided by the Open Society Institute (OSI). Aurie Hall, Program Officer with the OSI, provided much assistance and support as well.

# Executive Summary

## Major Findings

1. DC prisoners released in 2002 who had been sentenced under the DC code prior to August 2002 as compared to other state prisoners had much longer sentences and served longer prison terms.

2. About two thirds (67%) of the prisoners released in 2002 were re-arrested at least one time, 52% were re-convicted and 37% were returned to the custody of the BOP within three years of being released from prison.

3. These three year recidivism rates are relatively comparable to the most recent recidivism data that were published by the U.S. Department of Justice Bureau of Justice Statistics (BJS) as well as other states.

4. While 67% of the released prisoners were re-arrested at least once, the average number of arrests (1.9) during this three year post-release period is much lower than the rate of arrests three years for the same prisoners prior to their incarcerated (5.9). In effect the rate of arrests dropped by over 60% (from 5.9 to 1.9 arrests per prisoner).

5. The types of crimes being committed by the released DC prisoners are similar to other states in that the vast majorities are non-violent in nature.

6. The non-guideline risk factors that are associated with recidivism are as follows:

   a. Gender – women have a much lower rate
   b. Age – younger prisoners have a higher rate
   c. Weapon Not Used in the Offense – lower rate
   d. Participation in BOP programming – lower rate
   e. Transferred to Community Corrections Prior to Parole – lower rate
   f. Released to Spouse, Friend, Shelter Care – lower rate
   g. Released with Photo ID, Drivers License or SSN – lower rate

7. Consistent with other studies, the amount of time imprisoned (length of stay) is not associated with rates of recidivism.

8. Many of the salient factor items have either weak or non-existent relationships with recidivism.

9. Not surprisingly, the overall scale also has a weak association with recidivism with only the very good risk category showing a difference from the other risk levels.

10. An alternative risk instrument that uses both static dynamic risk factors does a better job of sorting releases by risk level.

11. Once the risk level is determined, another set of computations are made by the USPC staff to determine whether parole should be granted at the initial parole eligibility date or sometime thereafter.

12. The vast majority (80%) of cases score "0" months range with the remainder scoring 12-24 months.

13. These resulting higher ranges (or add ons) are largely based on the severity of the crime or prior criminal record which are not related to recidivism.

14. The SFS is also used to imprison parole violators based on the nature of the violation(s) and SFS score. Within a violation category, the difference in months to serve can vary by several years. Under this practice, the amount of time served for a technical violation can exceed the original sentence.

15. This practice is placing too much emphasis on the SFS as a criteria for revocations – especially given the lack of prediction in the instrument as shown earlier.

# Recommendations

1. Modify the SFS and implement a modified risk instrument as suggested by this study that takes into a number of dynamic factors (with some modification).

2. Discontinue the application of the other guideline factors being used to enhance presumptive release dates and replace them with a simple offense/risk level matrix.

3. The USPC needs to determine the extent to which it wishes to extend parole eligibility dates based solely on offense severity and history of violence; especially given the long period of incarceration DC sentenced prisoners are now serving and the lack of a relationship between length of time served and recidivism.

4. Review its parole revocation grid and allow for much shorter periods of incarceration with the assumption that low risk parolees shall not be re-incarcerated for low severity violations.

5. On a more generic level, there should be a concerted effort to reduce the length of imprisonment and parole supervision based on good conduct and completion of programs. The current lengths of stay are well above the national averages for similar crimes. Such efforts would include allowing release at an earlier stage of

the sentence, awarding of good-time credits for prisoners who complete rehabilitative programs and allowing for the period of the parole supervision to be reduced based on good conduct.

6. Given that dynamic factors related to prisoner completion of rehabilitative programs are associated to lower recidivism rates, a study should be conducted by the Commission and the Bureau of Prisons to determine if DC sentenced prisoners are receiving the same level of services as other BOP prisoners.

# Introduction and Background

At the request of the U.S. Parole Commission (USPC) and the Washington, DC Criminal Justice Coordinating Council (CJCC), the JFA Institute was asked to complete a revalidation of the salient risk factor instrument that is currently being used by the USPC to evaluate the suitability of parole for DC sentenced prisoners (also known as DC Code prisoners).

Prior to the adoption of federal sentencing guidelines in the 1980s and the subsequent introduction of determinate sentencing as described below, the U.S. Parole Board had been using a two dimensional matrix (offense severity and risk) to help guide parole decisions for federal prisoners. Each cell in the matrix had a presumptive range for the prisoner to serve prior to being reviewed by the Board. Absent negative institutional behavior or some other documented reasons for not granting parole, it was expected that the Board would release the prisoner based on that range.

This parole guideline system was used for many years until the *Comprehensive Crime Control Act of 1984* was created. Through this legislation, the United States Sentencing Commission was established to set new sentencing guidelines for the federal courts and to replace indeterminate sentencing with a determinate sentencing structure. Under determinate sentencing, prisoners sentenced by the federal courts receive a fixed term and with some exceptions must serve 85% of the imposed sentence. The balance of the sentence is served on post-release supervision as provided by the federal probation officers. Hence, there is no discretionary parole decision within the federal sentencing structure. The USPC no longer (with a few exceptions as noted below) has any release authority for federal prisoners.

Within the District of Columbia and as part of the *National Capital Revitalization and Self-Government Improvement Act of 1997,* the DC sentencing structure was changed in August 2000 from an indeterminate to a determinate scheme (similar to the federal guidelines). As part of that reform, the USPC was given some responsibilities that had been under the DC Parole Board which has now been abolished. These responsibilities include release decisions for a declining number of prisoners sentenced under the old indeterminate sentencing structures; the imposition supervision conditions and parole revocation decisions.

Currently, the USPC retained jurisdiction over the following persons.

    1.  <u>Federal Offenders (offenses committed before November 1, 1987)</u>: Granting or denying parole to federal offenders who committed their offenses before November 1, 1987 and who are not otherwise ineligible for parole; and making determinations regarding the initial conditions of supervision, modification of the conditions of supervision for changed circumstances, early discharge from supervision, issuance of a warrant or summons for violation of the conditions of supervision, and revocation of release for such offenders released on parole or mandatory release supervision. Supervision in the community is provided by United States Probation Officers.

2. DC Code Offenders (offenses committed before August 5, 2000): Granting or denying parole to DC Code offenders who committed their offenses before August 5, 2000 and who are not otherwise ineligible for parole; and setting conditions of supervision.

3. DC Code Offenders (offenses committed after August 4, 2001 The USPC sets the initial conditions of supervision as above for DC Code offenders who committed their offenses after August 4, 2001 and who are sentenced to a determinate sentence of imprisonment followed by a term of supervised release. Supervision in the community is provided by Supervision Officers of the Court Services and Offender Supervision Agency (CSOSA) of the District of Columbia.

4. Uniform Code of Military Justice Offenders: Granting or denying parole to parole-eligible Uniform Code of Military Justice offenders who are serving a sentence in a Bureau of Prisons' institution; and setting conditions of supervision as above. Supervision in the community is provided by United States Prob ation Officers.

5. Transfer-Treaty Cases: The Parole Commission has the responsibility for conducting hearings and setting release dates for U.S. citizens who are serving prison terms imposed by foreign countries and who, pursuant to treaty, have elected to be transferred to the United States for service of that sentence.

6. State Probationers and Parolees in Federal Witness Protection Program: Making determination of initial conditions of supervision, modification and related matters as above for certain state probationers and parolees who have been placed in the federal witness protection program. Supervision in the community is provided by United States Probation Officers.

In performing its release and the imposition of supervision conditions on these various populations, the USPC continues to use the salient risk score instrument. It's important to note that this instrument was developed and normed on the samples of federal prisoners in the 1970s and 1980s using bivariate analysis. One of the last published articles on the instrument was written by Peter Hoffman and James Beck in 1985. It showed that based on a sample of released federal prisoners, the items and the instrument were predictive of recidivism.[1] The US Bureau of Prisons has found the SFS to be a good predictor of recidivism among its prisoners in a study based on prisoners released in 1987.[2]

It's noteworthy that a number of versions of the salient factor risk score have been adopted by several states including Washington, Maryland, Ohio, Oregon, Connecticut and Georgia. Further, the salient factor scale now used by the USPC differs from the one that was used historically. For example, earlier versions of the salient factor score had

---

[1] Hoffman, Peter and James Beck. 1985. "Recidivism Among Released Prisoners", Criminal Justice and Behavior, Vol. 12, No.4: 501-507.
[2] Harer, Miles. 1994. Recidivism Among Federal Prisoners Released in 1987. Washington, DC: Federal Bureau of Prisons, Office of Research and Evaluation.

different weights for the scoring items and included a factor that measured heroin and opiate addiction.

The salient risk factor instrument portion of the USPC guidelines consists of a small number set of factors that had been shown to be associated with success or failure on parole. In today's jargon, the factors were exclusively static factors that reflected the prisoner at the time of admission. Thus, once the risk level was established either at the time of admission to prison or before the parole hearing, it would not change.

The six items and associated weights used on the USPC salient factor instrument are as follows:

> *1. Prior Convictions/Adjudications (Adult or Juvenile)*
>     None = 3;   One = 2;   Two or Three = 1;   Four or More = 0

> *2. Prior Commitment(s) of More Than 30 Days (Adult or Juvenile)*
>     None = 2;   One or Two = 1;   Three or More = 0

> *3. Age at Current Offense/Prior Commitments*

| | | |
|---|---|---|
| 26 years or more | Three or fewer prior commitments | = 3 |
| | Four prior commitments | = 2 |
| | Five or more commitments | = 1 |
| 22 - 25 years | Three or fewer prior commitments | = 2 |
| | Four prior commitments | = 1 |
| | Five or more prior commitments | = 0 |
| 20 - 21 years | Three or fewer prior commitments | = 1 |
| | Four prior commitments | = 0 |
| 19 years or less | Any number of prior commitments | = 0 |

> *4. Recent Commitment Free Period (Three Years)*
>     No prior commitment of more than 30 days (adult or juvenile) or released to the community from last such commitment at least 3 years prior to the commencement of the current offense = 1; Otherwise = 0

> *5. Probation/Parole/Confinement/Escape Status Violator This Time*
>     Neither on probation, parole, confinement or escape status at the time of the current offense; nor committed as a probation, parole, confinement, or escape status violator this time =1; Otherwise =0

> *6. Older Offenders*
>     If the offender was 41 years of age or more at the commencement of the current offense (and the total score from Items A-E above is 9 or less) = 1; Otherwise = 0

However, this instrument has never been validated on a sample of released DC prisoners. This is important since the DC prisoner population is quite different from the federal prisoner population especially with regard to commitment offense. The BOP prisoner population is largely a population of prisoners convicted of drug crimes with a large proportion being distribution or conspiracy to distribute. The DC sentenced population is

largely an urban and Black population who has been convicted of a more traditional array of crimes one typically finds within a state prison population. In particular, there are greater numbers of prisoners convicted of property, violent and other non-drug crimes.

For these reasons, the USPC wanted a re-validation study completed that would test the validity of the risk instrument and see what, if any, changes should be made to enhance its predictive attributes. The remainder of this report summarizes the research methods, results and recommendations.

# Research Design

A validity test is designed to see how well risk factors actually predict recidivism. This test is done by drawing a sample of all DC Code offenders who were sentenced to probation or released from prison and tracking them for a period of three years. The validation sample records the offender attributes or background items (independent variables) that are believed to be predictive of recidivism (the dependent variable). Recidivism can be measured a number of ways but the three major measures are re-arrest, reconviction and re-admission to prison.

The validation study consisted of a sample of 700 DC Code sentenced prisoners released in 2002 who had a salient risk factor score completed. As suggested above, these prisoners had been sentenced under the old indeterminate sentencing system. Under that system, the sentence consisted of a minimum and maximum sentence –the latter had to be at least three times higher than the minimum. This produced a very large range in sentence length. The SFS was a major factor in determining what proportion of the sentence would be served by the prisoner.

A very detailed data collection form was developed by the USPC staff that was to be used to collect detailed data from the cases files. The actual salient factor score items had to be extracted from the USPC data files, downloaded and key entered into a separate data base. Staff from the CJCC then manually entered all of the data into a data base file that was formatted for SPSS and statistical analysis. Unfortunately there were a significant number of releases where the USPC could not locate a Salient Factor Score sheet. A comparison of the missing and cases used for analysis found no differences between the two groups so the results presented here are representative of the entire release cohort (see Appendix).

# Analysis

This section of the report summarizes the major analysis and findings associated with the study. The appendix contains more detailed tables which the reader may wish to review as well.

Table 1 summarizes the overall recidivism measures for the 2002 release cohort. There were three measures of recidivism recorded for each released prisoner:

1. Re-arrest with three years
2. Reconvicted within three years

3.  Returned to prison (BOP) within three years[3]

As shown in the table about 2/3 of the cohort were re-arrested at least one time, 52% were re-convicted and 37% were returned to the custody of the BOP. These recidivism rates are relatively comparable to the most recent recidivism data that were published by the U.S. Department of Justice Bureau of Justice Statistics (BJS) as well as other states. For example, the three re-arrested percentage of 67% is virtually identical to the 68% reported by BJS. The three year re-conviction rate is slightly higher (52% versus 47%) while the return to the BOP is slightly lower than the BJS 40% rate state.  In other words, the recidivism rates of the DC prisoners are relatively typical of other state prison systems.

**Table 1**
**Basic Three Year Recidivism, Length of Stay and Sentence Length Facts**

| Recidivism Measures | Rates |
|---|---|
| Three Year Re-arrest Rate | 67% (68%) |
| Three Year Reconviction Rate | 52% (47%) |
| Three Year Return to Prison (BOP) | 37% (40%) |
| Time Served Prior to Release | 44 months (30 months) |
| Average Time to New Conviction | 18.2 months |
| Suppression Effect | |
| 3 Years Prior to Current Incarceration | 5.3 Arrests |
| 3 Years After Current Incarceration | 1.9 Arrests |
| Suppression Effect | -64% |
| | |
| Percent that were Non-violent Crimes | 83% (86%) |
| Length of Stay Prior to Release | 44 months |
| Sentence Length Range | 35-71 months |

Note: Numbers in parenthesis are based on BJS 1994 recidivism rates. (Recidivism of Prisoners
Released in 1994. US DOJ. Washington, DC: Bureau of Justice Statistics, 2002) and
http://www.ojp.usdoj.gov/bjs/prisons.htm#selected.

One area where the DC inmates are very different from other state prisoners is the length of time served prior to being released.  As shown in Table 1, the average length of stay (or LOS) is 44 months or 14 months more than reported by BJS in its national correctional reporting program.  As such, these DC prisoners experienced a much longer period of incarceration than state prisoners.  This longer LOS is true even when controlling the offense a prisoner is sentenced for as shown in Table 2.

A comparison of the types of crimes for which DC prisoners are sentenced for suggests that that the longer prison time is not explained by the severity of the crime. Table 3 shows the offenses for which the DC prisoners were sentenced for and how they compare to the data provided by BJS for state sentenced prisoners. The major difference is in the drug and property offense categories where the DC prisoners are more likely to be sentenced for a drug crime and less likely for a property crime.

---

[3] The 3 three year follow-up was consistent for all persons in the cohort.

**Table 2**
**Sentence and Length of Stay by Offense**

| Offense | N | % | Avg. High Sentence (Months) | Avg. Low Sentence (Months) | Avg. Time from Conviction to Release (Months) | Other State Length of Stay (Months)* |
|---|---|---|---|---|---|---|
| Assault | 28 | 4% | 92.8 | 42.8 | 53 | 32 |
| Sex Crime | 9 | 1% | 114.9 | 44.5 | 108 | 81 |
| Robbery | 40 | 6% | 104.9 | 70.8 | 64 | 55 |
| Drug | 286 | 42% | 86.9 | 39.0 | 48 | 23 |
| Burglary | 29 | 4% | 72.3 | 27.9 | 46 | 32 |
| Theft/Fraud | 60 | 9% | 45.2 | 25.2 | 42 | 19 |
| Other Non-violent | 29 | 4% | 61.6 | 37.0 | 39 | 16 |
| Probation Revocation | 89 | 13% | 49.2 | 18.5 | 28 | NA |
| Other Violent | 83 | 12% | 41.6 | 25.5 | 33 | 24 |
| Weapons | 31 | 4% | 72.0 | 31.4 | 44 | 23 |

*Source: http://www.ojp.usdoj.gov/bjs/prisons.htm#selected

**Table 3**
**Sentenced Offense for DC Versus other State Prisons Releases**

| Offense Type | DC | Other States |
|---|---|---|
| Violent | 23% | 27% |
| Drug | 42% | 32% |
| Property | 17% | 28% |
| Weapons | 4% | 3% |
| Other | 13% | 10% |

"Other State" data based on BJS data as reported at tp://www.ojp.usdoj.gov/bjs/prisons.htm#

The long lengths of stay for this sample of DC prisoners do not necessarily apply to prisoners now being sentenced under the new determinate sentencing structure. The most recent data from the DC Sentencing Commission show that the average sentence length for prisoners sentenced for drug crimes have declined while sentence lengths have increased for violent crimes.[4] Indeed as shown later on in the report, the current sentence length for some crimes is less than the amount of time the USPC can revoke a parolee.

Another interesting statistic in Table 1 is a measure of recidivism that is called the suppression effect. This statistic compares the rate of arrest both before and after

---

[4] Based on information provided by Kim Hunt, Executive Director, District of Columbia Sentencing and Criminal Code Revision Commission

incarceration for a similar time frame (in this case three years prior and three years post the current incarceration) to see if the frequency of arrest is changing. Consistent with a few studies that have attempted this calculation, the results here show a sharp reduction in the rate of arrests that was occurring prior to the current incarceration. [5]

Specifically, the average number of arrests three years prior to the current incarceration was 5.3 as compared to the 1.9 average number of arrests post the current incarceration. This calculation was done by attempting to control for "street" crime by extending the pre and post follow-up periods for time periods where the person was incarcerated. Attempting to account for the incarceration time does not change the magnitude of the suppression effect. For a number of reasons, (maturation, regression to the mean, program completion, post release supervision, or specific deterrence), it is clear that this cohort is sharply reducing its rate of arrest.

Finally, Table 1 also reports that the vast majority (83%) of the crimes for which the DC prisoners are being re-arrested for are non-violent offenses. This is also consistent with the national recidivism data reported by BJS. Table 4 offers a more detailed breakdown of these crimes data and shows that most of the crimes fall into the non-violent offense category. Especially noteworthy is the large number of "crimes" that appear to be technical violations as they are coded as "parole revocation". Whatever the interpretation of that offense type, it adds further evidence that the types of crimes being committed are property, drug or non-compliance with parole or probation conditions. Again, the types of crimes being committed by DC prisoners are similar to other states in that the vast majorities are non-violent in nature.

**Table 4**
**Type of Re-Arrest Charges**

| Re-arrest Offense | N | % |
|---|---|---|
| Violent Crimes | | 17% |
| Assault | 148 | 11% |
| Sex Crime | 6 | 0% |
| Robbery | 22 | 2% |
| Other violent | 37 | 3% |
| Drug | 313 | 24% |
| Property | 703 | 29% |
| Burglary | 21 | 2% |
| Theft/Fraud | 169 | 13% |
| Other Non-violent | 182 | 14% |
| Probation Revocation | 33 | 2% |
| Parole Revocation | 371 | 28% |
| Weapons | 21 | 2% |
| Total | 1,323 | 100% |

*[handwritten annotations: "15%" next to Violent Crimes 17%; "30 percent are for technical violations" next to Parole Revocation]*

---

[5] Austin, J., Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy. *Crime and Delinquency*, Vol. 32, No. 4, October 1986: 404-502.

The next level of analysis assessed the attributes of the 2002 released prisoners as well as the relationships between these attributes and the three measures of recidivism (see Appendix for the detailed tables). In general, this analysis shows that the following attributes are associated with recidivism:

1. Gender – women have a much lower rate
2. Age – younger prisoners have a higher rate
3. Weapon Not Used in Offense – lower rate
4. Friends Incarcerated – higher rate (but high number of missing cases)
5. History of Substance Abuse – higher rate
6. Participation in BOP programming – lower rate
7. Transferred to Community Corrections Prior to Parole – lower rate
8. Released to Spouse, Friend, Shelter Care – lower rate
9. Released with Photo ID or Drivers License or SSN –lower rate

One item that did not show a relationship with recidivism is the amount of the time served. As shown in Table 5, there is no variance in recidivism rates based on how long a person is imprisoned. This means that whether a person is incarcerated for a longer or shorter period, the recidivism rate does not vary.

This statistic has been noted in other research studies including the BJS recidivism reports.[6] It has much importance to DC prisoners who have been sentenced prior to 2000 have one of the longest lengths of stay in the nation and largely for non-violent crimes. Any reductions in these lengths of stay would have substantial impact on the sentenced prisoner population without any adverse effects on recidivism rates.

**Table 5**
**Length of Stay and Recidivism Rates**

| Length of Stay | N | % | Arrested | Convicted |
|---|---|---|---|---|
| 12 months or less | 37 | 5% | 62% | 43% |
| 13-24 months | 161 | 23% | 68% | 56% |
| 25-36 months | 173 | 25% | 71% | 56% |
| 37-48 months | 108 | 16% | 68% | 51% |
| 49-60 months | 52 | 8% | 83% | 62% |
| 61-120 months | 118 | 17% | 58% | 46% |
| 121 months or more | 29 | 4% | 66% | 48% |

Analysis was also completed on the Salient Risk Score and the associated factors used by the USPC to render a parole decision. One of the unfortunate discoveries of this study was that the individual items that make up the risk score were not readily available for analysis. It was necessary to print out the available forms that had been completed and were stored in the USPC data system which lowered the sample size to 503 cases.

---

[6] *Recidivism of Prisoners Released in 1994.* US DOJ. Washington, DC: Bureau of Justice Statistics, 2002.

As noted earlier in the report, the risk score consists of six items. These are tallied and then converted to a scale that sorts inmates into the four risk levels. Table 6 shows how the release cohort was scored on each item and the associated recidivism rates. Here one sees that many of the items have either weak or non-existent relationships with recidivism. Not surprisingly, the overall scale also has a weak association with recidivism with only the very good risk category showing a difference from the other risk levels. Logistic multivariate analysis was done at the request of outside reviewers and produced the same results (see Appendix).

Once the risk level is determined, another set of computations based on six items are made by the hearing examiners to determine whether parole should be granted and after what period of imprisonment. The items are:

1. Base point score guideline range (based on the SFS, assessment of violence record, death of victim or other violence associated with the crime)
2. Months to parole eligibility
3. Disciplinary guidelines prior to last hearing
4. Superior Program Assignment prior to last hearing
5. Disciplinary guidelines since last hearing
6. Superior Program Assignment since last hearing

This must be described as a very complex and difficult computation to understand. It also explicitly re-introduces aspects of the current offense, the prior record and institutional conduct to either mitigate or aggravate the prisoner's expected range of time to serve. There is no other parole board that uses such an elaborate scoring mechanism.

What follows is an example of some of the scoring logic that must be applied in order to arrive at an expected time to serve range.

*Disciplinary Infractions - If the prisoner had 1 additional point added to the point score for disciplinary infractions, use (a) 1 x the applicable rehearing range; or (b) the guideline range from Section 2.36, whichever is less. If the prisoner had 2 additional points added to the point score for disciplinary infractions, use (a) 2 x the applicable rehearing range, or (b) the guideline range from Section 2.36, whichever is less.*

*Superior Program Achievement - .If the prisoner received a 2 point reduction for SPA (not ordinary program achievement), subtract 1 x the applicable rehearing range.*

Table 7 shows how this sample of released prisoners has been scored on these factors used to extend or reduce time to serve. Here one can see that some factors are rarely employed and/or are unrelated to recidivism. The points that are eventually computed are used to develop a range of months one must serve beyond their parole eligibility date.

13

**Table 6**
**Salient Factor Risk Factor Scores and Recidivism Rates**

| Item | N | % | % with New Conviction | % with Re-arrest |
|---|---|---|---|---|
| **Totals** | **503** | **100%** | **52.1%** | **66.8%** |
| **1.  Prior Convictions/Adjudications** | | | | |
| None | 37 | 7% | 47% | 68% |
| One | 84 | 17% | 45% | 64% |
| Two or three | 173 | 34% | 47% | 64% |
| Four or more | 209 | 42% | 57% | 71% |
| **2.  Prior Commitments (30 days+)** | | | | |
| None | 163 | 32% | 51% | 67% |
| One or two | 205 | 41% | 48% | 67% |
| Three or more | 135 | 27% | 56% | 67% |
| **3.  Age at Current Offense Score (see matrix)** | | | | |
| 0 points | 43 | 9% | 53% | 74% |
| 1 points | 116 | 23% | 54% | 69% |
| 2 points | 119 | 24% | 52% | 67% |
| 3 points | 225 | 45% | 48% | 65% |
| **4.  Recent Commitment Free Period** | | | | |
| None | 265 | 53% | 51% | 69% |
| Otherwise | 238 | 47% | 51% | 65% |
| **5.  Violator/Escape Status** | | | | |
| No Probation/Parole Violation/escape | 162 | 32% | 55% | 70% |
| Otherwise | 341 | 68% | 49% | 66% |
| **6.  Older Offenders** | | | | |
| 41 years or older | 77 | 15% | 45% | 58% |
| Otherwise | 426 | 85% | 52% | 69% |
| **7.  Salient Factor** | | | | |
| Very good risk | 67 | 13% | 40% | 58% |
| Good risk | 139 | 28% | 50% | 67% |
| Fair risk | 172 | 34% | 55% | 71% |
| Poor risk | 125 | 25% | 53% | 67% |

The vast majority (80%) of cases score "0" months range with the remainder scoring the 12-24 months. What this means is that the prisoners who receive these extended months will have significantly longer periods of confinement than prisoners who either have a lower risk (which is not that predictive), a current or violence offense, or a crime where there was a high level of violence or the victim died.  Presumably these are factors that were taken into account when the sentence was imposed by the courts. These resulting in higher ranges (or add ons) are largely arbitrary in that there is no scientific rationale behind them. Further, as was noted earlier, there is no difference in the recidivism rates between the "time to serve" ranges.

14

Based on these findings, an alternative risk assessment instrument was developed. This one relies on the factors that were found to be predictive of recidivism and are separated into static and dynamic categories. The latter are items recorded at admission that will not change during the course of the prisoner's incarceration. The latter are factors that do change based on time (like age), inmate behavior and program participation. These items and the preliminary set of weights are shown in Table 8 based on the strength of the bi-variate analysis and various simulations of risk scales and item weights. The table also shows that most released parolees have some special condition imposed with the drug condition being the most frequent one applied. Interestingly, parolees who had no special condition imposed had lower recidivism rates.

These factors were then summed and scaled according to their predictive attributes. The result is shown in Table 9. Here one can see that this system is doing a better job of assessing risk than the current SFS simply because we have eliminated the non-predictive items and added additional ones that are associated with risk.

This is just a preliminary scale and needs to undergo more thorough testing (both reliability and validity). But it seems to be promising version to the current SFS. Why the SFS is not performing well on this cohort of released prisoners is not clear. But one issue to be pursued is the accuracy of the scoring process by USPC staff. Unless there is a rigorous training system that tests the inter-rater reliability of the scoring process there may be a substantial level of "noise" in the data. In order for an instrument to be valid it must first demonstrate its reliability.

Finally, the    that dynamic factors related to prisoner completion of rehabilitative programs are associated to lower recidivism rates, a study should be conducted by the Commission and the Bureau of Prisons to determine if DC sentenced prisoners are receiving the same level of services as other BOP prisoners. A request was made to the BOP to have such a comparison made. As of the writing of this report, no such analysis has been completed by the BOP.

**Table 7**
**Guideline Factors and Recidivism Rates**

| Item | | % | % with New Conviction | % with Re-arrest |
|---|---|---|---|---|
| Total Cases | 503 | | 52.1% | 66.8% |
| **1. Base Guideline Factors** | | | | |
| **I. Current or Prior Violence** | | | | |
| Violence Current Offense + Two Priors | 1 | 0% | 0% | 100% |
| Violence Current Offense + One Prior | 23 | 5% | 61% | 83% |
| Violent Current/Firearm Current | 122 | 24% | 42% | 60% |
| No Violence in Current with One Prior violation | 67 | 13% | 63% | 79% |
| None | 289 | 57% | 52% | 66% |
| **II. Death of Victim or High Level of Violence** | | | | |
| Current offense - death of victim | 2 | 0% | 0% | 0% |
| Current offense – attempted death | 1 | 0% | 100% | 100% |
| Current offense – high level of violence | 23 | 5% | 35% | 57% |
| None | 476 | 95% | 52% | 68% |
| **III. Negative Institutional Behavior** | | | | |
| Assault/weapon/drugs/arson | 2 | 0% | 100% | 100% |
| Other | 16 | 3% | 50% | 75% |
| None | 79 | 16% | 34% | 54% |
| **2. Program Achievement Prior to Last Hearing** | | | | |
| Ordinary | 53 | 11% | 34% | 51% |
| Superior | 7 | 1% | 14% | 43% |
| None | 37 | 7% | 49% | 73% |
| **3. Disciplinary Impact (adds time)** | | | | |
| Yes | 95 | 19% | 64% | 80% |
| No | 408 | 81% | 48% | 64% |
| **4. Superior Achievement Impact (subtracts time)** | | | | |
| Yes | 52 | 10% | 52% | 65% |
| No | 451 | 90% | 51% | 67% |
| **5. Base Guideline Range** | | | | |
| 0 months | 401 | 80% | 52% | 66% |
| 12-18 months | 56 | 11% | 50% | 75% |
| 18-24 months | 40 | 8% | 48% | 68% |
| 36-48 months | 4 | 1% | 50% | 100% |
| 54 months and above | 2 | 0% | 0% | 50% |
| **Special Conditions** | | | | |
| Drug | 383 | 76% | 54% | 70% |
| Alcohol | 17 | 3% | 65% | 76% |
| Mental Health | 7 | 1% | 57% | 100% |
| Community Corrections Center | 37 | 7% | 27% | 51% |
| No Special Conditions Imposed | 61 | 12% | 40% | 44% |

16

**Table 8**
**Alternative Risk Instrument**

| Static | PT | | Dynamic | PT |
|---|---|---|---|---|
| **Gender** | | | **Current Age** | |
| Male | 2 | | 20 & younger | 3 |
| Female | 0 | | 21-39 | 2 |
| **Current or Prior Violent Offense** | | | 40-49 | 1 |
| Violent Current w/ Firearm | 0 | | 51 & older | 0 |
| None | 1 | | **Participated in BOP Programs** | |
| Else | 2 | | Yes | 0 |
| **History of Substance Abuse** | | | No/Unknown | 1 |
| Yes | 1 | | **Transfer to CCC Prior to Release** | |
| None/Unknown | 0 | | Yes | 0 |
| **Prior Jobs Held** | | | Else | 1 |
| None | | | **Released to** | |
| Else | | | Legal Spouse, Friend, Transitional, Shelter, Extended Family | 0 |
| **Prior Convictions** | | | Else | 1 |
| Four or More | 1 | | **Release with Job training** | |
| Else | 0 | | Yes | 0 |
| **Instant Offense** | | | Else | 1 |
| Assault/Sex/Prob./Weapons, Burglary | 0 | | **Release with SSN, Photo ID, Driver License.** | |
| Else | 1 | | No | 0 |
| Robbery/Theft/Other Violent, Drugs | 2 | | One of the Above | 1 |
| | | | Two or More of the Above | 2 |
| | | | **Disciplinary impact** | |
| | | | Yes | 2 |
| | | | No | 0 |

**Table 9**
**Alternative Risk Levels and Re-Arrest Rates**

| Risk Level | % of Total | Re-Arrest Rate |
|---|---|---|
| Low | 16% | 33% |
| Moderate | 50% | 54% |
| High | 34% | 65% |

17

# Application of the Salient Risk Factor to Parole Violations

Related to the use of the SFS on parole release is the application of this instrument to parole revocations. Basically, parolees who violate their terms of parole of supervision are returned to the BOP for a specific period of time. That period of re-confinement is based on a matrix developed by the USPC that weighs the severity of the technical violation(s). Within a severity of the parole violation matrix the difference in months to serve can vary by several years. Under current sentencing practices, the amount of time a parolee can be re-incarcerated for a technical violation can exceed the original sentence. Table 10 shows the average sentence lengths for DC sentenced prisoners by offense type. This is placing too much emphasis on the SFS as a criteria for revocations – especially given the lack of prediction in the instrument as shown earlier.

### Table 10: Average Sentence Lengths in Months by Offense Type 2002-2005

| Year | Violent | Property | Drug | Weapon | Public Order |
|------|---------|----------|------|--------|--------------|
| 2002 | 124 | 22 | 24 | 13 | 12 |
| 2003 | 127 | 25 | 14 | 20 | 23 |
| 2004 | 109 | 23 | 14 | 12 | 11 |
| 2005 | 122 | 19 | 16 | 10 | 10 |

Source: DC Sentencing and Code Revision Commission

It should also be noted that these guidelines do not presume to allow a parolee to be reinstated on parole supervision even for low risk parolees who have violated a low level violation. In several states such guidelines first determine if the parole needs to be simply sanctioned (sometimes repeatedly) rather than re-incarcerated.

# Recommendations

Based on this study the following policy changes should be considered by the USPC:

1. Modify the SFS and implement a modified risk instrument as suggested by this study that takes into a number of dynamic factors (with some modification).

2. Discontinue the application of the other guidelines factors being used to enhance presumptive release dates and replace them with a simple offense/risk level matrix.

3. The USPC needs to determine the extent to which it wishes to extend parole eligibility dates based solely on offense severity and history of violence; especially given the long period of incarceration DC sentenced prisoners are now

serving and the lack of a relationship between length of time served and recidivism.

4. Review its parole revocation grid and allow for much shorter periods of incarceration with the assumption that low risk parolees shall not be re-incarcerated for low severity violations.

5. On a more generic level, there should be a concerted effort to reduce the length of imprisonment and parole supervision based on good conduct and completion of programs. The current lengths of stay are well above the national averages for similar crimes. Such efforts would include allowing release at an earlier stage of the sentence, awarding of good-time credits for prisoners who complete rehabilitative programs, and allowing for the period of the parole supervision to be reduced based on good conduct.

6. Given that dynamic factors related to prisoner completion of rehabilitative programs are associated to lower recidivism rates, a study should be conducted by the Commission and the Bureau of Prisons to determine if DC sentenced prisoners are receiving the same level of services as other BOP prisoners.

19

# APPENDIX TABLES

### Table A-1
### Demographics

| Demographic | N=689 | % | % With Re-arrest (Base=66.8%) | % With New Conviction (Base=52.1%) | Avg. Arrests After Release (Base=1.9) | Avg. Arrests Before (Base=5.3) |
|---|---|---|---|---|---|---|
| Ethnicity | | | | | | |
| Black | 658 | 96% | 68% | 53% | 1.9 | 5.4 |
| White | 14 | 2% | 65% | 47% | 1.9 | 6.6 |
| Other | 17 | 2% | 51% | 50% | 0.7 | 2.9 |
| Sex | | | | | | |
| Male | 635 | 92% | 68% | 53% | 1.9 | 5.3 |
| Female | 49 | 7% | 51% | 39% | 1.6 | 6.8 |
| Age at Release | | | | | | |
| 20 & | 124 | 18% | 77% | 56% | 2.2 | 7.5 |
| 25-29 | 120 | 17% | 70% | 49% | 2.1 | 5.0 |
| 30-34 | 118 | 17% | 69% | 53% | 2.0 | 4.9 |
| 35-39 | 113 | 16% | 74% | 60% | 2.2 | 5.8 |
| 40-44 | 94 | 14% | 63% | 51% | 1.7 | 4.7 |
| 45-49 | 63 | 9% | 59% | 51% | 1.5 | 4.5 |
| 50 & | 46 | 7% | 50% | 41% | 1.0 | 3.2 |
| Incident Offense | | | | | | |
| Assault | 28 | 4% | 64% | 43% | 1.2 | 3.0 |
| Sex Crime | 9 | 1% | 67% | 44% | 2.0 | 0.6 |
| Robbery | 40 | 6% | 73% | 58% | 1.9 | 3.7 |
| Drug | 286 | 42% | 57% | 50% | 1.8 | 4.3 |
| Burglary | 29 | 4% | 59% | 52% | 1.8 | 5.0 |
| Theft/Fraud | 60 | 9% | 78% | 63% | 2.6 | 4.9 |
| Other -violent | 29 | 4% | 76% | 52% | 2.3 | 6.0 |
| Probation Revocation | 89 | 13% | 58% | 47% | 1.8 | 7.0 |
| Other violent | 83 | 12% | 69% | 61% | 2.2 | 10.1 |
| Weapons | 31 | 4% | 61% | 48% | 1.8 | 3.7 |

*Source: BOP sample; note: missing cases excluded*

**Table A-2:  Crime Description**

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| **Weapon in Offense** | | | | | | |
| None | 537 | 78% | 38% | 52% | 2.0 | 5.9 |
| Firearm | 89 | 13% | 62% | 52% | 1.6 | 2.8 |
| Knife | 14 | 2% | 79% | 64% | 1.9 | 5.9 |
| Other/unknown | 43 | 6% | 68% | 59% | 1.5 | 3.6 |
| **Weapon in Offense/Co-defendant** | | | | | | |
| None | 307 | 45% | 67% | 58% | 1.8 | 4.8 |
| Firearm | 25 | 4% | 48% | 36% | 1.1 | 1.2 |
| Knife | 3 | 0% | 100% | 100% | 3.0 | 3.7 |
| Other/ | 25 | 4% | 72% | 56% | 1.4 | 4.4 |
| **Victim - Sexual Abuse/Violence** | | | | | | |
| Yes | 115 | 17% | 68% | 56% | 1.8 | 3.5 |
| No | 545 | 79% | 67% | 51% | 1.9 | 5.7 |
| Unknown | 29 | 4% | 60% | 55% | 1.2 | 4.8 |
| **Immediate Family Members Under** | | | | | | |
| Yes | 92 | 13% | 71% | 57% | 2.2 | 6.3 |
| No | 398 | 58% | 67% | 51% | 1.9 | 5.0 |
| Unknown | 199 | 29% | 67% | 54% | 1.9 | 5.6 |
| **Subject Ever Abused** | | | | | | |
| Physically | 23 | 3% | 70% | 61% | 2.6 | 6.0 |
| Sexually | 13 | 2% | 54% | 54% | 1.4 | 6.4 |
| Physically and | 3 | 0% | 67% | 33% | 2.0 | 10.3 |
| None | 573 | 83% | 68% | 53% | 1.9 | 5.1 |
| Unknown | 77 | 11% | 65% | 48% | 1.9 | 6.7 |
| **Gang Affiliation** | | | | | | |
| Yes | 3 | 0% | 100% | 67% | 2.0 | 2.0 |
| No | 231 | 34% | 65% | 50% | 1.6 | 5.0 |
| Unknown | 455 | 66% | 68% | 53% | 2.1 | 5.6 |
| **Drug Use Associated with Offense** | | | | | | |
| Opiates | 27 | 4% | 63% | 59% | 1.3 | 4.6 |
| PCP | 18 | 3% | 72% | 72% | 3.0 | 7.1 |
| Cocaine | 36 | 5% | 72% | 67% | 1.8 | 4.0 |
| Crack | 17 | 2% | 65% | 53% | 1.9 | 4.8 |
| Marijuana | 29 | 4% | 69% | 59% | 1.7 | 6.5 |
| Alcohol | 47 | 7% | 66% | 60% | 1.5 | 5.6 |
| **Friends Incarcerated** | | | | | | |
| Yes | 51 | 7% | 67% | 45% | 1.9 | 4.6 |
| No | 91 | 13% | 51% | 37% | 1.2 | 6.2 |
| Unknown | 547 | 79% | 70% | 56% | 2.0 | 5.3 |

**Table A-3**
**Employment, Education, Substance Abuse History**

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| History of Substance/Alcohol Abuse | | | | | | |
| Yes | 568 | 82% | 68% | 54% | 1.9 | 5.4 |
| No | 44 | 6% | 59% | 39% | 1.8 | 3.3 |
| Unknown | 77 | 11% | 67% | 47% | 1.9 | 6.8 |
| History of Substance Use/Abuse Treatment Interventions | | | | | | |
| Yes | 195 | 28% | 67% | 54% | 1.8 | 5.0 |
| No | 412 | 60% | 68% | 52% | 2.0 | 5.3 |
| Unknown | 82 | 12% | 65% | 46% | 2.0 | 6.7 |
| Highest Level of Education Completed | | | | | | |
| 8th Grade or less | 67 | 10% | 64% | 57% | 1.9 | 4.9 |
| Some | 291 | 42% | 68% | 55% | 2.0 | 5.1 |
| High /GED | 200 | 29% | 67% | 48% | 1.8 | 5.0 |
| More than | 76 | 11% | 71% | 54% | 2.2 | 6.4 |
| Unknown | 48 | 7% | 71% | 54% | 2.1 | 7.7 |
| Number of Jobs Held Year Prior to Arrest | | | | | | |
| None | 285 | 41% | 69% | 58% | 2.0 | 5.4 |
| One | 258 | 37% | 65% | 48% | 1.9 | 5.3 |
| Two | 42 | 6% | 69% | 41% | 1.6 | 4.5 |
| Three or | 5 | 1% | 80% | 60% | 1.8 | 3.0 |
| Unknown | 88 | 13% | 65% | 49% | 2.0 | 7.8 |
| Number of Months Employed Year Prior | | | | | | |
| Always | 111 | 16% | 65% | 44% | 1.8 | 4.6 |
| Never | 178 | 26% | 75% | 61% | 2.2 | 5.4 |
| One to | 107 | 16% | 66% | 59% | 1.9 | 5.7 |
| Seven to | 52 | 8% | 65% | 40% | 1.7 | 4.3 |
| One | 144 | 21% | 60% | 48% | 1.7 | 5.3 |
| Unknown | 89 | 13% | 65% | 49% | 2.0 | 6.4 |

22

### Table A-4
### BOP Programming

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| Participated in BOP Programming | | | | | | |
| Yes | 592 | 86% | 66% | 51% | 1.9 | 5.0 |
| No | 66 | 10% | 76% | 67% | 2.2 | 8.0 |
| Unknown | 22 | 3% | 75% | 60% | 2.1 | 8.0 |
| Certificates Earned While In BOP Custody | | | | | | |
| GED | 90 | 13% | 69% | 57% | 2.0 | 3.1 |
| H.S. Diploma | 7 | 1% | 71% | 71% | 2.6 | 7.7 |
| College | 2 | 0% | 50% | 50% | 1.5 | 4.5 |
| None | 539 | 78% | 66% | 51% | 1.9 | 5.7 |
| 500 Hours or More of Substance Abuse Program | | | | | | |
| Yes | 60 | 9% | 60% | 58% | 1.5 | 3.2 |
| No | 583 | 85% | 67% | 51% | 1.9 | 5.5 |
| Unknown | 23 | 3% | 71% | 57% | 2.0 | 7.4 |
| Sex Offender Treatment | | | | | | |
| Yes | 3 | 0% | 33% | 33% | 1.0 | 0.3 |
| No | 639 | 93% | 67% | 52% | 1.9 | 5.3 |
| Unknown | 23 | 3% | 70% | 67% | 2.0 | 7.0 |
| Mental Health Treatment | | | | | | |
| Yes | 20 | 3% | 70% | 55% | 1.8 | 5.3 |
| No | 624 | 91% | 66% | 52% | 1.9 | 5.3 |
| Unknown | 22 | 3% | 70% | 55% | 2.0 | 7.0 |
| Major Medical | | | | | | |
| Yes | 34 | 5% | 71% | 59% | 1.7 | 7.0 |
| No | 610 | 89% | 66% | 51% | 1.9 | 5.2 |
| Unknown | 22 | 3% | 70% | 55% | 2.0 | 7.0 |

*Source: BOP sample; note: missing cases excluded*

**Table A-5**
**Release History**

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| **Transfer To Community Corrections Center** | | | | | | |
| Yes | 271 | 39% | 62% | 48% | 1.6 | 3.9 |
| No | 389 | 56% | 71% | 55% | 2.1 | 6.3 |
| Unknown | 19 | 3% | 72% | 56% | 2.0 | 6.4 |
| **Release to Location** | | | | | | |
| Legal | 43 | 6% | 58% | 40% | 1.5 | 4.0 |
| Girlfriend/boyfriend | 69 | 10% | 67% | 54% | 2.3 | 6.1 |
| Parent | 254 | 37% | 72% | 58% | 2.1 | 5.6 |
| Extended Family | 196 | 28% | 65% | 49% | 1.8 | 4.6 |
| Friend | 37 | 5% | 60% | 38% | 1.7 | 5.6 |
| Transitional/helter | 31 | 4% | 58% | 48% | 1.7 | 4.9 |
| Other | 24 | 3% | 88% | 63% | 2.8 | 6.0 |
| Unknown | 26 | 4% | 69% | 65% | 2.2 | 7.6 |
| **Release with Job/Training** | | | | | | |
| Yes | 232 | 34% | 62% | 49% | 1.6 | 3.8 |
| No | 415 | 60% | 69% | 53% | 2.1 | 6.0 |
| Unknown | 34 | 5% | 74% | 59% | 2.2 | 7.3 |
| **Release with SSN** | | | | | | |
| Yes | 232 | 34% | 60% | 47% | 1.5 | 3.6 |
| No | 219 | 32% | 71% | 55% | 2.2 | 6.4 |
| Unknown | 220 | 32% | 71% | 55% | 2.0 | 6.2 |
| **Release with Photo ID** | | | | | | |
| Yes | 243 | 35% | 60% | 47% | 1.5 | 3.7 |
| No | 218 | 32% | 72% | 55% | 2.2 | 6.4 |
| Unknown | 220 | 32% | 71% | 55% | 2.0 | 6.1 |
| **Release with Driver's License** | | | | | | |
| Yes | 232 | 34% | 60% | 46% | 1.5 | 3.6 |
| No | 219 | 32% | 71% | 55% | 2.2 | 6.4 |
| Unknown | 230 | 33% | 71% | 56% | 2.0 | 6.1 |

**Table A-6**
**Comparison of Cases with Missing SFS Forms**

| Characteristic | No Score | | Scored | |
|---|---|---|---|---|
| | N=171 | % | N=518 | % |
| Sex | | | | |
| Male | 161 | 94% | 474 | 92% |
| Female | 7 | 4% | 42 | 8% |
| Age at Release | | | | |
| 24 & under | 30 | 18% | 94 | 18% |
| 25-29 | 23 | 13% | 97 | 19% |
| 30-34 | 38 | 22% | 80 | 15% |
| 35-39 | 29 | 17% | 84 | 16% |
| 40-44 | 22 | 13% | 72 | 14% |
| 45-49 | 9 | 5% | 54 | 10% |
| 50 & older | 14 | 8% | 32 | 6% |
| Race | | | | |
| Black | 160 | 94% | 498 | 96% |
| White | 5 | 3% | 12 | 2% |
| Other | 6 | 4% | 8 | 2% |
| Offense | | | | |
| Assault | 6 | 4% | 22 | 4% |
| Sex crime | 7 | 4% | 2 | 0% |
| Robbery | 11 | 6% | 29 | 6% |
| Drug | 59 | 35% | 227 | 44% |
| Burglary | 8 | 5% | 21 | 4% |
| Theft/fraud | 14 | 8% | 46 | 9% |
| Other non-violent | 8 | 5% | 21 | 4% |
| Probation revocation | 31 | 18% | 58 | 11% |
| Other violent | 18 | 11% | 65 | 13% |
| Weapons | 6 | 4% | 25 | 5% |
| Reconvicted | | | | |
| Yes | 92 | 54% | 267 | 52% |
| No | 79 | 46% | 251 | 48% |
| Rearrested | | | | |
| Yes | 111 | 65% | 349 | 67% |
| No | 60 | 35% | 169 | 33% |
| Length of Stay in Prison | | | | |
| 12 mos. or less | 11 | 6% | 26 | 5% |
| 13-24 | 41 | 24% | 120 | 23% |
| 25-36 | 46 | 27% | 127 | 25% |
| 37-48 | 22 | 13% | 86 | 17% |
| 49-60 | 12 | 7% | 40 | 8% |
| 60-120 | 23 | 13% | 95 | 18% |
| 121 months or more | 10 | 6% | 19 | 4% |

**Table A-7. Logistic Regression Results for SFS Measures Predicting Outcome of Rearrest (0=no, 1=yes) (n=518)**

| | B | S.E. | Wald | df | Sig. | Exp(B) |
|---|---|---|---|---|---|---|
| <u>Prior Convictions</u> (0=None, 1=One, 2=Two or Three, 3=Four or More | .259 | .146 | 3.114 | 1 | .078 | 1.295 |
| <u>Prior Commitments</u>[7] (0=None, 1=One or Two, 2=Three or More) | .016 | .207 | .006 | 1 | .939 | 1.016 |
| <u>Age at Current Offense</u> (1=20 or younger, 2=21-39, 3=40-49, 4=51 or older) | .155 | .098 | 2.520 | 1 | .112 | 1.168 |
| <u>Recent Commitment Free Period</u> (0=None, 1=Otherwise) | -.275 | .250 | 1.214 | 1 | .270 | .759 |
| <u>Violator/Escape Status</u> (0=No escape, 1=Otherwise) | -.248 | .220 | 1.272 | 1 | .259 | .780 |
| Older Offenders (0=Otherwise, 1=41 years or older) | -.603 | .251 | 5.788 | 1 | .016 | .547 |
| Constant | .277 | .329 | .710 | 1 | .399 | 1.319 |

Logistic regression results reveal that the only significant predictor of rearrest is older offenders (e.g., those 41 years or older) ($p < .05$). Results show that older offenders are less likely to be rearrested (B = -.603). None of the other variables is statistically significant.

---

[7] 30 days +

26

**Table A-8. Logistic Regression Results for SFS Measures Predicting Outcome of Conviction (0=no, 1=yes) (n=518)**

|  | B | S.E. | Wald | df | Sig. | Exp(B) |
|---|---|---|---|---|---|---|
| Prior Convictions (0=None, 1=One, 2=Two or Three, 3=Four or More | .304 | .137 | 4.938 | 1 | .026 | 1.356 |
| Prior Commitments[8] (0=None, 1=One or Two, 2=Three or More) | .043 | .192 | .051 | 1 | .821 | 1.044 |
| Age at Current Offense (1=20 or younger, 2=21-39, 3=40-49, 4=51 or older) | .137 | .090 | 2.305 | 1 | .129 | 1.147 |
| Recent Commitment Free Period (0=None, 1=Otherwise) | -.176 | .233 | .567 | 1 | .451 | .839 |
| Violator/Escape Status (0=No escape, 1=Otherwise) | -.335 | .204 | 2.690 | 1 | .101 | .715 |
| Older Offenders (0=Otherwise, 1=41 years or older) | -.468 | .246 | 3.622 | 1 | .057 | .626 |
| Constant | -.499 | .313 | 2.542 | 1 | .111 | .607 |

Logistic regression results reveal that the only significant predictor of conviction is prior convictions ($p < .05$). Results show that those with prior convictions are more likely to be rearrested (B = -.304). None of the other variables is statistically significant.

---

[8] 30 days +