**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **TONY R. SELLMON, *et al.*,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-01650 (ESH)** |
| | ) | |
| **EDWARD F. REILLY, JR., Chairman of** | ) | |
| **the United States Parole Commission, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

## MEMORANDUM OPINION

Plaintiffs Tony Sellmon, Carlton Martin, Charles Phillips, Darius Smith, Daru Swinton, Benson West-El, Curtis Eason, and James Gambrell[1] are inmates serving prison sentences for committing criminal offenses under the District of Columbia Code.  Each committed his crime and was sentenced prior to August 5, 1998, when the United States Parole Commission ("USPC") took over responsibility from the District of Columbia Parole Board ("the Board") for conducting parole hearings for D.C. Code offenders.   Although the facts of each plaintiff's case differ materially, all plaintiffs allege that USPC retroactively applied its own parole guidelines and practices so as to significantly increase the risk that they would serve longer terms of incarceration in violation of the *Ex Post Facto* Clause of the Constitution.  Before the Court are plaintiffs' motion for summary judgment and defendants' motion for judgment on the pleadings.

---

[1] Plaintiffs Swinton and Phillips were not parties to the original complaint.  Their cases (Civil Action Nos. 07-742 and 07-1120) were consolidated with the above-captioned suit, and counsel in the *Sellmon* case, Jason Wallach of Dickstein Shapiro LLP, graciously agreed to take on their representation.

For the reasons stated herein, plaintiffs' motion will be granted in part and denied in part and defendants' motion will be granted in part and denied in part.

## BACKGROUND

### I.    PAROLE PRACTICES FOR D.C. OFFENDERS

On August 5, 1997, Congress enacted the National Capital Revitalization and Self-Government Improvement Act ("the Revitalization Act"), Pub. L. No. 105-33, § 11231 111 Stat. 712, 734-37 (codified at D.C. CODE §§ 24-101 *et seq.* (2001 & Supp. 2005)). (Pls.' Joint Stmt. of Material Facts ["Pls.' Joint Stmt."] ¶ 13.)    The Revitalization Act abolished the D.C. Parole Board, *see* Pub. L. No. 105-33 § 11231(b), and directed the USPC to conduct parole hearings for D.C.  Code offenders "pursuant to the parole laws and regulations of the District of Columbia." *Id.* § 11231(c).   Since August 5, 1998, the USPC has conducted the hearings and decided the requests for parole of all persons convicted of violating the D.C. Code.  (Pls.' Joint Stmt. ¶ 2.) Prior to this date, the D.C. Parole Board conducted the parole hearings for D.C. Code offenders, applying guidelines it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Regulations").  (*Id.* ¶ 18 (citing D.C. MUN. REGS. tit. 28, §§ 100 *et seq.* (1987) (repealed Aug. 5, 2000).)[2]

#### A.    1987 Regulations

The 1987 Regulations were adopted to "structure the exercise of the paroling authority's discretion" and to promote "increased consistency in parole release decisions and enhanced accountability of the Board" by making "*explicit* those factors that will be considered in each

---

[2] Prior to August 5, 1998, the USPC conducted parole hearings for D.C. Code offenders who were in federal custody, but applied D.C. parole practices at these hearings pursuant to the Court's order in *Cosgrove v. Thornburgh*, 703 F.Supp. 995, 1003-04 (D.D.C. 1998). (*Id.* ¶ 16.)

case." (Pls.' Joint Ex. 1 [Report on the Development of the Paroling Policy Guidelines for the District of Columbia Board of Parole] at 1-2) (emphasis in original).) The Board's stated goals in promulgating formal parole regulations were to: (1) promote consistent decision-making; (2) make the Board's parole policies more explicit; (3) ensure that the offender's time served is proportionate to the sentence imposed by the court and risk posed by the offender; (4) "achiev[e] the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilitation;" (5) "penaliz[e] institutional misconduct;" and (6) "develop[] an evolutionary model of management control . . . ." (*Id.* at 2-3.) In formulating the Regulations, the Board was guided by three principles: (1) the touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involvement in criminal behavior;" (2) "the court should addresse[] the purposes of retribution and general deterrence through the sentence it imposes . . . ." and the Board "will not function in a manner that might be viewed as the usurpation of the functions of the sentencing judge;" and (3) "in determining the factors to be used in assessing the guidelines, consideration should be given to their fairness as well as to their statistical reliability." (*Id.* at 3-4.) The Board concluded that "[g]uidelines oriented to the assessment of risk and institutional performance, therefore touching on the need for progress towards rehabilitation, [would] be consistent with the intent of this Act." (*Id.* at 4.)

After serving his or her minimum sentence, a D.C. Code offender became eligible to considered for parole.[3] Once a prisoner became *eligible* for parole, the D.C. Parole Board would

---

[3] The indeterminate sentencing scheme under which plaintiffs were sentenced provides that: "the justice or judge of the court imposing [a felony] sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not

then determine whether he or she was *suitable* for parole.[4]  Under the 1987 Regulations, the D.C.

Parole Board would make this determination employing an analytical framework that relied on

both pre- and post-incarceration factors. (*See* Pls.' Joint Stmt. ¶ 30.)  The Regulations  were

"comprised of four factors, two of which utilize[d] information known at the time of

incarceration, the other two based on post-incarceration factors."  (Pls.' Joint Ex. 1 at 5.)   The

D.C. Parole Board intentionally did not use an offense severity factor in its regulations because

its philosophy was to let the "court-imposed sentence serve as its offense severity indicant."

(Pls.' Joint Stmt. ¶32 (quoting Pls.' Joint Ex. 1 at 17).)

The first and "primary" factor the Board considered was the degree of risk posed by an

offender.  (*See* Pls.' Joint Ex. 1 at 5.)  This factor was "based on [the] calculation of the Salient

Factor Score ["SFS"], an actuarial risk assessment device that relies exclusively on information

known at the time of incarceration."  (*Id.*)   In calculating a prisoner's SFS, the Board considered

six pre-incarceration factors: (1) prior convictions and adjudications; (2) prior commitments of

more than 30 days; (3) age at the commission of current offense; (4) recent commitment-free

period; (5) status of prisoner at time of current offense; and (6) history of heroin or opiate

---

exceeding one-third of the maximum sentence imposed, and any person so convicted and
sentenced may be released on parole . . . at any time after having served the minimum sentence."
 D.C. CODE § 24-403 (2001).  Therefore, an offender would be sentenced to a range (*i.e.*, 15
years to life) and would be eligible for parole upon reaching the minimum sentence imposed by
the judge minus good time credits.

[4] To clarify, eligibility "is established by the sentencing court and defines the limits of the
inmates' possibility of parole. [Suitability] is a decision made by the parole authority as to
whether an inmate who is eligible, or has come up for parole review, is suitable for parole.
Eligibility is determined according to statute and suitability is determined primarily either by
guidelines or regulations promulgated by the paroling authority pursuant to statute."  *Cosgrove*,
703 F.Supp. at 997.

dependence. *See Fletcher v. Reilly*, 433 F.3d 867, 871 (D.C. Cir. 2006) ("*Fletcher III*") (citing D.C. MUN. REGS. tit. 28, § 204.4-204.16). The SFS placed the candidate into one of four risk categories (10-9 = low risk, 8-6 = fair risk, 5-4 = moderate risk, or 3-0 = high risk) from which the Board would determine a baseline number of points ("base point score") that provided 0 for low risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk. (Pls.' Joint Ex. 1 at 5; D.C. MUN. REGS. tit. 28, § 204.17, app. 2-1.) The Board would then take the base point score and adjust it using the remaining pre-incarceration factor and the two-post incarceration factors to arrive at the Point Assignment Grid Score ("total point score"). (Pls.' Joint Ex. 1 at 5-6.)

The remaining pre-incarceration factor was the "type of risk" posed by the offender; "an aggravating factor applicable to those cases in which the Board . . . made findings that the current offense, or the offender's pattern of past offenses, involved violence, weapons, or drug trafficking." (*Id.* at 5.) This factor recognized that "if an offender has already indicated through past behavior that he or she is capable of committing a *type* of crime that is considered particularly serious . . ., [the Board] should be willing to tolerate a lesser *degree* of risk." (*Id.* at 21) (emphasis in original). If the Board determined that the parole candidate's current offense, or two prior felony convictions involved violence, weapons, and/or drug trafficking, then the Board could increase the baseline point score by a maximum of one point. D.C. MUN. REGS. tit. 28, § 204.18, app. 2-1.

The two post-incarceration factors were the offender's institutional adjustment, "an aggravating factor applicable to those cases in which the Board . . . made findings that disciplinary infractions . . . [were] either serious or repetitious enough to impact negatively on the parole decision," and the offender's program participation, "a mitigating factor applicable to

those cases in which the Board has made findings that the program or work accomplishments of

the prisoner . . . [were] substantial enough to impact favorably on the parole decision."  (Pls.'

Joint Ex. 1 at 5.)   The Board could add one point to the candidate's baseline point score for

"negative institutional behavior" and subtract one point for sustained program or work

assignment achievement.  *See* D.C. MUN. REGS. tit. 28, § 204.18 & apps. 2-1, 2-2.

Once the Board calculated the offender's total point score, the 1987 Regulations directed

that a parole request could be granted (with varying levels of supervision) at the initial hearing if

the offender's final adjusted score was 0, 1, or 2, or denied if the offender's final adjusted score

was 3-5.  *Id.* § 204.19.  In the case of a parole rehearing, parole could be granted for a score of

0-3, or denied if the score was 4-5.  *Id.* § 204.21.  The Board recognized, however, that "there

occasionally will be unique circumstances that are not taken into account by either the Salient

Factor Score or the type of risk assessment, but that none-the-less should impact on the release

decision."  (Pls.' Joint Ex. 1 at 22.)  In such a case, the Parole Board could depart from the action

indicated by the SFS by referencing an applicable aggravating or mitigating factor listed in

Appendices 2-1 and 2-2.  *See* D.C. MUN. REGS. tit. § 204.22.  In Appendix 2-1 of the 1987

Regulations, the D.C. Parole Board listed six pre-incarceration factors that, if applicable,

demonstrated that the candidate was a greater risk for parole than reflected by his or her total

point score: (1) the offender  repeatedly failed under parole supervision; (2) the current offense

involved ongoing criminal behavior; (3) the offender had a lengthy history of criminally related

alcohol abuse; (4) the offender had a history of repetitive sophisticated criminal behavior; (5) the

offender had an unusually serious prior record of at least five felony convictions; or (6) the

offender's crime involved unusual cruelty to victims.  *See* D.C. MUN. REGS. tit. 28, app. 2-1.

**B.    1991 Policy Guideline**

In 1991, to ensure consistent and equitable application of the 1987 Regulations, the Board adopted a policy guideline to define the terms used in the appendices to the 1987 Regulations (the "1991 Policy Guideline").  (Pls.' Joint Stmt. ¶ 65; Pls.' Joint Ex. 8 [1991 Policy Guideline] at 1 (The purpose of the 1991 Policy Guideline was "[t]o define criteria and parameters for determining the applicability of descriptive terminology used in the [1987 Regulations] for release decisionmaking, and to facilitate consistency in [Regulation] Application.").)

The Board explained that "negative institutional behavior" in initial parole cases meant: (1) one Class I Offense for murder, manslaughter, kidnapping, armed robbery, or first degree burglary at any time during the minimum sentence; (2) one Class I Offense during the twelve months preceding the hearing or during the last half of the minimum sentence up to a period of three years, whichever is longer; or (3) two Class II Offenses during this same time frame.  (*See* Pls.' Ex. 8 at 2.)  In parole reconsideration cases, "negative institutional behavior" was defined as either (1) one Class I Offense or (2) two Class II Offenses occurring since the preceding release consideration on the sentence.  (*Id.*)

The Board further clarified that "sustained program or work assignment achievement" in the context of an initial parole consideration meant "[s]uccessful completion of one or more educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area."  (*Id.* at 3.)   In parole reconsideration cases, an offender would be found to have "sustained work or program achievement" if he or she completed the

required programs since the last consideration for release.  (*Id.*)

Finally, the Board defined each of the unique or "unusual circumstances" listed in appendix 2-1 of the 1987 Regulations.[5]  The Board also added and defined three additional "unusual circumstances" that would justify a departure from the action indicated by the total base point score: (1) repeated or extremely serious negative institutional behavior;[6] (2) lengthy history of criminally-related substance abuse;[7] and (3) absence of community resources which ensure the safety of the community.[8] (*Id.* at 6-9.)

---

[5]  The Board explained that "Repeated Failure Under Parole Supervision" requires "two . . . or more revocations of parole on the current sentence, OR three . . . or more revocations of parole on any sentence within the preceding five years."  (*Id.* at 6.)   "Unusually Extensive or Serious Prior Record" was defined as consisting of "at least five . . . felony convictions" for the commission of certain crimes of violence.  (*Id.* at 6-7.)   An offense involving "Unusual Cruelty to Victims was defined as requiring a showing that the offense involved "[p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense" or "[e]specially vulnerable victims, *e.g.*, children or elderly persons . . . ."  (*Id.* at 7.)

[6]  This was defined in initial parole cases to mean: "[o]ne or more Class I offenses for murder, manslaughter, kidnapping, armed robbery, or first degree burglary at any time during the minimum sentence;"  "[t]wo or more Class I Offenses . . . during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer;"  "[o]ne Class I Offense *plus* two Class II Offenses . . . during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer;"  "[t]hree or more Class II Offenses . . . during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer;"  "[o]pen charge(s) for new crime(s) committed during this sentence," or "[n]ew conviction(s) for crime(s) committed during this sentence."  (Pls.' Joint Ex. 8 at ¶ 7.)   Any of these findings would also support a departure at a candidate's parole reconsideration.  (*Id.*)

[7]  This was defined to mean a history "of at least five (5) convictions, including the current conviction, for criminal activity committed: . . . while under the influence of illegal substances or illegally used controlled substances; OR, . . . [i]nvolving the sale, distribution, purchase or possession of any narcotic drug, controlled dangerous substance or related paraphernalia."  (*Id.* at ¶ 8.)

[8]  The Board could make this finding if it determined that the "services necessary to support an offender's personal or community adjustment, and to minimize the risk to the community, any other person or the offender . . . ." were not available.  (*Id.* at ¶ 9.)

### C.    2000 Guidelines

Between 1998 and 2000, the USPC drafted new parole regulations and guidelines (the "2000 Guidelines") that it applied to any offender who received an initial parole hearing after August 5, 1998.  (Pls.' Joint Stmt. ¶ 14.)    The USPC justified its revisions explaining that its research demonstrated that "[t]he point score system used by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from the guidelines based upon factors that should be included in the guidelines . . . ."  63 Fed. Reg. 17771, 17772 (Apr. 10, 1998).  The USPC claimed that in a random sample of 100 cases decided by the Board in 1997, over half resulted in upward departures.  63 Fed. Reg. 39172, 39172 (July 21, 1998).   The USPC also undertook a study to "identify factors relevant to current offense and criminal history that [could] be empirically correlated with repeat violent crime."  *Id.*  Based on these studies, the USPC replaced the 1987 Regulations with the 2000 Guidelines for D.C. Code offenders who received their first hearing after August 5, 1998.  (Pls.' Joint Stmt. ¶ 89.)  The USPC was concerned that its new guidelines might increase the period of incarceration that D.C. Code offenders would have to serve, but it has not analyzed whether this in fact has occurred. (*Id.*)

Similar to the 1987 Regulations, the 2000 Guidelines use a point score system to determine whether a candidate is presumptively suitable for parole.   This system begins with a calculation of the Salient Factor Score ("SFS"), which assesses the degree of risk that a parole candidate will become a recidivist.  *See* 28 C.F.R. §§ 2.80(c) and 2.20.   The candidate's "criminal conduct (including the nature and circumstances of the current offense) . . . [is then] used to assist the Commission in determining the probable seriousness of the recidivism that is predicted by the Salient Factor Score."  *Id.* § 2.80(c).  Like the 1987 Regulations, the 2000

Guidelines also determine the "type of risk" posed by the parole candidate by looking at his or her history of violence, the use of weapon, and/or death of the victim as a result of the candidate's crime. *Id.* § 2.80(f). Under the 2000 Guidelines, a candidate can receive as many as 7 points based on the "type of risk" factor. *Id.* Any parole candidate serving a sentence for a crime of violence that resulted in the death of the victim automatically had 5 points added to his or her base point score. (Pls.' Joint Stmt. ¶ 126.)

After calculating both the degree and type of risk posed by an offender, the base point score is converted into a "base guideline range" of months that are added to the parolee's minimum sentence imposed by the court. *See* 28 C.F.R. § 2.80(h). Any offender with a base point score of greater than 3 points will, absent superior program achievement, have additional months added to his or her parole eligibility period. *Id.* §§ 2.80(h), (i).

After adding the base guideline range to the parole eligibility period, the USPC then adds or subtracts months to reflect negative institutional behavior and/or superior program achievement. *See* 28 C.F.R. §§ 2.80(j), (k), & (l). The final range of months is referred to as the "total guideline range," which is "the amount of time [an offender] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. 70663, 70664 (Nov. 27, 2000). Until a parole candidate has served a period of time equal to the bottom of his total guideline range, the candidate is presumed to be unsuitable for parole. See 28 C.F.R. §§ 2.80(h), (i), & (l).

Finally, similar to the 1987 Regulations, the 2000 Guidelines permit the USPC to deny parole to a candidate who is presumptively eligible under "unusual circumstances." The 2000 Guidelines provide examples of "unusual circumstances" but do not limit the discretion of the

USPC to depart on any basis that it classifies as "unusual" except that it cannot have been "fully

taken into account in the guidelines."  28 C.F.R. § 280(n).

## II.    PLAINTIFFS

Each plaintiff is a  D.C. Code offender who committed his crime and was sentenced prior

to August 5, 1998, when the D.C. Parole Board was responsible for determining the criteria to

apply to D.C. Code Offenders.  Since August 5, 1998, the USPC has decided plaintiffs' parole

requests.   Plaintiffs can be grouped into four categories according to the timing of their offenses

and of their initial parole hearings.  James Gambrell and Curtis Eason committed their offenses

after the Board adopted the 1987 Regulations and were considered by the USPC under the 1987

Regulations.  Charles Phillips and Benson West-El committed their offenses before the Board

adopted the 1987 Regulations and were considered by the USPC under the 2000 Guidelines.

Tony Sellmon and Carlton Martin committed their offenses after the Board adopted the 1987

Regulations, but before the 1991 Policy Guideline was enacted, and were considered by the

USPC under the 2000 Guidelines.  Finally, Darius Smith and Daru Swinton committed their

offenses after the 1987 Regulations and 1991 Policy Guideline were adopted, and were

considered by the USPC under the 2000 Guidelines.

### A.    Plaintiffs Considered Under the Parole Board's 1987 Regulations: Gambrell and Eason

#### 1.    *James Gambrell*

James Gambrell was sentenced on January 3, 1991, to imprisonment for a term of 12

years to life for Murder II While Armed for an offense he committed on February 13, 1989.

(Gambrell's Stmt of Undisputed Material Facts ["Gambrell Stmt."] ¶ 1; Gambrell Ex. 2

[Sentence Monitoring Computation Data] at 2.)  Gambrell first became eligible for parole on

11

November 26, 1999, after serving his minimum sentence. (Gambrell Ex. 2 at 3.) At Gambrell's initial parole hearing on July 14, 1998, the D.C. Parole Board represented that it would apply the 1987 Regulations. (Gambrell Stmt. ¶ 3; 28 C.F.R. § 2.80(a)(4).) Parole was denied and the Board set a rehearing date for August 20, 1999. (*Id.*) On December 9, 1999, a USPC Pre-Hearing Assessment Reviewer prepared a reconsideration prehearing assessment for Mr. Gambrell. (*Id.* ¶ 5.) In his report, the Reviewer expressed his concern that "[t]he major issue[] is whether this is sufficient accountability for the murder of an unarmed guard during a robbery. The history in this case is extremely volatile with numerous incidents of his possession of weapons and assaultive behavior." (Gambrell Ex. 4 [D.C. Reconsideration Pre-Hearing Assessment of James Gambrell (Dec. 9, 1999)] at 3.) On December 14, 1999, Gambrell appeared before a USPC hearing examiner. (Gambrell Stmt. ¶ 6.) The Hearing Examiner reduced Gambrell's total point score by one point for sustained program achievement since his last year, giving him a total point score of 0, which indicated that Gambrell was presumed suitable for parole. (*Id.*) The Hearing Examiner noted that Gambrell had programmed well, had received no disciplinary infractions, and had a total point score of 0, but nonetheless recommended a departure from the D.C. Parole Guidelines stating that "a close review of the crime itself as well as the subject's history would suggest that he represents a clear threat to the community and should not be released at this time." (Gambrell Ex. 5 [D.C. Reconsideration Hearing Summary of James Gambrell (Dec. 14, 1999)] at 2.) On January 18, 2000, the USPC adopted the Hearing Examiner's conclusions and recommendations and departed from the recommended action under the 1987 to deny Gambrell's request for parole. (Gambrell's Stmt. ¶ 8.) The USPC gave Gambrell a four-year set-off for August 2003. (*Id.*)

12

The USPC conducted Gambrell's second rehearing on July 1, 2003, at which time Gambrell again received a total point score of 0 and was presumptively suitable for parole. (*Id.* ¶ 9.) The Hearing Examiner again recommended a denial of the parole request based on the same reasons previously used to deny parole on January 18, 2000, and the USPC again denied parole on July 29, 2003. (*Id.* ¶ 10.) The USPC gave Gambrell a three-year set-off, with rehearing scheduled for July 2006. (*Id.*) After Gambrell's third rehearing, at which he again received a total point score of 0, the USPC again denied parole based on the same reasons and gave him a two-year set-off. (*Id.* ¶¶ 11-12.) Between Gambrell's third and fourth rehearings, Gambrell brought this lawsuit. (*Id.* ¶ 19.)

On July 24, 2007, the USPC conducted Gambrell's fourth rehearing. (*Id.* ¶ 20.) Gambrell had completed the Challenge Program between hearings pursuant to the USPC's request at his prior hearing, and he had not been subject to any disciplinary actions. (*Id.*) The Hearing Examiner recommended parole, writing that Gambrell "is remorseful for his instant offense and said that he has demonstrated that through his corrective action and programming. This examiner believes giving the subject a parole date at this juncture is appropriate and would not lessen the severity of the offense. It would hold him accountable for his actions and the subject has done everything possible in order for him to succeed." (*Id.*) Executive Reviewer Kostbar disagreed and recommended that Gambrell be given a five-year set-off, explaining that "19 years is simply not enough time for an individual to serve in a crime of this nature, and I believe that release at this time, or any time in the near future, would depreciate the seriousness of the offense behavior and promote disrespect for the law." (Gambrell Ex. 11 [Rehearing Summary of James Gambrell (Jul. 24, 2007)] at 3.) On August 10, 2007, the USPC adopted the Executive

Reviewer's conclusions and recommendations and denied parole, citing the same reasons for departing from the guidelines as it had in the prior three rehearings, but giving Gambrell a five-year set-off and setting rehearing for July 2012.  (Gambrell Stmt. ¶ 24.)

2.    *Curtis Eason*

On November 9, 1988, Curtis Eason was sentenced to a term of 14 years to life for the crime of Murder in the Second Degree While Armed. (Eason's Stmt. of Material Facts ["Eason Stmt."] ¶ 1.)  Eason became eligible for parole on March 18, 1998, after serving his minimum sentence.  (*Id.* ¶ 2.)   On February 20, 1998, the D.C. Parole Board held Eason's initial hearing and determined that Eason had a total point score of 3, which indicated that he was not presumed suitable for parole.  (*Id.* ¶ 3.)  The Board denied Eason parole on November 23, 1998, and gave him a one year set-off and a rehearing date of March 18, 1999.  (*Id.* ¶¶ 4-5.)  The Board gave Eason two special instructions for reconsideration: (1) "program participation" and (2) "no new disciplinary reports."  (*Id.*)

On March 9, 1999, a USPC Pre-Hearing Assessment Reviewer prepared an assessment and computed a total point score of 2.  The Reviewer noted that "[Eason] is now within the parolable guidelines with a total point score of 2.  The issue is whether or not 11 years in custody is adequate accountability for the taking of a life during a robbery offense." (Eason Ex. 4 [D.C. Reconsideration Prehearing Assessment (March 9, 1999)] at 3.)  At the hearing, the Examiner noted that Eason had followed the Board's instructions for reconsideration, had continued programming well, and had no new disciplinary infractions, but recommended departing from the 1987 Regulations and denying parole.  (Eason Stmt. ¶ 9.)   The Examiner stated that:

The prisoner certainly is doing extremely well in terms of programming and conduct, however in this examiner's opinion, the

14

> prisoner's favorable institutional adjustment does not outweigh the
> issues of risk or accountability. This examiner would believe that .
> . . for the nature of the prisoner's instant offense some minimum
> sentence service up to 20 years would be indicated or possibly
> even more. It appears that the prisoner has served between 10 and
> 11 years in continuous custody at this juncture and again in this
> examiner's opinion, it simply would not be sufficient for purposes
> of accountability, not to mention risk.

(*Id.*) The USPC adopted the Examiner's recommendation finding that a departure from the

Regulations was warranted because Eason was "a more serious risk than indicated by [his] total

point score . . ." based on his prior criminal history. (Eason Ex. 6 [Notice of Action (April 23,

1999)] at 1.) The USPC gave Eason a five-year set-off with a rehearing date of March 2004.

(Eason Stmt. ¶ 10.)

The USPC conducted Eason's second rehearing on March 2, 2004, at which time the

Hearing Examiner reduced Eason's total point score by one point for program achievement,

giving him a total point score of 1, which rendered him presumptively suitable for parole. (*Id.* ¶

11.) The Hearing Examiner recommended that parole be granted. (*Id.*) The Executive

Reviewer, however, rejected the Examiner's decision and recommended denial of parole on the

basis that

> [a] review of the file documents reveals that although the offender
> was permitted to plead to the reduced offense of Murder II, the
> offense behavior has all of the elements of Murder I. There was
> planning, aforethought, etc. The offender brought to the table a
> serious assault/violent criminal history and must still be considered
> [a] threat to the public safety. Although he has made a generally
> good inst[itutional] adjustment, the behavioral accountability
> factor has not been met. In many jurisdictions release for a case of
> this magnitude would not be seriously considered until[] at least 20
> years had been served. It is noted also that at the 1999 hearing the
> USPC imposed the maximum "setoff" (5 yrs) and would possibly
> have made a more lengthy one if permitted.

(*Id.*)  The USPC adopted the recommendation of the Executive Reviewer and departed from the 1987 Regulations in denying Eason parole.  The Notice of Action stated that "[a]fter consideration of all factors and information presented, a departure from the guidelines is warranted because your offense behavior is more serious than your conviction to Murder II in that the murder was planned and an act of revenge.  Consequently, the Commission has determined additional time incarcerated is necessary for accountability purposes." (*See* Eason Ex. 8 [Notice of Action (Apr. 1, 2004)] at 1.)    The USPC gave Eason a three-year set-off with a rehearing date of March 2007.  (*See* Eason Stmt. ¶ 12.)

The USPC conducted Eason's third rehearing on March 13, 2007, and reduced his total point score to 0 for sustained program achievement.  (*Id.* ¶ 13.)   The Hearing Examiner recommended a grant of parole.  Executive Reviewer Jeffrey Kostbar disagreed

> This is a highly aggravated case and outside the "heartland" of a 2nd degree murder case.  The case specifics are more closely associated with a 1st degree, premeditated murder.  Consequently I believe that the subject should serve much more time on this term, possibly as long [as] 25 - 30 years.  A decision less than that, would, in my opinion, depreciate the seriousness of the [offense] behavior and promote disrespect for the rule of law . . .

(Eason Ex. 9 [Hearing Summary (Mar. 13, 2007)] at 3-4.)  The USPC adopted Kostbar's recommendation and denied Eason's request for parole, noting that "additional time is necessary for accountability purposes."  (Eason Ex. 10 [Notice of Action (Mar. 23, 2007)] at 1.)

### B.    Plaintiffs Considered Under the USPC's 2000 Guidelines

#### 1.    Crimes Committed Before Publication of the 1987 Guidelines: Phillips and West-El

##### a.    *Charles Phillips*

On October 25, 1978, Charles Phillips was sentenced to a term of thirty-five years and

16

six months to life for assault with a deadly weapon, two counts of second-degree murder, carrying a pistol without a license, and unlawful entry. (Phillips Stmt. of Undisputed Material Facts ["Phillips Stmt."] ¶ 1.) He became eligible for parole on February 8, 2003. (Phillips Ex. 2 [Sentence Monitoring Computation Data] at 3.)

On November 19, 2002, the USPC conducted Phillips's initial parole hearing under the 2000 Guidelines. (Phillips Stmt. ¶ 4.) The USPC calculated Phillips's SFS as 9, giving him a baseline score of 0. (Phillips Ex. 3 [Hearing Summary (Nov. 19, 2002)] at 2.) The USPC then added 5 points to the base point score because his offense was a crime of violence resulting in the death of the victims, thereby producing a base point score of 5. (*Id.* at 2, 4.) The base point score was converted into a base guideline range of 18-24 months, which the USPC added to his parole eligibility period of 302 months. It then subtracted 16 months for superior program achievement and added 0-24 months because of nine disciplinary infractions Phillips received in 1987 or earlier, producing a Total Guideline Range of 304-334 months. (*Id.* at 1, 3.) The USPC denied Phillips's request for parole on December 13, 2002, and gave Phillips a three-year set-off with a rehearing date of November 2005. (*See* Phillips Stmt. ¶¶ 7-8.) This date was outside the 2000 Guidelines because the rehearing date was set later than the top of Phillips's Total Guideline Range. (*Id.*) The USPC explained its reasoning as follows:

> On May 28, 1977, you stabbed an individual to death after luring him to your ex-girlfriend's apartment. You the[n] seriously assaulted her by stabbing her in the left side and cutting her on the wrist. After being arrested on this offense and released from custody, you broke into your ex-girlfriend's apartment on December 22, 1977, confronted her and her companion and shot her companion to death after an altercation. Your Base Point Score of 5 reflects 2 point[s] assessed in Category II for violence and 3 points in Category III for death of a victim. However, the addition of these points capture[s] only the murder which occurred

17

> on May 28, 1977; stabbing of your ex-girlfriend on May 28, 1977,
> breaking into and entering her apartment on December 22, 1977
> and murdering her companion on the same date are not reflected in
> the Base Point Score. The Commission at your next hearing will
> consider the risk you pose to the community based on your
> homicidal acts not captured in the Base Point Score.

(Phillips Ex. 4 [Notice of Action (Dec. 13, 2002)] at 1.)

On October 27, 2005, the USPC conducted Phillips's rehearing under the 2000

Guidelines, at which time his Total Guideline Range remained at 304-334 months. (Phillips

Stmt. ¶ 14.) The Hearing Examiner recommended granting the request for parole at 370 months

because that would "hold [Phillips] accountable for the two deaths of his victims and the

stabbing of the [woman] that he cared for which he apologized for all of the crimes that he has

committed." (Phillips Ex. 5 [Reconsideration Hearing Summary (Oct. 27, 2005)] at 2.) The

Executive Reviewer disagreed and recommended denying parole.

> I disagree with setting a release date at this hearing and
> recommend a reconsideration hearing in 36 months. The examiner
> is recommending a release date after the service of approximately
> 31 years. This offense involved two murders and a stabbing . . . .
> It should be noted that the companion/victim was a police officer.
> Phillips denies knowing that the victim was a police officer[]. The
> guidelines only take into consideration one murder . . . . As a
> result, the second murder and assault are not considered in the
> computation of the guidelines. Phillips['s] guidelines are 304-334
> months. At the top of the hearing, he had served 335 months. The
> difference between the top of the range and the recommendation
> for a release date made by the examiner is 36 months. Thirty-six
> months is not sufficient sanction for a second murder and
> aggravated assault.

(*Id.* at 3.) The USPC adopted the recommendation of the Executive Reviewer and denied parole

explaining that "Breaking and Entering into [his ex-girlfriend's] apartment on 12/22/77 and the

murdering of her companion on the same date are not reflected in the Base Point Score."

(Phillips Ex. 6 [Notice of Action (Nov. 18, 2005)] at 1.)  Phillips received a three-year set-off
and a rehearing date of October 2008. (Phillips Stmt. ¶ 17.)

> b.    *Benson West-El*

On February 16, 1984, Benton West-El[9] was sentenced to imprisonment for a combined,
concurrent term of twenty years to life for attempted robbery while armed, first degree murder
while armed, attempted robbery, and carrying a weapon without a license. (West-El's Stmt. of
Undisputed Material Facts ["West-El Stmt."] ¶ 1.)  He became eligible for parole on January 5,
2003.  (West-El Ex. 1 [Sentence Monitoring Computer Data] at 2.)

On April 29, 2002, the USPC conducted West-El's initial parole hearing under the 2000
Guidelines.  (West-El Stmt. ¶ 4.)   The USPC calculated his SFS as 7 with a base point score of
1, to which five points were added because West-El committed a crime of violence resulting in
the death of the victim.  (West-El Ex. 2 [Hearing Summary (Apr. 29, 2002)] at 3.)   The base
point score of 6 was converted into a base guideline range of 36-48 months, which was added to
West-El's parole eligibility period of 227 months.  (*Id.* at 3-4.)   The USPC then added 24-40
months based on disciplinary infractions committed in 1983, 1984, 1986, 1989, and 1992,
resulting in a total guideline range of 287-315 months.  (*Id.* at 2-4.)  West-El did not receive any
credit for superior program achievement, despite his program achievements in Metal Fabrication
and Industrial Maintenance, the Refrigeration Squad, 24 weeks of the Drug Program, and
religious and self-help groups.  (*Id.* at 3.)  The USPC denied parole, a decision within the
Guidelines, and gave West-El a four-year set-off, with a rehearing date of April 2006. (West-El

---

[9] During his incarceration, plaintiff changed his name from Benton West to Benton West-
El.  (West-El Stmt. ¶ 1 n.1.)

Stmt. ¶ 9.)

On March 22, 2006, the USPC conducted West-El's rehearing under the 2000
Guidelines. (*Id.* ¶ 18.)  The Hearing Examiner made a correction in West-El's parole eligibility
period and then subtracted 16 months for superior program achievement resulting in a corrected
total guideline range of 284-312 months. (*Id.*)  The Hearing Examiner recommended that West-
El be paroled on November 5, 2007, after the service of 298 months, a sentence "[t]hat seems to
appropriately fit this case." (West-El Ex. 4 [Hearing Summary (Mar. 22, 2006)] at 3.)  The
USPC denied parole and ordered that he be paroled after the service of 312 months. (West-El's
Stmt. ¶ 20.)  West-El is currently scheduled to be paroled on January 5, 2009.[10]

### 2. Crimes Committed After the Publication of the 1987 Guidelines: Sellmon and Martin

#### a. Tony R. Sellmon

On February 26, 1992, Tony Sellmon was sentenced to a combined concurrent term of 15
years to life for second degree murder while armed and possession of a firearm during the
commission of a crime of violence or dangerous offense. (Sellmon's Stmt of Undisputed
Material Facts ["Sellmon Stmt."] ¶ 1.)  He became eligible for parole on May 13, 2003.
(Sellmon Ex. 2 [Sentence Monitoring Computation Data] at 2.)

On August 7, 2002, the USPC conducted Sellmon's initial parole hearing under the 2000
Guidelines. (Sellmon Stmt. ¶ 4.)   The USPC calculated Sellmon's SFS as a 9, placing him in the
very good risk category with a base point score of 0, then added 5 points because his offense was
a crime of violence resulting in the death of the victim. (*Id.* ¶ 5.)  The USPC converted the base

---

[10] West-El was originally ordered paroled on March 5, 2008, which would have been
after service of 302 months rather than the 312 ordered by the USPC.

point score of 5 into a base guideline range of 18-24 months, which it added to his parole eligibility period of 136 months, resulting in a total guideline range of 154-160 months. (*Id.*) The Hearing Examiner recommended that 43 months be subtracted for superior program achievement, but the Executive Hearing Examiner refused to grant this reduction because he believed that Sellmon had not been held sufficiently accountable for his crime. He then recommended that the USPC deny parole. (*Id.* ¶ 6.) The USPC adopted the Executive Hearing Examiner's recommendation and denied parole. (*Id.* ¶ 7.)

Sellmon successfully challenged the USPC's refusal to grant him a program achievement deduction in federal court and a second initial parole hearing was held. (*Id.* ¶¶ 8-9.) At the second hearing, the USPC calculated Sellmon's total guideline range in the same way it had at his first hearing, but subtracted 50 months for superior program achievement, resulting in a total guideline range of 104-110 months. (*Id.*) Sellmon had served 149 months by that date, so the Hearing Examiner recommended parole. (*Id.* ¶¶ 9-10.) Executive Reviewer Denton disagreed and recommended a three-year set-off due to the brutality of the murder. (Sellmon Ex. 6 [Hearing Summary (Jun. 22, 2004)] at 3-4.) Executive Reviewer Husk agreed with Denton and recommended that the USPC exceed the 2000 Guidelines "because the murder that [Sellmon] committed while armed was extremely brutal, as evidenced by the massive head trauma . . . inflicted upon the victim." (*Id.* 5) The USPC denied parole and gave Sellmon a three-year set-off, with a rehearing date of August 2005. The USPC erroneously left this rationale off the Notice of Action, but stated only that "additional time is necessary for planning purposes." (Sellmon Ex. 7 [Notice of Action (Jul. 24, 2004)] at 1.) The error was noted and corrected at the time of Sellmon's first rehearing. (*See* Sellmon Ex. 8 [Hearing Summary (Aug.

2, 2005)] at 1.)

On August 2, 2005, Hearing Examiner Jeffrey Kostbar conducted Sellmon's rehearing and did not add or subtract any months from Sellmon's total guideline range of 104-110 months. Although Sellmon had served 163 months by this date, (*i.e.*, 53 months longer than the top of his guideline range), Kostbar recommended that parole be denied.

> This examiner believes that accountability for the offense behavior not only is a consideration of the factors that go into the guideline calculation, but also factors that are outside of that calculation. That would include the brutality exhibited by an offender in committing a murder. In this case, subject chose to beat a female victim to death by beating her in the head with a gun, thereby, causing massive head trauma and her ultimate death. This methodology is extremely brutal. I do not believe that it is captured by the guidelines . . . . I do not believe that the extreme brutality of the offense is captured by his current service of nearly 14 years, or even by the next Reconsideration Hearing date, which would be scheduled after service of approximately 17 years . . . .

(Sellmon Ex. 8 [Reconsideration Hearing Summary (Aug. 2, 2005)] at 3.)   On August 11, 2005, the USPC denied Sellmon parole "because the murder that [he] committed while armed was extremely brutal, as evidenced by the massive head trauma . . . inflicted upon the victim." (Sellmon Ex. 9 [Notice of Action (Aug. 11, 2005)] at 1.)  Sellmon was continued to a three-year rehearing in August 2008.

### b.    *Carlton Martin*

On February 19, 1992, Carlton Martin was sentenced to a combined, concurrent term of 15 years to life for manslaughter while armed, possession with intent to distribute cocaine, and possession of a firearm during the commission of a crime of violence. (Martin's Stmt. of Undisputed Material Facts ["Martin Stmt."] ¶ 1.)  He became eligible for parole on June 14, 2003. (*See* Martin Ex. 2 [Sentence Monitoring Computation Data] at 3.)

On January 21, 2003, the USPC conducted Martin's initial parole hearing under the 2000 Guidelines. (Martin Stmt. ¶ 4.) The USPC calculated Martin's SFS as a 5, placing him in the fair risk category with a base point score of 2, and added 5 points because his offense was a crime of violence that resulted in the death of the victim. (Martin Ex. 3 [Notice of Action (Feb. 13, 2003)] at 2.) The base point score of 7 was converted to a base guideline range of 54-72 months, which was added to Martin's parole eligibility period of 138 months. (Martin Stmt. ¶ 5.) The USPC then added 0-2 months for a minor non-drug related infraction, resulting in a total guideline range of 192-212. (*Id.*) The USPC denied Martin's request for parole on February 13, 2003, a decision within the Guidelines. (*Id.* ¶ 6.) At that time, Martin had served 133 months and was 59 months away from the bottom of his total guideline range. He was given a rehearing date of January 2006.[11] (*Id.* ¶ 7.)

On March 22, 2006, the USPC conducted Martin's rehearing under the 2000 Guidelines (*Id.* ¶ 15.) The USPC subtracted 13 months for superior program achievement and produced a new total guideline range of 179-199 months. (*Id.*) The Hearing Examiner recommended that

_____

[11] Stephen Husk, the USPC's current Case Operations Administrator, testified that USPC committed an error in calculating Martin's SFS. (Pls.' Joint Ex. 10 [Husk Deposition] at 10.) Husk testified that Martin should have received an additional point since he was not on probation, parole, confinement, or escape status when he committed the current offense. (*Id.*) Martin argues that with an SFS of 6, he would have been placed in the good risk category with a score of 1 and the addition of 5 points would have resulted in a Base Point Score of 6 and a Base Guideline Range of 36-48 months. (Martin Stmt. ¶ 9.) Added to his parole eligibility period of 138 months and an additional 0-2 months for an infraction, Martin's Total Guideline Range would have been 174-188 months. (*Id.*) Defendants do not contest Husk's testimony, but object on the grounds that Martin's recalculation is speculative. (Defs.' Stmt of Genuine Issue in Response to Individual Pls.' Stmt of Materials Facts ¶ 43.)

This alleged calculation error is not relevant to Martin's *ex post facto* challenge, and the Court therefore declines to consider how much time Martin would have been required to serve had his SFS been computed differently.

Martin be granted parole on September 10, 2007, after serving 189 months. (*Id.* ¶ 16.)  The

Executive Reviewer rejected this recommendation with the following explanation:

> As indicated in previous summaries, since the victim was shot
> multiple times in the head, it is unlikely that the victim's death was
> unintentional.  In a separate offense/conviction that is being
> considered at this hearing, subject was found in possession of
> drugs and a firearm.  The examiner is recommending release after
> approximately 15.5 years. This is not sufficient accountability for
> the death of the victim in addition to possession of a firearm during
> a drug offense.

(Martin Ex. 4 [Reconsideration Hearing Summary (Mar. 22, 2006)] at  4.)  The USPC adopted the

Executive Reviewer's recommendation and denied Martin parole on April 12, 2006.  (Martin Ex.

5 [Notice of Action (Apr. 12, 2006)] at 1.)   The USPC gave Martin a three-year set-off and a

rehearing date of March 2009, 8 months later than the top of his Total Guideline Range.  (*Id.*)

### 3. Crimes Committed After the Publication of the 1991 Guidelines: Smith and Swinton

#### a. *Darius Smith*

On April 6, 1994, Darius C. Smith was sentenced to imprisonment for a combined,

concurrent term of 15 years to life for possession of a firearm during a crime of violence,

carrying a weapon without a license, and second-degree murder.  (Smith's Stmt. of Undisputed

Material Facts ["Smith Stmt."] ¶ 1.)  He became eligible for parole on February 26, 2005.  (*Id.* ¶

2.)

On June 22, 2004, the USPC conducted Smith's initial parole hearing under the 2000

Guidelines. (*Id.* ¶ 4.)  The USPC calculated Smith's SFS as an 8, placing him in the very good

risk category with a base point score of 0.  (Smith Ex. 8 [Notice of Action (Jul. 20, 2004)] at 2.)

The USPC added 5 points because Smith's offense was a crime of violence that resulted in the

death of a victim.  (*Id.*)   It then converted the base point score of 5 to a base guideline range of 18-24 months, which it added to his parole eligibility period of 140 months.  (*Id.* at 4.)  The USPC then added 88-124 months because of disciplinary infractions Smith received in 1997 and 1998, more than six years before his initial hearing, and subtracted 12 months for superior program achievement, for a total guideline range of 234-276 months.  (*Id.*)

The USPC denied Smith's request for parole on July 20, 2004, a decision within the Guidelines, and set a rehearing date for June 2009.  (Martin Stmt.  ¶¶ 7-8.)

b.    *Daru Swinton*

On May 8, 1998, Daru Swinton was sentenced to a term of five years to life for armed robbery and a term of twenty months to five years for attempted kidnapping.  (Swinton's Stmt. of Undisputed Material Facts ["Swinton Stmt."] ¶ 1.)  Swinton became eligible for parole on July 22, 2004.  (*Id.* ¶ 2.)

On December 2, 2004, the USPC conducted Swinton's initial parole hearing under the 2000 Guidelines. (*Id.* ¶ 4.)  The USPC calculated his SFS score as a 5, placing him in the fair risk category with a base point score of 2.  (Swinton Ex. 4 [Notice of Action (Jan. 22, 2004) at 2.)  The USPC added 3 points to Swinton's base point score because his offense was a crime of violence with other high level violence, producing a base point score of 5, which converted to a base guideline range of 18-24 months.  (*Id.* at 2-3.)  The USPC then added this range to Swinton's parole eligibility period of 80 months, subtracted 8 months for superior program achievement and added 12-16 months because of a disciplinary infraction that Swinton received in 2003.  (*Id.* at 3.)  This resulted in a total guideline range of 102-112 months.  (*Id.*)  On January 22, 2004, the USPC denied Swinton's request for parole, a decision within the

Guidelines, and gave him a three-year set-off and a rehearing date of December 2006.  (*Id.* at 3.)

On October 23, 2006, the USPC conducted Swinton's rehearing under the 2000 Guidelines.  (Swinton Stmt. ¶ 11.)  The USPC subtracted 4 months for superior program achievement and added 0-2 months for a minor disciplinary infraction, resulting in a new total guideline range of 98-110 months.  (Swinton Ex. 5 [Rehearing Summary (Oct. 23, 2006)] at 2-3.) The Hearing Examiner recommended granting Swinton's request for parole on January 19, 2007, after he served 110 months.  (*Id.* at 1.)  The Executive Reviewer disagreed and recommended denying parole and a set-off of 36 months.

> In Category III of the Score, you receive[d] 1 point for a crime involving high level violence, kidnapping.  However, in your offense, three individuals were kidnapped and held at gunpoint for over 3 hours while you forced the adult victim to withdraw all of her available cash out of various ATMs during the ordeal.  The victims were a mother and her two young sons.  Your callous disregard for the victims, to include two young boys, coupled with your propensity to carry weapons as reflected in your prior record and your possession of a weapon (sharpened metal blade) create a risk to the safety of the community.

(*Id.* at 4.)   The USPC adopted the Executive Reviewer's conclusions and recommendation and denied parole on November 7, 2006, a decision outside the Guidelines.  (Swinton Stmt. ¶ 13.) Swinton had served 108 months by that date and was only 2 months away from the top of his new Guidelines range, but the USPC gave Swinton a three-year set-off with a rehearing date of October 2009.  (*Id.* ¶¶ 13-14.)


## ANALYSIS

## I.    STANDARD OF REVIEW

Plaintiffs have moved for summary judgment.  Under Fed. R. Civ. P. 56(c), a motion for

summary judgment shall be granted if there is no genuine issue of material fact, and the moving

party is entitled to judgment as matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). In considering a motion for summary judgment, the "evidence of the non-movant

is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also*

*Wash. Post. Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir.

1989). The moving party "bears the initial responsibility of informing the district court of the

basis for its motion and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). In response, the opposing party must "go beyond the pleadings and by [its] own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (internal quotation marks

omitted).

　　　Defendants have moved for judgment on the pleadings. Under Fed. R. Civ. P.12(c), a

motion for judgment on the pleadings may be granted if the moving party demonstrates that "no

material fact is in dispute and that it is entitled to judgment as a matter of law.*"  Peters v. Nat'l*

*R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (internal quotation marks and

citations omitted).  "The standard for reviewing a motion for judgment on the pleadings is the

same as that applied to a motion to dismiss for failure to state a claim upon which relief can be

granted under Rule 12(b)(6)." *National Ass'n of Mfrs. v. Taylor*, -- F.Supp.2d -- , 2008 WL

1390606, at *10 (D.D.C. Apr. 11, 2008) (citing *Dale v. Exec. Office of the President*, 164

F.Supp.2d 22, 24 (D.D.C. 2001)). To defeat a motion to dismiss for failure to state a claim,

plaintiffs' complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

## II.    PROCEDURAL POSTURE OF THE SUIT

As a preliminary matter, defendants contend that plaintiffs' suit may not proceed under 42 U.S.C. § 1983.  Defendants first argue that plaintiffs may not bring their *ex post facto* challenge pursuant to 42 U.S.C. § 1983 because the Commissioners of the USPC are not considered "persons" under the statute. (*See* Defs.' Mot. 37.)   This position was previously rejected by the D.C. Circuit in *Fletcher v. District of Columbia*, 370 F.3d 1223 (D.C. Cir. 2004) ("*Fletcher I*"), *vacated on reh'g by Fletcher v. District of Columbia*, 391 F.3d 250 (D.C. Cir. 2004) ("*Fletcher II*").   In *Fletcher I*, a D.C. prisoner brought an *ex post facto* claim against the USPC under 42 U.S.C. § 1983.  *Id.* at 1225.  The USPC argued that Fletcher could not maintain his suit because it does not act "under color of state law" and is not "a person" subject to suit under the statute.  *Id.* at 1227.    The D.C. Circuit first held that the members of the USPC act under color of state law when they act pursuant to the D.C. Revitalization Act.  *Id.*  The Court then "construe[d the prisoner's] complaint to have named the individual members of the Commission" and allowed the suit to proceed.   *Id.* at 1227 n. *.  Following the authority of *Fletcher I*, plaintiffs here have properly sued the Chairman and the Commissioners of the USPC in their official capacities, and not the Commission itself, for acts taken by the defendants pursuant to their authority under the

Revitalization Act.[12]

Defendants next contend that plaintiffs may not pursue their claims under 42 U.S.C. §
1983, but rather must seek writs of habeas corpus in the various jurisdictions where they are
incarcerated because plaintiffs' claims "necessarily imply or automatically result in a speedier
release." (Defs.' Mot. 38 (quoting *Fletcher v. Reilly*, 370 F.3d at 1227).) This argument ignores
the holding of the Supreme Court in *Wilkinson v. Dotson*, 544 U.S. 74 (2005), which concluded
that suits which "seek relief that will render invalid the state procedures used to deny parole
eligibility . . . and parole suitability . . . ," may be brought pursuant to § 1983 because success on
such claims "would [not] necessarily spell speedier release." *Id.* at 82. Were these plaintiffs to
prevail in their *ex post facto* challenge, they would gain "at most a new parole hearing at which . .
. [the USPC] may, in [its] discretion, decline to shorten [their] prison term[s]." *Id.* This case
therefore falls squarely within the holding of *Wilkinson*.[13]

---

[12] Citing *Settles v. United States Parole Comm'n*, 429 F.3d 1098 (D.C. Cir. 2005),
defendants argue that the question of whether defendants are "persons" under 42 U.S.C. § 1983
is still undecided in this circuit. (Defs.' Reply 8.) This argument is somewhat disingenuous. In
*Settles*, as in *Fletcher I*, plaintiff sued the USPC, not its individual members. *Settles*, 429 F.3d
at 1100. Because the USPC failed to raise the argument that it is not a "person" under § 1983
before the district court, the D.C. Circuit declined to consider it on appeal. *Id.* at 1104-05. The
Court then went on to explain that it would not, as it had in *Fletcher I*, construe the complaint to
have named the USPC's individual members because Settles, unlike Fletcher, had been
represented by counsel and therefore should have been aware that the USPC itself was not
amenable to suit under this statute. *Id.* at 1106-07. The holding of *Settles* is thus entirely
consistent with *Fletcher I* in that it identifies the individual Commissioners as the appropriate
parties in a suit for injunctive and declaratory relief under § 1983. This conclusion was also
reached by this Court in *Fletcher* on remand from the D.C. Circuit. *See Fletcher v. District of
Columbia*, 481 F.Supp.2d 156, 158 (D.D.C. 2007) ("The Court . . . concludes that the plaintiff
can only proceed against the present Commissioners in their official capacities on the claim
under 42 U.S.C. § 1983 for prospective injunctive and declaratory relief.")

[13] Defendants argue strenuously that plaintiffs' stated belief that the correct application
of the 1987 Regulations to their cases would result in earlier release undercuts their ability to
proceed pursuant to § 1983. (Defs.' Reply 4-5.) This argument was directly rejected by the

### III.    *EX POST FACTO* CLAIMS

The Court now turns to the merits of plaintiffs' argument that defendants violated their

constitutional rights under the *Ex Post Facto* Clause by applying the USPC's policies and

procedures to their cases, rather than those of the D.C. Parole Board.

The *Ex Post Facto* Clause of the United States Constitution prohibits retroactive increases

in punishment for a crime after its commission.  *See* U.S. CONST. art. I, § 9, cl. 3; *Collins v.*

*Youngblood*, 497 U.S. 37, 42-43 (1990).   It is meant "to assure that legislative Acts give fair

warning of their effect and permit individuals to rely on their meaning until explicitly changed."

*Weaver v. Graham*, 450 U.S. 24, 28-29 (1981).   The Supreme Court has held that a retroactively

applied parole regulation, guideline, or policy statement may violate the *Ex Post Facto* Clause if

it creates "a significant risk" of "a longer period of incarceration than under the earlier rule."

*Garner v. Jones*, 529 U.S. 244, 255 (2000).

A determination of whether the retroactive application of a new parole regime violates the

*Ex Post Facto* Clause requires a "searching comparison" of the two parole regimes.  *Fletcher III*,

433 F.3d at 879.  Although *Garner* provides that "significant risk" may be demonstrated *either*

through a facial showing of a difference in the two policies, *or* through evidence that the agency's

discretionary implementation of the new policy results in a longer period of incarceration than

under the earlier rule, *see Garner*, 529 U.S. at 255, the D.C. Circuit has clarified that "[t]he

controlling inquiry is one of practical effect."  *Fletcher III*, 433 F.3d at 877 (citation and internal

quotation marks omitted).   To prevail on an *ex post facto* claim, therefore, plaintiffs must

─────────────────────

*Wilkinson* Court, which characterized the error in the State of Ohio's logic as a  "jump from a
true premise (that in all likelihood the prisoners hope the[ir] actions will bring about earlier
release) to a faulty conclusion (that habeas is their sole avenue of relief)."  *Wilkinson*, 544 U.S.
at  78.

demonstrate that as applied to their individual cases, the "practical effect" of the application of the federal parole standards and/or the 2000 Guidelines was a "substantial risk" of lengthier incarceration.

**A.      Plaintiffs' Ability to Invoke the *Ex Post Facto* Clause**

Defendants first argue that several of the plaintiffs may not raise *ex post facto* challenges based on the 1987 Regulations or the 1991 Policy Guideline because their offenses were committed before one or both of these policies were adopted.  The 1987 Regulations were formally adopted in 1985 and published in May 1987 (*see* Pls.' Joint Stmt ¶ 18), and the 1991 Policy Guideline was adopted on December 16, 1991.  (*See* Pls.' Joint Ex. 8 [1991 Policy Guideline] at 9.)  Defendants contend that plaintiffs Eason, West-El, Gambrell, and Phillips[14] may not rely on either policy because their offenses were committed prior to 1987 (*see* Defs.' Mot. 47, 50), and that plaintiffs Sellmon and Martin may not rely on the 1991 Policy Guideline because their offenses were committed before 1991. (*Id.* 53.)

---

[14]  Defendants challenge Gambrell's ability to raise an *ex post facto* challenge based on the 1987 Regulations because his first offense was committed in 1968. (*See* Defs.' Mot. 47.)  They offer no explanation, however, for why his 1968 offense, and not the 1989 offense that resulted in the sentence that he is currently serving, should be the relevant one for determining whether he is entitled to *ex post facto* protection.  It appears from the record that when Gambrell came up for parole for the first time after being reincarcerated, he was considered as a new parole candidate under the 1987 Regulations, not as a re-parole candidate.  (*See* Gambrell Ex. 3 at 1; Gambrell Ex. 4 at 1.)   That is because Gambrell was reincarcerated not on the basis of a parole revocation, but rather based on the aggregated sentence he received for the new crime. (*See* Gambrell Ex. 1.)   Therefore, absent any argument by defendants to the contrary, the Court concludes that Gambrell's 1989 offense is the relevant one for this inquiry.

Defendants also challenge Eason's ability to rely on the 1987 Regulations because his crime was committed in 1987, after the Guidelines were adopted but before they were officially published.  (*Id.*)   Given that the focus of the *ex post facto* inquiry is on the comparison between the actual parole practices at the time the offender committed his offense and at the time he was considered for parole, the Court concludes that Eason may claim protection based on the 1987 Regulations as the parole practices that were in use at the time his offense was committed.

The principles of "fair notice and governmental restraint" which underlie the *Ex Post Facto* Clause are implicated "when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver*, 450 U.S. at 30. It is therefore clear, that plaintiffs may only invoke *ex post facto* protection based on the parole regime that was in place at the time they committed their offenses. Plaintiffs do not contest this core principle. Rather, they contend that the practices codified in the 1987 Regulations were actually in place prior to their enactment. (*See* Pls.' Opp'n 49.) To support their argument, they cite *Davis v. Henderson*, 652 A.2d 634 (D.C. Cir. 1994), which rejected an *ex post facto* challenge by a D.C. Code offender to the application of the 1987 Regulations to his case and held that "the 1987 Regulations formalized the manner in which the D.C. Parole Board had exercised its discretion prior to the regulations." (Pls.' Opp'n 49 (citing *Davis*, 652 A.2d at 636).) Plaintiffs argue that based on the D.C. Court of Appeals' determination that the Board's practice in 1980 was the same as its practice after 1987 (such that no *ex post facto* violation occurred when applying the new regulations to offenders whose crimes were committed prior to their implementation), it is only logical that pre-1987 offenders can rely on the 1987 Regulations as an accurate description of the parole regime which applied to them at the time they committed their offenses.

Although plaintiffs' argument has facial appeal, they have somewhat overstated the holding in *Davis*. Davis challenged the application of the 1987 Regulations to his case on the grounds that new scoring system limited the Board's ability to exercise its discretion to grant release. *Davis*, 652 A.2d at 635. The D.C. Court of Appeals concluded that the 1987 Regulations merely formalized (but did not limit) the Board's exercise of discretion and therefore did not did not violate the *Ex Post Facto* Clause because they did not prevent the Board from

exercising its discretion to grant Davis parole if it so chose. *Id.* at 635-36. The *Davis* decision did not hold that the 1987 Regulations actually represented or codified the actual practice of the Board prior to their enactment.

Moreover, plaintiffs fail to acknowledge that the D.C. Circuit has already held that the *Davis* decision is not binding on federal courts with respect to the question of whether the retroactive application of the 1987 Regulations violated the *Ex Post Facto* Clause. In *Blair-Bey v. Quick*, 151 F.3d 1036 (D.C. Cir. 1998), the D.C. Circuit considered the case of a parole candidate who was similarly situated to Davis. The Court explained that it was required to "defer to the ruling that the D.C. parole guidelines 'merely formalize the manner in which the Board' exercises its discretion," but then went on to clarify that it was not bound by "*Davis*'s reading of what the ex post facto clause requires . . . ." *Id.* at 1050. The Court also noted that the *Davis* holding was limited to the challenge raised by the petitioner in that case, and that other grounds could exist to support a finding that the retroactive application of the 1987 Regulations violated the *Ex Post Facto* Clause. *Id.* The Court remanded for further consideration of Blair-Bey's *ex post facto* claim.

Because Blair-Bey appears not to have pursued his habeas petition, the question of whether the retroactive application of the 1987 Regulations to pre-1987 offenders violates the *Ex Post Facto* clause appears to be unresolved in this circuit. Therefore, contrary to plaintiffs' representations, there is simply no evidence before the Court that the Board's practices pre- and post-1987 were similar enough to allow plaintiffs convicted prior to 1987 to rely upon the 1987 Regulations for purposes of arguing an *ex post facto* violation.[15] The claims of plaintiffs Phillips,

_____

[15] On the contrary, the Court has reviewed the regulations that were in place prior to 1987. Under that regime, the Board had almost unbridled discretion to grant parole "[w]henever

and West-El are thus dismissed.

The Court now turns to the 1991 Policy Guideline.[16]  As plaintiffs explain, the 1991 Policy Guideline was adopted "to ensure consistent and equitable application of the 1987 Regulations . . ." by eliminating the subjectivity from the parole criteria.  (Pls.' Joint Stmt ¶¶ 69-70.)   The 1991 Policy Guideline thus represented a departure from the Parole Board's previous practices.  It is difficult to see how "[t]he elements of fair notice and reasonable reliance" that underlie the proscription of *ex post facto* regulation could be implicated by the elimination of a guideline that was not in place at the time that plaintiffs committed their offenses.   The Court therefore concludes that plaintiffs Smith, Swinton, Martin, and Sellmon may proceed with their *ex post facto* challenge based on the 1987 Regulations, but only plaintiffs Smith and Swinton may claim *ex post facto* protection based on the 1991 Policy Guideline.

**B.    Plaintiffs Considered Under the 2000 Guidelines**

**1.    Facial Differences Between the 1987 and 2000 Regimes**

Four plaintiffs (the "2000 Plaintiffs") came up for parole after the USPC Commission

---

. . . [it appeared] that there is a reasonable probability that a prisoner [would] live and remain at liberty without violating the law, that his release [was] not incompatible with the welfare of society, and that he [had] served the minimum sentence imposed . . . ." 9 D.C.R.R. § 105 (1972). The regulations provided a list of factors that the Board was to take into account in making this determination, but offered no guidance as to how these factors should be weighted in the decision.  *Id.* § 105.1. The pre-1987 Regulations are thus of minimal help in demonstrating how the Board exercised its discretion in practice prior to 1987.

[16] Defendants also argue that because the 1991 Policy Guideline was "not officially published in the District of Columbia Register, [it] did not have the same force of law as that of the 1987 guidelines." (Defs.' Mot. 24.)   As *Fletcher II* clarified, however, there is no "categorical distinction between a measure with a force of law and guidelines . . . from which [a parole board] may depart in its discretion."  391 F.3d at 251 (internal citations and quotation marks omitted).

assumed responsibility for making parole decisions for D.C. Code offenders and have had the 2000 Guidelines applied to them. The 2000 Plaintiffs first argue that there are several important facial differences between the 1987 Regulations and the 2000 Guidelines, which give rise to a compelling inference that the application of the 2000 Guidelines significantly increased plaintiffs' risk of serving lengthier terms of incarceration.

First, under the 2000 Guidelines, an offender who has committed a crime of violence resulting in the death of the victim can *never* be found suitable for parole at the time they first become eligible for parole after having served their minimum sentence. Unlike the 1987 Regulations, which add only 1 point to a candidate's SFS if his current or past offenses involved violence, weapons, and/or drug trafficking, the 2000 Guidelines treat a candidate's history of violence, use of a weapon, and the death of the victim as separate factors for which the USPC may award up to 7 points. Because of this change in how "risk" is evaluated, any offender convicted of a crime of violence resulting in the death of a victim (which includes most of the 2000 Plaintiffs) will receive *at least* 5 points and will be required to serve *at least* 18 to 24 additional months before being considered for parole.[17] Therefore, while under the 1987 Regulations, a violent offender could be paroled immediately after service of his minimum sentence, under the 2000 Guidelines, the presumption is that a violent offender is not suitable for parole until after the service of a substantial additional period of time.

Second, the 2000 Guidelines penalize an offender more harshly for negative institutional behavior. Under the 1987 Guidelines, an offender could have one additional point added to his

---

[17] If the offender had a history of violence prior to being convicted of a crime of violence resulting in the death of a victim, an additional 54-72 months could be added to the offender's parole eligibility period. *See* 28 C.F.R. § 2.80(f) & (h).

SFS for disciplinary violations, which, depending on the offender's record, might not have any impact on his eligibility for parole. Under the 2000 Guidelines, institutional disciplinary reports are used to add a range of months to the period that a candidate must serve to be presumed eligible for parole. Therefore, in contrast to the 1987 Regulations, under the 2000 Guidelines, disciplinary infractions translate *directly* into additional months of incarceration. Furthermore, the 1991 Guideline clarified that when determining whether an offender has engaged in negative institutional behavior, the Board should not consider any infractions that occurred more than three years prior to the hearing date, except where the disciplinary infractions rose to the level of murder, manslaughter, armed robbery, or first degree murder. The 2000 Guidelines permit the USPC to consider *all* disciplinary infractions, thus permitting for the addition of months of incarceration for offenses that the Board should not have previously considered.

Third, the 2000 Guidelines limit the impact of an offender's rehabilitative efforts. Under the 1987 Regulations, "sustained achievement in the area of prison programs, industries, or work assignments" would allow an offender to reduce his or her total point score by 1 point, thus offsetting a 1 point increase due to risk assessment or negative institutional behavior. The 1991 Policy Guideline defined "sustained program achievement" as successful completion of 1 or 2 vocational programs or short-term special needs programs; achievement of a GED or higher educational degree; or successful participation in one or more work details for at least 1/3 of the period of incarceration. In contrast, under the 2000 Guidelines, only a finding of *superior* program achievement (as determined subjectively by the Hearing Examiners and Commissioners) results in reduction of the offender's total guideline range by 1/3 of the period for which such achievement is demonstrated.

Fourth, the 2000 Guidelines, unlike the 1987 Regulations, explicitly permit the USPC to consider offense accountability when determining whether a candidate is suitable for parole. The 1987 Regulations presume that the minimum sentence imposed by the sentencing court appropriately accounts for a parole candidate's offense severity and accountability and that the parole decision should be limited to consideration of the offender's risk of recidivism and institutional conduct. Under the Guidelines, the USPC can overrule this presumption in "exceptional cases" based on the "gravity of the offense," a factor that the Board purposefully did not consider under the 1987 Regulations.

Finally, the 2000 Guidelines do not contain any formal criteria for determining whether a particular circumstance is "unusual" enough to warrant a departure from an offender's point score. Under the 1987 Regulations, the Board could deny a presumptively suitable candidate for parole based on a finding of (1) repeated failure under parole supervision; (2) ongoing criminal behavior related to the current offense ; (3) a lengthy history of criminally related alcohol abuse; (4) a history of repetitive sophisticated criminal behavior; (5) an unusually extensive and serious prior record (at least five prior felony convictions); or (6) unusual cruelty to victims. The 1991 Policy Guideline further defined how the Board was to make each of these findings and added three additional "unusual circumstances" upon which the Board could rely to deny parole: (1) repeated or extremely serious institutional behavior; (2) a lengthy history of criminally-related substance abuse; and (3) the absence of community resources to ensure the safety of the community in the event of the offender's release. Under the 2000 Guidelines, defendants may treat as "unusual" any circumstance not already accounted for in the total guideline range, thus substantially enlarging the USPC's discretion to impose a non-guidelines decision.

37

After careful review of the two sets of policies, the Court concludes that plaintiffs have made a compelling showing that there are facial differences between them that could give rise to an *ex post facto* violation in individual cases.[18]  The 2000 Plaintiffs have therefore made out a *prima facie* case that their *ex post facto* rights have been violated under the new regime.[19]

### 2.    Practical Effect of the 2000 Regulations on Plaintiffs

Defendants do not challenge plaintiffs' comparative analysis of the two sets of guidelines.[20]   Rather, defendants contend that this comparison is meaningless because the

---

[18] The Court recognizes that this conclusion may appear to be at odds with dicta from *Fletcher III*.  In identifying the major facial difference between the two *re-parole* regimes, the Court noted that "the new federal regulations adopted by the Commission mirrored the rehabilitative focus of the Board's former regulations covering *parole*."  *Fletcher III*, 433 F.3d at 869 (emphasis in original).  Some courts have interpreted this observation to mean that the 2000 Guidelines do not differ substantially from the 1987 Regulations and therefore may be retroactively applied.  These courts take the position that the presence of similar factors in the analysis in both parole regimes ends the *ex post facto* inquiry.  *See, e.g.*, *Hargrow v. Minor*, 2007 WL 2068628, at * 4 (M.D. Pa. 2007).   Applying *Fletcher III*, this Court believes that this conclusion is misguided.

 Under *Fletcher III*, the fundamental question is simply whether the offender can demonstrate that changes in the parole regime created a significant risk of lengthier incarceration in his case.  *Fletcher*, 433 F.3d at 876-77.  The 2000 Plaintiffs have demonstrated substantial differences between the 1987 and 2000 regimes in terms of the valuation of risk, institutional behavior, and program achievement, and in the factors that may justify a departure from a recommended action.  The *Fletcher III* Court pointed to one similarity (*i.e.*, rehabilitative focus) between the two sets of parole policies -- it did not, nor was it asked to, engage in an exhaustive review of the two regimes.  Nor did it conclude that the similarity of the two parole regimes on this single factor was necessarily dispositive of an *ex post facto* analysis.  The Court therefore concludes that the instant case was not decided by the *Fletcher III*, but that given the significant differences between the 1987 Regulations and the 2000 Guidelines, *Fletcher III* requires this Court to proceed and determine how the deciding authority "exercise[d] discretion in practice."  *Fletcher III*, 433 F.3d at 876.

[19] Because the 2000 Plaintiffs have made out a *prima facie* case, defendants' motion for judgment on the pleadings is denied with respect to these four plaintiffs.

[20] Defendants' only response to plaintiffs' detailed description of the facial differences in the policies is to argue that because the USPC incorporated all of the factors of the 1987

practice of the D.C. Parole Board under the 1987 Regulations was to depart in cases that were

similar to plaintiffs'. (*See* Defs.' Mot. 40.) Defendants maintain that the 2000 Guidelines simply

codified and made more transparent the actual practice of the Board under the 1987 Regulations,

and therefore, any facial differences between the two policies had no practical impact on

plaintiffs. (*Id.*) In effect, defendants are arguing that the Board exercised unlimited discretion in

making its parole decisions, unimpeded by the 1987 Regulations or the 1991 Policy Guideline,

and therefore plaintiffs cannot succeed. As evidence of this remarkable argument that the Board

basically ignored its own regulations and policies prior to 1998, defendants point to a USPC study

of 100 randomly selected cases.[21] (*Id.* 43-44.) The Court finds that this evidence fails to support

---

Regulations and expanded them to comport with Board practice," "[t]he facial similarity of these
guidelines is . . . without question." (Defs.' Mot. 39) This argument appears to conflate facial
differences between the two policies with their practical effect. The defendants themselves
acknowledge that the 2000 Guidelines "expanded" upon the 1987 Regulations (*id.*), so their real
argument seems to be not that the policies are actually facially similar, but rather, that these
policies, as applied, operated in identical fashion.

   [21] Defendants also point to six decisions by the D.C. Court of Appeals in which
departures from the 1987 Guidelines were upheld. They contend that these decisions
demonstrate that the Board's paroling authority "was not bound by the suggestions of the 1987
guidelines, especially in extremely violent and criminally repetitive cases . . . ." (Defs.' Mot.
43.) A non-random sample of six cases does not constitute persuasive evidence of the Board's
practice. The question is not whether the Board could depart in similar cases, but rather whether
it did so on such a regular basis that plaintiffs cannot show that the retroactive application of the
2000 Guidelines substantially increased their *risk* of lengthier incarceration.

   Moreover, a review of the cases demonstrates that the Board's departures were in fact
based on the justifications for departure provided in the 1987 Regulations and the 1991 Policy
Guideline. *See Hall v. Henderson*, 672 A.2d 1047, 1056 (D.C. 1996) (extending set-off time
based on the "unusual cruelty" of the victim's offense); *Smith v. Quick*, 680 A.2d 396, 398 (D.C.
1996) (departure justified by offender's history of assaultive criminal behavior and need for
rehabilitative services); *McRae v. Hyman*, 667 A.2d 1356, 1361 (D.C. 1995) (departure
warranted based on, *inter alia*, repeated failure under supervision, a history of criminally related
alcohol abuse, an extensive prior record, and the unusual cruelty of his crime); *Davis v.
Henderson*, 652 A.2d 634, 634-35 (D.C. 1995) (parole denied based on offender's negative
institutional behavior, escape from a halfway house the year before his parole hearing, and

defendants' position.

When the USPC assumed responsibility for parole decisions in 1998, it conducted a study based on a random sample of 100 cases decided in 1997 to determine how the Board was applying its guidelines. Based on this sample, the USPC claimed to have "found departures in half of the cases." 63 Fed. Reg. 39172, 39172 (July 21, 1998). "Factors cited by the Board to justify departures most often appear to involve aspects of the prisoner's current offense or criminal history that indicate a risk of violent recidivism." *Id.* The 2000 Guidelines were intended to "improve[] [the] point score system to serve the Board's original purpose of predicting violent crime and incapacitating offenders with a high probability of serious recidivism." *Id.* Defendants argue that this study proves that the 2000 Guidelines accurately reflect the Board's actual practice under the 1987 Regulations.

Defendants have not, however, provided the Court with the study or any of its underlying data. As plaintiffs correctly argue (*see* Pls.' Opp'n 26-7), evidence offered in support or in opposition to a motion for summary judgment "must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm. Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Defendants offered nothing to rebut this argument. Moreover, defendants have failed to provide plaintiffs with either the actual study or all of the underlying data so that plaintiffs could perform their own analysis. (*See* Pls.' Opp'n 38.) In discovery, defendants produced a document labeled as a "preliminary report," with information regarding only 50 cases. (*Id.*) Defendants also provided 34 coding forms for cases in the sample. (*Id.*) Only 5 of the

_____

mental illness); *White v Hyman*, 647 A.2d 1175, 1177 (D.C. 1994) (parole denied based on negative institutional behavior including escape from pre-parole work release program.) This is hardly a representative sample, but to the extent that defendants propose it as such, it indicates that the Board did in fact follow its own regulations when making departures.

coding forms are for individuals included in the report. (*Id.*) Assuming the remaining 29 coding forms were for individuals included in the 100 case sample (but not represented in the 50 cases upon which the preliminary report was based), plaintiffs were provided no information about the remaining 21 individuals in the 100 case sample.

In an attempt to replicate defendants' representations regarding the sample,[22] plaintiffs' counsel analyzed the data from 79 cases he was provided and determined that in 49 cases (63.64%), the Board conformed to the 1987 Regulations. (*Id.* 40.) In 28 cases (36.36%), the Board departed from the Regulations; however, in only 7 of those cases (7.14%) was the departure for unusual cruelty or violence.[23] (*Id.*) Based on this analysis, it appears that the study undercuts defendants' contention that the 2000 Guidelines simply codified the Board's existing practice.

The Court does not find either the defendants' study or plaintiffs' analysis of the data to be particularly persuasive on the ultimate issue of how the Board implemented the 1987 Regulations in cases that are similar to those of the plaintiffs. The Board's incomplete sample does not even appear to be limited to parole candidates with criminal offenses or histories comparable to those of plaintiffs. Defendant nonetheless argues that the absence of statistical evidence as to the Board's practice is fatal to plaintiffs' case. (*See* Defs.' Mot. 41-42.) However, the Supreme Court has clearly stated, "[a]bsent evidence to the contrary, [this Court] presume[s] the Board follows its statutory commands and internal policies in fulfilling its obligations." *Garner*, 529

---

[22] For a detailed explanation of methodology, *see* Pls.' Opp'n Ex. C [Declaration of Jason D. Wallach].

[23] In 5 cases, no reason was given for the departure, in 4 cases, departure was based upon ongoing criminal activity, and in 12 cases, the departure was based solely on negative institutional behavior or needed programming. (*See* Pls.' Opp'n 40.)

U.S. at 256. The burden in this case is therefore on defendants to demonstrate that the Board did

not, in practice, follow its own regulations and guidelines as written.

     For these reasons, the Court rejects defendants' position that none of the 2000 Plaintiffs

may show an *ex post facto* violation because the 2000 Guidelines worked no meaningful change

in the Board's actual practice under the 1987 Regulations.[24] Defendants are correct, however,

that plaintiffs may not prevail simply by showing facial differences between the old and new

policies. Rather plaintiffs must demonstrate that the practical effect of the new policies was to

substantially increase the risk that they each would serve lengthier terms of incarceration.

*Fletcher III*, 433 F.3d at 877 (quoting *Fletcher II*, 391 F.3d at 251) ( [t]he controlling inquiry 'is

one of practical effect.'"). The Court will now to turn to the facts presented by each plaintiff to

determine if the plaintiff has shown that he faced a significantly increased risk of lengthier

---

[24] The defendants also cite several cases for the general proposition that the "searching comparison" required by *Fletcher III* "is futile . . . where the Parole Board retained discretion to depart from numerical guidelines and frequently did." (*Id.* 34.) Some of these cases are facially distinguishable. *See, e.g., Seagroves v. Tenn. Bd. Of Probation and Parole*, 86 Fed. App. 45 (6th Cir. 2003) (analyzing changes in Tennessee state guidelines). Others do not reflect the law of this circuit after the *Fletcher III* decision. *See Pindle v. Poteat*, 360 F.Supp.2d 17, 18-19 (D.D.C. 2003) (denying *ex post facto* claim prior to *Fletcher III*); *Moore v. O'Brien*, 2007 WL 1412934, at * 3 (W.D.Va. May 10, 2007) (distinguishing *Fletcher III* and holding that parole regulations are not laws for purposes of the *ex post facto* analysis).

     Finally, some of the cases defendants cite simply do not support their position. Rather, they hold that individual offenders could not show a substantial risk of increased incarceration based on their personal circumstances. *See, e.g.*, *Glascoe v. Bevy*, 421 F.3d 543, 548 (7th Cir. 2005) (Glascoe could not show substantial risk of increased punishment given that the basis for departure cited by the USPC was available under the previous regulations as well); *Bennett v. LaManna*, 2007 WL 781679, at *7 (D.S.C. Mar. 13, 2007) (no *ex post facto* violation because parole was denied on the basis of (1) repetitive and ongoing assaultive behavior; (2) murder committed within 70 days of being reparoled for the *third* time; and (3) murder demonstrated extreme homicidal vindictiveness). This is the type of individualized inquiry which *Fletcher III* requires and which this Court is undertaking.

incarceration due to the 2000 Guidelines.

          *a.*     *Darius  Smith*

      Smith explains that under the 1987 Regulations, his background would have qualified him for an SFS of 8, placing him in a good risk category with a baseline point score of 0.  (*See* Smith Stmt ¶ 10.)   One point would have been added to his baseline score because his current offense involved violence and one point would have been subtracted for sustained program achievement, leaving him with a total point score of 0.  (*Id.*)   Smith's disciplinary infractions would not have been considered because they occurred more than six years prior to his parole hearing.  (*Id.* ¶ 11.) With a total point score of 0, Smith would have been presumed suitable for parole at his initial hearing with a low level of supervision.[25]  (*Id.* ¶ 12.)

      In contrast, under the 2000 Guidelines, Smith had five points added to his base point score because his offense was a crime of violence that resulted in the death of the victim.  (*Id.* ¶ 5.) This translated into an additional 18 to 24 months, which was added to his parole eligibility period of 140 months.  (*Id.*)   An additional 88 to 124 months was also added based on his six-year-old disciplinary infractions and 12 months was subtracted for superior program achievement. (*Id.* ¶¶ 5-6.)  Smith argues, therefore, that changes in the way risk is calculated and in which disciplinary infractions and program achievement are counted under the 2000 Guidelines substantially increased the risk that he would serve additional time

      Defendants do not challenge Smith's calculation of his SFS and total point score based on

---

[25] Even if his disciplinary infractions had been considered (which would require an assumption that the Regulations were not followed), one point would have been added bringing his total point score to 1, and he would still have been presumed suitable for parole with a high level of supervision.

the 1987 Regulations.[26]  Rather, they argue that Smith would not have been paroled even though

he was presumptively suitable because the Board would have exercised its discretion to depart

based on Smith's conduct while incarcerated.  (*See* Defs.' Mot. 55.)    Smith had three

disciplinary infractions, two involving possession of homemade weapons and one involving an

assault on another inmate with a homemade weapon.  (*See* Smith Ex. 3 [Hearing Summary (Jun.

22, 2004)] at 2.)  As Smith points out, under the 1987 Regulations and the 1991 Policy Guideline,

the Board could not have considered his disciplinary infractions either as  part of his SFS or as a

reason for departing from the Regulations since they occurred more than six years prior to his first

parole hearing and did not involve murder, manslaughter, armed robbery, or first degree murder.[27]

Presuming therefore that the Board followed its own policies, as required by *Garner*, Smith has

demonstrated that the application of the 2000 Guidelines to his case substantially increased the

risk that he would serve additional time.  Summary judgment is granted with respect to his *ex post*

*facto* claim.

        b.    *Daru Swinton*

        Swinton calculates that under the 1987 Regulations he would have received an SFS of 6,

which would have placed him in the fair risk category with a baseline point score of 1.  (Swinton

---

    [26] Defendants object to each plaintiff's calculation of his parole suitability as
"speculative."  They do not, however, point to any evidence in the record that would support
alternative findings.  Absent any evidence that the Board did not regularly follow its own
guidelines even in the development of the total point score, or any attempt to challenge each
individual plaintiff's calculations with support from the record, the Court rejects this
unsupported objection as inconsistent with LCvR 7(h).

    [27] Moreover, even if these disciplinary infractions had been considered, the additional
point that Smith would have received would still have left him with a total point score of 1,
which would have made him presumptively suitable for parole.   Defendants have pointed to
nothing in Smith's administrative record that would have justified a departure from the 1987
Regulations.

Stmt. ¶ 8.)  He would have received 1 point because his current offense involved violence and an additional 1 point for having committed a disciplinary infraction within three years.  (*Id.* ¶ 9.) One point would have been deducted for sustained program achievement.  (*Id.*) With a total point score of 2, Swinton would have been presumed suitable for parole with the highest level of supervision at his initial hearing.  (*Id.* ¶ 10.)  At his first rehearing, he would have begun with a total point score of 2 and had 1 point deducted for sustained program achievement and  would again have been presumed suitable for parole.[28]  (*Id.*  ¶¶ 15, 16.)

Under the 2000 Guidelines, Swinton also received an SFS of 2, but had an additional 3 points added for committing a crime of violence involving other "high level violence."  (*Id.* ¶ 5; 28 C.F.R. § 2.80(f).)   The USPC converted his base point score of 5 into a base guideline range of 18-24 months, which was added to his parole eligibility period.  (*Id.*)  The USPC then added another 12-16 months for a 2003 disciplinary infraction, giving Swinton a total guideline range of 102-112 months.  (*Id.*)  At his first rehearing, the USPC subtracted 4 months for superior program achievement and added 0-2 months for a minor disciplinary infraction.  (*Id.* ¶ 11.)   The USPC then departed from the 2000 Guidelines recommendation based on "his callous disregard for the victims, to include two young boys, coupled with [his] propensity to carry weapons . . . " and gave Swinton a three-year set-off for October 2009, 34 months later than the top of his new guideline range.  (*Id.* ¶¶ 12, 14.)

Defendants do not challenge Swinton's calculation of this suitability under the 1987 Regulations.  Rather, they argue that the USPC chose to depart from the 2000 Guidelines on

---

[28]  Swinton had one minor infraction between his first parole hearing and his first rehearing, which would not have risen to the level of "negative institutional behavior" under the 1987 Regulations, as clarified by the 1991 Policy Guideline.  (*Id.* ¶ 17.)

grounds that would also have justified departure under the 1987 Guidelines. (*See* Defs.' Mot. 55.) The USPC based its decision on the "callous disregard" evidenced by Swinton's crime, which involved kidnapping a mother and two children and holding them at gunpoint for over three hours while forcing the mother to drive to various ATMs to withdraw cash. Under the 1987 Guidelines and the 1991 Policy Guideline, the victimization of two children would have justified the same departure for "unusual cruelty." Swinton has therefore failed to make a showing that his treatment under the 2000 Guidelines substantially increased the risk that he would serve additional time because the basis for the USPC's departure was available under the prior regime. *See Glascoe*, 421 F.3d at 548.

### c.    Carlton Martin

Martin explains that under the 1987 Regulations, he would have received an SFS of 7 at his first parole hearing, which would have placed him in the fair risk category with a baseline point score of 1. (Martin Stmt. ¶ 11.) One point would have been added because his current offense involved violence.[29] (*Id.*) With a total point score of 2, Martin would have been presumed eligible for parole with the highest level of supervision. (*Id.* ¶ 14.) At his first rehearing, one point would have been subtracted for sustained program achievement, leaving him with a point score of one, which would again have made him presumptively suitable for parole. (*Id.* ¶ 15.)

Under the 2000 Guidelines, Martin received an SFS of 5, which gave him a base point

---

[29] Martin argues that he would have received a point for sustained program achievement. However, because he cannot rely on the 1991 Policy Guideline, there is no basis for the Court to conclude that this deduction would have been awarded. Notably, the USPC did not grant him superior program achievement at his initial hearing, which would permit the Court to presume that he would have qualified for the reduction under the less stringent standard.

score of 2. (*Id.* ¶ 5.) Five points was automatically added because his offense was a crime of violence resulting in the death of the victim. (*Id.*) Martin was therefore required to serve an additional 54-72 months in addition to his parole eligibility period of 138 months. (*Id.*) The USPC also added 0 to 2 months for a minor disciplinary infraction, giving Martin a total guideline range of 192 to 212 months. (*Id.*) At Martin's first rehearing, the USPC subtracted 13 months for superior program achievement, reducing Martin's total guideline range to 179-199 months. (*Id.* ¶ 15.) However, the USPC denied parole based on the Martin's possession of a second gun at the time of the offense[30] and gave Martin a new three-year set-off, setting a rehearing date for March 2009, eight months later than the top of the new guideline range. (*Id.* ¶¶ 16, 18.) Martin therefore argues that the changes in the way risk is calculated and in how disciplinary infractions are considered, and the expansion of the grounds for a departure, together increased the risk that he would serve a longer term of incarceration.

Defendants' only response is to argue that since the USPC chose to depart from the allegedly harsher 2000 Guidelines, logic dictates that the USPC would do the same under the more permissive guidelines. (*See* Defs.' Mot. 52.) This position is simply insupportable. As both parties acknowledge, the 2000 Guidelines permit the USPC to depart based on any circumstance not previously accounted for in the SFS calculation. The fact that USPC identified a reason to depart under the more lenient 2000 standards indicates nothing about how this offender would have been treated under the 1987 Regulations. Moreover, the reason on which the USPC based its departure -- Martin's possession of a second weapon and his propensity to use

---

[30] Notably, the Executive Reviewer who recommended the three-year set-off stated that parole should be denied because 15.5 years "is not sufficient accountability for the death of the victim in addition to possession of a firearm during a drug offense." (*Id.* ¶ 16.)

weapons -- would not have justified a departure under the 1987 Regulations.  Martin has therefore

met his burden and summary judgment will be granted with respect to his *ex post facto* claim.

> ### d.    Tony Sellmon

Sellmon calculates that under the 1987 Regulations he would have received a perfect 10

SFS score at his first parole hearing, which would have translated into a base point score of 1.

(Sellmon Stmt. ¶ 14.)   One point would have been added for a crime of violence and 1 point

subtracted for sustained program achievement, resulting in a total point score of 0, which would

have rendered him presumptively suitable for parole with low level supervision.  (*Id.* ¶ 15.)   At

rehearing, Sellmon would again have had a total point score of 0 and would have been

presumptively suitable for parole.  (*Id.* ¶¶ 20, 21.)

Under the 2000 Guidelines, Sellmon received an SFS of 9,[31] placing him in the good risk

category with a baseline point score of 0.  (*Id.* ¶ 5.)   The USPC then added 5 points to his

baseline score because his offense was a crime of violence that resulted in the death of the victim,

and added 18-24 months to his parole eligibility period of 136 months, producing a guideline

range of 154-160 months.  (*Id.*)   Fifty months were subtracted for superior program achievement,

resulting in a total guideline range of 104-110 months.   (*Id.* ¶ 9.)   At the time of this hearing,

Sellmon had already served 149 months, 39 months more than the top of his guideline range.[32]

---

[31] Under the 1987 Regulations, Sellmon's score would have been 1 point higher because he would have received one point in Category F for having no history of heroin/opiate dependence. Under the 2000 Guidelines, he received 0 points in this category because he was younger than 41 years of age when he committed his offense.  The USPC removed heroin/opiate dependence as a factor in the SFS calculation.  (*Id.* ¶ 14.)

[32] This occurred because Sellmon was originally denied an award for program achievement and successfully challenged the denial in federal court.  Therefore, by the time his initial parole hearing was conducted for the second time, he had already served more than his guideline range.

(*Id.*)  The USPC chose to depart from the guidelines and deny parole on the basis that Sellmon's

crime was extremely brutal.  (*See* Sellmon Ex. 7 at 5 ("A decision above the guidelines is

warranted because the murder that you committed while armed was extremely brutal as

evidence[d] by a massive head trauma you inflicted upon the victim.").)   At Sellmon's first

rehearing, the USPC again denied parole, justifying the departure on the basis of the brutality of

the offense. (*Id.* ¶ 18.)   Sellmon argues that the change in the way risk is measured under the

2000 Guidelines, together with the Hearing Examiner's improper focus on offense accountability,

substantially increased the risk of extending his incarceration.

    Contrary to Sellmon's characterization, however, it appears quite clear that the USPC

departed on the basis of the brutality of his crime.[33]  Under the 1987 Regulations, the unusual

cruelty of a crime qualified as an "unusual circumstance" that justified departure from the

guidelines recommendation.  Given that this departure was available under either regime, Sellmon

has failed to demonstrate that the application of the 2000 Guidelines to his case substantially

increased his risk of lengthier incarceration.

### C.    Plaintiffs Considered Under the 1987 Guidelines: Gambrell and Eason

    The Court turns now to the remaining two plaintiffs,  Eason and Gambrell (the "1987

Plaintiffs").  The 1987 Plaintiffs had their initial parole hearings before the Board prior to August

5, 1998, and were allegedly considered under the 1987 Regulations when they came up for

rehearing before the Board.  Defendants argue, therefore, that they have no basis for an *ex post*

*facto* challenge given that the USPC expressly stated that it considered the 1987 Regulations in

---

[33] The fact that the Examiner thought of the "brutality" as related to offense
accountability does not change the fact that "unusual cruelty" was explicitly listed as a basis for
a departure under the 1987 Regulations.  (*See* Sellmon Ex. 8 at 3.)

making its determinations.  (Defs.' Mot. 48.)   Plaintiffs counter that, despite their

representations, defendants actually relied impermissibly upon the federal parole standards to

deny them parole.  (Pls.' Opp'n 48-50.)   They maintain that the USPC's consideration of offense

accountability in its parole determinations, a practice which was precluded under the 1987

Regulations, substantially increased the risk that they would serve more time on their offenses.

The Court is unpersuaded that the USPC's reference to the 1987 Regulations, standing

alone, is sufficient to bar an *ex post facto* challenge.  "From the outset, . . .the ex post facto

clauses have been understood to have been principally aimed at curtailing legislative abuses."

*Warren* v. *U.S. Parole Com'n*, 659 F.2d 183, 187 (D.C. Cir. 1981).  These protections would be

rendered meaningless if they did not apply in cases where the rules had not yet been formally

changed, but the actual practice reflected a revision of the rules from those that governed at the

time the prisoner committed his offense.  Defendants may not avoid a constitutional challenge

simply by citing the correct rules, while in fact following a federal practice that is inapplicable to

plaintiffs.  *See Cosgrove*, 703 F.Supp. at 1003-04.  Plaintiffs have shown a clear facial difference

between the 1987 Regulations and both the federal guidelines and the 2000 Guidelines in that

under the former, offense accountability was not a legitimate rationale for departing from the

action indicated by the base point score.   *Compare* Pls.' Joint Ex. 1 at 3-4 *with* 28 C.F.R. § 2.18

and 28 C.F.R § 2.73(b).  It is readily apparent (in fact, defendants do not appear to contest)  that

offense accountability was considered in plaintiffs' cases.[34]   Therefore, if plaintiffs can

---

[34] Defendants instead argue that plaintiffs' challenge to their consideration of "offense accountability" is a challenge to the USPC's discretionary decision-making authority.  (Defs.' Opp'n 48.)   As plaintiffs explain, however, their challenge is not to defendants' discretionary determinations, it is to the USPC's "ability to make such discretionary determinations using criteria . . . that is contrary to the parole practices in effect when these plaintiffs committed their crime[s] . . . ."  (Pls.' Opp'n 50.)

demonstrate that the retroactive application of this new factor to their cases had the practical effect of substantially increasing their risk of lengthier incarceration, then they will prevail on their *ex post facto* challenge.

          *1.*    *James Gambrell*

Gambrell was denied parole at his first parole hearing before the Board on July 14, 1998, and the Board set a rehearing date for August 20, 1999. (Gambrell Stmt. ¶ 3.) The Board's special instructions for reconsideration indicated that they would focus on his "program participation," "psychological evaluation" and "work training program" participation. (Gambrell Ex. 3 at 1.)

On December 9, 1999, a USPC Pre-Hearing Assessment Reviewer prepared a reconsideration prehearing assessment for Mr. Gambrell. (Gambrell's Stmt. ¶ 5.) In his report, the Reviewer found that Gambrell's juvenile and adult history [was] replete with assaultive and dangerous behavior" and concluded that he "represents a more serious risk" than his SFS indicated. (Gambrell's Ex. 4 at 3.) On December 14, 1999, Gambrell appeared before a USPC Hearing Examiner. (Gambrell's Stmt. ¶ 6.) The Hearing Examiner reduced Gambrell's total point score to 0, but nonetheless recommended a departure from the D.C. Parole Guidelines stating that "a close review of the crime itself as well as the subject's history would suggest that he represents a clear threat to the community and should not be released at this time." (Gambrell's Ex. 5 at 2.) The Hearing Examiner went on to explain that Gambrell

> is a more serious risk based upon his juvenile history which involves arrests and convictions for robbery and assault with a dangerous weapon as well as a commitment to the National Training School for assault with a deadly weapon. As an adult, the subject served for rape and armed robbery and when paroled from this offense was committed to serve an additional 35-year sentence

51

for bank robbery and kidnapping.  While on parole for this offense,
he was involved in the current murder offense.

(*Id.* at 2-3.)  On January 18, 2000, the USPC adopted the Hearing Examiner's conclusions and

recommendations and denied Gambrell's request for parole.  (Gambrell's Stmt. ¶ 8.)  The USPC

has conducted three additional rehearings for Gambrell to date.  Each time it was determined that

he presented a continued threat to the community and parole was denied.  At the second

rehearing, he was given a three-year set-off and at the third, a one-year set-off.  (*Id.* ¶¶ 16, 18.)

On July 24, 2007, the USPC conducted Gambrell's fourth rehearing. (*Id.* ¶ 20.)  Gambrell

had completed the programming recommended at his previous rehearing and had not been subject

to any disciplinary actions during his entire period of incarceration, and his Hearing Examiner

recommended parole.  (*Id.*)  Executive Reviewer Kostbar disagreed and recommended that

Gambrell be given a five-year set-off, explaining that "19 years is simply not enough time for an

individual to serve in a crime of this nature, and I believe that release at this time, or any time in

the near future, would depreciate the seriousness of the offense behavior and promote disrespect

for the law." (Gambrell's Ex. 11 at 3.)   This standard is the one applied to determine federal

prisoners' suitability for parole under the federal parole guidelines.  *See* 28 C.F.R. § 2.18.  On

August 10, 2007, the USPC again denied parole, citing the same reasons for departing from the

1987 Regulations as it had in the prior three rehearings, but giving Gambrell the recommended

*five-year* set-off and setting a rehearing for July 2012.  (Gambrell's Stmt. at 24.)

It is apparent from the administrative record that concern for offense accountability (a

factor that should not have been considered by the Board under the 1987 Regulations)  was a

substantial  factor in denying Gambrell parole at his most recent rehearing in 2007, and, more

significantly, in giving him a five-year set-off.[35]  The USPC denied Gambrell parole at each of his prior rehearings for identical reasons and given him progressively shorter set-offs each time.  It was not until Executive Reviewer Kostbar applied the federal accountability standard to Gambrell's case that the trend was reversed and Gambrell received a 5-year set-off.  Given that the reasons for denying parole in the Notice of Action were no different at the fourth rehearing than they were at any of the prior rehearings, it is clear that the impermissible application of the federal accountability standard to Gambrell's case significantly increased his risk of lengthier incarceration.  Gambrell's motion for summary judgment will therefore be granted.

2.    *Curtis Eason*

At his initial hearing on February 20, 1998, the D.C. Parole Board determined that Eason had a total point score of 3, which indicated that he was not presumed suitable for parole.  (Eason Stmt. ¶ 3.)  The Board denied Eason parole on November 23, 1998, giving him a one year set-off and a rehearing date of March 18, 1999.  (*Id.* ¶¶ 4-5.)  The Board gave Eason two special instructions for reconsideration: (1) "program participation" and (2) "no new disciplinary reports."  (*Id.*)

---

[35] Defendants argue that the Court's review of the USPC's decisions must "be limited to the officially stated reasons" contained in the Notice of Action.  (Defs.' Mot. 49.)  None of the cases they cite, however, actually stands for this proposition.  As plaintiffs correctly point out, in reviewing decisions by the USPC, courts regularly look past the Notice of Action to uphold the parole decision on the basis of the entire record.  *See e.g.*, *Koach v. Wooten*, 87 F.3d 1327, at *3 (10th Cir. 1996) (unpublished) ("The hearing examiners and the Commission adequately set forth in the hearing summaries and the Notices of Action the reasons for their parole determinations.");  *Campbell v. U.S. Parole Com'n*, 704 F.2d 106, 113 (3d Cir. 1983) (rejecting petitioner's argument that the USPC failed to consider mitigating factors on the basis of the content of the examiners' reports); *Hughes v. Hastings*, 2006 WL 1868487, at *4 (E.D. Ky. Jul. 3, 2006) (upholding denial of parole on the basis of petitioner's record); *Webber v. U.S. Parole Com'n*, 2007 WL 2683993, at *5 (S.D.Miss. Aug. 7, 2007) (upholding Commission's decision on the basis of reports of institutional misconduct and reviewer and psychological reports).

On March 9, 1999, a USPC Pre-Hearing Assessment Reviewer prepared an assessment

and computed a total point score of 2. The Reviewer noted that "[Eason] is now within the

parolable guidelines with a total point score of 2. The issue is whether or not 11 years in custody

is adequate accountability for the taking of a life during a robbery offense." (Eason's Ex. 4 at 3.)

At the rehearing, the Examiner noted that Eason had followed the Board's instructions for

reconsideration and had continued programming well and had no new disciplinary infractions, but

recommended departing from the D.C. parole guidelines and denying Eason parole. (Eason's

Stmt. ¶ 9.) The Examiner observed that

> [t]he prisoner is still doing extremely well in terms of
> programming and conduct, however in this examiner's opinion, the
> prisoner's favorable institutional adjustment does not outweigh the
> issues of risk or accountability. This examiner would believe that .
> . . for the nature of the prisoner's instant offense some minimum
> sentence service up to 20 years would be indicated or possibly
> even more. It appears that the prisoner has served between 10 and
> 11 years in continuous custody at this juncture and again in this
> examiner's opinion, it simply would not be sufficient for purposes
> of accountability, not to mention risk.

(*Id.*) The UPSC adopted the Examiner's recommendation finding that a departure from the

guidelines warranted because Eason was "a more serious risk than indicated by [his] total point

score . . . " based on his prior criminal history. (Eason's Ex. 6 at 1.) The UPSC gave Eason a

five-year set-off with a rehearing date of March 2004. (Eason's Stmt. ¶ 10.)

The USPC conducted Eason's second rehearing on March 2, 2004, at which time the

Hearing Examiner reduced Eason's total point score by one point for program achievement,

giving him a total point score of 1, which rendered him presumptively suitable for parole. (*Id.* ¶

11.) The Hearing Examiner recommended that parole be granted. (*Id.*) The Executive Reviewer,

however, rejected the Examiner's decision and recommended denial of parole explaining that

> [a] review of the file documents reveals that although the offender
> was permitted to plead to the reduced offense of Murder II, the
> offense behavior has all of the elements of Murder I. There was
> planning, aforethought, etc. The offender brought to the table a
> serious assault/violent criminal history and must still be considered
> [a] threat to the public safety. Although he has made a generally
> good inst[itutional] adjustment, the behavioral accountability
> factor has not been met. In many jurisdictions release for a case of
> this magnitude would not be seriously considered until[] at least 20
> years had been served. It is noted also that at the 1999 hearing the
> UPSC imposed the maximum "setoff" (5 yrs) and would possibly
> have made a more lengthy one if permitted.

(*Id.*) The UPSC adopted the recommendation of the Executive Reviewer and departed from the

guidelines in denying Eason parole. (*Id.* ¶ 12.) The Notice of Action stated that "[a]fter

consideration of all factors and information presented, a departure from the guidelines is

warranted because your offense behavior is more serious than your conviction to Murder II in that

the murder was planned and an act of revenge. Consequently, the Commission has determined

additional time incarcerated is necessary for accountability purposes." (Eason's Ex. 8 at 1.)   The

USPC gave Eason a three-year set-off with a rehearing date of March 2007. (Eason's Stmt. ¶ 12.)

        The USPC conducted Eason's third rehearing on March 13, 2007, and reduced his total

point score to 0 for sustained program achievement. (*Id.* ¶ 13.) Again, the Hearing Examiner

recommended a grant of parole but the Executive Reviewer Jeffrey Kostbar disagreed stating that

> [t]his is a highly aggravated case and outside the "heartland" of a
> 2nd degree murder case. The case specifics are more closely
> associated with a 1st degree, premeditated murder. Consequently I
> believe that the subject should serve much more time on this term,
> possibly as long [as] 25 - 30 years. A decision less than that,
> would, in my opinion, depreciate the seriousness of the [offense]
> behavior and promote disrespect for the rule of law . . . [Eason's]
> behavior is more serious than [his] conviction to Murder II in that
> the murder was planned and an act of revenge. Consequently the
> Commission has determined that additional time incarcerated is
> necessary for accountability purposes.

(Eason's Ex.9 at 3-4.)  The UPSC adopted Kostbar's recommendation and denied Eason's request for parole, noting that "additional time is necessary for accountability purposes." (Eason's Ex. 10 at 1.)

In his most recent evaluation, the Executive Reviewer again expressly referenced the federal standard to justify a departure from the action indicated by the 1987 Regulations, and as far back as Eason's second rehearing,  the USPC explicitly relied on offense accountability to deny Eason parole.   Eason has therefore demonstrated a substantial risk of increased incarceration and his motion for summary judgment will be granted.[36]

### CONCLUSION

For the reasons stated herein, the USPC is ordered to conduct a new parole hearing  within 45 days for plaintiffs Gambrell, Smith, Eason, and Martin at which time the 1987 Regulations must be correctly applied.  The cases of West-El and Phillips are dismissed for failure to state a claim and summary judgment is granted with respect to plaintiffs Swinton and Sellmon.[37]  An Order accompanies this Memorandum Opinion.

---

[36] Defendants argue with respect to both Gambrell and Eason that "plaintiffs' extensive criminal history and heinous crimes warranted a parole denial under the D.C. parole statute, regardless of the guidelines the USPC employed." (Defs.' Opp'n 50.)  Essentially, their position is that the Court should ignore the fact that the USPC relied on an improper consideration to deny parole because it could have reached the same result based on the proper considerations. The Court cannot rely on these *post hoc* justifications to surmise what the results would have been for these plaintiffs had the 1987 Regulations been properly applied.   Defendants will have the opportunity to reconsider their reasoning on rehearing.

[37] Although defendants did not move for summary judgment, the Court has authority to enter summary judgment *sua sponte* as long as the losing party receives notice.  *See Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).   Should plaintiffs Swinton and Sellmon have additional evidence upon which to argue that summary judgment should not be entered against them, they may move for reconsideration of this Order within the next fourteen (14) days.

_____
/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:   May 5, 2008